**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ALYSSA MERCANTE,

*Plaintiff,*

v.

JEFF TARZIA,

*Defendant.*

**24-cv-8471 (MKB) (LKE)**

---

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS**

---

COHEN&GREEN P.L.L.C.
J. Remy Green
1639 Centre St., Suite 216
Ridgewood, New York 11385
t: (929) 888-9480

KAMERMAN, UNCYK, SONIKER, &
KLEIN, PC
Lane A. Haygood
1700 Broadway, 16th Floor
New York, New York 10019
Tel. 646.845.6085

July 14, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iv

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

STANDARDS OF REVIEW ............................................................................................ 6

ARGUMENT .................................................................................................................... 7

   I.     The SAC Plausibly Alleges Jurisdiction.................................................... 7

       A.   Tarzia is subject to jurisdiction under section 302(a)(3) on Plaintiff's non-defamation causes of action. .............................................. 7

       B.   Tarzia is also subject to personal jurisdiction under section 302(a)(1) on all of Plaintiff's claims, because he transacted business in New York and Plaintiff's claims arise out of that transaction of business. ................................................. 10

   II.   Tarzia's "Documentary Evidence" Submitted Under CPLR 3211(a)(1) is Impermissible and Irrelevant. ........................................................................... 12

       A.   CPLR 3211(a)(1) does not apply in Federal Court. ......................................... 12

       B.   Post-publication events cannot be used to assess state of mind. ...................... 13

   III.   The SAC Plausibly Alleges Defamation.................................................. 13

       A.   The SAC plausibly alleges the Statements are false. ...................................... 14

       B.   The SAC plausibly alleges fault.......................................................................... 16

       C.   The SAC Plausibly alleges *per se* defamation and harm, and Defendant's defamation proof argument fails. ........................................................... 22

   IV.   Plaintiff's § 79-n and Prima Facie Tort Claims are Free-Standing. ......................... 23

V.      The SAC Plausibly Alleges a § 79-n Claim.............................................................. 24

        A.      Defendant's unconstitutionality "questions" would require notice to the Attorney General, but any argument the law is unconstitutional is insufficiently made. ....................................................................................................... 24

        B.      The SAC alleges conduct that satisfies N.Y. Pen. L. § 240.25. ...................... 25

        C.      The SAC plausibly alleges bias-based motivation. ........................................... 28

VI.     The SAC Plausibly Alleges Prima Facie Tort and/or Common Law Stochastic Harassment.......................................................................................................... 29

VII.    Defendant's Anti-SLAPP Argument is Insufficient. ................................................ 30

CONCLUSION.................................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 US 662 (2008)............................................................................6, 7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..........................................................................6, 7

*Best Van Lines, Inc. v. Walker,*
    490 F.3d 239 (2d Cir. 2007).................................................................11

*Biro v Condé Nast,*
    963 F Supp 2d 255 (SDNY 2013) .........................................................18

*Boyler v City of Lackawanna,*
    765 F App'x 493 (2d Cir. 2019)............................................................28

*Bungie v. Comer,*
    No. 22-2-10761-8 SEA (Wash. Super. Ct., July 11, 2023).........................30

*Burdick v. Verizon Communs., Inc.,*
    305 AD2d 1030 (4th Dept 2003) .........................................................15

*Burns Jackson Miller Summit & Spitzer v. Linder,*
    59 N.Y.2d 314 (1983) .......................................................................29

*Calder v Jones,*
    465 U.S. 783 (1984)......................................................................9, 16

*Cardali v Slater,*
    56 Misc 3d 1003 (Sup Ct, NY County 2017) .........................................15

*Case, et al. v. City of N.Y., et al.,*
    233 F.Supp.3d 372 (SDNY 2017) .........................................................7

*Casper v Lew Lieberbaum & Co.,*
    1998 US Dist. LEXIS 4063 (SDNY Mar. 31, 1998) ................................22

*Chau v Lewis,*
    771 F3d 118 (2d Cir. 2014)................................................................13

*Chloe v. Queen Bee of Beverly Hills, LLC,*
    616 F.3d 158 (2d Cir. 2010)...............................................................10

*DEX Sys., Inc. v. Deutsche Post AG*,
  727 F. App'x 276 (9th Cir. 2018) ........................................................12

*Do The Hustle, LLC. v. Rogovich*,
  No. 03 CIV. 3870(VM), 2003 WL 21436215 (SDNY June 19, 2003)............................11, 12

*EnviroCare Techs., LLC v. Simanovsky*,
  No. 11-CV-3458 JS ETB, 2012 WL 2001443 (EDNY June 4, 2012)....................................11

*Gargiulo v Forster & Garbus Esqs.*,
  651 F Supp 3d 188 (SDNY 2009) ........................................................17

*Gasperini v. Ctr. for Humans., Inc.*,
  518 U.S. 415 (1996)........................................................12

*Goldhaber v Kohlenberg*,
  395 NJ Super 380, 928 A2d 948 (N.J. App Div 2007)............................9

*Graham v. Connor*,
  490 U.S. 386 (1989)........................................................13

*Hapag-Lloyd AG. v U.S. Oil Trading LLC*,
  814 F3d 146 (2d Cir. 2016)........................................................17

*Harris v City of Seattle*,
  152 F App'x 565 (9th Cir. 2005)........................................................19

*Haughwout v. Tordenti*,
  332 Conn. 559, 211 A.3d 1 (2019) ........................................................26

*HB Prods., Inc. v. Faizan*,
  603 F. Supp. 3d 910 (D. Haw. 2022) ........................................................12

*Herron v. KING Broad. Co.*,
  109 Wash. 2d 514, 746 P.2d 295 (Wash. 1987) ........................................................20

*Hsin Ten Enter. USA, Inc. v. Clark Enters.*,
  138 F. Supp. 2d 449 (SDNY 2000)........................................................11

*Jaegly v. Couch*,
  439 F.3d 149 (2d Cir. 2006)........................................................13

*James v. City of Rochester*,
  673 F. Supp. 3d 279 (WDNY 2023) ........................................................12, 15, 16

*James v Gannett Co.*,
  40 NY2d 415 (1976) ........................................................15, 16

*Karam v. Cty. of Rensselaer*,
  2016 U.S. Dist. LEXIS 368 (NDNY Jan. 4, 2016)...............................................25

*Kipper v NYP Holdings Co.*,
  12 NY3d 348 (2009) .................................................................................13, 21, 22

*Kuiken v County of Hamilton*,
  669 F Supp 3d 119 (NDNY 2023)......................................................................29

*La Liberte v Reid*,
  966 F3d 79 (2d Cir. 2020)..................................................................................17

*LaMarca v Pak-Mor Mfg. Co.*,
  95 NY2d 210 (2000) ...........................................................................................10

*Le v Triza Elec. Corp.*,
  2020 U.S. Dist LEXIS 45300 (EDNY Mar. 16, 2020)........................................25

*Legros v. Irving*,
  38 A.D.2d 53 (1st Dep't 1971) ...........................................................................11

*Levy v Nissani*,
  179 AD3d 656 (2d Dept 2020) ...........................................................................13

*Lindner v IBM Corp.*,
  2008 U.S. Dist LEXIS 47599 (SDNY June 18, 2008)................................8, 23, 29

*McGuire v State*,
  132 NE3d 438 (Ind Ct App 2019)......................................................................27

*Minuto v Longo*,
  2010 NY Slip Op 31468[U] (Sup Ct, NY County 2010)......................................16

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
  102 F.3d 660 (2d Cir. 1996)...............................................................................12

*Nguyen-Lam v. Cao*,
  171 Cal. App. 4th 858 (Cal. Ct. App. 2009) ......................................................19

*Nolan v State of NY*,
  158 AD3d 186 (1st Dept 2018)...........................................................................23

*People v Dietze*,
  75 NY2d 47 (1989) .............................................................................................25

*Pontarelli v. Shapero*,
  231 A.D.2d 407 (1st Dep't 1996) .........................................................................8

*Powell v City of Jamestown*,
  2022 U.S. Dist LEXIS 99749 (WDNY June 3, 2022) ...........................................................12

*Reich v. Lopez*,
  38 F. Supp. 3d 436 (SDNY 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017) ....................................8

*Ross v. Thomas*,
  No. 09 CIV. 5631(SAS), 2009 WL 3698024 (SDNY Nov. 5, 2009) ....................................10

*Royalty Network Inc. v. Dishant.com, LLC*,
  638 F. Supp. 2d 410 (SDNY 2009)........................................................................................10

*Samah DD. v. Mark VV.*,
  235 A.D.3d 1116 (3d Dep't 2025) ..........................................................................................28

*Matter of Samah DD. v Mark VV.*,
  235 AD3d 1116 (3d Dept 2025) .............................................................................................26

*Satanic Temple, Inc. v Newsweek Mag. LLC*,
  661 F Supp 3d 159 (SDNY 2023) ..........................................................................................17

*Savage Universal Corp. v. Grazier Const., Inc.*,
  2004 U.S. Dist LEXIS 16088, at *33 (SDNY Aug. 12, 2004) ..............................................9

*Shamir v. City of N.Y.*,
  804 F.3d 533 (2d Cir. 2015)....................................................................................................6

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ................................................................................................................17

*Stanton v Montee*,
  83 Misc 3d 1207[A], 2024 NY Slip Op 50668[U] (Sup Ct, Bronx County 2024)................15

*State v Thieme*,
  2020 N.J. Super. Unpub. LEXIS 1711 (N.J. App Div Sep. 11, 2020)....................................27

*Stolarik v Kaplun Marx PLLC*,
  2018 U.S. Dist LEXIS 163243 (SDNY Sep. 24, 2018)..........................................................10

*Tardif v. City of New York*,
  991 F.3d 394 (2d Cir. 2021).............................................................................................14, 24

*Turner v. KRTK Television, Inc.*,
  38 S.W.3d 103 (Tex. 2000) (Baker, J., concurring in part) ...................................................20

*United States v Adams*,
  2025 US Dist LEXIS 62719 (SDNY Apr. 2, 2025)................................................................2

*Vecchio v. S & T Mfg. Co.*,
    601 F. Supp. 55 (EDNY 1984) ...................................................................9

*Ye Olde Time Keepers, Inc. v C.R. Martin Auctioneers, Inc.*,
    2018 U.S. Dist LEXIS 64537 (EDNY Apr. 17, 2018) ...........................10

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007)......................................................................7

*Zuckerbrot v. Lande*,
    75 Misc 3d 269 (Sup Ct, NY County 2022) ..........................................20

## Statutes

28 U.S.C. § 2403(b) ...........................................................................................24

N.Y. Civ. R. L. § 70-a(1)(a) ...............................................................................30

N.Y. Civ. R. L. § 79-n ................................................................................23, 24

N.Y. Civ. R. L. § 79-n(2) ...................................................................................24

N.Y. Pen. L. § 240.25 ............................................................................24, 25, 26

N.Y. Pen. L. § 240.30 .........................................................................................28

## Rules

CPLR 302(a)(1) ..................................................................................................12

CPLR 302(a)(2) ....................................................................................................8

CPLR 302(a)(3)(ii)................................................................................................8

CPLR 3211(a)(1) .................................................................................................12

CPLR 3211(a)(8) .................................................................................................30

Fed. R. Civ. P. 8(a)(2)...........................................................................................6

## Other Authorities

Alexander Barnes, *Real-World Consequences for Online Actions: The Case for Expanding Employee Harassment Protection via Employers' Rights of Action*, 48 Seattle U. L. Rev. 165 (2024)...........................................................................................................27, 30

Marquitta Dorsey, et al., *"I Don't Really Need You. I Got a Body that's Going to Get me What I Need": A case study on Sexual Autonomy and Agency through Camming and Social Media Engagement among Black Young Adult Females*, 15 J. Soc. Social Work Res. 303, 303 (2024) .................................................................................................................................16

Jeff Tarzia, *Kotaku Detected*, SMASHJT, https://www.smashjt.com/kotaku-detected ...............29

Katie Kane, *3 Reasons to Live Stream to Your Guests' Social Media Channels (And How)*, STREAMYARD, https://streamyard.com/blog/3-reasons-to-live-stream-to-guests-social-media-channels.........................................................................................................................................6

"Webcam model," Wikipedia, *available at* https://en.wikipedia.org/wiki/Webcam_model ("In addition to performing sex work, cam models…"). ...............................................................16

Wes Michael Tomaselli, *Webcam Sex Work Is a Lifeline for Women Who Lost Their Jobs During COVID*, VICE (Sep. 22, 2022); ...........................................................................................16

## PRELIMINARY STATEMENT

Somewhere in the middle of more than 150 hours of video, 50 blogs, and at least 100 tweets targeting Plaintiff Alyssa Mercante, Defendant Jeff Tarzia rhetorically asked, "How many times do I need to teach these crazy bitches this lesson?" ECF No. 13 (Second Amended Complaint, or "SAC") ¶ 414. The lesson? People like Mercante — or, as Defendant likes to call her sometimes, "Mer**cunt**e" ("SAC ¶ 140 (emphasis added) — are not welcome in the video game industry and should just go away. To send the message, Defendant and his allies have declared they "need to pull every lever" to get people like Plaintiff "out of the game industry." SAC ¶ 20. And when those who think video games are not just for straight white men — or think, perhaps, video games should have characters that represent the full range of human experience — do not simply disappear, Defendant will "call [them] out." SAC ¶ 257. He declares success when people like Plaintiff "fle[e]" a platform. SAC ¶ 180. It's a "lesson" he will keep on "teach[ing]," unless the Court intervenes.

Nor is he subtle. The "call out[s]" are, in Defendant's own words (*see* n. 27, below), a "calculated strategy" to "incite" followers and "outsource the task of doxxing." SAC ¶ 258. Those supporting diversity in gaming, he tells his followers, "refuse[] to hold their own employees accountable for their abhorrent actions, [so, i]f you want something done right, ***sometimes you have to do it yourself***." SAC ¶ 126 (emphasis added). To make it easy, he links and gives credit to notorious harassment hub, Kiwi Farms. And incite followers he does. With thousands of death threats and rape threats, Plaintiff receives a daily deluge of vile, violent, and bigoted harassment, including, as an average representation (SAC ¶ 218):

- "Don't forget to keep on being such a miserable bitch, the world will keep on repaying you until your last solitary breath… Fuck you to the moon you despicable cunt" (ECF No. 13-1 at 1);
- A picture of a noose on a hanging scaffold, saying "Kotaku is next, alyssa needs

to be hanged" (*id.* at 2);

- A picture of a man's penis, with "You know you want my meat sLappin all over ur face" (*id.* at 3);
- "you're next in line to be digitally hanged" (*id.* at 4);
- "Subhuman weak stupid whores like you deserve to die screaming with black n[*****] hands beating your stupid skull until you piss yourself and start seizing" (*id.* at 6);
- "You're a fat ugly whore lmfao smashJT [e.g.,. Defendant] is gunna bend you over and fuck you raw in the courtroom like the slut you are" (*id.* at 8); and
- "Kill yourself you dyke cunt bitch" (*id.* at 10).

Tarzia reacts to the harassment, and his glee is palpable. *See, e.g.,* SAC ¶¶ 125-26; 128-131. The deluge of things like the above, he says, is "pure comedy gold." *Id.* Predictably, the volume and viciousness ebbs and flows with Defendant's conduct — and the sheer volume of material he has created allows easy confirmation of that fact. SAC ¶¶ 219-25.

Defendant says none of this matters. It's just "Tarzia and, allegedly, his friends mocking Mercante online." Defendant's Memorandum of Law ("DMOL") at 2.[1] As shown below, he's wrong. There might be some subset of what he's done that would not be actionable, but caselaw is clear there are lines he has crossed. The motion should be denied.

## STATEMENT OF FACTS

Once his windfall from meme stocks dried up, Tarzia needed a new source of income. His career as a right-wing gaming culture influencer was going nowhere; five years after launching his YouTube channel, he had fewer than 20,000 subscribers (SAC ¶ 103), and most of his blog articles received fewer than 20 views. *Id.* ¶ 104. Previous attempts to gain viewers by stirring up controversy fizzled out. Tarzia then returned to an oft-drawn well, grinding his axe about diversity and representation in the video games industry. *Id.* ¶ 111. His chosen target became

---

[1] In this memorandum, pin-cites are to internal (e.g., not ECF) pagination unless specifically noted. Additionally, "in quotations from cases" Plaintiffs "omit citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated." *United States v Adams*, 2025 US Dist LEXIS 62719, at *1, n 1 (SDNY Apr. 2, 2025). Formatting and typography in quotes from social media and the like is all preserved.

Alyssa Mercante, then-senior editor for video game blog Kotaku. Mercante is a witty and well-educated journalist who writes about video games and pop culture from a feminist perspective, and her work has appeared in publications other than Kotaku, including Rolling Stone. *Id.* ¶ 115.

Tarzia began targeting Mercante in March 2024. *Id.* ¶ 102. Almost immediately, his viewership increased. *Id.* ¶¶ 102-103. Tarzia has freely acknowledged that he views Mercante as "a content mine," *id.* ¶ 140, but he rapidly discovered that he could not maintain the kind of breathless focus that his viewers (and revenue stream) demanded while publishing only the truth. On March 30 and April 1, 2024, he decided to inflame his fan base even further by claiming that Mercante had "come forward stating that she used to be a sex worker, sucking dicks for money before working at Kotaku." *Id.* ¶¶ 143-145. These statements were false. *Id.* ¶¶ 153-155. Tarzia knew they were false at the time he made it. *Id.* ¶¶ 156-163. At the time of publication, Tarzia did not identify any statement made by Plaintiff as the basis for his claim that she had "come forward" with these supposed admissions. Nor could he, for Plaintiff never made such a statement. *Id.* Indeed, Tarzia impliedly admitted as such when he later lied about the basis for his statement, citing to a tweet Mercante made on April 6*th*, 2024, days after his knowing falsehood. *Id.* Claiming that his lie was based on something Plaintiff said afterward is tantamount to a confession that it was based on nothing at all — that the "coming forward" was as fictional as the allegation. Time, after all, only moves forward.

Having cut his teeth on one lie, Tarzia continued to embellish the truth for his growing audience of culture-war obsessed trolls desperate for new information to fuel their rage. Tarzia eventually made more than 90 videos about Plaintiff within a single year, totaling more than 150 hours of play time — nearly a week straight if played end-to-end. *Id.* ¶¶ 174-75. These videos, like the supporting articles on Tarzia's website and Tarzia's own prolific tweeting about

Mercante, *id.* ¶ 176, contained numerous exhortations directing his audience to "hold [Plaintiff] accountable" for ambiguous unsourced faults, *id.* ¶¶ 8-9, 12, 50-51, both as an individual and as the senior editor of long-running and industry-leading video games journalism website Kotaku, *id.* ¶¶ 10, 120-26. Tarzia has even gone so far as to create a "project" entitled "End Kotaku" on his SmashJT Website which highlights employees whom he finds particularly objectionable, *id.* ¶¶ 9, 49-52, including Mercante, *id.* ¶¶ 119-24. The vast majority of the Kotaku employees Tarzia focuses on are women, people of color, on the LGBTQ+ spectrum, and/or Jewish. *Id.* ¶ 10. Indeed, Tarzia's largely right-wing audience craves negative information on people in these groups and is known to harass those people named in such articles. And the goal is explicit: "pull every lever to get" those targets "out of the game industry altogether." SAC ¶ 20.

The SmashJT Website is highly interactive. Forum-style comments appear below each of Tarzia's articles, allowing his fans and followers to respond not only to Tarzia but to each other, engaging in conversation and repeating and amplifying his statements. *Id.* at ¶¶ 60-61. Tarzia's most loyal fans also have the option to purchase subscriptions to the SmashJT Website, which allows them early access to posts of Tarzia's choosing.[2] *Id.* ¶ 63. Many of the articles Tarzia selects for this "early access" paywall are about Plaintiff; in fact, one article about Plaintiff and this litigation is *permanently* paywalled. *Id.* ¶ 64.

The SmashJT Website is a major instrumentality for much of Tarzia's harassment campaign against Plaintiff. Its interactive features are key: the interactive comments create a forum where his users can discuss and embellish his harassment and defamatory comments, and his practice of putting articles behind a requirement that people subscribe or pay him money to

---

[2] Tarzia appears to have confused these subscriptions on the SmashJT **Website** with the memberships Tarzia sells to the SmashJT **YouTube Channel**. DMOL at 6. At issue is the former, and indeed, the example in SAC ¶ 64 remains behind the paywall as of the time of briefing. *See*, https://www.smashjt.com/post/alyssa-mercante-s-lawsuit-just-got-nuked ("Subscribe to smashjt.com to keep reading this exclusive post").

access the posts he deems sufficiently titillating to present an incentive for paying for a subscription helps increase the chatter and hype for those articles. Both features are available on the SmashJT Website as part of the Wix Paid Services, a features package Tarzia purchased from his web host Wix.com to enhance the functionality and interactivity of his website and to provide additional revenue. *Id.* ¶¶ 54-59.[3]

The ebb and flow of Tarzia's interest corresponds closely to the volume of harassment Plaintiff receives. SAC ¶¶ 221-224. This pattern is repeated for other targets of Tarzia's harassment. *Id.* ¶¶ 183-85, 225. Tarzia directed his focus at Plaintiff while fully aware that she would experience harassment and fear for her safety as a result. *Id*. ¶¶ 169-72, 188-92. The harassment of Plaintiff and her family has been organized and coordinated in part from online forums hosted and managed by Tarzia, *id.* ¶¶ 138-39, with his awareness and approval, *id*. ¶¶ 140-42. Tarzia has gone so far as to describe the harassment experienced by Plaintiff and her family as "undeniably hysterical," *id*. ¶ 128, "pure comedy gold," *id*. ¶ 130, "a form of poetic justice or retribution," *id*. ¶ 131, and "karma," *id*. ¶ 180.

Tarzia has conducted this harassment campaign directed at Plaintiff for the express purpose of interfering with her employment with Kotaku, and in the gaming industry at all. *Id*. ¶¶ 20, 119, 123 and 126. His other references to Plaintiff make it clear that she is one of the "activists" whom he seeks to remove from the industry, *id*. ¶¶ 240-41, and that he thinks of her as a "crazy bitch" whom he has to "teach … a lesson," *id*. ¶¶ 357-58. In fact, he has claimed that his harassment campaign is "for the betterment of the game industry." *Id.* ¶ 360.

On top of his own website and YouTube channel, Tarzia is a frequent guest on other content creators' videos, including fellow video games streamer RealHypnotic1 ("Hypnotic"),

---

[3] Wix's relevant Terms of Service provide for the application of New York law and that any disputes relating to his transactions with Wix will be settled in New York courts. *Id.* at 56.

who streams from his residence in Long Island, New York. SAC ¶¶ 38-45. Tarzia often associates with other New York-based streamers including Selmarie Adorno ("ToastywiththeMosty") and Louis Testone, Jr. ("RevSaysDesu"), appearing on their streams as they appear on his, all specifically to stoke rage at Mercante. *Id.* ¶ 46. Such planned cross-promotional appearances are an often recommended way for emerging streamers to increase their viewership and thereby their revenue.[4] The success of Tarzia's efforts in this regard is plain from the way his fellow influencers pick up and repeat his claims word-for-word without any independent investigation, confirmation, or thought. *Id.* ¶¶ 195-215.

Tarzia also maintains a "Discord" server called "SmashJT," where he and his subscribers and fans post about his website, videos, and content. *See* SAC ¶¶ 135-139. Tarzia has admitted on this Discord server that his targeted harassment of Plaintiff is profitable and aids his business. *Id.* ¶ 140. He has encouraged the members of the Smash JT Discord to abuse and harass Mercante and her family members. SAC ¶¶ 138-39. He has even used the SmashJT Discord as a war room for coordinating his harassment of Mercante, including working with his close friend and official channel moderator, Jordon Nowotny, while lying to his audience and the public saying Nowotny's alias, "Mr. Nobody," was some unknown third party. SAC ¶¶ 299-354. This elaborate sham was designed to keep the cycle of harassment going. *E.g., id*. ¶¶ 337; 354.

## **STANDARDS OF REVIEW**

The applicable federal rules require only that a plaintiff plead "a short and plain statement of the claim" to entitle them to discovery. *See* Fed. R. Civ. P. 8(a)(2);[5] *see also, e.g., Shamir v.*

---

[4] *See, e.g.,* Katie Kane, *3 Reasons to Live Stream to Your Guests' Social Media Channels (And How)*, STREAMYARD, https://streamyard.com/blog/3-reasons-to-live-stream-to-guests-social-media-channels (last accessed July 13, 2025).
[5] While Defendant complains about the length of the complaint (DMOL at 8), he cites a case from before *Twombly* and *Iqbal*. Perhaps a truism, but post-*Twombly*, pleading length has expanded quite a bit, given the need to plead more to get to plausibility around ultimate facts. Defendant also discounts his role in expanding the pleadings, denying certain facts in his initial motion and demanding far more detail underlying certain conclusions by saying there wasn't enough there in the initial complaint.

*City of N.Y.*, 804 F.3d 533, 556 (2d Cir. 2015). Under the familiar standard, the Court must accept as true all plausibly pleaded allegations in the SAC and draw all reasonable inferences therefrom in Plaintiff's favor. *See, e.g., See Case, et al. v. City of N.Y., et al.*, 233 F.Supp.3d 372, 382 (SDNY 2017) (citing cases). If the allegations in the pleadings sufficiently "raise the right to relief above the speculative level," dismissal is inappropriate. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To the extent there are any disputed facts, they are for a jury. *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368, 371 (2d Cir. 2007) (citing cases). As long as there is enough factual matter to 'nudge[ plaintiff's] claims…'across the line from conceivable to plausible,'" the case should proceed. *Ashcroft v. Iqbal*, 556 US 662, 680 (2008), *quoting Twombly*, 550 U.S. at 570.

## ARGUMENT

### I.    The SAC Plausibly Alleges Jurisdiction.

Defendant, a California resident, is subject to the Court's personal jurisdiction because his conduct falls squarely within the parameters of New York's long-arm statute and the exercise of personal jurisdiction comports with due process.[6]

#### A.    Tarzia is subject to jurisdiction under section 302(a)(3) on Plaintiff's non-defamation causes of action.

Plaintiff's Second Amended Complaint alleges five causes of action against Tarzia: (1) defamation, (2) bias related violence or intimidation and harassment, (3) intentional infliction of emotional distress, (4) tortious interference, and (5) stochastic terrorism/prima facie tort. New York's long-arm statute provides that — "except as to a cause of action for defamation of character arising from the act" — a foreign defendant is subject to personal jurisdiction in New

---

[6] Defendant does not challenge that the exercise of jurisdiction over Tarzia would be consistent with due process, addressing only whether Tarzia's conduct falls within the parameters of the long-arm statute. *See* DMOL at 4-8. Indeed, Defendant concedes that the exercise of jurisdiction would present no due process concerns. *See id.* at 6 (citing *Trachtenberg v. Failedmessiah.com*, 43 F. Supp. 3d 198 (EDNY 2014), for the proposition that N.Y.'s long-arm statute poses a "stricter test" than the due process clause requires). Plaintiff accordingly does not further address due process here.

York if he "commits a tortious act without the state causing injury to person or property within the state" and "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." CPLR 302(a)(3)(ii). The SAC alleges that Tarzia: (1) committed tortious acts outside the state, *see, e.g.,* SAC ¶¶ 68, 126, 216-218, 221-225; that (2) caused injury in New York, *see, e.g.,* SAC ¶¶ 73, 167, 193-94, 284, (3) did so fully expecting (indeed expressly hoping) his conduct would have consequences in New York, *see, e.g.,* SAC ¶¶ 70-72, 125-26, 128-131**,** and (4) derives substantial revenue from interstate commerce, *see, e.g.,* SAC ¶¶ 63-67, 73.

Against this showing, Tarzia makes only futile arguments. *First*, Tarzia argues that Section 302(a)(3) should not apply at all because Plaintiff's second through fifth causes of action are, he says, "tag-along causes of action" and the litigation is "essentially a defamation action." DMOL at 5. But the cases Tarzia cites in support of that proposition simply do not apply here.[7] Rather, as explained in Point IV below, this is a dramatic misreading of the caselaw and the complaint. In short, because the relevant non-defamation claims involve "alleged harm suffered by the plaintiff" that "is not ***precisely*** the same as that caused by defamation," they do not get analyzed as defamation claims. *Lindner v IBM Corp.*, 2008 U.S. Dist LEXIS 47599, at *43 (SDNY June 18, 2008) (emphasis in original; collecting cases). *See*, *e.g.*, SAC ¶¶ 172, 378, 408-409 (harm relevant to prima facie tort and 79-n).

---

[7] In *Reich v. Lopez*, 38 F. Supp. 3d 436 (SDNY 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017), the plaintiffs alleged jurisdiction under Section 302(a)(2) of the CPLR, which provides for jurisdiction based on tortious acts committed within New York except, as with Section 302(a)(3), for defamation claims. 38 F. Supp. 3d 458. The court rejected that as a basis for personal jurisdiction on claims for tortious interference, trade libel, and "injurious falsehood" where each such cause of action was based on the claim that the defendants had made false statements about the plaintiffs. *Id.* at 458-459 ("Although Plaintiffs attempt to distinguish between 'the falsity of the statement' and 'its defamatory nature' [] they provide no support for such a distinction, nor is it logical to draw one"). And in *Pontarelli v. Shapero*, 231 A.D.2d 407 (1st Dep't 1996), the plaintiff had only alleged one tort – defamation – and therefore could not rely on CPLR 302(a)(2) or (3). *Id.* at 410. Both stand for the self-evident proposition that jurisdiction for a tort claim that is based on a foreign defendant's false statement cannot be founded on Section 302(a)(2) or (3) of the CPLR.

*Second*, Tarzia argues that Plaintiff insufficiently alleges (1) that Tarzia should have expected his conduct to have repercussions in New York and (2) that he generates substantial revenue from interstate commerce or that he expected. DMOL at 7-8. His argument on (1) is frivolous. The SAC sufficiently alleges that Plaintiff is a New York resident, that her former employer Kotaku is a New York-based employer, that Tarzia was aware of that, and that Tarzia directed his harassment campaigns at Plaintiff and Kotaku. SAC ¶¶ 3-9, 52-53. He's made over 150 hours of video about Mercante, to serve his "goal" getting Mercante "out of the game industry." SAC ¶ 20. ***Of course*** he expected — or should have expected — his tortious conduct to have an impact in New York. *See, e.g., Calder v Jones,* 465 U.S. 783, 789-790 (1984) (defendants made statements "they knew would have a potentially devastating impact … felt by respondent in the State in which she lives and works … Under the circumstances, petitioners must reasonably anticipate being haled into court there"); *Goldhaber v Kohlenberg*, 395 NJ Super 380, 390, 928 A2d 948, 953 (N.J. App Div 2007). Almost exactly on point is *Savage Universal Corp. v. Grazier Const., Inc*., where a "campaign" of attacks at a New York company plus interactive websites sufficed. 2004 U.S. Dist LEXIS 16088, at *33 (SDNY Aug. 12, 2004).

Similarly, on (2), the SAC more than sufficiently alleges that Tarzia generates substantial revenue from interstate commerce. For purposes of Section 302(a)(3), revenue is "substantial" if the Defendant earns a sufficient percentage of its revenue from interstate commerce, and percentages as low as 4% have been found high enough. *Vecchio v. S & T Mfg. Co.*, 601 F. Supp. 55, 57 (EDNY 1984). The revenue derived from interstate commerce need not have any connection to either New York or the tortious act. *Id.*[8] Here, the SAC alleges that Tarzia derives

---

[8] Tarzia's argument on this subject appears to conflate the requirements of Section 302(a)(3)(ii), which imposes jurisdiction for extraterritorial tortious conduct that was expected to have an impact within New York on anyone who derives substantial revenue from *interstate or international commerce*, with the requirements of Section 302(a)(3)(i), which imposes jurisdiction for extraterritorial conduct *even if it was not expected to have an impact in*

his entire revenue from interstate commerce: from his YouTube channel and website. SAC ¶¶ 16, 63-73. That is more than sufficient to establish substantial revenue for purposes of Section 302(a)(3). *LaMarca v Pak-Mor Mfg. Co.*, 95 NY2d 210, 215 (2000). And to whatever extent more is required, Plaintiff would be entitled to jurisdictional discovery into Tarzia's income and revenue sources. *See, e.g., Ye Olde Time Keepers, Inc. v C.R. Martin Auctioneers, Inc.*, 2018 U.S. Dist LEXIS 64537, at *30 (EDNY Apr. 17, 2018); *Stolarik v Kaplun Marx PLLC*, 2018 U.S. Dist LEXIS 163243, at *7-9 (SDNY Sep. 24, 2018).

Plaintiff has thus adequately alleged that Tarzia is subject to jurisdiction under Section 302(a)(3)(ii), and her Second through Fifth Causes of Action may proceed on that basis alone.

**B. Tarzia is also subject to personal jurisdiction under section 302(a)(1) on all of Plaintiff's claims, because he transacted business in New York and Plaintiff's claims arise out of that transaction of business.**

In any event, Tarzia is subject to personal jurisdiction on each of Plaintiff's claims under Section 302(a)(1) of New York's long-arm statute, which provides for jurisdiction over a non-resident defendant who "transacts any business within the state" *Ross v. Thomas*, No. 09 CIV. 5631(SAS), 2009 WL 3698024, at *3 (SDNY Nov. 5, 2009). Section 302(a)(1) is a "single act statute" that allows for exercise of jurisdiction if the defendant engaged in even "one transaction in New York … so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010), *quoting Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). Here, the SAC more than sufficiently alleges that Tarzia "transacted business" in New York, identifying both his execution of a contract with a New York entity,

---

*New York* if the tortfeasor "derives substantial revenue from goods used or consumed or services rendered, *in the state.*" *See* Moving Brief at 8, *citing Hartman v. Low Sec. Corr. Inst. Allenwood*, No. 03 CIV. 5601 (DLC), 2004 WL 34514, at *2 (SDNY Jan. 7, 2004) (insufficient allegation of revenue in New York) and *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 420 (SDNY 2009) (assessing whether Royalty sufficiently alleged New York based revenue only in its assessment of jurisdiction under 302(a)(3)(i) and not under 302(a)(3)(ii)).

Wix, to provide hosting and ongoing ecommerce services to Tarzia for his highly interactive website, SAC ¶¶ 36, 54-67, and his appearances on a New York-based YouTube channel. SAC ¶¶ 38-45; *see also, e.g., id.,* ¶¶ 46-47. *See, e.g., EnviroCare Techs., LLC v. Simanovsky*, No. 11-CV-3458 JS ETB, 2012 WL 2001443, at *3 (EDNY June 4, 2012) ("if a website is interactive and allows a buyer in New York to submit an order online, courts typically find that the website operator is 'transacting business' in New York …"); *Hsin Ten Enter. USA, Inc. v. Clark Enters.*, 138 F. Supp. 2d 449, 456 (SDNY 2000); *accord, Do The Hustle, LLC. v. Rogovich*, No. 03 CIV. 3870(VM), 2003 WL 21436215, at *6 (SDNY June 19, 2003) (sending files to webserver host in New York for publication, and entering into a contract with a New York webserver host, would support jurisdiction if files related to claim). Thus, the only remaining question is whether Plaintiff's claims have a substantial nexus to that New York transaction of business. *Cf. Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 254 (2d Cir. 2007) (interactivity of website insufficient where the claims at issue did not have a substantial nexus to the interactivity). They do.

As alleged in the SAC, Tarzia contracted with Wix, a New York-based entity, to provide hosting and ecommerce services for his website, including the features that allow him to paywall certain posts and therefore charge users for access to them. *E.g.,* SAC ¶¶ 54-68. At least one paywalled article from which Tarzia raises revenue using the New York-based Wix services was directly related to Plaintiff and the defamatory claims at issue. *Id.* ¶ 64. *Cf. Legros v. Irving*, 38 A.D.2d 53, 56 (1st Dep't 1971) (fact that publishing contract and print location of allegedly defamatory book were tied to New York was relevant to jurisdiction being proper). More, as Plaintiff has plausibly alleged, Tarzia has conducted his campaign of defamation and harassment specifically to increase the revenue he earns through that interactive website and his YouTube channel, which revenue is largely dependent on his conduct at issue. SAC, ¶¶ 240-243. And the

11

SAC likewise plausibly alleges that Tarzia has knowingly used and directed New York-based agents to amplify his statements. *Id.*, ¶¶ 45-47. *Cf.* N.Y. CPLR 302(a)(1) (providing for jurisdiction where the transaction of business occurs through agents). All of that provides a sufficiently "substantial nexus" between Tarzia's transaction of business in New York and the causes of action. *See*, *e.g.*, *DEX Sys., Inc. v. Deutsche Post AG*, 727 F. App'x 276, 278 (9th Cir. 2018) (location of servers supported personal jurisdiction where it was a deliberate contractual choice to have server located in California); *Do The Hustle*, 2003 WL 21436215, at *6.[9] Thus, the Court has jurisdiction over Tarzia on each of Plaintiff's claims.

## II.  Tarzia's "Documentary Evidence" Submitted Under CPLR 3211(a)(1) is Impermissible and Irrelevant.

### A.  CPLR 3211(a)(1) does not apply in Federal Court.

A 12(b)(6) motion to dismiss is decided solely on the contents of the complaint. *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662-63 (2d Cir. 1996). But Tarzia confuses Federal practice with the CPLR, which allows a "defense … founded upon documentary evidence" to be raised by motion to dismiss. *See* DMOL at 4, *citing* CPLR 3211(a)(1). And on that basis, Tarzia pulls in a variety of material beyond the complaint, placing it in-line in four numbered figures and one unnumbered figure.[10] *See, e.g.,* DMOL at 9. But "New York's procedural rules no longer govern" in federal court. *James v. City of Rochester*, 673 F. Supp. 3d 279, 292 (WDNY 2023); *see also, generally, Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427, (1996). Federal courts do not apply CPLR 3211(a)(1). *See, e.g., Powell v City of Jamestown*, 2022 U.S. Dist LEXIS 99749, at *54-55 (WDNY June 3, 2022). Tarzia's extra-complaint material[11] must be ignored.

---

[9] *See also, HB Prods., Inc. v. Faizan*, 603 F. Supp. 3d 910, 923-926 (D. Haw. 2022) (collecting cases and explaining that for personal jurisdiction purposes, the location of the server or webhost supports purposeful availment).
[10] There is no "Figure 4." DMOL at 12. Defendant cites "Figure (2)" while quoting the unnumbered figure, "Figure (3)" while quoting the image labeled as "Figure 2," and "Figure (4)" while quoting the image labeled as "Figure 3." DMOL at 11-12. To be clear, throughout this memo, Plaintiff is using the labels on the actual figures.
[11] While the unnumbered figure is mentioned in the SAC, and therefore fair game, none of the rest are.

12

**B.  Post-publication events cannot be used to assess state of mind.**

Additionally, Defendant's unnumbered Figure (DMOL at 11) and Figure 2 (DMOL at 12) both post-date the statements at issue in the defamation claims. It is black-letter New York defamation law that the inquiry solely "focus[es] upon the state of mind of the publisher of the allegedly libelous statements *at the time of publication*." *Kipper v NYP Holdings Co*., 12 NY3d 348, 354-355 (2009) (emphasis added).[12] So, neither the unnumbered Figure or Figure 2 have any relevance to fault — and Defendant, for his part, never explains how they do.

**III.  The SAC Plausibly Alleges Defamation.**[13]

A defamation claim is adequately pled when a complaint contains plausible allegations of (1) a factual statement about the plaintiff; (2) publication; (3) fault; (4) falsity; and (5) "special damages or *per se* actionability." *Chau v Lewis*, 771 F3d 118, 126-127 (2d Cir. 2014). The parties do not appear to dispute elements (1)[14] or (2). *See generally* DMOL at 8-16. Instead, As to element (3), Defendant argues actual malice is not pled because (he claims) extra-complaint materials make it reasonable for Tarzia to have believed his statements were true. And he argues "plaintiff has rendered herself 'libel-proof' with respect to chastity through her own voluntary, public descriptions of herself and her moral standards" as to elements (4) and (5).

The statements at issue are specific. Namely:

---

[12] This sort of rule is hardly unique to defamation. *See, e.g., Graham v. Connor*, 490 U.S. 386, 396 (1989); *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (probable cause inquiry).

[13] The parties agree the causes of action for intentional infliction of emotional distress and tortious interference with contract require an underlying tort and therefore rise and fall with the other claims. However, as explained below, the prima facie tort and bias-based harassment claims do not seek reputational damages, so they must be analyzed on their own terms (and can each serve as the necessary predicate tort for the other claims). Relatedly, while Defendant simply declares "[t]he emotional distress claim also fails because it fails to allege specific special damages that arose from the alleged emotional harm," that ignores SAC ¶ 194. Since the Court permitted sealing of the special damages allegations (May 9, 2025 Minute Order, granting ECF No. 14), and Defendant did not make any argument at all about the special damages in the sealed allegations, Defendant seems to concede the point he nominally contests.

[14] It appears Defendant is not arguing the statements at issue are not statements of fact.  If he was, given the "she has since come forward" (SAC ¶ 144 and 357), that argument would be barred by the black letter rule that a statement "that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, is a mixed opinion and is actionable." *Levy v Nissani*, 179 AD3d 656, 658 (2d Dept 2020).

(1) Plaintiff is "sucking dicks in her off time for money." SAC ¶ 143 and 356; and

(2) "Alyssa Mercante […] has since come forward stating that she used to be a sex worker, sucking dicks for money before working at Kotaku." SAC ¶ 144 and 357.

(together, the "Statements"). Yet the Statements are not even quoted in Defendant's moving papers, let alone properly analyzed.

### A. The SAC plausibly alleges the Statements are false.

The Statements contain two factual accusations: (1) that Plaintiff "suck[s] dicks for money" and (2) that Plaintiff "has since come forward" admitting to that conduct.[15],[16] SAC ¶¶ 143-44; 356-358. These were published, respectively, on March 30, 2024 and April 1, 2024. *Id.* The SAC plausibly alleges both are false.

Start with the latter. Nothing in Defendant's motion engages with it. Nowhere does he suggest that it was true, as of April 1, 2024, that Plaintiff had "come forward stating [she was] sucking dicks for money before working at Kotaku." SAC ¶ 144. Indeed, the words "come forward" do not even appear in his motion. And the SAC directly alleges "[n]o such 'coming forward' exists; Tarzia invented it." SAC ¶ 369. So, it appears Defendant concedes, for the purposes of this motion, that this statement is false. *See, e.g., Tardif v. City of New York*, 991 F.3d 394, 404 n.7 (2d Cir. 2021).

As for the former, Defendant's argument misses the mark: He focuses not on the actual allegation, but on an assertion that *another* statement — not in the SAC — that Plaintiff did "sex work" *necessarily* means she did the specific acts alleged. DMOL at 9-11. Courts have explained

---

[15] As detailed above, in the SAC, and in pre-motion letter practice — although still not grappled with in the DMOL — Defendant's unnumbered figure on page 11 was posted April 6, 2024. The statements at issue were made a week before, on March 30 and April 1, 2024. So, "[l]inear time prevents Defendant's claim to have relied on it." ECF No. 8 at 3 n. 8; *see also,* SAC ¶¶ 157-163 (detailing Defendant's false claim to have relied on the later-in-time response to his statements in making them).

[16] To be clear, the "used to be a sex worker" piece of the second statement is not at issue. It is also simply not true to call this a "pivot." DMOL at 13. *See, e.g.,* ECF No. 1 ¶¶ 92-99. That Defendant needed the added context in the SAC to understand this (*see, e.g.,* SAC ¶ 256 n. 110) is neither here nor there.

in other contexts that "[t]here is a big difference between alleging specific conduct (forging documents, collaborating with an adversary) and calling someone a common criminal." *Cardali v Slater*, 56 Misc 3d 1003, 1012 (Sup Ct, NY County 2017). *See also Stanton v Montee*, 83 Misc 3d 1207[A], 2024 NY Slip Op 50668[U], *2 (Sup Ct, Bronx County 2024).

So, it is critical that, as explained in the SAC, some sex work is legal, some is criminal. *See, e.g.,* SAC ¶¶ 146-150; 364. Indeed, New York's high court has basically explained this, saying a statement about an erotic stage act and accompanying matters was not defamatory because "the publication does no more than allege that the plaintiff accepted money in return for providing a few hours of companionship to lonely men. There is nothing in the sentence complained of to support an inference that the sale of anything more was involved." *James v Gannett Co*., 40 NY2d 415, 418 (1976). That is, sale of even erotic attention is not a crime — and an accusation of that cannot be defamatory.[17]

Bearing this out, defamation caselaw is replete with cases establishing that statements that admit of both a criminal and non-criminal construction "fall short of being reasonably susceptible to a connotation of criminality." *Burdick v. Verizon Communs., Inc*., 305 AD2d 1030, 1031 (4th Dept 2003). Indeed, the argument Defendant is making is straight from *James*, though he does not cite it:

> "The second alleged libel, that plaintiff sold her time to lonely old men, is a bit more difficult. However, we again conclude that this sentence is not susceptible to a defamatory construction. Although, on its face, this portion of the article states that the plaintiff sold her time to men on occasion, the statement itself negates the possibility that the plaintiff was thereby committing an act of prostitution since her role was to do no more than 'sit with him and be nice to him.'"

*James*, 40 NY2d at 420-421. But *James* — though it is both binding and mirrors Defendant's

---

[17] Defendant even explained this himself, arguing that calling someone a "whore" might merely mean "a woman who has multiple sexual partners" or is "sexually promiscuous" and "not defamatory" because it "is susceptible of many meanings." ECF No. 7 at 2-3. Just so.

argument — is absent from Defendant's briefing.

Perhaps the reason is that *James* — in the very same paragraph that tracks his argument — explains exactly why his argument fails on the facts *here:* "Whether a publication alleging that a woman sold her time to men charges an act of prostitution ***depends necessarily upon what services were to be performed in exchange for the money*** tendered to the woman." *James*, 40 NY2d at 420-421 (emphasis added). Thus, it also distinguishes all the cases Defendant cites. Erotic performance and "sit[ting]" and "being nice" to older men in *James* compares well to an accusation of being a "cam girl"[18] here. But what Defendant published goes further. That is, Tarzia added the specifics that *James* says trigger liability (but were left only *implied* in *James*): that "plaintiff was acting as a prostitute who was offering her body and her time for sale at a price, was committing the crime of prostitution*." Id.* at 419. *Accord, e.g., Minuto v Longo*, 2010 NY Slip Op 31468[U], *10-11 (Sup Ct, NY County 2010) (calling a person a "crook" was not defamatory, but the more specific "allegation that Plaintiff 'stole and embezzled money from the Company' [wa]s particular enough" to state a claim).

In other words, the plaintiff in *James* read too much into the statements there, and so her claim did not survive. But here, because — *contra James* — the statements specifically say sexual "services were to be performed in exchange for the money tendered to the woman," the opposite is true. *Id.* And *Jones* is binding.

**B.  The SAC plausibly alleges fault.**

---

[18] While Defendant says "Defendant[] [is] not aware of any source defin[]ing 'cam girl' employment as 'sex work'" (DMOL at 13) that awareness appears to solely be an issue of Defendant not having looked. *See, e.g.,* Marquitta Dorsey, et al., *"I Don't Really Need You. I Got a Body that's Going to Get me What I Need": A case study on Sexual Autonomy and Agency through Camming and Social Media Engagement among Black Young Adult Females*, 15 J. Soc. Social Work Res. 303, 303 (2024) ("Described by participants as virtual sex work, 'camming', short for webcamming has become a popular method of achieving independence and financial gain…"); Wes Michael Tomaselli, *Webcam Sex Work Is a Lifeline for Women Who Lost Their Jobs During COVID*, VICE (Sep. 22, 2022), available at https://www.vice.com/en/article/webcam-sex-work-is-a-lifeline-for-women-who-lost-their-jobs-during-covid/; "Webcam model," Wikipedia, *available at* https://en.wikipedia.org/wiki/Webcam_model ("In addition to performing sex work, cam models…").

The parties disagree about the relevant degree of fault, but under any standard, fault is plausibly alleged. If Defendant meets his burden of showing Plaintiff is a public figure, as he correctly states (albeit without citation), the standard is so-called "actual malice." DMOL at 8-9; *accord St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Otherwise, all that is required is "fault amounting to at least negligence." *Gargiulo v Forster & Garbus Esqs*., 651 F Supp 2d 188, 192 (SDNY 2009).

### 1. *Defendant does not establish Plaintiff is a public figure.*

Defendant says the actual malice standard applies because, he declares without explanation, "Plaintiff is unquestionably a public figure." DMOL at 8. But this is the only time the words "public figure" appear in his brief, and nothing about Mercante's publicity (or not) appears in Defendant's page-and-change statement of facts. And presumably, since Mercante has by no measure achieved "such pervasive fame or notoriety that … she be[came] a public figure for all purposes," Defendant's reference here appears to be to the limited-purpose public figure test. *See, e.g., La Liberte v Reid*, 966 F3d 79, 91 (2d Cir. 2020).

A showing that "a plaintiff is a public figure … is not easily made at [the motion to dismiss] stage, however, given that defendant bears the burden of proof on this score." *Satanic Temple, Inc. v Newsweek Mag. LLC*, 661 F Supp 3d 159, 168 (SDNY 2023). And one sentence, without explanation, authority, or even citation to the pleadings, does not carry that burden. Indeed, Defendant's "one-sentence statement[]" would be "generally insufficient to preserve an issue for appeal," let alone to persuade in the first instance. *Hapag-Lloyd AG. v U.S. Oil Trading LLC*, 814 F3d 146, 155 (2d Cir. 2016). Plus, Defendant does not appear to even make the argument sincerely, with his lawyer recently appearing on Defendant's stream, saying "she's not particularly prominent in th[e] area" of controversy. SAC ¶ 287. That sits in significant tension with the fact that limited purpose public figure status turns on a plaintiff's "prominent role" in relation to a controversy.

17

*Biro v Condé Nast*, 963 F Supp 2d 255, 275 (SDNY 2013). So, given the express concession — well-pled as a fact in the SAC — that Plaintiff is "not particularly prominent in th[e relevant] area" (*id.*), Defendant does not meet his burden.

And without Defendant meeting that burden — at least for the purpose of this motion — the Court should apply the traditional, lower fault standard.

2. *The SAC plausibly alleges fault, regardless of standard.*

Regardless of the standard, the SAC plausibly alleges fault — and Defendant seems to concede (through silence, since the word "negligence" or any similar discussion does not appear even once in the moving papers) — that, if actual malice does not apply, the SAC alleges at least negligence. Either way, however, the facts allege plausibly establish fault.

Defendant also does not seem to contest that the SAC plausibly alleges fault. Nor could he: The SAC extensively alleges facts from which a reasonable jury could find that Tarzia was negligent, or that he knew he was inventing the claims that (1) Plaintiff was "sucking dicks in her off time for money" and more than that, had "since come forward ***stating*** that she used to be a sex worker, sucking dicks for money before working at Kotaku." SAC ¶¶ 143-44 and 356-57 (emphasis added). As discussed above and in the SAC, Defendant wholly invented the claim that Mercante was "sucking dicks for money before working at Kotaku." *See, e.g.,* SAC ¶ 369. He also wholly invented — and has never substantiated in *any* form — the claim that she came forward "stating" as much.

Regardless of the concession, the SAC plausibly alleges fault. To start, Tarzia's public explanation of his basis the Statements was necessarily a lie. Tarzia initially explained the Statements — made on March 30 and April 1, 2024 — by saying he made them relying on the April 6, 2024 tweet Plaintiff made as "a specific response to Tarzia's public claims, made in an attempt to – with humor – tamp down the effects of Tarzia's defamation (as the duty to mitigate

would require)." SAC ¶¶ 157-164. He knew that statement was false, and made it anyway. And "[b]ecause Tarzia knew that Mercante's after-the-fact tweet was not the source of his claim, Tarzia necessarily knowingly lied about the source of his claim." SAC ¶ 162. And that, in turn, (plausibly) confirms "Tarzia … knew he had invented it and wanted to cover that fact up." SAC ¶ 163. He has, of course, never identified ***any*** source where Defendant "c[a]me forward" saying she "suck[ed] dicks for money." *Id.* ¶¶ 164-65. Actual malice may be inferred when a story, fabricated by the defendant, is a product of his imagination, and based wholly on unverified information received by the defendant. *See Nguyen-Lam v. Cao*, 171 Cal. App. 4th 858, 869 (Cal. Ct. App. 2009); *accord* SAC ¶¶ 259-283; 299-354.

Further, by analogy, in media defamation cases courts have found "evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence." *Harris v City of Seattle*, 152 F App'x 565, 568 (9th Cir. 2005). Defendant's necessarily false story is similar: It requires that he "consciously set out to make the evidence conform to the preconceived story," and tried to find evidence that conformed to it. But he forgot to check the date — and got caught lying. "Quite powerful evidence," indeed.

Beyond that — and the motion does not even contest — the SAC plausibly pleads Defendant has a long history of simply lying for no real reason. *See generally,* SAC ¶¶ 259-283; 299-354. For example, in a recent and dramatic example, he spent months lying and supporting a dramatic song and dance by one of his moderators pretending not to be the shock-jock content producer "Nobody," and using that lie to stimulate engagement with content attacking Plaintiff. *Id.* ¶¶ 299-354. Defendant specifically covered "Nobody's" videos about Plaintiff as if they were some external commentary — as opposed to being made by Defendant's own moderator. *Id.* He

has since lied publicly claiming both (1) it was a surprise Nobody was his moderator and (2) that it wasn't a big deal, because everyone knew it. Tarzia's extensively alleged willingness to simply lie is a factual basis — particularly in combination with the specific lies about the basis for his claims — from which a jury could infer both negligence and actual malice. Again, the SAC has more. SAC ¶¶ 259-283. Such "evidence of a pattern of fabrication" is something a "jury is entitled to consider in determining actual malice." *See Herron v. KING Broad. Co.*, 109 Wash. 2d 514, 526, 746 P.2d 295, 303 (Wash. 1987) ("Moreover, although the statement in the 11 p.m. broadcast that Herron accepted $50,000 in bail bondsmen contributions is time-barred as a separate cause of action, it is."); *see also Turner v. KRTK Television, Inc.*, 38 S.W.3d 103, 137 (Tex. 2000) (Baker, J., concurring in part).

Finally, Tarzia's "personal animus toward" Plaintiff also "provides further circumstantial evidence of actual malice." *Zuckerbrot v. Lande*, 75 Misc 3d 269, 297 (Sup Ct, NY County 2022). True, "the two concepts are distinct," but the statements alleged throughout the complaint (partly discussed in more depth in Point V(B) below) — and across the more than 150 hours of vitriol-driven video (SAC ¶ 117) — "plainly brimmed with raw personal contempt," and "such evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may support a finding of actual malice." *Id.*, *quoting Celle v. Filipino Rep. Enters.*, 209 F3d 163, 183 (2d Cir. 2000).

### 3. Defendant's use of the improper Figures requires assumptions that do not assume the truth of the pleadings.

As noted above, Defendant does not really contest that the SAC alleges fault at the baseline — indeed, his motion does not even engage with that part of the SAC. Rather, his argument seems to be that, given the Figures he includes, actual malice could not exist as a matter of law. That is, after citing the Figures, Defendant argues — notwithstanding everything else pled (which he does

not mention or cite) — he "reasonably interpreted [the Figures] to mean that plaintiff exchanged in sex for money," and therefore "Mr. Tarzia [could not] have known that she had never done so and [therefore, was not] intentionally lying when he said she had." DMOL at 14. But even if the Court could consider them Tarzia's improper figures would not save his argument, because he never establishes (certainly not as a matter of law) that he even *saw*, let alone "reasonably interpreted" the Figures. Nor does he offer anything to suggest he did so "at the time of publication." *Kipper*, 12 N.Y.3d at 354-355. Both are fatal.

First, Defendant cannot make this move because it deviates from well-pled facts in the SAC. The SAC alleges he made his claims out of whole cloth, and perhaps more importantly, specifically alleges that he made *different* — and necessarily false — claims about what he relied on in making the Statements. SAC ¶¶ 157-163.

Moreover, the factual claim here — that Tarzia was thinking about (or even aware of) the Figures when he made the Statements — is not exactly likely, let alone true as a matter of law (as it would need to be to defeat the motion). The Figures themselves essentially show why. Figure 1 is a tweet with a scant 30 likes and just over 2,000 views,[19] published months before the Statements, where Mercante made pun-based joke (centered around "get[ting] fucked") about "go[ing] back to sex work." DMOL at 10. Figure 3 has Mercante saying she "used to be a cam girl" in a tweet with only 28 likes, 2 reposts, and 1,392 views, published nearly a *year* before the

---

[19] Defendant's failure to even attempt to authenticate his Figures is particularly problematic here, because it is not clear whether these tweets had even the scant reach shown as of the date the Statements were published. *See, e.g.,* DMOL at 10 and (saying Figure 1 was accessed Mar. 16, 2025 on the Internet Archive, but not what date was archived). And given that Defendant and his followers routinely dig up old posts, it is not clear how many of those views are from long after Defendant made his statements. *See, e.g.,* SAC ¶¶ 250-53 (detailing an incident where someone in Defendant's ecosystem "attacked Mercante … [by] digging up a two-year-old article," and Defendant then copied the attack about the article, presumably accessing it himself). And, indeed, the digging up of the article here happened in December 2024, months after the Statements were made — so it seems quite likely some meaningful share of the views shown on the Figures comes from after the Statements, when Defendant's followers were digging around for vectors of attack.

Statements. DMOL at 12. This reach is in contrast to, say, Figure 2 (278 likes; 16,800 views, from about two months *after* the Statements) or, for that matter, Defendant's reach.[20] Yet, again, nothing in the SAC — or for that matter, even in Defendant's papers — shows that Defendant even saw either of the barely-viewed tweet. More, Tarzia's claim that he was thinking about Mercante's statement that she had worked as a cam girl would *confirm* actual malice, not rebut it; no reasonable person would understand "cam girl" work to be "sucking dicks for money."

So there is no basic factual foundation for Defendant's argument that there was no fault. And given the tweets' tiny reach — along with Defendant's contrary statements about what he *did* rely on (SAC ¶¶ 157-163) — it is not true as a matter of law that Defendant saw and relied on these statements. That is, the Figures simply do not bear on Defendant's "state of mind … ***at the time of publication***." *Kipper v NYP Holdings Co*., 12 NY3d at 354-355 (emphasis added). And Defendant's brand new fact claim — solely made in a memo — that they do so is an issue for discovery.

### C. The SAC Plausibly alleges *per se* defamation and harm, and Defendant's defamation proof argument fails.

The SAC alleges harm that Plaintiff never addresses, so his complaint about damages is insufficient. Moreover, he is simply wrong to suggest *per se* defamation is not alleged for an accusation of the "serious crime[] of prostitution." *See, e.g., Casper v Lew Lieberbaum & Co*., 1998 US Dist. LEXIS 4063, at *25 (SDNY Mar. 31, 1998).

His defamation-proof argument, meanwhile, only addresses "chastity." DMOL at 15. Suffice to say, the cases he cites are a far cry from saying someone open about enjoying sex can be freely accused of specific acts of prostitution without harm to reputation. Additionally,

---

[20] *See, e.g.,* https://x.com/SmashJT/status/1867300432974164214 (Defendant's pinned tweet, with 4,100 likes, 1,200 reposts, and *988,800 views,* as of the time of drafting). In fact, even the tweet where "Tarzia first rose to relative prominence" garnered 156 likes and 4,265 views.

Defendant's seeming argument that an aspirational aim of not viewing something as particularly bad would bar defamation cites no authority and is rejected by New York precedent. *See, e.g., Nolan v State of NY*, 158 AD3d 186, 197 (1st Dept 2018) ("we recognize that the very campaign in which claimant was unwittingly enmeshed was designed to correct such outmoded attitudes toward people infected with HIV. However, we disagree with the State that this somehow provides safe harbor from the defamation claim at issue").

## IV.  Plaintiff's § 79-n and Prima Facie Tort Claims are Free-Standing.

Defendant argues that the non-defamation claims are "tag-along causes of action," and "all five counts sound in defamation, regardless of how styled," avoiding analyzing (1) non-defamation jurisdiction standards (discussed above above) and (2) not analyzing the §79-n and prima facie tort claims on their own terms. *See* DMOL at 18. But it is black letter law that "where the alleged harm suffered by the plaintiff is not ***precisely*** the same as that caused by defamation" — namely, harm to the plaintiff's reputation — "the Court should decline to construe a claim as one for defamation." *Lindner v IBM Corp*., 2008 U.S. Dist. LEXIS 47599, at *43 (SDNY June 18, 2008) (emphasis in original; collecting cases). Plaintiff's N.Y. Civ. R. L. § 79-n and prima facie tort/stochastic harassment claims are based on — by their express terms — entirely different acts and damages as the defamation claim. Indeed, the prima facie tort claim specifies explicitly that it "does not seek any damages for injury to reputation, or from the falsity of Tarzia's statement[s]." SAC ¶ 408.

Defendant's cases even confirm this basic rule: As he quotes, the tag-along approach applies only when "the factual allegations underlying the prima facie tort cause of action ***relate to the dissemination of allegedly defamatory materials***." DMOL at 19 (emphasis added), *quoting Lanasa v. Stiene,* No. 24-1325, 2025 U.S. App. LEXIS 6775, at *12 (2d Cir. Mar. 24, 2025). And the *prima facie* tort claim here is decidedly *not* about "dissemination of allegedly defamatory materials." *Id.* Instead, it is about the "the harassment campaign Tarzia has led" — his efforts to

"teach th[is] crazy bitch[] [a] lesson" and get her "out of the game industry." SAC ¶¶ 20, 414. Defendant's decision not to make any argument specific to the *prima facie* tort claim amounts to a concession[21] (unless the Court agrees with him that it rises and falls with defamation) that the claim is well-pled, particularly given that this issue was argued in the pre-motion letters (ECF No. 16 at 2-3).

## V.    The SAC Plausibly Alleges a § 79-n Claim.

N.Y. Civ. R. L. § 79-n, passed in 2010, has two elements: A claim exists when a defendant (1) "subjects a person to conduct that would constitute harassment under section 240.25 of the penal law" and (2) does so "in whole or in substantial part because of a belief or perception regarding the race, color, national origin, ancestry, gender, religion, religious practice, age, disability or sexual orientation of a person." N.Y. Civ. R. L. § 79-n(2). Defendant contests both elements, and gestures at — but declines to make— an argument the law is unconstitutional. His arguments fail.

### A.  Defendant's unconstitutionality "questions" would require notice to the Attorney General, but any argument the law is unconstitutional is insufficiently made.

If there were any question that § 79-n is constitutional, the Court would be required to "certify" the question of constitutionality "to the attorney general of the State, and [] permit the State to intervene … for argument on the question of constitutionality." 28 U.S.C. § 2403(b). But Defendant does no more than say there are "legitimate constitutional questions" about the law, and for that proposition, cites a 20-year-old law review piece written before § 79-n was even adopted. DMOL at 17. So the Court should find Defendant has not sufficiently "drawn into question" the constitutionality of § 79-n, and therefore, no certification is required.[22]

---

[21] Defendant cannot argue otherwise for the first time on reply. *Tardif*, 991 F.3d at 404 n.7.
[22] In the alternative, if the Court believes constitutionality has been "drawn into question," the Court should — and must — certify the question under 28 U.S.C. § 2403(b) before proceeding.

**B.  The SAC alleges conduct that satisfies N.Y. Pen. L. § 240.25.**

The language in current § 79-n that adds "conduct that would constitute harassment under section 240.25" to its sweep was added in 2022. NY LEGIS 213, ch. 213, s. 9465 (2022). That addition was part of a broader package addressing social media and violent extremism. The language was essentially designed to expand the statute to cover the conduct here, and overrule cases like *Le v Triza Elec. Corp.*, 2020 U.S. Dist LEXIS 45300 (EDNY Mar. 16, 2020).

*1.  Plaintiff only cites pre-2022 amendment cases.*

Plaintiff's argument only cites cases decided before the 2022 amendment to § 79-n. But as noted above, the law was meaningfully amended in 2022. So while it may have been true that — pre-2022 — a claim "require[d] an act of violence or intimidation," that is simply not true anymore. DMOL at 17, *citing Le*, 2020 U.S. Dist. LEXIS 45300, at *7 and *Karam v. Cty. of Rensselaer*, 2016 U.S. Dist. LEXIS 368, at *55 (NDNY Jan. 4, 2016). Those cases held as much because that was what the prior text of the statute said. But now, a claim need only involve "conduct that would constitute harassment under section 240.25" § 79-n(2), which includes committing "acts which place[ Plaintiff] in reasonable fear of physical injury," even without direct violence. N.Y. Pen. L. § 240.25. Since Plaintiff's only argument that a claim must include "an act of violence or intimidation" is based on an earlier version of the statute, he necessarily fails to address whether the conduct alleged satisfies N.Y. Pen. L. § 240.25, and thereby concedes that it does.[23]

*2.  The conduct alleged satisfies N.Y. Pen. L. § 240.25.*

Notwithstanding the above and in an abundance of caution, Plaintiff also explains why the conduct alleged satisfies N.Y. Pen. L. § 240.25.[24] Section 240.25 requires a "repeated[]"

---

[23] Again, Defendant cannot do so for the first time in reply.
[24] Former § 240.25, which swept far broader to "abusive or obscene language" without any connection to fear of physical injury, was found unconstitutional in 1989. *People v Dietze*, 75 NY2d 47 (1989).

course of conduct "place[s Plaintiff] in reasonable fear of physical injury."[25] N.Y. Pen. L. §

240.25. "Repeated" does not appear to be disputed.[26] As for "reasonable fear of physical injury,"

as detailed in the SAC, Defendant has ring-led, incited, and directed a brutal harassment

campaign. Because of Tarzia's conduct, every day, Mercante faces a deluge of death and rape

threats, disgusting insults, and the like. SAC ¶ 218. The examples in Appendix 1 "are neither the

worst nor the mildest of the harassment" (*id.*), and the vile examples in the introduction are just

the baseline. There is a daily stream of such threats. What is attached to the complaint is,

essentially, a random sample. And the volume of this harassment goes up and down depending

on whether Defendant is egging it on — and indeed, "the only substantive relief from Tarzia's

harassment came for a period of approximately three weeks in September 2024 … and [w]hen

Tarzia stopped publishing videos and articles about Mercante, the amount of harassment she

received decreased substantially." SAC ¶¶ 219-224.

　　This harassment, "place[s Plaintiff] in reasonable fear of physical injury." N.Y. Pen. L. §

240.25. *Cf. Haughwout v. Tordenti*, 332 Conn. 559, 211 A.3d 1 (2019) (question of whether

something is a "true threat" is fact-specific inquiry); ECF 13-1 at 3, 5 (images of noose and

bullet sent to Plaintiff). And that is particularly true because "notorious doxing website Kiwi

Farms, posted Mercante's private information" in July 2024, and Tarzia links to and thanks to

Kiwi Farms for its efforts. SAC ¶ 179; *see also,* Jeff Tarzia (@SmashJT), X,

https://x.com/SmashJT/status/1920593857781084526 (May 8, 2025) (Defendant saying "much

of this insight [in a post] came from" Kiwi Farms, and offering "credit where it is due" to a Kiwi

---

[25] Courts have been clear that "direct contact with a victim is not necessary" under New York's harassment laws. *Matter of Samah DD. v Mark VV*., 235 AD3d 1116, 1120 (3d Dept 2025).

[26] Nor could it be. As detailed above, Defendant has made over 150 hours of video about Plaintiff. SAC ¶ 117. He has published more than 100 videos about here, "counting only those videos where she is a substantive topic of discussion, or her name or face appears in the title or thumbnail of the video. *Id.* ¶ 116. And he has posted over 100 tweets and more than 50 blog posts about her. SAC ¶¶ 173 and 176.

Farms user with the user description "N[*****] Heil Hitler"). So, everyone knows that those Tarzia is goading on can easily find Plaintiff's home address — and Tarzia has made it easier. Mercante is very reasonably in fear of being physically injured by someone following through on these threats (SAC ¶¶ 172, 378), when someone inevitably decides Tarzia's exhortation to "pull *every* lever" that can be pulled to get Mercante "out of the game industry" includes real — not just simulated or pictured — violence. SAC ¶ 20 (emphasis added).

More, Defendant knows of, and encourages the harassment. In his own words, his endless videos, tweets, and blogs "create[] a pathway for harassment and intimidation" by, among other things, "intentionally invoking" Mercante's name as part of a "calculated strategy" to "incite" followers and "outsource the task of doxxing."[27] *See, e.g.,* SAC ¶¶ 169-171. "Tarzia is aware that this conduct should, and does, reasonably put a person in fear of physical injury." SAC ¶ 172. He is pleased with its results, because it furthers the aim of "shut[ting] down" anywhere that allows diversity in the gaming industry. SAC ¶¶ 7-12. And he urges followers to "[j]oin us in holding these individuals responsible." *Id.* Making clear what he is telling followers to do, he says, "Kotaku refuses to hold their own employees accountable for their abhorrent actions. If you want something done right, sometimes you have to do it yourself." SAC ¶ 126. "Pull *every* lever," he says with a wink and a nod. SAC ¶ 20 (emphasis added).

Courts have found that similar deluges of harassment triggered reasonable fear. *See, for example, State v Thieme*, 2020 N.J. Super. Unpub. LEXIS 1711, at *2 (N.J. App Div Sep. 11, 2020); *McGuire v State*, 132 NE3d 438, 444 (Ind Ct App 2019). *See also, generally,* Alexander Barnes, *Real-World Consequences for Online Actions: The Case for Expanding Employee Harassment Protection via Employers' Rights of Action*, 48 Seattle U. L. Rev. 165 (2024).

---

[27] His words, as described in the complaint, were an accusation — not a literal confession. But that accusation describes exactly what he is doing, and shows he understands exactly what happens.

Likewise, courts have found similar conduct can satisfy the higher burden for N.Y. Pen. L. § 240.30 *aggravated* harassment. *See, e.g., Boyler v City of Lackawanna*, 765 F App'x 493, 497 (2d Cir. 2019) ("photos and videos of Captain Leo with disparaging comments about his appearance and character, as well as a post taunting Captain Leo for supposedly complaining that Boyler was harassing him"); *Samah DD. v. Mark VV.*, 235 A.D.3d 1116, 1119–20 (3d Dep't 2025) ("respondent's repeated calls and activity on social media fall within the ambit of" both 240.26 and 240.30). Given Defendant's lack of argument on this point, Plaintiff stops here.

### C.  The SAC plausibly alleges bias-based motivation.

Defendant, again in a single sentence without citation, simply declares: "Nor does the SAC include any alleged facts that could plausibly support its conclusory allegation that defendant 'intentionally selected' plaintiff for harassment, as that term is used in NYCRL § 79-n, because of her 'gender presentation and sexual orientation.'" DMOL at 18. The allegations are anything but conclusory.[28]

As detailed above, the evidence of bias is extreme. Tarzia constantly calls Mercante, "Mer**cunt**e." SAC ¶ 140 (emphasis added). He has said his goal is to "teach these crazy bitches" who criticize his bigotry — including Mercante — a "lesson." SAC ¶¶ 414-415. The harassment Defendant laughs at as "pure comedy gold" (SAC ¶128-131) is explicitly bigoted. *See, for examples,* ECF 13-1. And the entire "Kotaku Detected" project is meant to eliminate people "pushing activist agendas and narratives" from video games. SAC ¶ 50. As applied, this means drumming from the games industry anyone who is LGBTQ, a woman, not white, or who values diversity. *See, e.g.,* SAC ¶ 122 (Tarzia seeking to remove from gaming a list of people, the vast

---

[28] Because Defendant's initial motion to dismiss did not make any argument on this point, Plaintiff did not amend to say more. However, to the extent there is not enough for the Court to find bias, Plaintiff respectfully requests leave to amend and add more — including, for example, the constant bigotry and slurs targeting the fact that one of Plaintiff's lawyers is transgender.

majority of whom are women, people of color, non-binary individuals, LGBTQ+ people, or Jewish people).[29] Given that courts have found bias-based motivation well-pled based solely on the allegation, without more, that a defendant was "intentionally selecting plaintiff 'for harm by targeting him for arrest and prosecution because of his age and perceived disability'" (plus the details of the harassment itself), the detail here is sufficient. *Kuiken v County of Hamilton*, 669 F Supp 3d 119, 134 (NDNY 2023).

## VI. The SAC Plausibly Alleges Prima Facie Tort and/or Common Law Stochastic Harassment.

The elements of a *prima facie* tort are: (1) the intentional infliction of harm; (2) which results in special damages; (3) without any excuse or justification; and (4) by an act or series of acts that would otherwise be lawful. *Burns Jackson Miller Summit & Spitzer v. Linder*, 59 N.Y.2d 314, 332 (1983).

The conduct discussed at length in Point V(B) above satisfies this standard, at least if any part of it is not otherwise actionable. *See Linder*, 59 N.Y.2d at 332. And since Defendant makes *no* argument other than his defamation argument, and — as shown in Point IV — the specific prima facie tort claim here alleges harm that is "not ***precisely*** the same as that caused by defamation," he waives opposition. *Lindner,* 2008 U.S. Dist LEXIS 47599, at *43; SAC ¶ 408 ("This cause of action does ***not*** seek any damages for injury to reputation, or from the falsity of Tarzia's statements") (emphasis in original).

Defendant also waives opposition to the common law "stochastic" harassment tort. *See* SAC ¶¶ 410-436. While the DMOL begins by acknowledging "[t]he SAC alleges that these

---

[29] By way of example, one person is on the list of people who Defendant wants to "hold … accountable" simply because she "[l]isted 'Lack of Diversity and Representation' as a 'Con' in her Black Myth: Wukong review." Jeff Tarzia, *Kotaku Detected*, SMASHJT, https://www.smashjt.com/kotaku-detected. Apparently that is "awful behavior" (*id.*) that warrants being drummed "out of the game industry" SAC ¶ 20. Which, in turn, shows motivation based on association with protected categories, since it is an admission the mere suggestion "diversity" should exist Defendant's motivation.

comments constituted … a new offense called 'stochastic terrorism'" and continues by saying "[t]he SAC lists five causes of action [including … ] a proposed new tort of 'stochastic terrorism'" (DMOL at 1 and 2), the phrase never shows up again. That waiver, then, seems intentional. But even if it is not, Defendant offers no criticism of the reasoning in *Bungie v. Comer*, No. 22-2-10761-8 SEA (Wash. Super. Ct., July 11, 2023) (cited in SAC ¶ 410 n. 115), or the analysis thereof in Barnes, 48 Seattle U.L. Rev., cited above. In short, "even if none of the above causes of action provided a basis for damage recovery" for the campaign of "intentionally targeting the [Plaintiff] with harassment and threats, the Court [sh]ould exercise its authority to recognize a new common law tort that does." *Bungie*, Slip Op. at *11.

## VII. <u>Defendant's Anti-SLAPP Argument is Insufficient.</u>

Finally, Defendant himself highlights the first issue with granting anti-SLAPP fees: The majority of decisions do not permit fees as an *Erie* matter (or, as Defendant puts it, "confuse two issues"). DMOL at 20. Given space, Plaintiff does not dive deeply into the competing views, as Defendant aptly cites them.

Still, there is more: While the primary relief Defendant seeks is a jurisdictional dismissal, he does not explain how such a dismissal would constitute a finding the "claim" itself was "without a substantial basis in fact and law." N.Y. Civ. R. L. § 70-a(1)(a). At least one Court has found such jurisdictional dismissals do not trigger the anti-SLAPP law. *See Dewald v. Riegel*, 2025 NYLJ LEXIS 1887, *5-6, 2025 LX 148359 (N.Y. Cty. Sup. Ct. 2025) (dismissal under CPLR 3211(a)(8) for want of "jurisdiction over Defendants").

## CONCLUSION

For the reasons discussed above, the Court should deny Defendant's motion to dismiss in full.

Respectfully submitted,

**COHEN&GREEN P.L.L.C.**

/s/

_____

BY:    J. Remy Green

1639 Centre Street, Suite 216
Ridgewood, NY 11385
(929) 888-9480
remy@femmelaw.com

**KAMERMAN, UNCYK, SONIKER, & KLEIN, PC**
Lane A. Haygood
1700 Broadway, 16th Floor
New York, New York 10019
Tel. 646.845.6085
lhaygood@kusklaw.com

31