

January 20, 2026

Hon. Lara K. Eshkenazi, U.S.M.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

By Electronic Filing.

          Re:      Mercante v. Tarzia, 24-cv-08471

Dear Judge Eshkenazi:

      As the Court may recall, my firm, with co-counsel, represents Plaintiff in the case above. I write to provide a reply on Plaintiff's motion seeking various discovery relief.

      As discussed below, Defendant still has not complied with the baseline the Federal Rules require of a party. He has also injected serious Rule 11 issues into this dispute by citing LLM chatbots as if they were factual authorities, without fact checking. And at bottom, he is still refusing to comply with basic discovery obligations, perhaps because, in his own words, he feels the need to wait "***until [his] back[ is] against the wall*** before anything needed to be given, because that's[] how [he] operate[s]." Jeff Tarzia (@SmashJT), *SHOCKING Ice Ice, Baby, More Ubisoft Layoffs*, YouTube, at 20:31 to 26:18 (Jul. 14, 2025) ("Back Against the Wall Video").[1] *Accord Klipsch Group, Inc. v ePRO E-Commerce Ltd.*, 880 F3d 620, 631 (2d Cir. 2018) ("we have held that discovery sanctions are proper even against parties who have belatedly complied with their obligations, because an alternative rule 'would encourage dilatory tactics, and compliance with discovery orders would come ***only when the backs of counsel and the litigants were against the wall***'").

      As explained below, the Court should grant the motion and issue sanctions — and perhaps should have the teleconference suggested in the moving papers to get to the bottom of how discovery is going so wrong in this case. And because of the chatbot issues, the Court may wish to consider an Order to Show Cause to address Defendant's "use of AI tools without independent fact-checking and citation-checking," since such conduct "unquestionably violates Rule 11." *Jarrus v Governor of Michigan*, 2025 US Dist LEXIS 234830, at *4 (ED Mich Dec. 2, 2025).

      **I.**    **Defendant Does Not Dispute He Still Has Not Complied with the 2015**

---

[1] Originally streamed https://www.youtube.com/watch?v=ZG6QPZ2l6eg and the pincite is to that video, but because of the paywall, Plaintiff has made an excerpt available at https://kusklaw.sharefile.com/share/view/sca79bbdfe7954b0984b229b42f376eff



**Amendments.**

Defendant says, in bold, "**No documents are being withheld on the basis of any objection made during discovery**." ECF No. 47 at 2. But just over a page later, he explains he *is* withholding "email addresses" from the GiveSendGo. *Id.* at 4.[2] That gets to the heart of why 2015 Amendment compliance is crucial — and why Defendant's refusal to follow the Rules has gotten this case off track. And yet, Defendant does not even nominally address the 2015 Amendment issues in his opposition, seeming to concede the motion should be granted.

Critically, Defendant did not say no documents were being withheld *in his responses.* Again, as set out at length in the moving papers — and not disputed in opposition — the point of the 2015 Amendments is that a party needs to respond clearly and specifically to each request. And a party must do so specifically so that the responses can "facilitate" rather than hinder "an informed discussion of the objection[s]." Fed. R. Civ. P. 34(b)(2)(C) (Advisory Committee's 2015 Amendment Notes).

Defendant has not updated his responses to comply with the Rules. He does not dispute that his current, formal responses are rife with statements he admits now are false. The Court should order what Defendant should have done in the first place — and seems to admit he initially promised to do, even as he quibbles with Plaintiff's description of it as "walking back" a commitment (ECF No. 47 at 2). And for each request, if it is true, he can say, "No documents are being withheld on the basis of any objection made during discovery." ECF No. 47 at 2. But a blanket declaration of that sort — one completely inconsistent with the formal responses, no less[3] — is improper. Nor does he dispute that his responses are often to the wrong request; that one request has no response at all; and he even admits directly that his responses were "sometimes insufficient[.]" ECF No. 47 at 2.

Defendant's silence on this part of the motion concedes both its substance and the need for Rule 37 fees — particularly since the first motion *also* addressed 2015 Amendment issues.

## II. Defendant's Suggestion He Is Not Withholding Anything Beyond DMs is False, and His Use of LLM Chatbots May Warrant Rule 11 Treatment.

The crux of Defendant's opposition is to say he is no longer withholding anything, and Plaintiff does not understand that his production is complete. He is wrong. And his reliance on

---

[2] As discussed below, Defendant's suggestion the request did not cover emails is frivolous, and depends on changing what the request says. The request seeks "***all records*** of financial transactions," without limitation. Defendant re-writes that to "a request for 'all financial transactions.'" ECF No. 47 at 4. But the request unambiguously seeks *all records*, not some other concept subject to "be interpreted to include basic transaction details such as dates, amounts, and participant identities, but not necessarily email addresses." *Id.*

[3] *See, e.g.,* ECF No. 40-4 at 6 (a response that reads, in full, "Defendant objects to this Request on the ground that it is not calculated to lead to the discovery of admissible evidence as concerns discoverable information bearing on personal jurisdiction").





LLM chatbots — without any fact checking — to say no documents exist suggests Rule 11 sanctions are required.

**Request 9**. Defendant says he "has no chatbot logs related to jurisdiction." ECF No. 47 at 3. Not true.

Even in what he has publicly posted, he specifically says he asked ChatGPT "will this be thrown out with the jurisdiction clause [sic]," and has on screen a ChatGPT response. Jeff Tarzia (@SmashJT), *Lawsuit Update, Alyssa S[****]s Out, Ubisoft LIES!,* YOUTUBE at 4:25:26 to 4:38:40 (Jul. 14, 2025).[4] Nor was that the only prompt. Defendant apparently uploaded the opposition to the motion to dismiss, and again asked ChatGPT to analyze jurisdiction — and it did, saying the filing "buil[t] two parallel bases for New York jurisdiction" that were "legally clever and potentially persuasive. *See* Jeff Tarzia (@SmashJT), *I Asked ChatGPT If I'll Win Against Alyssa Mercante...,* YOUTUBE at 3:15-3:50 (Jul. 17, 2025).[5]

So, Defendant's demonstrably false statement he "has no chatbot logs related to jurisdiction" (ECF No. 47 at 3) suggests counsel has simply not collected and reviewed records. Such a failure is not a good-faith effort to comply with discovery, and the Court should require baseline compliance. And again, for this (and all the requests that follow), Defendant's false claims amply demonstrate why his failure to follow the 2015 amendments is not cured by simply declaring "No documents are being withheld on the basis of any objection made during discovery." ECF No. 47 at 2

**Request 10**. Defendant makes the claim he complied with this request, by re-writing it to "a request for 'all financial transactions,'" and then claiming a "fair reading of the Request did not contemplate the production of email addresses," because email addresses are not necessarily covered by the construct "all financial transactions." ECF No. 47 at 4. But the request was not ambiguous in that way Defendant re-constructed it. It sought "***all records*** of financial transactions from GiveSendGo." ECF No. 40-1 at 6. Not "all records but emails," but "all records." And if a user gave an email as part of their transaction (which Defendant seems to admit many did), that was one of the "records of [that] financial transaction." *Id.*

As for the privacy concerns, first, those concerns are not in Defendant's formal responses — and despite many opportunities, Defendant has refused to serve proper responses. Accordingly, they are waived. But even if they were not, any privacy concerns could be addressed — as Plaintiff has said repeatedly (*e.g.,* ECF No. 40-5 at 5) — by an attorneys' eyes only or other similar designation. Defendant ***does not dispute*** email addresses are (1) attached to these transactions, (2) were part of the record set he produced, and (3) that he removed them (though he quibbles at calling that withholding "silent").

---

[4] Originally streamed https://www.youtube.com/watch?v=1f7s877ID9U, and the pincite is to that video, but because of the paywall, Plaintiff has made an excerpt available at https://kusklaw.sharefile.com/share/view/se36e9908203e48ee8cfdec549caecbc4.
[5] *Available at available at* https://www.youtube.com/watch?v=Ee5w0_QzZGU.

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



**Requests 11, 12, 13, 24, 26, and 34**. Defendant asserts that he has produced "all conceivably responsive reports from Google Analytics." ECF No. 47 at 5. But this is not the case.

Defendant has produced subscriber counts, views, and total watch time by state. But these are only three of the metrics available on a per-state basis under YouTube's Basic user activity statistics for US states; he has not produced data for, at the least: "engagedViews," "redViews," "estimatedMinutesWatched," "estimatedRedMinutesWatched," "averageViewPercentage," "annotationClickThroughRate," "annotationCloseRate," "annotationImpressions," "annotationClickableImpressions," "annotationClosableImpressions," "annotationClicks," "annotationCloses," "cardClickRate," "cardTeaserClickRate," "cardImpressions," "cardTeaserImpressions," "cardClicks," and "cardTeaserClicks," all of which are available per-state per YouTube itself. *See* Check Your YouTube revenue, YOUTUBE, *available at* https://support.google.com/youtube/answer/9314488?visit_id=639045344171668097-3739181953&rd=1.

Plaintiff attempted to confer on this issue, and Defendant did not respond. Had this issue been the only one — and had there been no 2015 Amendment issue — Plaintiff might not have moved. And Plaintiff remains open to a meet and confer where Defendant's counsel screenshares so we can see what is causing the disconnect. But given the malicious compliance discussed below, like recording an hour of video instead of just exporting Twitter DMs even after we provided a link explaining how to export Twitter data, it is hard to take Defendant's representations at face value, or believe such a meet and confer would be productive.

For these Requests, the Court should order Defendant to produce, and order the parties to confer if — after a Court Order — Defendant is truly asserting all data has been produced.

**Requests 14 and 35**. Defendant seemingly claims that his payment processer for SuperChats is YouTube itself. But he does so only by citing an LLM chatbot query — citing it as if it were "explained by Google, the owner of YouTube."[6] And if that were true, it does not explain why Defendant has not produced any SuperChat related documents — or why he has not responded to repeated attempts to confer on this issue. And while Defendant says he has "made every effort to generate all conceivably responsive reports from Google Analytics," none of the documents he produced appear to cover SuperChat revenue.[7]

---

[6] Misciting a chatbot log as if it were an official statement by Google is frivolous. "[T]he use of AI tools without independent fact-checking and citation-checking unquestionably violates Rule 11." *Jarrus v Governor of Michigan*, 2025 US Dist LEXIS 234830, at *4 (ED Mich Dec. 2, 2025). More on this in relation to Request 25.

[7] Additionally, Defendant says each of the spreadsheets he produced contain what is "described in the respective data sets' titles." ECF No. 47 at 3.

Putting aside that one is titled "transaction revenue by state," but does not contain that information, none of the spreadsheets produced mention SuperChats, or appear to cover SuperChat revenue. Google confirms such information *is* available to those who use YouTube's native SuperChat features, saying that in YouTube Studio, a user can look at specific "metrics" for "Supers revenue," including "[e]stimated revenue from

COHEN&GREEN                                                                                                Page 4 of 10

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



Some of this is explained by Defendant's frivolous reliance on a Google LLM chat bot, rather than his personal knowledge.  Google's YouTube certainly does have some native SuperChat features, but even the LLM response Defendant cites notes that "**some creators use third-party tools like Streamlabs for alternative donations**."[8]  Yet, Defendant does not address that part of his chat bot source:  He does not say whether *he* uses a "third-party tool[.]"  Frankly, it appears Defendant's counsel (or whomever generated the transcript) decided it would say what was expected and did not bother to read the output before citing it, or notice it contradicted the claim being made.

In any case, whether in his formal discovery or even now in his opposition, Defendant has not stated that *he* uses Google as a payment processor for his SuperChats.  Rather, he asked a chatbot a question and presented that query to the Court as if Google itself — not an LLM chatbot — had answered it.  That is not sufficient for federal discovery.  And Defendant's formal discovery response is still facially inadequate.

In short, Defendant has not produced any documents about his SuperChat revenue.  And his opposition seems to leave two options:  (1) Defendant used a chatbot to mislead the Court into thinking incorrectly that he used Google for SuperChats when he instead used a third-party provider; or (2) Defendant was not telling the truth about fully producing everything from his YouTube dashboard.  Either way, Defendant's use of the chatbot response violates Rule 11, and he provides no explanation for why substantive discovery is missing.

**Request 25.**  Defendant does not justify his reading of a request for "[a] copy of your website's code, including any interactive elements" as **excluding** back-end source code — nor is a plausibly justification.  ECF No. 47 at 5.  A website's "code," of course, includes all code, regardless of whether it is front end or back end.

Here again, rather than use personal knowledge, Defendant goes to a chatbot as a factual authority — citing what appear to be chats counsel had with Google's Gemini and OpenAI's ChatGPT — for the proposition that a Wix user cannot access *any* backend source code.

To be clear, this warrants serious Rule 11 treatment.  "[T]he use of AI tools without independent fact-checking and citation-checking unquestionably violates Rule 11." *Jarrus v Governor of Michigan*, 2025 US Dist LEXIS 234830, at *4 (ED Mich Dec. 2, 2025).  Not only is there no fact checking, as with the issue with "third-party tools" above, Defendant appears not to have even read the responses he cites.  Given this and the issue above, the Court may want to issue a separate Order to Show Cause to address the use of LLM chatbots without any fact-checking.

---

Supers, such as Super Chat, Super Stickers, and Super Thanks."  Check Your YouTube revenue, YouTube, *available at* https://support.google.com/youtube/answer/9314488?visit_id=639045344171668097-3739181953&rd=1.  But no documents containing those metrics have been produced here.

[8] Curiously, for this fact, none of the sources the chatbot links as related seem to mention "Streamlabs" — though Streamlabs does appear to provide SuperChat services.

COHEN&GREEN                                                                                                  Page 5 of 10

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



And again, it does not appear that Defendant reviewed the product of his chats: Literally the first item in the Gemini response says that a Wix user can access "custom backend logic," including "Backend Modules … hidden from site visitors." And the two line ChatGPT response — that does not include the query (which could be anything) — only says "On Wix, you do not have access to the actual server hosting," without any comment about back end *source code*. Even if chatbot logs had factive value (they do not), the logs Defendant cites would only confirm Defendant has access to backend source code for his own website — even if he lacks access to some subset of Wix's proprietary code.

More on point, per Wix's actual website, backend functions are common and can be built by a user. *See Writing Backend Code*, WIX, *available at* https://dev.wix.com/docs/velo/articles/getting-started/writing-backend-code ("you can easily and securely call backend functions from your frontend code using web modules," and noting how a user can write an use their own backend functions, while "code in your backend web modules is not visible to [web] users").

So there is no question Defendant is withholding information, without any objection: Wix itself confirms backend code is accessible to users, and even if LLM chat logs had factual value, the logs Defendant produced say he has access to at least some backend code. The Court should order production and issue Rule 11 sanctions.

### III. Defendant's History of False Statements and Repeated Claims of Technical Incompetence Cautions Against Taking His Factual Claims at Face Value.

The Court also should not take Defendant's claims he is not withholding anything, that something is technically impossible, or that no documents responsive to a request exist at face value.

For example, consider Defendant's previous claims that of the DMs between Defendant and others, "none, or perhaps none at all, actually reveal anything about the extent of any business relationship between him and these persons." ECF No. 42 at 3. A true copy of some relevant screenshots from the video production of DMs that Defendant made is attached as **Exhibit 1**. And that DM history is rife with relevant communications: Discussions of how Hypnotic is deliberately hiding his address (*e.g.,* Ex. 1 at 1 ("the house i actually live in, is not under my name purposefully")); discussion of how Defendant would come on to Hypnotic's show (*id.* at 2-5); discussion of their revenue (*id.* at 5); discussion of Defendant running "admin" for Hypnotic's show (*id.* at 6-9; 11) and being paid for such "running the show" (Ex. 1 at 13); and even a specific discussion of what would make for "terrible for optics when it comes to NY jurisdiction" in this case (Ex. 1 at 12).[9] Suffice to say, if the Court had taken Defendant's claim that "no

---

[9] As part of conferring with Hypnotic's counsel on the subpoena served pursuant to the Court's Jan. 14, 2026 Minute Order granting leave to serve by email, Plaintiff agreed not to include any of the documents showing a New York address where Defendant has repeatedly sent Hypnotic mail and has made redactions to matter she does not believe the Court needs to consider. But she notes his messages suggest he physically streams from New York, but has legally incorporated in another state. *See, e.g.,* Ex. 1 at 10 ("The beauty of the internet is i can stream from whereever i want[,] *but* my income and everything is tied [elsewhere]").

COHEN&GREEN                                                                                     Page 6 of 10

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



communications or other produceable materials appear to be responsive to a properly-tailored understanding of the Court's order" (ECF No. 42 at 4) at face value, it would have been deceived.

Likewise, technical limitations that Defendant asserts appear to be self-imposed, whether in ignorance or something like malicious compliance. For example, while Defendant says he has complied with some part of the order on ECF No. 40,[10] the manner of production smacks of malicious compliance.[11] As he admits, rather than producing text-searchable PDFs or another standard format, he inexplicably created an hour-long "smart phone 'screen shot' documenting the entirety of Mr. Tarzia's online messaging" on X, for one account, with two specific users. ECF No. 47 at 2. If not cured, later, the form of production will be at issue, because an hour of video of a party scrolling through direct messages violates Rule 34's command that documents be produced in "a reasonably usable form" (Fed. R. Civ. P. 34(a)(1)(A)), and when "ESI is kept in an electronically-searchable form, it should not be produced in a form that removes or significantly degrades this feature," as Defendant has done here. *Zhulinska v Niyazov Law Group, P.C.*, 2021 US Dist LEXIS 219213, at *17 (EDNY Nov. 12, 2021).

But for now, that Defendant felt the need to take an absurd approach to production only demonstrates either a lack of baseline technical knowhow (and indeed, if counsel does not have the technical competence to review the archive generated by a data export from Twitter/X, we are happy to do so) or a deliberate, play-acted incompetence. To be sure, recording a screen for an hour while scrolling through it was surely burdensome (especially as multiple other chats also need to be produced) — but it is a burden Defendant inexplicably took on himself. And that it imposed a burden has no relevance, since any reasonable party could produce Twitter DMs the ordinary way, using standard tools.

With that history, without further inquiry, there is little basis to rely on similar statements in this opposition: Since the statements Defendant made like the ones above in the last opposition were easily and immediately shown false once production happened, the Court should not trust them here either.

### IV. **Defendant's Public Statements Suggest Sanctions are Required Under the**

---

[10] That production is still significantly incomplete. In the chats produced, Defendant confirms, among other things, the existence of multiple "alyssa dedicated chat[s]." Ex. 1 at 16; at 15 (Hypnotic: "If I get added to one more alyssa mercante group chat Im going to lose my shit" / Defendant: "dont tempt me lmfao"). But those have not been produced. Nor have emails (despite DMs indicating emails were sent), texts, or DMs from Defendant's secondary Twitter account, among other things.

[11] It is also perhaps a bit of an overstatement when Defendant says "the undersigned conferred with … plaintiff's counsel … concerning compliance." ECF No. 47 at 2. Counsel sent an email saying, "It would be helpful if you could share some of this magic you have described below about exporting Twitter DM threads." In response, I noted that it was covered in the motion at ECF No. 45, and gave the link. But the production that followed did not come from the export easily conductible in Twitter/X's interface.

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



### Deterrence Principles Embodied in Rule 37.

As Defendant seems to acknowledge in his opposition, without "good faith efforts to comply" with discovery requests, sanctions under Rule 37 are mandatory.  ECF No. 47 at 5-6.  And Defendant suggests his near total failure to produce for most requests was a good-faith effort to comply with discovery.  But that is not so, and Defendant himself disagrees with his counsel.

While the Court "defer[red] ruling on whether sanctions are appropriate at this time" on the motion at ECF No. 40, saying it would "consider whether sanctions are appropriate after resolving the second motion to compel filed by Plaintiff on 1/12/2026," Defendant went out and publicly declared — essentially — that his conduct in discovery was exactly what Rule 37 sanctions are designed to deter.  *Compare, e.g.,* Back Against the Wall Video *with Klipsch Group, Inc. v ePRO E-Commerce Ltd.*, 880 F3d 620, 631 (2d Cir. 2018) ("we have held that discovery sanctions are proper even against parties who have belatedly complied with their obligations, because an alternative rule 'would encourage dilatory tactics, and compliance with discovery orders would come **only when the backs of counsel and the litigants were against the wall**'").

Specifically, contrary to the professions of good faith, Defendant publicly made clear his view was discovery would *never* happen until his back was against the wall:

> "At the end of the day, I'm not surprised by this, but I'm also not the kind of person to just come forward and give information instantly.  I'm not a snitch, I'm not a person that's just like, yes, please, whatever I need to do to, to be free, here, here's everyone's information you're asking for … That's not, that's not how I operate.
>
> It is one of those situations where **I was waiting until [my] back[ was] against the wall** before anything needed to be given, **because that's[] how I operate.**"

Back Against Wall Video (emphasis added).

It is rare that a party so directly echoes the governing rule.  But the Second Circuit has been more than clear that the deterrence principle governing Rule 37 has led the Court to "h[o]ld that discovery sanctions are proper even against parties who have belatedly complied with their obligations, because an alternative rule 'would encourage dilatory tactics, and compliance with discovery orders would come **only when the backs of counsel and the litigants were against** *Klipsch Group, Inc. v ePRO E-Commerce Ltd.*, 880 F3d 620, 631 (2d Cir 2018).  And while *Klipsch* is specifically addressing discovery orders and case terminating sanctions, the principle — traced by the Second Circuit to in *National Hockey League v Metro. Hockey Club*, 427 US 639, 642 (1976) ("*National Hockey*")[12] — applies to Rule 37 as a whole:  Sanctions under Rule 37 are intended "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."  *Id.* at 643.

---

[12] *Klipsch* quotes *Cine Forty-Second St. Theatre Corp. v Allied Artists Pictures Corp.*, 602 F2d 1062, 1068 (2d Cir. 1979), which in turn discusses "the deterrence principle of *National Hockey*."

Page 8 of 10

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com



Discovery — even without a Court order — should not only come when a party feels his "back [is] against the wall." Back Against the Wall Video. And confirming that, far from the hapless, well-meaning efforts described in Defendant's letter, his direct messages confirm he was dedicated to "fighting" discovery, "it [was] a[n] impasse[e]," and "the judge will decide." Ex. 1 at 17. Defendant admits he was intentionally refusing to produce anything until his back was against the wall, and the Second Circuit is clear that sanctions under Rule 37 are mandatory specificalkly to prevent compliance with discovery from coming "only when the backs of counsel and the litigants are against the wall." *Klipsch*, 880 F3d at 631.

The sanctions sought here are — and Defendant does not argue otherwise — not severe: They merely shift the burden Defendant has sought to place on Plaintiff by refusing to engage in good faith while "waiting until [his] back[ was] against the wall before anything needed to be given, because that's[] how I operate." Back Against the Wall Video.[13] Even now, Defendant has attempted to mislead the Court about basic facts by citing chatbot statements that do not even say what he claims they do — to say nothing of the fact that even if they said what he claims, "the use of AI tools without independent fact-checking and citation-checking unquestionably violates Rule 11." *Jarrus,* 2025 US Dist LEXIS 234830, at *4.

To echo a principle well-articulated by the Seventh Circuit in another fee-shifting area set by the Rules: "a defendant like [Tarzia] that wants to stand on formalities, for whatever reason, is entitled to do so, as long as [he] is willing to pay for the privilege." *Troxell v Fedders of N. Am.*, 160 F3d 381, 383 (7th Cir. 1998). Defendant has stood on formalities, and imposed significant costs on Plaintiff and the Court. That cost should be born by Defendant. And as required by *National Hockey*, the Court should make clear to other parties that such conduct has a cost: Parties cannot refuse to provide any information until they have their "back against the wall" just because it is "how [they] operate." Back Against Wall Video; *accord Klipsch.*, 880 F3d at 631.

As always, we thank the Court for its time and consideration.

Respectfully submitted,

/s/
_____
J. Remy Green
    *Honorific/Pronouns: Mx., they/their/them*
**COHEN&GREEN P.L.L.C.**
*Attorneys for Plaintiff*
1639 Centre St., Suite 216
Ridgewood, New York 11385

---

[13] For the same reason, Defendant's suggestion that his belated compliance with discovery should relieve him of sanctions — because, he says, "Your Honor made clear what the Court's view is concerning defendant's objections. Defendant does not wish to revisit that issue. Our view is that a 'full production' of all responsive materials has already been ordered" — adopts the wrong frame. Sanctions are mandatory when "disclosure or requested discovery is provided after the motion ***was filed***" — and whether a party complies with a Court's order directing production is irrelevant. Fed. R. Civ. P. 37(a)(5)(A) (emphasis added).

COHEN&GREEN    Page 9 of 10

Cohen&Green P.L.L.C. · 1639 Centre Street, Suite 216 · Ridgewood, New York · 11385 · t: (929) 888.9480 · f: (929) 888.9457 · FemmeLaw.com



cc:
All relevant parties by electronic filing.

Page 10 of 10

Cohen&Green P.L.L.C.  ·  1639 Centre Street, Suite 216 · Ridgewood, New York · 11385  ·  t : (929) 888.9480  ·  f : (929) 888.9457  ·  FemmeLaw.com