UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ALYSSA MERCANTE, | ) | 1:24-CV-08471-MKB-LKE |
| | ) | |
| Plaintiff, | ) | Brooklyn, NY |
| | ) | February 9, 2026 |
| vs. | ) | |
| | ) | |
| JEFF TARZIA, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LARA K. ESHKENAZI
UNITED STATES MAGISTRATE JUDGE

APPEARANCES (All present by video or telephone):

For the Plaintiff:          REMY GREEN
                            Cohen & Green
                            1639 Centre Street
                            Suite 216
                            11385
                            Ridgewood, NY 11207

For the Defendant:          RONALD D. COLEMAN
                            COLEMAN LAW FIRM, PC
                            50 Park Place
                            Suite 1105
                            Newark, NJ 07102

ECR OPERATOR:               NO NAME PROVIDED


                    Rachel Wiley, CET-3353
                        eScribers
                7227 North 16th Street
                    Phoenix, AZ 85020
                    www.escribers.net

Proceedings recorded by electronic sound recording; transcript produced by transcription service.



Colloquy

THE COURT:  Motion hearing, 24-cv-8471.  Can everyone state their appearance for the record?

MX. GREEN:  Good morning.  This is Remy Green for plaintiff.  For the Court -- from Cohen & Green, PLC.  For the Court reporter, I should appear in the transcript as Mx. Green, if we order the recording, spelled M-X period rather than Mr. or Ms.  With me are a few other lawyers at Koch (ph.), but they won't be speaking, so I think it's fine to just put my appearance on.

THE COURT:  Okay.  Good morning.

MR. COLEMAN:  Ronald Coleman for the defendant, Coleman Law Firm.

THE COURT:  Good morning.  All right.  So I've reviewed the parties' letters back and forth.  And since the parties have submitted their letters, have there been any further productions or discussions among the parties about the outstanding discovery?

MX. GREEN:  So Your Honor, we sent a follow up. There's been no more production and no more communication from defendant's side.  But I think highlighted in one of the letters was the fact that we didn't get direct messages in a standard format.  Instead, we got an hour of video of defendants scrolling through a list, and that there are some obvious holes in the production --

THE COURT:  Right.



Colloquy

MX. GREEN:  -- like the, the Alyssa-specific chats with the quote in the direct messages we have.  We followed up about that, and Mr. Coleman told us he was going to get back to us, but did not; although defendant himself posted a tweet about it, so we know that he got our message.

THE COURT:  Okay.  Does defense counsel wish to be heard on that, Mr. Coleman?

MR. COLEMAN:  Yes.  I was anticipating that the Court would help us work our way through this.  It wasn't clear to me what Your Honor's intentions were.  And in fact, by my -- I had -- my last discussion with Mr. (sic) Green was that I would --

MX. GREEN:  Mx. Green, please.

MR. COLEMAN:  I'm sorry, Mx. Green.  Was that we would stipulate to however much time was needed pending the Court's resolution of the motion, so that we could ultimately comply with the Court's guidance and make appropriate discovery.  And Your Honor then said, well, let's not change the end of the discovery date until we've had our meeting.  So I was a little bit unclear because, frankly --

THE COURT:  But I didn't mean that things should stop. What my point there was that I wanted to have this discussion to know how much time was needed before just setting an arbitrary date.  But the production is meant to be ongoing.  I didn't mean for anything to stop as a result of that.

Colloquy

But let's go through each of these, because, I mean, I'll tell you, my overall sense is that defendant is not meeting their obligations and not doing enough to figure out how to, number one, whether there are responsive documents. Number two, if there are, how to produce them in the appropriate manner and in a format that's usable. And three, that the objections are not compliant with the rules in that they don't specify whether there are responsive documents that are not being produced, whether they're narrowing the requests. They're just too vague.

But let's go through each one that's currently in contention, starting with 9, request number 9, producing the LLM chatbot logs, which the defense response is there nothing relevant to jurisdiction. That's a pretty broad objection. And it's not clear to me what search was done and how that determination was made.

MX. GREEN: Your Honor --

MR. COLEMAN: Your Honor --

MX. GREEN: -- if I can --

Please. I'm sorry.

MR. COLEMAN: Go --

MX. GREEN: Please.

MR. COLEMAN: -- go ahead, Remy. Go ahead.

MX. GREEN: Okay. I mean, as we said in the reply, it's also just not true. There are -- he has been -- defendant

Colloquy

has been on stream with chatbot logs on screen that literally discuss jurisdiction.

THE COURT:  Um-hum.  Yeah, no, I saw that.  But --

MR. COLEMAN:  I don't -- so I'm not sure we're talking about the same thing.  Chatbot logs, logs are not the same thing as content that's actually discussed in the course of chats.  My understanding from my client is that chats are not retained.  Once a chat is over -- once the stream is over, the chat is gone.

MX. GREEN:  I mean, to me that sounds like a spoliation issue, but that's also not the response.

THE COURT:  Yeah.  Your response is that defendant has no chatbot logs relating to jurisdiction, right?  Look, I'm not familiar enough with the technology to know whether logs are retained or not even if the chat is gone.  Those are two different things, right?  The actual chat versus the log of the chat; am I correct that those are two different things?

MX. GREEN:  I don't think so.  That's certainly not how I have always, in the context of large language models, used the term log to refer to the log of queries and answers.  I think most people use it that way.  I think the --

MR. COLEMAN:  Then I would be --

MX. GREEN:  It sounds like Mr. Coleman may be confused between the chat log of a YouTube stream and the log of communications with ChatGPT or Claude or --

Colloquy

THE COURT:  Um-hum.

MX. GREEN:  -- what have you.

MR. COLEMAN:  So what if you would -- what if we would ask the plaintiff to specify precisely what is meant?  Because, I mean, if we're using -- if we're acknowledging here that we're using the term in a way that would be consonant with that used by log language models, I mean, that's not necessarily an obvious interpretation of the discovery demand.

These are not everyday terms.  These are not the kind of terms that are that are typically used in discovery.  I think it would be -- and plaintiff knows that we have consistently -- well, okay, I'm not going to put words in plaintiff's mouth.  I will maintain that we have consistently taken guidance, technical guidance, from plaintiff when precise questions have been asked.

With respect to our response that there were no chatbot logs, as we understood that term to mean relating to jurisdiction, I'm just reiterating the fact that going to my over -- to the objection that we've made overall and mentioned in our letter, it's incredibly difficult to see the difference between jurisdictional jurisdiction here and simply -- I mean, jurisdictional discovery and just simply merits discussion, merits discovery.  I don't see what the difference is.

THE COURT:  Well, I mean, there was a ruling by Judge Brodie that allowed jurisdictional discovery.  And I think

Colloquy

her --

MR. COLEMAN:  But that --

THE COURT:  -- ruling specifies why she's permitting that and what the scope of that discovery is.  I mean, to the extent that --

MR. COLEMAN:  Yes.  So that's why chatbot -- any -- whatever a chatbot -- chatbot log is, we would all agree that it would be limited to the issue of jurisdiction, right?

THE COURT:  Yes.  This is jurisdictional discovery.

MR. COLEMAN:  Okay.  So that's why my response in the letter is limited to chatbot logs related to jurisdiction.  But since we now -- since it turns out that we may be talking about something else, I will ask if the Court will endorse this, that plaintiff really drill down and specify what is meant, and we can tell them what is available, what we can get.

MX. GREEN:  I mean, this is just not -- none of this is true.  I mean, so here is the --

THE COURT:  You say none of this is true.  What do you mean -- I'm sorry -- what --

MX. GREEN:  So here is the exact text of the request; there's no ambiguity here,

"Please provide all ChatGPT, Claude AI, or other large language model prompts submitted by Jeff Tarzia or someone else concerning Mercante and Kotaku (ph.) and the lawsuit".

Right?  There is -- this is not -- there's no -- law



Colloquy

gives the term I used in the motion to compel, but --

MR. COLEMAN:  But do you realize that we just had a completely different discussion.  You told the Court that you could see chats coming up in the course of streams --

MX. GREEN:  Right.  On --

MR. COLEMAN:  -- that had to do --

MX. GREEN:  -- screen.

MR. COLEMAN:  -- with jurisdiction.

MX. GREEN:  Right.

MR. COLEMAN:  What does that have to do with chat?

THE COURT:  Everybody -- No.  This is not the place to argue.  Let's just try to clarify, and let's bring the temperature down.  Okay?

And so I'm going to ask Mx. Green to please explain further what you're looking for.

MX. GREEN:  Right.  Right.  Well, so there's a few things, or a few issues here, right?  The response as we have it is this doesn't exist.  That's what they said in the letter.  Well, actually, I'm sorry, the formal response here is there is no formal response.  They did not respond to this request.  We sent two formal letters saying they didn't respond to this request, and they never responded, even though we raised that.

THE COURT:  But now in their letter, they say they don't have any chatbot logs --

MX. GREEN:  They don't have any -- and what I was

Colloquy

referring to on stream is on stream, Mr. Tarzia pulled up ChatGPT, entered queries into it about jurisdiction, and asked it questions about jurisdiction.  And it gave answers about jurisdiction.  And that's what we said in the letter.

We're not talking about the chats -- like the YouTube chat.  We're not talking about anything ambiguous here.  And of course, the fact that he has false -- the letter falsely states that there are no responsive documents, right, and he doesn't say anything about, well, there are responsive documents, but they're not about jurisdiction.  It just says no responsive documents at all, right?

With that in the background, it's hard to take seriously the idea that, okay, well, we saw those on stream, and those are the only ones.

THE COURT:  Right.  Okay.

MR. COLEMAN:  So --

THE COURT:  Comments?

MR. COLEMAN:  -- so chat -- I just never -- I have to admit, I never dreamt that the plaintiff was asking about logs of AI queries that were done live that plaintiff itself -- herself -- her counsel saw taking place.  How was that discovery?  How -- I mean --

THE COURT:  Are you --

MR. COLEMAN:  -- I don't even understand -- I mean --

THE COURT:  Well, just because counsel saw it doesn't

Colloquy

make it not discovery.  I mean, counsel saw some, but what that is indicative of is there could be more.  I mean, it's not counsel's responsibility to monitor the chatbot logs live --

MR. COLEMAN:  But he --

THE COURT:  -- to determine whether in fact there is discovery, more discovery than that.  Just the fact that they saw something --

MR. COLEMAN:  Well --

THE COURT:  -- doesn't mean that --

MR. COLEMAN:  Okay.

THE COURT:  -- that --

MR. COLEMAN:  Yeah.

THE COURT:  -- that they saw everything.

MR. COLEMAN:  Your Honor, I am going to -- so now it's clear to me what we're talking about, and I will comply with the request within seventy-two hours.

THE COURT:  Okay.  Let's move on to the next one.

MX. GREEN:  And I -- I just, if I may, I do want to put a pin in some of that issue when we get around to talking about Rule 37.

THE COURT:  Okay.  All right.  So number 10, financial records relating to defendant's GiveSendGo fundraiser.

My understanding there is that some documents have been produced, but email addresses of the donors were withheld without notification to plaintiff; do I have the issue?

Colloquy

MX. GREEN:  Correct.

THE COURT:  All right.  Just so I understand, putting aside that it was a move without notice, which I understand is the concern, are the email addresses themselves.  Just explain to me how those are relevant to jurisdictional discovery.

MX. GREEN:  Right.  So it appears that in creating the GiveSendGo, my understanding is there's a setting where you can either require or not require people to state their state of residence.  I think some of that is obviously you need that option if you're going to do any kind of political fundraiser, et cetera.  But it appears that here, defendant did not check that option, he checked that don't require state of residence or ZIP Code.

THE COURT:  So --

MX. GREEN:  So none of the data is associated with any state.  One of the issues that we're digging into is kind of where does his support come from, where is his audience, where is his income coming from, right?  That's kind of the call that -- the million dollar question about jurisdiction is where -- the internet is everywhere, but where is his specific audience, where is his specific operation.

The email addresses, there's kind of standard open source investigation techniques that can, with a high degree of reliability, take an email address and probably get about ninety-five percent confidence on where ninety-five percent of

Colloquy

people are, which it's not perfect; it would be better if we could get the state of residence.  But because we don't have state of residence, right, this is the next best thing.

THE COURT:  Explain to me how that works, though.  Like, let's say, just so I understand it --

MX. GREEN:  Yeah.

THE COURT:  -- someone has a Gmail address --

MX. GREEN:  Right.  So --

THE COURT:  -- how were you able to determine what state they're in?

MX. GREEN:  So there are many databases.  One of the ways -- I will admit I'm not the expert here -- but they will have all of their Google reviews associated with that, and they'll all be in one city.  Right?  There are other things you can do like -- I think there are some databases where you can -- well, you know what, I do have Ms. Tucson (ph.), our paralegal, who is actually an open source investigator and an expert on this, on the line, if Your Honor would allow her to give --

THE COURT:  I mean --

MX. GREEN:  -- a little more detail?

THE COURT:  -- I'm guessing is there --

MX. GREEN:  If that's what you're after.

THE COURT:  Here's my question.  Is there a simpler way to get this information?

Colloquy

MX. GREEN:  Not --

MR. COLEMAN:  I think -- Your Honor, can I suggest that there is?

THE COURT:  Okay.

MR. COLEMAN:  We will produce -- we'll produce -- I just want to make it clear.  I explained in my letter why this was not a deficient response.  Having said that, if a supplemental response, we can deem this discussion to be in the manner of a supplemental response, we can produce the emails on an attorney's-eyes-only basis for purposes of this analysis, because we believe that the -- as long as the results are shared with -- as long as the results are shared regardless of how they come out.

THE COURT:  Okay.  Did that -- is that --

MX. GREEN:  Yeah.  No.

THE COURT:  -- acceptable?  Okay.

MX. GREEN:  I mean, that was what we talked about at the two --

THE COURT:  Okay.

MX. GREEN:  -- meetings first.  What's in our letters, I don't know --

MR. COLEMAN:  Can we stop going over -- the --

THE COURT:  Okay.  So we agreed to this.  They'll be produced with attorney's eyes only.  Is there currently a protective order in place with an attorney's-eyes-only

14

Colloquy

designation option, or are the parties going to need to submit one?

MX. GREEN:  If it -- we have a confidentiality order, we'll propose an additional attorney's eyes only, and I can send that over today.

THE COURT:  Okay.  Okay.  Okay.  Next one, so 11, 12, 13, 24, 26, and 34 all seek financial information.  The major issue there, as I understand it, you can correct me if I'm wrong, is that the revenue by state, which is the same issue that we're talking about now, is omitted; is that correct?

MX. GREEN:  That's right.  And I think there are a number of other data fields.  There is some overlap, but I think with the super chat issue, but we can discuss that when we get there specifically.  But yeah, I mean, more or less, we have revenue, and we have views by state, but we don't have revenue by state and a number of other categories that Google says YouTube can produce are missing.

MR. COLEMAN:  And as the person who generated these reports, I went -- I'm represented, and I'm prepared to submit an affidavit to the effect that these -- the information -- again, this is information which we believe will only help our client if it were available, which is why I spent the time doing this.  It's not available.

Wix and Google Analytics do not -- as much as we wish they would -- they do not present -- they do not offer an

Colloquy

infinite number variations of -- you can't drill down on every single criterion you want.  There are limitations by time.  There are -- it's a relational database, but its limitations are not infinite.

Every possible iteration that could generate relevant, responsive documents was produced.  There aren't any more.

MX. GREEN:  I mean, we know that that's not true from the YouTube --

MR. COLEMAN:  Please stop that with the -- please -- stop that.  Stop saying we know that that's not true.  If you want to say we have a different understanding of the matter, but stop accusing --

THE COURT:  Okay.

MR. COLEMAN:  -- me --

THE COURT:  Let's not -- no yelling.  No yelling.  I understand.  Let's try again to use less inflammatory language.

Mx. Green, what is your understanding of what type of information would be available?

MX. GREEN:  Right.  So what we have from YouTube, and this is page 4 of our reply letter at ECF 48, there are at least a bunch of fields that YouTube says can be produced that have not been, right?  Like that's annotation clicks, card click rate.  There are a bunch of things, estimated minutes watched; those fields are not in what has been produced.

Now, what exactly can be produced I'm less sure of



Colloquy

because I don't have access to the dashboard.  But particularly given this and given, frankly, the issues with producing DMs or videos, I have a lot of trouble --

MR. COLEMAN:  We -- no one asked about your trouble.

Your Honor, I'm --

THE COURT:  Hey --

MR. COLEMAN:  -- trying -- we --

THE COURT:  I'm sorry.  Mr. Coleman, stop.  Okay?  No one's going to speak to anyone this way in a conference with me.  Okay?

We're going to be respectful.  I understand that there are disagreements here, but everyone's going to be respectful.

Now, what I'm hearing, and it appears that there may be more information available, but am I right, Mx. Green, that I'm not sure that you're sure that revenue by state would actually be available in the data?

MX. GREEN:  Yeah.  We are not sure about that.  We know some things are missing.  We have --

THE COURT:  Okay.

MX. GREEN:  -- some things from YouTube suggesting that it might be available but --

THE COURT:  Okay.

MX. GREEN:  -- like the --

THE COURT:  So the things that are missing specifically, are those things that you can identify to Mr.

Colloquy

Coleman and say, can you produce these things? And then you determine -- because I think if you say they're missing revenue by state, but you don't know whether revenue by state is actually available, then there's going to be a disconnect here. But if --

MX. GREEN: Right.

THE COURT: -- there are specific categories of information that you're understanding that are available that have not been produced, I think you should identify those to Mr. Coleman and then have them produce that. And if that reveals what you want, fine. If it doesn't, it doesn't. But then at least you're talking about the same thing.

MX. GREEN: Yeah. That makes perfect sense to me. We've got the list at the page of 48 that I cited, page 4. What I had suggested in the letter -- or the reply letter is it seems like the best thing to do here is to have a (indiscernible) screen share so that we can actually just be sure we're talking about the same thing.

THE COURT: Sorry, you cut out there. The best thing to do is to what? You cut out --

MX. GREEN: Is --

THE COURT: -- a little bit.

MX. GREEN: -- is to have a meet and confer on --

THE COURT: Okay.

MX. GREEN: -- Zoom or something where we can screen

Colloquy

share and just be looking at the console together.

THE COURT:  That sounds reasonable to me.

Mr. Coleman?

MR. COLEMAN:  I don't think it's reasonable, Your Honor.  I think that we are at the point here where there are these -- there are scores and scores of varieties of data.  And to say that we can identify three or four types of data that may be broken out geographically, that you didn't break out geographically, you know what?  I'm hard pressed to imagine what the probative value of those marginal additional data could be.  But I'm prepared to go in and fetch them.

But the idea that because I didn't anticipate every conceivable metric -- and we are -- I would submit, Your Honor, we are way past the point of cumulative at this point.  This is cumulative upon cumulative.  I'm willing to go in and get the additional criteria, the additional metrics.  But to say that, no, we're going to hop in together to my client's screen so plaintiff's counsel is satisfied that I've clicked every box, I don't consider that reasonable.

THE COURT:  Well, what -- I'm going to still order you to have a meet and confer and share screen and have them identify for you what they think is missing.  Look, if at that point you think some of it is stuff you don't have to produce, then that's part of your meet and confer.

But I'm going to ask the parties to work together on

Colloquy

this and see if you can agree upon a limited set of categories that you will go back and produce on. It doesn't mean that it's everything. Maybe some of them you won't agree on. That's fine. But --

MR. COLEMAN: Oh, no, I -- let me make it clear, Your Honor, everything is -- if I could give them everything, I would give them everything.

THE COURT: Okay. So have --

MR. COLEMAN: But what I'm not --

THE COURT: -- your meet and confer --

MR. COLEMAN: -- going to give them the keys.

THE COURT: Okay. Have your meet and confer. They will identify for you, because one of the things that you have stated in this call is that you feel like they could identify more for you what they're looking for, so that's what's going to happen. They're going to screen share it with you. And have your meet and confer and discuss what can and can't be produced. Okay? And that's --

MR. COLEMAN: Yes.

THE COURT: -- for 11, 12, 13, 24, 36, and 34.

Moving on to 14 and 35, which is the super chat donation data, my understanding, Mr. Coleman has stated that you don't know how to extract the data; am I getting that correct?

MR. COLEMAN: I don't believe that it is possible

Colloquy

based on the information available to us by Google.

MX. GREEN:  So I do want to say Mr. Coleman is referring to a chat he had with Google's Gemini.  That is not Google saying something.  Frankly, we identified this in the reply.  I think, like, in kind of in keeping with the matter line of cases after, right, like I do not think it is consistent with Rule 11 to cite a chatbot conversation as a source of fact.

But more to the point, we don't -- he -- plaintiff -- or, I'm sorry -- defendant still has not stated who he uses for super chats.  What he has done is ask a chatbot does Google have -- or I'm sorry, does YouTube provide super chat services.  And the response from the chatbot, which it doesn't look like they processed, was yes, YouTube has this, but there are also third-party providers, right?  Even the chatbot said this.  And so we don't know --

MR. COLEMAN:  Okay.  I --

MX. GREEN:  -- who the provider is --

I'm sorry, Mr. Coleman, please let me finish.

-- we don't know who their provider is.  And what had been represented to us is they've exported everything they could think to export from Google, and we don't have any super chat information.  So I don't think they use YouTube for their super chats because they've said they've produced everything from YouTube and we don't have super chat data.

Colloquy

MR. COLEMAN:  Okay.  I'm going to try to answer this again.  All super chat we have -- there are no third-party super chat clients that are used, and the -- and all the super chats are done through YouTube, and YouTube doesn't provide this information.  I thought that was really clear.

MX. GREEN:  But that -- again, that just isn't accurate.  Like again, if you go to actual Google information, this is footnote 7 of our reply letter at ECS 48, YouTube provides a tutorial for extract -- for getting the fields relevant to super chat information.  Those fields include, let me see, super chat, super stickers, and super (indiscernible).  Those are data fields that can be exported, but they haven't been.  Right?

And so if the representation was, we've exported everything we could having to do with money from YouTube, we would expect it to be there, unless that representation is inactive.

MR. COLEMAN:  Wait a minute.  But does that information say that that information relevant to jurisdictional discovery would be in those fields?

MX. GREEN:  I -- that --

MR. COLEMAN:  That's the only thing we're talking about, right?

MX. GREEN:  Right.  And financial revenue is relevant to jurisdictional discovery.  And again, this is the global

Colloquy

2015 amendment problem; that's, right, that's not what they said.  They did not say there is no information relevant to jurisdictional discovery because X, Y, and Z.  It's a boilerplate refusal to produce.  Right?

And again, we sent two letters on this.  We had two meet and confers on this.  And what defendant committed to do at both meet and confers was tell us the provider, and never did that.  It was only here on this conference for the first time that he said, I think my provider is YouTube.  Again, I don't think that's true, because I'm accepting Mr. Coleman's representation that he clicked everything --

MR. COLEMAN:  What's your --

MX. GREEN:  -- that looked like financial anything in producing YouTube --

MR. COLEMAN:  -- what's your --

MX. GREEN:  -- information.

MR. COLEMAN:  -- what are your grounds for your belief that there is a provider other than YouTube for super chats?

MX. GREEN:  The representation that you've produced everything from YouTube that you could.  Maybe that --

MR. COLEMAN:  I --

MX. GREEN:  -- representation --

MR. COLEMAN:  -- in other words --

MX. GREEN:  -- isn't accurate.

MR. COLEMAN:  -- the absence of proof is proof of

Colloquy

absence?

MX. GREEN:  No.  It -- your client uses super chats. They are on every single one of his streams.  He makes hundreds of --

MR. COLEMAN:  Right.

MX. GREEN:  -- dollars a stream; that money goes somewhere.  The records exist somewhere.  The fact that you've represented to the Court that you have produced everything YouTube can produce makes me think --

MR. COLEMAN:  That is within the -- everything that is responsive within the realm of jurisdictional discovery.

THE COURT:  Well, it sounds like that wasn't the response, though.  I think that's the issue.  And that's where your --

MR. COLEMAN:  Your Honor --

THE COURT:  -- responses are vague.  If that's the response, that you've searched everything in the YouTube super chat, that that's the service that they use for their super chats and that there's nothing responsive to jurisdictional discovery, then you need to be really specific in your response and say that.

MR. COLEMAN:  Well -- no.  Our response, Your Honor, I'm sorry, but our response did object to -- we made it clear in our written responses that all the responses were made on the understanding that the scope of discovery was information

Colloquy

that could reasonably lead to the production of discoverable information on the subject of jurisdiction.

THE COURT: I understand that --

MR. COLEMAN: That --

THE COURT: -- but you have to be specific in each of your responses. It's not enough to just do a general response, general objection on that basis but then not respond specifically to each request. So if your --

MR. COLEMAN: Your Honor, I understand that, except that --

THE COURT: All right. I'm going to ask you not to interrupt me. Okay? I promise I will give you a chance to talk.

But you're looking at the individual responses. A lot of them are very generalized. And while I hear you that you're saying that you have an overall, general objection to all of these requests to the extent they don't relate to jurisdiction, and that's fair, you still have to specifically, for each request, identify whether you were withholding documents based on your general objection or specific objection, that, yes, there are documents that are responsive to this request, but that since they do not relate to jurisdiction, we're not producing them, if that's the response.

MR. COLEMAN: Your Honor, so I would respectfully submit that when the entire scope of production in terms of

Colloquy

content is jurisdictional discovery, I don't even need to make that objection even once.

THE COURT: Well, I --

MR. COLEMAN: Anything that --

THE COURT: -- disagree -- I disagree with you. I disagree with you on that because you need to identify -- because let's say their request is overbroad. Let's say you're interpreting their request as going beyond the jurisdictional discovery, and you found documents that are actually responsive to their overbroad requests, but you're not producing them because they are not relevant to jurisdictional discovery. That is a specific response that you should put in your responses to their discovery. It's not an onerous requirement, right? That's just what the rules --

MR. COLEMAN: No.

THE COURT: -- require. You have to state if you are withholding what's technically responsive documents and why. That's what the rules require for each request.

MR. COLEMAN: Understood, Your Honor.

THE COURT: Okay?

MR. COLEMAN: I mean, I really do think it was -- I do think that a reasonable reading of our responses is that there are no -- I mean, I'm not responsible for announcing the lack -- we're not withholding documents. We're not withholding responsive documents.

Colloquy

If they're -- if I intended to narrow the response by an objection category, I would understand that.  But there are -- all super chats are done through Google.  I mean, I'll put it in writing, and then we'll submit it, and then it'll be in writing.  All super chats are being done through YouTube.  YouTube does not provide this information, does not provide information regarding the locations of super chat participants or donations.

MX. GREEN:  Right.  I think the problem with that is for that proposition, Mr. Coleman appears to be relying on an AI chatbot.  Like, you can look --

MR. COLEMAN:  No, no --

MX. GREEN:  -- at Google actually says -- Google says you can produce this information.  And again --

MR. COLEMAN:  Wait.  Wait, wait.  You didn't -- when I asked you where it says -- whether it said Google could produce information regarding geography or location, you weren't clear that it did.  Now you're saying that it does?

MX. GREEN:  We're not talking about geography right now.  We're talking about super chat revenue, which you're now saying --

MR. COLEMAN:  Revenue.

MX. GREEN:  -- that there are no responsive documents.  That's not true.

MR. COLEMAN:  Right.  So Your Honor, so can we have a

Colloquy

ruling on whether the issue of super chat revenue unrelated to geography is an appropriate subject for discovery here?

THE COURT:  Well, isn't that -- I'm sorry, so the point -- the reason the revenue is relevant is if it came from a different state, right?

MX. GREEN:  Right.

THE COURT:  We all agree on that?

MX. GREEN:  Correct.

THE COURT:  Okay.

MR. COLEMAN:  Yeah.

THE COURT:  And you're saying that information is not available, Mr. Coleman, on YouTube --

MR. COLEMAN:  On --

THE COURT:  -- correct?

MR. COLEMAN:  Yes.

THE COURT:  On YouTube --

MR. COLEMAN:  Yes.

THE COURT:  -- super chat.

And Mx. Green, you say that it is available; you have information that such information is available?

MX. GREEN:  Well, so I think we skipped a step.  And the step we skipped is they have not said location is unavailable.  What they have said, right, they have not produced anything for super --

THE COURT:  Right.  But --



(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

MX. GREEN:  -- chat.

THE COURT:  -- they're saying --

MX. GREEN:  It's not --

THE COURT:  -- but they don't have -- but the only thing they would have to produce is information on location, because that's really the only part that's relevant, right?

MX. GREEN:  Right.  And what I'm saying is the step we're missing is we, like, we don't know what -- I have no reason to think that the field is unavailable.

THE COURT:  But they're saying it is.

MX. GREEN:  But --

THE COURT:  So I don't know how you want to -- I mean, if they --

MX. GREEN:  I don't think that's what they're -- I mean, I know that that's what Mr. Coleman is saying now, but that's not what his papers say.  That's not what his objections say.  And that's not what YouTube says.  Right?  YouTube --

MR. COLEMAN:  Wait a minute --

MX. GREEN:  -- in their --

MR. COLEMAN:  -- that's not what --

MX. GREEN:  -- tutorial --

MR. COLEMAN:  -- YouTube says, but YouTube doesn't -- please.  I'm sorry.

THE COURT:  Okay.  Here's what I'm going to do.  Mr. Coleman, I want you to look into whether that information is

Colloquy

available on YouTube and verify and speak to someone who knows how to do that. I don't know if you have --

MR. COLEMAN: Yup.

THE COURT: -- someone helping you on your end with that. And then go from there. And if it's not available, then put that in writing in your objections very specifically that it's not available. If it is available, then --

MR. COLEMAN: I absolutely --

THE COURT: -- produce it.

MR. COLEMAN: -- will do.

THE COURT: Okay?

MR. COLEMAN: Yes, ma'am.

MX. GREEN: Your Honor --

MR. COLEMAN: Yes.

MX. GREEN: -- if I may. Like, the one thing I do want to say, right, is the ask for all, right, the requests asks for all information about --

THE COURT: Yeah. But --

MX. GREEN: -- super chat revenue and -- well, and they --

THE COURT: I think --

MX. GREEN: -- said --

THE COURT: -- really all --

MX. GREEN: -- they said --

THE COURT: -- that matters is the state, though,



(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

right?  That is the jurisdiction here.

MX. GREEN:  I think that is the most important thing. But as we talked about before, it might have email addresses associated with it.  And then we could reverse engineer that. If -- what the problem is that their response doesn't say we're withholding this because state-by-state information is not available, it says no responsive documents -- or well, it just has a boilerplate objection.  And then what we got in the papers, once we made the motion, was no responsive document exists.

THE COURT:  No, I hear you --

MX. GREEN:  But --

THE COURT:  -- that's why their previous response was deficient.  But what I'm saying now is that really, the only part they have to look for is location.  And if they don't have that, then it's not available and then you move on.  You have other ways to get at the information you want.

MX. GREEN:  Well --

THE COURT:  And --

MX. GREEN:  -- not this information.  The super chats are kind of the major way that this system functions financially.  Right?

THE COURT:  But I --

MX. GREEN:  It's not --

THE COURT:  -- can't -- if they -- if it doesn't give

Colloquy

it by location --

MX. GREEN:  Of course.

THE COURT:  -- then they don't.  So then you --

MX. GREEN:  Right.

THE COURT:  -- have other categories here that get you such as what we talked about before like the email addresses of the donors where you said you can reverse engineer it.  And I'm not sure that you need to do that here too.

If your goal is to establish what states he was doing business in, you have other ways -- other categories of information that's going to give you that information.

MX. GREEN:  Right.  I think the problem is the response from them once we do that is likely to be, well, just because you showed thirty percent of his audience is in New York -- or thirty percent of his donors are in New York, rather, that doesn't mean his audience is in New York and that doesn't mean -- right?

It's about -- if we're willing to say, you know, the donor spread is going to be representative of everything, and we can assume that that's true for everything, fair enough.  But if the response we're going to get on jurisdiction is going to be, well, that doesn't demonstrate anything about --

THE COURT:  Well, I can't say --

MX. GREEN:  -- the audience --

THE COURT:  -- what they're going to argue.  But in

Colloquy

terms of --

MX. GREEN:  Right.

THE COURT:  -- the super chat donation data, either there is that category or there isn't, and that's what --

MX. GREEN:  Right.

THE COURT:  -- they have to search for.  I mean, at some point --

MX. GREEN:  Right.

THE COURT:  -- this discovery does become broader than I think Judge Brodie intended.  And I do think that we need to limit it to jurisdiction in a tailored way so that the case can move on.

I want to move on now to 25, which is the back end source code for defendant's website.  I don't fully understand the technical issues of that, so if someone could explain to me where things sit with that --

MX. GREEN:  Yes.

THE COURT:  -- response.

MX. GREEN:  So Your Honor, a website typically has kind of call it two broad categories of code, back end and front end.  Front end is if you right click on a website on your computer and you say view source code, that's going to be the front end source code.  Of course, lots of source code, and this is typically for hacking reasons among others, right, how various little applets work on a website, that isn't displayed

Colloquy

to the public, it calls out to a different set of code, and that will run on the website.

What we asked for was all source code. We got a printout of what we could have done ourselves and would have taken five seconds, which is a right click on the website, say view source code, print. What we don't have, and what's very important, is the code that shows what the back end is doing and how interactive it is. This also should not be very difficult to produce.

And again, we have the chatbot issue where while Wix itself says you have access to all kinds of back end tools, I mean, the chatbot doesn't even actually say what they cite it for, but they're citing a chatbot log as if it's a source of fact. And that's their basis for saying they don't have access to back end source code. But every website owner has access to back end source code.

I have access to our website's back end source code. I'm sure the --

MR. COLEMAN:  Is your --

MX. GREEN:  -- administrator of the --

MR. COLEMAN:  -- on Wix?

MX. GREEN:  -- federal courts --

MR. COLEMAN:  Is yours on Wix?

MX. GREEN:  Wix says you have access, and it is unfathomable that an owner of a website doesn't have access to

Colloquy

their own back end.  It's --

MR. COLEMAN:  No, it's not.

MX. GREEN:  -- it's just unfathomable.

MR. COLEMAN:  No, it's not.

Your Honor, so my response is it's not unfathomable.  First of all, I'd like to start with the question of how this is jurisdictional discovery.

THE COURT:  Yeah, actually, that was going to be my next question.

How does that relate, the back end source code, to jurisdictional discovery?

MX. GREEN:  Right.  So one of the major things -- one of the four named items that Judge Brodie asked us to look into was the interactivity of the website.  The source code is how you determine interactivity --

THE COURT:  Um-hum.

MX. GREEN:  -- right?  And back end source code is the most important part of that, because that's what's actually running under the hood, that's what's interacting.

THE COURT:  Okay.

MX. GREEN:  I mean --

MR. COLEMAN:  And my client's representation --

I'm sorry.  Remy --

THE COURT:  No, go ahead.

MR. COLEMAN:  Mx. Green (indiscernible, simultaneous

Colloquy

speech) was?

MX. GREEN:  But on Wix's website, again, (indiscernible) website, users can access quote, "custom back end logic", including quote, "back end modules hidden from site viewers".  That's what Wix says about this.  The only contrary thing is not from Wix; it's from an AI chatbot that doesn't -- like AI chatbots don't know hacks.

THE COURT:  Right.  I understand.

Mr. Coleman?

MR. COLEMAN:  My client is not aware of any way to do this.  And the plaintiff says no, it can be done.  My client is prepared to state in an interrogatory that he doesn't know how to do this.

THE COURT:  Does he have a website?

MR. COLEMAN:  And as --

THE COURT:  Are you just consulting with someone other than your client, like, some sort of expert in --

MR. COLEMAN:  No.  No.  But here's the point.  The premise of plaintiff's argument for discoverability here is maybe there's code that induces people from New York --

THE COURT:  Um-hum.

MR. COLEMAN:  -- more than it induces people -- or in some way that is jurisdictionally significant to interact with the website and, therefore, that would mean that the defendant is availing himself of the jurisdiction.

Colloquy

My client is saying, I don't even know what you're talking about. I've never done that. I don't know how to do that. And so the idea that my client should know --

THE COURT: But the website could be doing that without his -- even if he doesn't know how it works, that doesn't mean it's not happening, right? If I understand correctly. Like, just because he --

MR. COLEMAN: I don't know --

THE COURT: -- doesn't know that --

MR. COLEMAN: -- I don't know about that.

THE COURT: -- that's what the back end code is doing, doesn't mean that it's not doing that.

MR. COLEMAN: And if it did that, that would be grounds for his availing himself of the jurisdiction, even if he didn't know it? I guess that --

THE COURT: Let's say --

MR. COLEMAN: -- could be. That could --

THE COURT: -- he -- I don't know --

MR. COLEMAN: -- be.

THE COURT: -- did he have someone else build this website for him? Did they discuss --

MR. COLEMAN: No. It's consumer, it's a retail -- I don't think so. No, no, no. Like, otherwise, we would ask that person for --

THE COURT: Wait, he built this --

Colloquy

MR. COLEMAN:  -- this is a --

THE COURT:  -- website himself, but he doesn't know how to access the back -- I mean, that doesn't make a --

MR. COLEMAN:  Right.

THE COURT:  -- lot of sense.

MR. COLEMAN:  Because -- no, no, Your Honor.  It does, because the whole selling point of Wix is that so dummies like lawyers and YouTube streamers can build a website without having to know how to build a website.  You tell us what you want it to look like, and we send elves to the back to --

THE COURT:  Okay.

MR. COLEMAN:  -- to make it happen.

THE COURT:  So let's say Wix built this website and that it built it in a way so that it entices customers from New York or various jurisdictions, that would be relevant to jurisdictional discovery, even if your client didn't know it.

MR. COLEMAN:  I guess so.  I guess I could see how that could be the case.  I guess --

MX. GREEN:  Your Honor --

THE COURT:  Okay.

MX. GREEN:  -- may --

MR. COLEMAN:  But my client simply just doesn't know how to do it.

THE COURT:  But you may need to -- but then you may need to consult with someone else to get that information to

Colloquy

them because there's someone who knows how to do this.  And maybe --

MR. COLEMAN:  Your Honor, I would submit that that goes beyond -- in other words, there's a general rule that you have to create -- you have to produce discovery that is within your reasonable custody and control.  And if that includes having to do a few keystrokes, then that's all -- then you also have to produce that.

But the idea that my client should engage a consultant to do things that he doesn't technologically know how to do himself in order to comply with this -- we're not talking about an e-discovery expert where you have volume, you have to deal with the volume, and you have to deal with large amounts of -- we're talking about --

THE COURT:  Well, let me ask you this, Mx. Green.  Is this something that, to get the back end code, you said it's actually not so hard to do and most websites owners could do.  Is this something you could provide guidance on how they could do it?

MX. GREEN:  I've never used Wix.  If he could -- if they're willing -- I've, as we've said repeatedly, if they're claiming they can't do something, we're always happy to get on a Zoom and screen share so that we can help them figure out how to do it.

THE COURT:  Okay.

Colloquy

MX. GREEN:  We've done that --

THE COURT:  So why don't you have a meet and confer on a Zoom and see whether you can discuss how to do this.  Okay?

MX. GREEN:  May I also just suggest another way to cut this knot would be to just subpoena.  Right?  And if they --

THE COURT:  Subpoena Wix?

MX. GREEN:  -- if they -- subpoena Wix.  If they -- if defendant agrees not to object to it, that might just be easier.

THE COURT:  Okay.  Mr. Coleman?

MR. COLEMAN:  I just think the problem with that is that we're basically kicking out jurisdictional discovery into the summer.

MX. GREEN:  I mean, we are --

MR. COLEMAN:  There's --

MX. GREEN:  -- already --

MR. COLEMAN:  -- there's really going to be no --

MX. GREEN:  -- doing that --

MR. COLEMAN:  -- end to it.

MX. GREEN:  -- where there is so much missing.

MR. COLEMAN:  Well, Your Honor, I mean, I think that that's the key to this.  I can't imagine that Judge Brodie ever intended that this level -- I mean, jurisdiction -- the courts have been doing jurisdictional discovery in cases for fifty years.  When has it ever been the case that months and months

Colloquy

of jurisdictional discovery have been necessitated because of a range of technological issues where the plaintiffs seeking the discovery says we might be able to find if we do -- if we use this kind of tool, we might be able to find, we might be able to find.

This jurisdictional discovery is what information is existing in the world that can demonstrate the existence of jurisdiction.

THE COURT:  But his -- look, this is -- but this is a case involving a lot of technology.  This is the world that we live in now.  And so jurisdictional discovery meant something different thirty years ago than it means today.  And the types of cases that are being brought today are different from the cases that were being brought thirty years ago, different technology.

So at this point, I'm trying to find a way to cut through this.  You have two choices.  I'm fine with a subpoena. I don't see why that pushes it out to the summer.  It shouldn't take them that long to produce it, but -- or you can talk and see whether you can do it yourself.  But I think we need to figure -- either of those options or both are fine with me.

MR. COLEMAN:  Okay.  We'll work it out.

THE COURT:  Okay.  So I think that covers all the areas.

I know that you want to discuss Rule 37, fees.  I am

Colloquy

going to defer on fees until all of this is resolved, because I want to see where things go and how long it takes to get this resolved and what cooperation there is going forward, and then we'll make a final determination on the fees application.

MX. GREEN:  Your Honor, may I raise the compliance with ECF 40?  And then I would like to just make -- say two sentences about Rule 37, but I understand where the Court's going on that.

So ECF Number 40, that was communications.  The deadline to produce was the 28th.  There was no extension of it.  There was no request for an extension.  In our reply, we raised the fact that they produced in a absurd format, right, an hour of him scrolling through his DMs.  We've explained in the papers we've filed, in multiple emails to counsel, that it's not very hard to do this, that you just go, you export all of your data, and then you go to the DM folder and extract that.  So format is -- the case law on this is pretty clear.  You can't erase text searchability, which is obviously what a video does.

But also there are massive holes in it.  The DMs we have in video, as we put on the docket, include them talking about what they describe as, "Alyssa-specific chats".  We don't have any of those.  They describe emails.  We don't have any of those.  We raised this with counsel, and I think this was actually after we filed the motion for an extension, but the --

Colloquy

of the discovery end date.

But the discovery end date isn't when they were required to comply with this.  They were required to produce months and months ago.  Then they were ordered to produce by the 28th.  And we still don't have a single proper production of DMs or messages or emails, and just on its face, massive holes in what's been produced because they discussed talking about our clients else, right, in other chats that were not produced.

I mean, there's also -- I think some of the problem here is that it's hard to -- I mean, well, I can say I know that Mr. Coleman on stream with his client said that he didn't watch the video before producing it.  And I think that that's kind of clear, because there's some stuff in there that I think they probably should have withheld.  And some -- in addition to that, I don't think they would properly withhold this, but I would have expected at least a facial privilege claim, because in this chat are screenshots of the defendant's emails to counsel and counsel's emails back.

MR. COLEMAN:  Which were obviously waived regarding those --

MX. GREEN:  Right.  And --

MR. COLEMAN:  -- communications --

MX. GREEN:  -- I mean --

MR. COLEMAN:  -- he shared them with third parties.



Colloquy

MX. GREEN:  Right.  And --

MR. COLEMAN:  So you're now trying to say by not making a meritless claim --

MX. GREEN:  Mr. Coleman (indiscernible) --

But I mean, the point is that it seems like part of this is that defendant himself is just not being forthcoming with what exists and is not doing proper searches.  And --

THE COURT:  Okay.  I'm --

MX. GREEN:  -- counsel is not --

THE COURT:  -- running out -- sorry, I'm just cutting you off because I actually have another --

MX. GREEN:  Okay.  Sorry.

THE COURT:  -- conference coming up very shortly.  So we've been at this for 45 minutes.

Mr. Coleman, are you producing those chats and those communications and those emails?  Like, what's --

MR. COLEMAN:  We will --

THE COURT:  -- are those going --

MR. COLEMAN:  -- yes, we will produce those chats and those communications and those emails.  And I will remind the Court, for the record, this is a SLAPP suit.  This is a SLAPP suit.  And all the discovery, all that we're talking about here, shouldn't even be taking place.  And the fact that the Court ordered jurisdictional discovery here and therefore gave the plaintiff here the ability in a SLAPP suit, in a meritless

Colloquy

SLAPP suit that should have been dismissed, the ability to demand all these communications among people that it considers and considers to be culture war rivals is outrageous.  And we're doing our best to comply because we want this -- we want to get rid of this case.  We've got nothing to hide.

But it's the idea that plaintiff is going to display all this moral dudgeon about a lawsuit based on his client's having had her feelings hurt under New York law is outrageous.

MX. GREEN:  Mr. Coleman, please use the correct way of referring to me.  It's inappropriate.

MR. COLEMAN:  Her client?  I'm sorry, I'm not trying --

THE COURT:  They.  They.

MX. GREEN:  You know that.

THE COURT:  They.  Use they/them pronouns, please.  Okay.

In any event, how much time -- now let's just talk about dates -- how much time do you think you need now to comply with all of these requests?

MR. COLEMAN:  A week.

THE COURT:  A week?  That includes all the communications?

MR. COLEMAN:  Yeah.  Because it's really not really -- it's not the treasure trove that plaintiff thinks it is.

THE COURT:  Okay.  But I don't -- I'm really -- if I


(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

set a week, I want it to be a week.  I don't want everybody coming back and then we need more time here so.

MR. COLEMAN:  Next Monday.  We will produce it --

THE COURT:  Well, Monday --

MR. COLEMAN:  -- next Monday --

THE COURT:  -- is a holiday --

MR. COLEMAN:  (Indiscernible, simultaneous speech)

THE COURT:  -- so I'm going to do it -- I'm going to set it for February -- I'm going to extend discovery to 2/7.

And that gives you both time for the meet and confer as we discussed as well?

MX. GREEN:  We can do that.

THE COURT:  Okay.

MR. COLEMAN:  Yup.  All right.  Thank you.

THE COURT:  Okay.  So I'm going to set the date for -- extend the discovery deadline 2/17.  I'm going to grant the motion to compel to the extent discussed on the record today.  I'm going to withhold ruling on fees.

What I'm going to ask is on 2/17 is for a letter confirming that the discovery has been completed and if not, inform -- a status letter informing the Court of where things stand.  Okay?  On 2/17.

MR. COLEMAN:  Yes.  Thank you.

MX. GREEN:  Yes, Your Honor.

MR. COLEMAN:  Thank you, Judge.



Colloquy

MX. GREEN:  Brief housekeeping, I think we are due to file a letter today to Judge Brodie.  Do you think we should do that or should we --

THE COURT:  What's the letter today to Judge Brodie? I'm sorry, what?

MX. GREEN:  I think it's basically the letter you just mentioned, which is we're supposed to file a letter today confirming jurisdictional discovery closed.

THE COURT:  Oh, I don't think you're going to need to do that once I put in my order --

MX. GREEN:  That's what I thought.

THE COURT:  -- stating what's going on.  I mean, she knows I have this hearing today so.  And --

MX. GREEN:  Okay.

THE COURT:  -- that -- and she also knows that I was going to wait until today to set the deadline for the end of jurisdictional discovery.

MX. GREEN:  I figured as much, but it's always better --

THE COURT:  Okay.

MX. GREEN:  -- to --

THE COURT:  Okay.

MX. GREEN:  -- when there when there's a deadline.

THE COURT:  And we will reach out to her chambers to let them know that you won't be filing that letter because --

Colloquy

in case our order goes up later today or in the morning.  Okay?

MX. GREEN:  Much appreciated, Your Honor.

THE COURT:  Okay.

MR. COLEMAN:  Thank you, Judge.

THE COURT:  All right.  Thank you.  All right.

MR. COLEMAN:  Thank you, Judge.

THE COURT:  Bye.  Bye.

MX. GREEN:  Bye.

(Proceedings concluded.)

* * * * *

C E R T I F I C A T I O N

I, Rachel Wiley, court-approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

February 14, 2026

_____          _____

Rachel Wiley, CET-3353                    DATE


eScribers, LLC
7227 North 16th Street
Phoenix, AZ 85020
www.escribers.net


(973) 406-2250 | operations@escribers.net | www.escribers.net