```
1                          UNITED STATES DISTRICT COURT
                           EASTERN DISTRICT OF NEW YORK
2
                                            )
3        ALYSSA MERCANTE,                    )    1:24-CV-08471-MKB-LKE
                                            )
4                        Plaintiff,          )    Brooklyn, NY
                                            )    February 9, 2026
5                        vs.                 )
                                            )
6        JEFF TARZIA,                        )
                                            )
7                        Defendant.          )


8
                            TRANSCRIPT OF MOTION HEARING
9                BEFORE THE HONORABLE LARA K. ESHKENAZI
                       UNITED STATES MAGISTRATE JUDGE
10
          APPEARANCES (All present by video or telephone):
11
         For the Plaintiff:        REMY GREEN
12                                 Cohen & Green
                                   1639 Centre Street
13                                 Suite 216
                                   11385
14                                 Ridgewood, NY 11207

15       For the Defendant:        RONALD D. COLEMAN
                                   COLEMAN LAW FIRM, PC
16                                 50 Park Place
                                   Suite 1105
17                                 Newark, NJ 07102

18        ECR OPERATOR:                NO NAME PROVIDED

19
                                   Rachel Wiley, CET-3353
20                                      eScribers
                                   7227 North 16th Street
21                                    Phoenix, AZ 85020
                                      www.escribers.net
22
         Proceedings recorded by electronic sound recording; transcript
23       produced by transcription service.

24

25
```

Colloquy

1          THE COURT:  Motion hearing, 24-cv-8471.  Can everyone

2    state their appearance for the record?

3          MX. GREEN:  Good morning.  This is Remy Green for

4    plaintiff.  For the Court -- from Cohen & Green, PLC.  For the

5    Court reporter, I should appear in the transcript as Mx. Green,

6    if we order the recording, spelled M-X period rather than Mr.

7    or Ms.  With me are a few other lawyers at Koch (ph.), but they

8    won't be speaking, so I think it's fine to just put my

9    appearance on.

10         THE COURT:  Okay.  Good morning.

11         MR. COLEMAN:  Ronald Coleman for the defendant,

12   Coleman Law Firm.

13         THE COURT:  Good morning.  All right.  So I've

14   reviewed the parties' letters back and forth.  And since the

15   parties have submitted their letters, have there been any

16   further productions or discussions among the parties about the

17   outstanding discovery?

18         MX. GREEN:  So Your Honor, we sent a follow up.

19   There's been no more production and no more communication from

20   defendant's side.  But I think highlighted in one of the

21   letters was the fact that we didn't get direct messages in a

22   standard format.  Instead, we got an hour of video of

23   defendants scrolling through a list, and that there are some

24   obvious holes in the production --

25         THE COURT:  Right.



Colloquy

1    MX. GREEN:  -- like the, the Alyssa-specific chats

2    with the quote in the direct messages we have.  We followed up

3    about that, and Mr. Coleman told us he was going to get back to

4    us, but did not; although defendant himself posted a tweet

5    about it, so we know that he got our message.

6    THE COURT:  Okay.  Does defense counsel wish to be

7    heard on that, Mr. Coleman?

8    MR. COLEMAN:  Yes.  I was anticipating that the Court

9    would help us work our way through this.  It wasn't clear to me

10    what Your Honor's intentions were.  And in fact, by my -- I

11    had -- my last discussion with Mr. (sic) Green was that I

12    would --

13    MX. GREEN:  Mx. Green, please.

14    MR. COLEMAN:  I'm sorry, Mx. Green.  Was that we would

15    stipulate to however much time was needed pending the Court's

16    resolution of the motion, so that we could ultimately comply

17    with the Court's guidance and make appropriate discovery.  And

18    Your Honor then said, well, let's not change the end of the

19    discovery date until we've had our meeting.  So I was a little

20    bit unclear because, frankly --

21    THE COURT:  But I didn't mean that things should stop.

22    What my point there was that I wanted to have this discussion

23    to know how much time was needed before just setting an

24    arbitrary date.  But the production is meant to be ongoing.  I

25    didn't mean for anything to stop as a result of that.

                                    4

                              Colloquy

1              But let's go through each of these, because, I mean,

2       I'll tell you, my overall sense is that defendant is not

3       meeting their obligations and not doing enough to figure out

4       how to, number one, whether there are responsive documents.

5       Number two, if there are, how to produce them in the

6       appropriate manner and in a format that's usable.  And three,

7       that the objections are not compliant with the rules in that

8       they don't specify whether there are responsive documents that

9       are not being produced, whether they're narrowing the requests.

10      They're just too vague.

11             But let's go through each one that's currently in

12      contention, starting with 9, request number 9, producing the

13      LLM chatbot logs, which the defense response is there nothing

14      relevant to jurisdiction.  That's a pretty broad objection.

15      And it's not clear to me what search was done and how that

16      determination was made.

17             MX. GREEN:  Your Honor --

18             MR. COLEMAN:  Your Honor --

19             MX. GREEN:  -- if I can --

20             Please.  I'm sorry.

21             MR. COLEMAN:  Go --

22             MX. GREEN:  Please.

23             MR. COLEMAN:  -- go ahead, Remy.  Go ahead.

24             MX. GREEN:  Okay.  I mean, as we said in the reply,

25      it's also just not true.  There are -- he has been -- defendant

Colloquy

1    has been on stream with chatbot logs on screen that literally

2    discuss jurisdiction.

3            THE COURT:  Um-hum.  Yeah, no, I saw that.  But --

4            MR. COLEMAN:  I don't -- so I'm not sure we're talking

5    about the same thing.  Chatbot logs, logs are not the same

6    thing as content that's actually discussed in the course of

7    chats.  My understanding from my client is that chats are not

8    retained.  Once a chat is over -- once the stream is over, the

9    chat is gone.

10           MX. GREEN:  I mean, to me that sounds like a

11   spoliation issue, but that's also not the response.

12           THE COURT:  Yeah.  Your response is that defendant has

13   no chatbot logs relating to jurisdiction, right?  Look, I'm not

14   familiar enough with the technology to know whether logs are

15   retained or not even if the chat is gone.  Those are two

16   different things, right?  The actual chat versus the log of the

17   chat; am I correct that those are two different things?

18           MX. GREEN:  I don't think so.  That's certainly not

19   how I have always, in the context of large language models,

20   used the term log to refer to the log of queries and answers.

21   I think most people use it that way.  I think the --

22           MR. COLEMAN:  Then I would be --

23           MX. GREEN:  It sounds like Mr. Coleman may be confused

24   between the chat log of a YouTube stream and the log of

25   communications with ChatGPT or Claude or --



Colloquy

1          THE COURT:  Um-hum.

2          MX. GREEN:  -- what have you.

3          MR. COLEMAN:  So what if you would -- what if we would

4    ask the plaintiff to specify precisely what is meant?  Because,

5    I mean, if we're using -- if we're acknowledging here that

6    we're using the term in a way that would be consonant with that

7    used by log language models, I mean, that's not necessarily an

8    obvious interpretation of the discovery demand.

9          These are not everyday terms.  These are not the kind

10   of terms that are that are typically used in discovery.  I

11   think it would be -- and plaintiff knows that we have

12   consistently -- well, okay, I'm not going to put words in

13   plaintiff's mouth.  I will maintain that we have consistently

14   taken guidance, technical guidance, from plaintiff when precise

15   questions have been asked.

16         With respect to our response that there were no

17   chatbot logs, as we understood that term to mean relating to

18   jurisdiction, I'm just reiterating the fact that going to my

19   over -- to the objection that we've made overall and mentioned

20   in our letter, it's incredibly difficult to see the difference

21   between jurisdictional jurisdiction here and simply -- I mean,

22   jurisdictional discovery and just simply merits discussion,

23   merits discovery.  I don't see what the difference is.

24         THE COURT:  Well, I mean, there was a ruling by Judge

25   Brodie that allowed jurisdictional discovery.  And I think

Colloquy

1      her --

2              MR. COLEMAN:  But that --

3              THE COURT:  -- ruling specifies why she's permitting

4      that and what the scope of that discovery is.  I mean, to the

5      extent that --

6              MR. COLEMAN:  Yes.  So that's why chatbot -- any --

7      whatever a chatbot -- chatbot log is, we would all agree that

8      it would be limited to the issue of jurisdiction, right?

9              THE COURT:  Yes.  This is jurisdictional discovery.

10             MR. COLEMAN:  Okay.  So that's why my response in the

11     letter is limited to chatbot logs related to jurisdiction.  But

12     since we now -- since it turns out that we may be talking about

13     something else, I will ask if the Court will endorse this, that

14     plaintiff really drill down and specify what is meant, and we

15     can tell them what is available, what we can get.

16             MX. GREEN:  I mean, this is just not -- none of this

17     is true.  I mean, so here is the --

18             THE COURT:  You say none of this is true.  What do you

19     mean -- I'm sorry -- what --

20             MX. GREEN:  So here is the exact text of the request;

21     there's no ambiguity here,

22             "Please provide all ChatGPT, Claude AI, or other large

23     language model prompts submitted by Jeff Tarzia or someone else

24     concerning Mercante and Kotaku (ph.) and the lawsuit".

25             Right?  There is -- this is not -- there's no -- law



Colloquy

1    gives the term I used in the motion to compel, but --

2            MR. COLEMAN:  But do you realize that we just had a

3    completely different discussion.  You told the Court that you

4    could see chats coming up in the course of streams --

5            MX. GREEN:  Right.  On --

6            MR. COLEMAN:  -- that had to do --

7            MX. GREEN:  -- screen.

8            MR. COLEMAN:  -- with jurisdiction.

9            MX. GREEN:  Right.

10            MR. COLEMAN:  What does that have to do with chat?

11            THE COURT:  Everybody -- No.  This is not the place to

12    argue.  Let's just try to clarify, and let's bring the

13    temperature down.  Okay?

14            And so I'm going to ask Mx. Green to please explain

15    further what you're looking for.

16            MX. GREEN:  Right.  Right.  Well, so there's a few

17    things, or a few issues here, right?  The response as we have

18    it is this doesn't exist.  That's what they said in the letter.

19    Well, actually, I'm sorry, the formal response here is there is

20    no formal response.  They did not respond to this request.  We

21    sent two formal letters saying they didn't respond to this

22    request, and they never responded, even though we raised that.

23            THE COURT:  But now in their letter, they say they

24    don't have any chatbot logs --

25            MX. GREEN:  They don't have any -- and what I was

Colloquy

1    referring to on stream is on stream, Mr. Tarzia pulled up

2    ChatGPT, entered queries into it about jurisdiction, and asked

3    it questions about jurisdiction.  And it gave answers about

4    jurisdiction.  And that's what we said in the letter.

5            We're not talking about the chats -- like the YouTube

6    chat.  We're not talking about anything ambiguous here.  And of

7    course, the fact that he has false -- the letter falsely states

8    that there are no responsive documents, right, and he doesn't

9    say anything about, well, there are responsive documents, but

10   they're not about jurisdiction.  It just says no responsive

11   documents at all, right?

12           With that in the background, it's hard to take

13   seriously the idea that, okay, well, we saw those on stream,

14   and those are the only ones.

15           THE COURT:  Right.  Okay.

16           MR. COLEMAN:  So --

17           THE COURT:  Comments?

18           MR. COLEMAN:  -- so chat -- I just never -- I have to

19   admit, I never dreamt that the plaintiff was asking about logs

20   of AI queries that were done live that plaintiff itself --

21   herself -- her counsel saw taking place.  How was that

22   discovery?  How -- I mean --

23           THE COURT:  Are you --

24           MR. COLEMAN:  -- I don't even understand -- I mean --

25           THE COURT:  Well, just because counsel saw it doesn't

Colloquy

1    make it not discovery.  I mean, counsel saw some, but what that

2    is indicative of is there could be more.  I mean, it's not

3    counsel's responsibility to monitor the chatbot logs live --

4                MR. COLEMAN:  But he --

5                THE COURT:  -- to determine whether in fact there is

6    discovery, more discovery than that.  Just the fact that they

7    saw something --

8                MR. COLEMAN:  Well --

9                THE COURT:  -- doesn't mean that --

10               MR. COLEMAN:  Okay.

11               THE COURT:  -- that --

12               MR. COLEMAN:  Yeah.

13               THE COURT:  -- that they saw everything.

14               MR. COLEMAN:  Your Honor, I am going to -- so now it's

15   clear to me what we're talking about, and I will comply with

16   the request within seventy-two hours.

17               THE COURT:  Okay.  Let's move on to the next one.

18               MX. GREEN:  And I -- I just, if I may, I do want to

19   put a pin in some of that issue when we get around to talking

20   about Rule 37.

21               THE COURT:  Okay.  All right.  So number 10, financial

22   records relating to defendant's GiveSendGo fundraiser.

23               My understanding there is that some documents have

24   been produced, but email addresses of the donors were withheld

25   without notification to plaintiff; do I have the issue?

Colloquy

1          MX. GREEN:  Correct.

2          THE COURT:  All right.  Just so I understand, putting

3   aside that it was a move without notice, which I understand is

4   the concern, are the email addresses themselves.  Just explain

5   to me how those are relevant to jurisdictional discovery.

6          MX. GREEN:  Right.  So it appears that in creating the

7   GiveSendGo, my understanding is there's a setting where you can

8   either require or not require people to state their state of

9   residence.  I think some of that is obviously you need that

10  option if you're going to do any kind of political fundraiser,

11  et cetera.  But it appears that here, defendant did not check

12  that option, he checked that don't require state of residence

13  or ZIP Code.

14         THE COURT:  So --

15         MX. GREEN:  So none of the data is associated with any

16  state.  One of the issues that we're digging into is kind of

17  where does his support come from, where is his audience, where

18  is his income coming from, right?  That's kind of the call

19  that -- the million dollar question about jurisdiction is

20  where -- the internet is everywhere, but where is his specific

21  audience, where is his specific operation.

22         The email addresses, there's kind of standard open

23  source investigation techniques that can, with a high degree of

24  reliability, take an email address and probably get about

25  ninety-five percent confidence on where ninety-five percent of

Colloquy

1    people are, which it's not perfect; it would be better if we

2    could get the state of residence.  But because we don't have

3    state of residence, right, this is the next best thing.

4            THE COURT:  Explain to me how that works, though.

5    Like, let's say, just so I understand it --

6            MX. GREEN:  Yeah.

7            THE COURT:  -- someone has a Gmail address --

8            MX. GREEN:  Right.  So --

9            THE COURT:  -- how were you able to determine what

10   state they're in?

11           MX. GREEN:  So there are many databases.  One of the

12   ways -- I will admit I'm not the expert here -- but they will

13   have all of their Google reviews associated with that, and

14   they'll all be in one city.  Right?  There are other things you

15   can do like -- I think there are some databases where you

16   can -- well, you know what, I do have Ms. Tucson (ph.), our

17   paralegal, who is actually an open source investigator and an

18   expert on this, on the line, if Your Honor would allow her to

19   give --

20           THE COURT:  I mean --

21           MX. GREEN:  -- a little more detail?

22           THE COURT:  -- I'm guessing is there --

23           MX. GREEN:  If that's what you're after.

24           THE COURT:  Here's my question.  Is there a simpler

25   way to get this information?

Colloquy

1          MX. GREEN:  Not --

2          MR. COLEMAN:  I think -- Your Honor, can I suggest

3     that there is?

4          THE COURT:  Okay.

5          MR. COLEMAN:  We will produce -- we'll produce -- I

6     just want to make it clear.  I explained in my letter why this

7     was not a deficient response.  Having said that, if a

8     supplemental response, we can deem this discussion to be in the

9     manner of a supplemental response, we can produce the emails on

10    an attorney's-eyes-only basis for purposes of this analysis,

11    because we believe that the -- as long as the results are

12    shared with -- as long as the results are shared regardless of

13    how they come out.

14         THE COURT:  Okay.  Did that -- is that --

15         MX. GREEN:  Yeah.  No.

16         THE COURT:  -- acceptable?  Okay.

17         MX. GREEN:  I mean, that was what we talked about at

18    the two --

19         THE COURT:  Okay.

20         MX. GREEN:  -- meetings first.  What's in our letters,

21    I don't know --

22         MR. COLEMAN:  Can we stop going over -- the --

23         THE COURT:  Okay.  So we agreed to this.  They'll be

24    produced with attorney's eyes only.  Is there currently a

25    protective order in place with an attorney's-eyes-only

Colloquy

1    designation option, or are the parties going to need to submit

2    one?

3           MX. GREEN:  If it -- we have a confidentiality order,

4    we'll propose an additional attorney's eyes only, and I can

5    send that over today.

6           THE COURT:  Okay.  Okay.  Okay.  Next one, so 11, 12,

7    13, 24, 26, and 34 all seek financial information.  The major

8    issue there, as I understand it, you can correct me if I'm

9    wrong, is that the revenue by state, which is the same issue

10   that we're talking about now, is omitted; is that correct?

11          MX. GREEN:  That's right.  And I think there are a

12   number of other data fields.  There is some overlap, but I

13   think with the super chat issue, but we can discuss that when

14   we get there specifically.  But yeah, I mean, more or less, we

15   have revenue, and we have views by state, but we don't have

16   revenue by state and a number of other categories that Google

17   says YouTube can produce are missing.

18          MR. COLEMAN:  And as the person who generated these

19   reports, I went -- I'm represented, and I'm prepared to submit

20   an affidavit to the effect that these -- the information --

21   again, this is information which we believe will only help our

22   client if it were available, which is why I spent the time

23   doing this.  It's not available.

24          Wix and Google Analytics do not -- as much as we wish

25   they would -- they do not present -- they do not offer an

Colloquy

1  infinite number variations of -- you can't drill down on every

2  single criterion you want.  There are limitations by time.

3  There are -- it's a relational database, but its limitations

4  are not infinite.

5        Every possible iteration that could generate relevant,

6  responsive documents was produced.  There aren't any more.

7        MX. GREEN:  I mean, we know that that's not true from

8  the YouTube --

9        MR. COLEMAN:  Please stop that with the -- please --

10  stop that.  Stop saying we know that that's not true.  If you

11  want to say we have a different understanding of the matter,

12  but stop accusing --

13        THE COURT:  Okay.

14        MR. COLEMAN:  -- me --

15        THE COURT:  Let's not -- no yelling.  No yelling.  I

16  understand.  Let's try again to use less inflammatory language.

17        Mx. Green, what is your understanding of what type of

18  information would be available?

19        MX. GREEN:  Right.  So what we have from YouTube, and

20  this is page 4 of our reply letter at ECF 48, there are at

21  least a bunch of fields that YouTube says can be produced that

22  have not been, right?  Like that's annotation clicks, card

23  click rate.  There are a bunch of things, estimated minutes

24  watched; those fields are not in what has been produced.

25        Now, what exactly can be produced I'm less sure of



Colloquy

1    because I don't have access to the dashboard.  But particularly

2    given this and given, frankly, the issues with producing DMs or

3    videos, I have a lot of trouble --

4              MR. COLEMAN:  We -- no one asked about your trouble.

5              Your Honor, I'm --

6              THE COURT:  Hey --

7              MR. COLEMAN:  -- trying -- we --

8              THE COURT:  I'm sorry.  Mr. Coleman, stop.  Okay?  No

9    one's going to speak to anyone this way in a conference with

10   me.  Okay?

11             We're going to be respectful.  I understand that there

12   are disagreements here, but everyone's going to be respectful.

13             Now, what I'm hearing, and it appears that there may

14   be more information available, but am I right, Mx. Green, that

15   I'm not sure that you're sure that revenue by state would

16   actually be available in the data?

17             MX. GREEN:  Yeah.  We are not sure about that.  We

18   know some things are missing.  We have --

19             THE COURT:  Okay.

20             MX. GREEN:  -- some things from YouTube suggesting

21   that it might be available but --

22             THE COURT:  Okay.

23             MX. GREEN:  -- like the --

24             THE COURT:  So the things that are missing

25   specifically, are those things that you can identify to Mr.

17

Colloquy

1    Coleman and say, can you produce these things?  And then you

2    determine -- because I think if you say they're missing revenue

3    by state, but you don't know whether revenue by state is

4    actually available, then there's going to be a disconnect here.

5    But if --

6              MX. GREEN:  Right.

7              THE COURT:  -- there are specific categories of

8    information that you're understanding that are available that

9    have not been produced, I think you should identify those to

10   Mr. Coleman and then have them produce that.  And if that

11   reveals what you want, fine.  If it doesn't, it doesn't.  But

12   then at least you're talking about the same thing.

13             MX. GREEN:  Yeah.  That makes perfect sense to me.

14   We've got the list at the page of 48 that I cited, page 4.

15   What I had suggested in the letter -- or the reply letter is it

16   seems like the best thing to do here is to have a

17   (indiscernible) screen share so that we can actually just be

18   sure we're talking about the same thing.

19             THE COURT:  Sorry, you cut out there.  The best thing

20   to do is to what?  You cut out --

21             MX. GREEN:  Is --

22             THE COURT:  -- a little bit.

23             MX. GREEN:  -- is to have a meet and confer on --

24             THE COURT:  Okay.

25             MX. GREEN:  -- Zoom or something where we can screen

Colloquy

1    share and just be looking at the console together.

2            THE COURT:  That sounds reasonable to me.

3        Mr. Coleman?

4        MR. COLEMAN:  I don't think it's reasonable, Your

5    Honor.  I think that we are at the point here where there are

6    these -- there are scores and scores of varieties of data.  And

7    to say that we can identify three or four types of data that

8    may be broken out geographically, that you didn't break out

9    geographically, you know what?  I'm hard pressed to imagine

10   what the probative value of those marginal additional data

11   could be.  But I'm prepared to go in and fetch them.

12           But the idea that because I didn't anticipate every

13   conceivable metric -- and we are -- I would submit, Your Honor,

14   we are way past the point of cumulative at this point.  This is

15   cumulative upon cumulative.  I'm willing to go in and get the

16   additional criteria, the additional metrics.  But to say that,

17   no, we're going to hop in together to my client's screen so

18   plaintiff's counsel is satisfied that I've clicked every box, I

19   don't consider that reasonable.

20           THE COURT:  Well, what -- I'm going to still order you

21   to have a meet and confer and share screen and have them

22   identify for you what they think is missing.  Look, if at that

23   point you think some of it is stuff you don't have to produce,

24   then that's part of your meet and confer.

25           But I'm going to ask the parties to work together on

19

Colloquy

1    this and see if you can agree upon a limited set of categories

2    that you will go back and produce on.  It doesn't mean that

3    it's everything.  Maybe some of them you won't agree on.

4    That's fine.  But --

5              MR. COLEMAN:  Oh, no, I -- let me make it clear, Your

6    Honor, everything is -- if I could give them everything, I

7    would give them everything.

8              THE COURT:  Okay.  So have --

9              MR. COLEMAN:  But what I'm not --

10             THE COURT:  -- your meet and confer --

11             MR. COLEMAN:  -- going to give them the keys.

12             THE COURT:  Okay.  Have your meet and confer.  They

13   will identify for you, because one of the things that you have

14   stated in this call is that you feel like they could identify

15   more for you what they're looking for, so that's what's going

16   to happen.  They're going to screen share it with you.  And

17   have your meet and confer and discuss what can and can't be

18   produced.  Okay?  And that's --

19             MR. COLEMAN:  Yes.

20             THE COURT:  -- for 11, 12, 13, 24, 36, and 34.

21             Moving on to 14 and 35, which is the super chat

22   donation data, my understanding, Mr. Coleman has stated that

23   you don't know how to extract the data; am I getting that

24   correct?

25             MR. COLEMAN:  I don't believe that it is possible

Colloquy

1    based on the information available to us by Google.

2            MX. GREEN:  So I do want to say Mr. Coleman is

3    referring to a chat he had with Google's Gemini.  That is not

4    Google saying something.  Frankly, we identified this in the

5    reply.  I think, like, in kind of in keeping with the matter

6    line of cases after, right, like I do not think it is

7    consistent with Rule 11 to cite a chatbot conversation as a

8    source of fact.

9            But more to the point, we don't -- he -- plaintiff --

10   or, I'm sorry -- defendant still has not stated who he uses for

11   super chats.  What he has done is ask a chatbot does Google

12   have -- or I'm sorry, does YouTube provide super chat services.

13   And the response from the chatbot, which it doesn't look like

14   they processed, was yes, YouTube has this, but there are also

15   third-party providers, right?  Even the chatbot said this.  And

16   so we don't know --

17           MR. COLEMAN:  Okay.  I --

18           MX. GREEN:  -- who the provider is --

19           I'm sorry, Mr. Coleman, please let me finish.

20           -- we don't know who their provider is.  And what had

21   been represented to us is they've exported everything they

22   could think to export from Google, and we don't have any super

23   chat information.  So I don't think they use YouTube for their

24   super chats because they've said they've produced everything

25   from YouTube and we don't have super chat data.

Colloquy

1    MR. COLEMAN:  Okay.  I'm going to try to answer this

2    again.  All super chat we have -- there are no third-party

3    super chat clients that are used, and the -- and all the super

4    chats are done through YouTube, and YouTube doesn't provide

5    this information.  I thought that was really clear.

6    MX. GREEN:  But that -- again, that just isn't

7    accurate.  Like again, if you go to actual Google information,

8    this is footnote 7 of our reply letter at ECS 48, YouTube

9    provides a tutorial for extract -- for getting the fields

10   relevant to super chat information.  Those fields include, let

11   me see, super chat, super stickers, and super (indiscernible).

12   Those are data fields that can be exported, but they haven't

13   been.  Right?

14        And so if the representation was, we've exported

15   everything we could having to do with money from YouTube, we

16   would expect it to be there, unless that representation is

17   inactive.

18        MR. COLEMAN:  Wait a minute.  But does that

19   information say that that information relevant to

20   jurisdictional discovery would be in those fields?

21        MX. GREEN:  I -- that --

22        MR. COLEMAN:  That's the only thing we're talking

23   about, right?

24        MX. GREEN:  Right.  And financial revenue is relevant

25   to jurisdictional discovery.  And again, this is the global

Colloquy

1   2015 amendment problem; that's, right, that's not what they

2   said.  They did not say there is no information relevant to

3   jurisdictional discovery because X, Y, and Z.  It's a

4   boilerplate refusal to produce.  Right?

5           And again, we sent two letters on this.  We had two

6   meet and confers on this.  And what defendant committed to do

7   at both meet and confers was tell us the provider, and never

8   did that.  It was only here on this conference for the first

9   time that he said, I think my provider is YouTube.  Again, I

10  don't think that's true, because I'm accepting Mr. Coleman's

11  representation that he clicked everything --

12          MR. COLEMAN:  What's your --

13          MX. GREEN:  -- that looked like financial anything in

14  producing YouTube --

15          MR. COLEMAN:  -- what's your --

16          MX. GREEN:  -- information.

17          MR. COLEMAN:  -- what are your grounds for your belief

18  that there is a provider other than YouTube for super chats?

19          MX. GREEN:  The representation that you've produced

20  everything from YouTube that you could.  Maybe that --

21          MR. COLEMAN:  I --

22          MX. GREEN:  -- representation --

23          MR. COLEMAN:  -- in other words --

24          MX. GREEN:  -- isn't accurate.

25          MR. COLEMAN:  -- the absence of proof is proof of

Colloquy

1   absence?

2           MX. GREEN:  No.  It -- your client uses super chats.

3   They are on every single one of his streams.  He makes hundreds

4   of --

5           MR. COLEMAN:  Right.

6           MX. GREEN:  -- dollars a stream; that money goes

7   somewhere.  The records exist somewhere.  The fact that you've

8   represented to the Court that you have produced everything

9   YouTube can produce makes me think --

10          MR. COLEMAN:  That is within the -- everything that is

11  responsive within the realm of jurisdictional discovery.

12          THE COURT:  Well, it sounds like that wasn't the

13  response, though.  I think that's the issue.  And that's where

14  your --

15          MR. COLEMAN:  Your Honor --

16          THE COURT:  -- responses are vague.  If that's the

17  response, that you've searched everything in the YouTube super

18  chat, that that's the service that they use for their super

19  chats and that there's nothing responsive to jurisdictional

20  discovery, then you need to be really specific in your response

21  and say that.

22          MR. COLEMAN:  Well -- no.  Our response, Your Honor,

23  I'm sorry, but our response did object to -- we made it clear

24  in our written responses that all the responses were made on

25  the understanding that the scope of discovery was information

Colloquy

1    that could reasonably lead to the production of discoverable

2    information on the subject of jurisdiction.

3              THE COURT:  I understand that --

4              MR. COLEMAN:  That --

5              THE COURT:  -- but you have to be specific in each of

6    your responses.  It's not enough to just do a general response,

7    general objection on that basis but then not respond

8    specifically to each request.  So if your --

9              MR. COLEMAN:  Your Honor, I understand that, except

10   that --

11             THE COURT:  All right.  I'm going to ask you not to

12   interrupt me.  Okay?  I promise I will give you a chance to

13   talk.

14             But you're looking at the individual responses.  A lot

15   of them are very generalized.  And while I hear you that you're

16   saying that you have an overall, general objection to all of

17   these requests to the extent they don't relate to jurisdiction,

18   and that's fair, you still have to specifically, for each

19   request, identify whether you were withholding documents based

20   on your general objection or specific objection, that, yes,

21   there are documents that are responsive to this request, but

22   that since they do not relate to jurisdiction, we're not

23   producing them, if that's the response.

24             MR. COLEMAN:  Your Honor, so I would respectfully

25   submit that when the entire scope of production in terms of

Colloquy

1    content is jurisdictional discovery, I don't even need to make

2    that objection even once.

3            THE COURT:  Well, I --

4            MR. COLEMAN:  Anything that --

5            THE COURT:  -- disagree -- I disagree with you.  I

6    disagree with you on that because you need to identify --

7    because let's say their request is overbroad.  Let's say you're

8    interpreting their request as going beyond the jurisdictional

9    discovery, and you found documents that are actually responsive

10   to their overbroad requests, but you're not producing them

11   because they are not relevant to jurisdictional discovery.

12   That is a specific response that you should put in your

13   responses to their discovery.  It's not an onerous requirement,

14   right?  That's just what the rules --

15           MR. COLEMAN:  No.

16           THE COURT:  -- require.  You have to state if you are

17   withholding what's technically responsive documents and why.

18   That's what the rules require for each request.

19           MR. COLEMAN:  Understood, Your Honor.

20           THE COURT:  Okay?

21           MR. COLEMAN:  I mean, I really do think it was -- I do

22   think that a reasonable reading of our responses is that there

23   are no -- I mean, I'm not responsible for announcing the

24   lack -- we're not withholding documents.  We're not withholding

25   responsive documents.

Colloquy

1          If they're -- if I intended to narrow the response by

2     an objection category, I would understand that.  But there

3     are -- all super chats are done through Google.  I mean, I'll

4     put it in writing, and then we'll submit it, and then it'll be

5     in writing.  All super chats are being done through YouTube.

6     YouTube does not provide this information, does not provide

7     information regarding the locations of super chat participants

8     or donations.

9          MX. GREEN:  Right.  I think the problem with that is

10    for that proposition, Mr. Coleman appears to be relying on an

11    AI chatbot.  Like, you can look --

12         MR. COLEMAN:  No, no --

13         MX. GREEN:  -- at Google actually says -- Google says

14    you can produce this information.  And again --

15         MR. COLEMAN:  Wait.  Wait, wait.  You didn't -- when I

16    asked you where it says -- whether it said Google could produce

17    information regarding geography or location, you weren't clear

18    that it did.  Now you're saying that it does?

19         MX. GREEN:  We're not talking about geography right

20    now.  We're talking about super chat revenue, which you're now

21    saying --

22         MR. COLEMAN:  Revenue.

23         MX. GREEN:  -- that there are no responsive documents.

24    That's not true.

25         MR. COLEMAN:  Right.  So Your Honor, so can we have a

Colloquy

1    ruling on whether the issue of super chat revenue unrelated to

2    geography is an appropriate subject for discovery here?

3              THE COURT:  Well, isn't that -- I'm sorry, so the

4    point -- the reason the revenue is relevant is if it came from

5    a different state, right?

6              MX. GREEN:  Right.

7              THE COURT:  We all agree on that?

8              MX. GREEN:  Correct.

9              THE COURT:  Okay.

10             MR. COLEMAN:  Yeah.

11             THE COURT:  And you're saying that information is not

12   available, Mr. Coleman, on YouTube --

13             MR. COLEMAN:  On --

14             THE COURT:  -- correct?

15             MR. COLEMAN:  Yes.

16             THE COURT:  On YouTube --

17             MR. COLEMAN:  Yes.

18             THE COURT:  -- super chat.

19             And Mx. Green, you say that it is available; you have

20   information that such information is available?

21             MX. GREEN:  Well, so I think we skipped a step.  And

22   the step we skipped is they have not said location is

23   unavailable.  What they have said, right, they have not

24   produced anything for super --

25             THE COURT:  Right.  But --

Colloquy

1        MX. GREEN:  -- chat.

2        THE COURT:  -- they're saying --

3        MX. GREEN:  It's not --

4        THE COURT:  -- but they don't have -- but the only

5   thing they would have to produce is information on location,

6   because that's really the only part that's relevant, right?

7        MX. GREEN:  Right.  And what I'm saying is the step

8   we're missing is we, like, we don't know what -- I have no

9   reason to think that the field is unavailable.

10       THE COURT:  But they're saying it is.

11       MX. GREEN:  But --

12       THE COURT:  So I don't know how you want to -- I mean,

13   if they --

14       MX. GREEN:  I don't think that's what they're -- I

15   mean, I know that that's what Mr. Coleman is saying now, but

16   that's not what his papers say.  That's not what his objections

17   say.  And that's not what YouTube says.  Right?  YouTube --

18       MR. COLEMAN:  Wait a minute --

19       MX. GREEN:  -- in their --

20       MR. COLEMAN:  -- that's not what --

21       MX. GREEN:  -- tutorial --

22       MR. COLEMAN:  -- YouTube says, but YouTube doesn't --

23   please.  I'm sorry.

24       THE COURT:  Okay.  Here's what I'm going to do.  Mr.

25   Coleman, I want you to look into whether that information is

Colloquy

1    available on YouTube and verify and speak to someone who knows

2    how to do that.  I don't know if you have --

3            MR. COLEMAN:  Yup.

4            THE COURT:  -- someone helping you on your end with

5    that.  And then go from there.  And if it's not available, then

6    put that in writing in your objections very specifically that

7    it's not available.  If it is available, then --

8            MR. COLEMAN:  I absolutely --

9            THE COURT:  -- produce it.

10           MR. COLEMAN:  -- will do.

11           THE COURT:  Okay?

12           MR. COLEMAN:  Yes, ma'am.

13           MX. GREEN:  Your Honor --

14           MR. COLEMAN:  Yes.

15           MX. GREEN:  -- if I may.  Like, the one thing I do

16   want to say, right, is the ask for all, right, the requests

17   asks for all information about --

18           THE COURT:  Yeah.  But --

19           MX. GREEN:  -- super chat revenue and -- well, and

20   they --

21           THE COURT:  I think --

22           MX. GREEN:  -- said --

23           THE COURT:  -- really all --

24           MX. GREEN:  -- they said --

25           THE COURT:  -- that matters is the state, though,



Colloquy

1      right?  That is the jurisdiction here.

2              MX. GREEN:  I think that is the most important thing.

3      But as we talked about before, it might have email addresses

4      associated with it.  And then we could reverse engineer that.

5      If -- what the problem is that their response doesn't say we're

6      withholding this because state-by-state information is not

7      available, it says no responsive documents -- or well, it just

8      has a boilerplate objection.  And then what we got in the

9      papers, once we made the motion, was no responsive document

10     exists.

11             THE COURT:  No, I hear you --

12             MX. GREEN:  But --

13             THE COURT:  -- that's why their previous response was

14     deficient.  But what I'm saying now is that really, the only

15     part they have to look for is location.  And if they don't have

16     that, then it's not available and then you move on.  You have

17     other ways to get at the information you want.

18             MX. GREEN:  Well --

19             THE COURT:  And --

20             MX. GREEN:  -- not this information.  The super chats

21     are kind of the major way that this system functions

22     financially.  Right?

23             THE COURT:  But I --

24             MX. GREEN:  It's not --

25             THE COURT:  -- can't -- if they -- if it doesn't give

Colloquy

1    it by location --

2                    MX. GREEN:  Of course.

3                    THE COURT:  -- then they don't.  So then you --

4                    MX. GREEN:  Right.

5                    THE COURT:  -- have other categories here that get you

6    such as what we talked about before like the email addresses of

7    the donors where you said you can reverse engineer it.  And I'm

8    not sure that you need to do that here too.

9                    If your goal is to establish what states he was doing

10   business in, you have other ways -- other categories of

11   information that's going to give you that information.

12                   MX. GREEN:  Right.  I think the problem is the

13   response from them once we do that is likely to be, well, just

14   because you showed thirty percent of his audience is in New

15   York -- or thirty percent of his donors are in New York,

16   rather, that doesn't mean his audience is in New York and that

17   doesn't mean -- right?

18                   It's about -- if we're willing to say, you know, the

19   donor spread is going to be representative of everything, and

20   we can assume that that's true for everything, fair enough.

21   But if the response we're going to get on jurisdiction is going

22   to be, well, that doesn't demonstrate anything about --

23                   THE COURT:  Well, I can't say --

24                   MX. GREEN:  -- the audience --

25                   THE COURT:  -- what they're going to argue.  But in

Colloquy

1    terms of --

2              MX. GREEN:  Right.

3              THE COURT:  -- the super chat donation data, either

4    there is that category or there isn't, and that's what --

5              MX. GREEN:  Right.

6              THE COURT:  -- they have to search for.  I mean, at

7    some point --

8              MX. GREEN:  Right.

9              THE COURT:  -- this discovery does become broader than

10   I think Judge Brodie intended.  And I do think that we need to

11   limit it to jurisdiction in a tailored way so that the case can

12   move on.

13             I want to move on now to 25, which is the back end

14   source code for defendant's website.  I don't fully understand

15   the technical issues of that, so if someone could explain to me

16   where things sit with that --

17             MX. GREEN:  Yes.

18             THE COURT:  -- response.

19             MX. GREEN:  So Your Honor, a website typically has

20   kind of call it two broad categories of code, back end and

21   front end.  Front end is if you right click on a website on

22   your computer and you say view source code, that's going to be

23   the front end source code.  Of course, lots of source code, and

24   this is typically for hacking reasons among others, right, how

25   various little applets work on a website, that isn't displayed

Colloquy

1    to the public, it calls out to a different set of code, and

2    that will run on the website.

3           What we asked for was all source code.  We got a

4    printout of what we could have done ourselves and would have

5    taken five seconds, which is a right click on the website, say

6    view source code, print.  What we don't have, and what's very

7    important, is the code that shows what the back end is doing

8    and how interactive it is.  This also should not be very

9    difficult to produce.

10          And again, we have the chatbot issue where while Wix

11   itself says you have access to all kinds of back end tools, I

12   mean, the chatbot doesn't even actually say what they cite it

13   for, but they're citing a chatbot log as if it's a source of

14   fact.  And that's their basis for saying they don't have access

15   to back end source code.  But every website owner has access to

16   back end source code.

17          I have access to our website's back end source code.

18   I'm sure the --

19          MR. COLEMAN:  Is your --

20          MX. GREEN:  -- administrator of the --

21          MR. COLEMAN:  -- on Wix?

22          MX. GREEN:  -- federal courts --

23          MR. COLEMAN:  Is yours on Wix?

24          MX. GREEN:  Wix says you have access, and it is

25   unfathomable that an owner of a website doesn't have access to

Colloquy

1        their own back end.  It's --

2                MR. COLEMAN:  No, it's not.

3                MX. GREEN:  -- it's just unfathomable.

4                MR. COLEMAN:  No, it's not.

5                Your Honor, so my response is it's not unfathomable.

6        First of all, I'd like to start with the question of how this

7        is jurisdictional discovery.

8                THE COURT:  Yeah, actually, that was going to be my

9        next question.

10               How does that relate, the back end source code, to

11       jurisdictional discovery?

12               MX. GREEN:  Right.  So one of the major things -- one

13       of the four named items that Judge Brodie asked us to look into

14       was the interactivity of the website.  The source code is how

15       you determine interactivity --

16               THE COURT:  Um-hum.

17               MX. GREEN:  -- right?  And back end source code is the

18       most important part of that, because that's what's actually

19       running under the hood, that's what's interacting.

20               THE COURT:  Okay.

21               MX. GREEN:  I mean --

22               MR. COLEMAN:  And my client's representation --

23               I'm sorry.  Remy --

24               THE COURT:  No, go ahead.

25               MR. COLEMAN:  Mx. Green (indiscernible, simultaneous

Colloquy

1  speech) was?

2          MX. GREEN:  But on Wix's website, again,

3  (indiscernible) website, users can access quote, "custom back

4  end logic", including quote, "back end modules hidden from site

5  viewers".  That's what Wix says about this.  The only contrary

6  thing is not from Wix; it's from an AI chatbot that doesn't --

7  like AI chatbots don't know hacks.

8          THE COURT:  Right.  I understand.

9          Mr. Coleman?

10          MR. COLEMAN:  My client is not aware of any way to do

11  this.  And the plaintiff says no, it can be done.  My client is

12  prepared to state in an interrogatory that he doesn't know how

13  to do this.

14          THE COURT:  Does he have a website?

15          MR. COLEMAN:  And as --

16          THE COURT:  Are you just consulting with someone other

17  than your client, like, some sort of expert in --

18          MR. COLEMAN:  No.  No.  But here's the point.  The

19  premise of plaintiff's argument for discoverability here is

20  maybe there's code that induces people from New York --

21          THE COURT:  Um-hum.

22          MR. COLEMAN:  -- more than it induces people -- or in

23  some way that is jurisdictionally significant to interact with

24  the website and, therefore, that would mean that the defendant

25  is availing himself of the jurisdiction.

Colloquy

1        My client is saying, I don't even know what you're

2   talking about.  I've never done that.  I don't know how to do

3   that.  And so the idea that my client should know --

4        THE COURT:  But the website could be doing that

5   without his -- even if he doesn't know how it works, that

6   doesn't mean it's not happening, right?  If I understand

7   correctly.  Like, just because he --

8        MR. COLEMAN:  I don't know --

9        THE COURT:  -- doesn't know that --

10       MR. COLEMAN:  -- I don't know about that.

11       THE COURT:  -- that's what the back end code is doing,

12   doesn't mean that it's not doing that.

13       MR. COLEMAN:  And if it did that, that would be

14   grounds for his availing himself of the jurisdiction, even if

15   he didn't know it?  I guess that --

16       THE COURT:  Let's say --

17       MR. COLEMAN:  -- could be.  That could --

18       THE COURT:  -- he -- I don't know --

19       MR. COLEMAN:  -- be.

20       THE COURT:  -- did he have someone else build this

21   website for him?  Did they discuss --

22       MR. COLEMAN:  No.  It's consumer, it's a retail -- I

23   don't think so.  No, no, no.  Like, otherwise, we would ask

24   that person for --

25       THE COURT:  Wait, he built this --

                            Colloquy

1           MR. COLEMAN:  -- this is a --

2           THE COURT:  -- website himself, but he doesn't know

3    how to access the back -- I mean, that doesn't make a --

4           MR. COLEMAN:  Right.

5           THE COURT:  -- lot of sense.

6           MR. COLEMAN:  Because -- no, no, Your Honor.  It does,

7    because the whole selling point of Wix is that so dummies like

8    lawyers and YouTube streamers can build a website without

9    having to know how to build a website.  You tell us what you

10   want it to look like, and we send elves to the back to --

11          THE COURT:  Okay.

12          MR. COLEMAN:  -- to make it happen.

13          THE COURT:  So let's say Wix built this website and

14   that it built it in a way so that it entices customers from New

15   York or various jurisdictions, that would be relevant to

16   jurisdictional discovery, even if your client didn't know it.

17          MR. COLEMAN:  I guess so.  I guess I could see how

18   that could be the case.  I guess --

19          MX. GREEN:  Your Honor --

20          THE COURT:  Okay.

21          MX. GREEN:  -- may --

22          MR. COLEMAN:  But my client simply just doesn't know

23   how to do it.

24          THE COURT:  But you may need to -- but then you may

25   need to consult with someone else to get that information to

Colloquy

1    them because there's someone who knows how to do this.  And

2    maybe --

3              MR. COLEMAN:  Your Honor, I would submit that that

4    goes beyond -- in other words, there's a general rule that you

5    have to create -- you have to produce discovery that is within

6    your reasonable custody and control.  And if that includes

7    having to do a few keystrokes, then that's all -- then you also

8    have to produce that.

9              But the idea that my client should engage a consultant

10   to do things that he doesn't technologically know how to do

11   himself in order to comply with this -- we're not talking about

12   an e-discovery expert where you have volume, you have to deal

13   with the volume, and you have to deal with large amounts of --

14   we're talking about --

15             THE COURT:  Well, let me ask you this, Mx. Green.  Is

16   this something that, to get the back end code, you said it's

17   actually not so hard to do and most websites owners could do.

18   Is this something you could provide guidance on how they could

19   do it?

20             MX. GREEN:  I've never used Wix.  If he could -- if

21   they're willing -- I've, as we've said repeatedly, if they're

22   claiming they can't do something, we're always happy to get on

23   a Zoom and screen share so that we can help them figure out how

24   to do it.

25             THE COURT:  Okay.



Colloquy

1          MX. GREEN:  We've done that --

2          THE COURT:  So why don't you have a meet and confer on

3    a Zoom and see whether you can discuss how to do this.  Okay?

4          MX. GREEN:  May I also just suggest another way to cut

5    this knot would be to just subpoena.  Right?  And if they --

6          THE COURT:  Subpoena Wix?

7          MX. GREEN:  -- if they -- subpoena Wix.  If they -- if

8    defendant agrees not to object to it, that might just be

9    easier.

10          THE COURT:  Okay.  Mr. Coleman?

11          MR. COLEMAN:  I just think the problem with that is

12    that we're basically kicking out jurisdictional discovery into

13    the summer.

14          MX. GREEN:  I mean, we are --

15          MR. COLEMAN:  There's --

16          MX. GREEN:  -- already --

17          MR. COLEMAN:  -- there's really going to be no --

18          MX. GREEN:  -- doing that --

19          MR. COLEMAN:  -- end to it.

20          MX. GREEN:  -- where there is so much missing.

21          MR. COLEMAN:  Well, Your Honor, I mean, I think that

22    that's the key to this.  I can't imagine that Judge Brodie ever

23    intended that this level -- I mean, jurisdiction -- the courts

24    have been doing jurisdictional discovery in cases for fifty

25    years.  When has it ever been the case that months and months

Colloquy

1  of jurisdictional discovery have been necessitated because of a

2  range of technological issues where the plaintiffs seeking the

3  discovery says we might be able to find if we do -- if we use

4  this kind of tool, we might be able to find, we might be able

5  to find.

6          This jurisdictional discovery is what information is

7  existing in the world that can demonstrate the existence of

8  jurisdiction.

9          THE COURT:  But his -- look, this is -- but this is a

10  case involving a lot of technology.  This is the world that we

11  live in now.  And so jurisdictional discovery meant something

12  different thirty years ago than it means today.  And the types

13  of cases that are being brought today are different from the

14  cases that were being brought thirty years ago, different

15  technology.

16          So at this point, I'm trying to find a way to cut

17  through this.  You have two choices.  I'm fine with a subpoena.

18  I don't see why that pushes it out to the summer.  It shouldn't

19  take them that long to produce it, but -- or you can talk and

20  see whether you can do it yourself.  But I think we need to

21  figure -- either of those options or both are fine with me.

22          MR. COLEMAN:  Okay.  We'll work it out.

23          THE COURT:  Okay.  So I think that covers all the

24  areas.

25          I know that you want to discuss Rule 37, fees.  I am

Colloquy

1    going to defer on fees until all of this is resolved, because I

2    want to see where things go and how long it takes to get this

3    resolved and what cooperation there is going forward, and then

4    we'll make a final determination on the fees application.

5            MX. GREEN:  Your Honor, may I raise the compliance

6    with ECF 40?  And then I would like to just make -- say two

7    sentences about Rule 37, but I understand where the Court's

8    going on that.

9            So ECF Number 40, that was communications.  The

10   deadline to produce was the 28th.  There was no extension of

11   it.  There was no request for an extension.  In our reply, we

12   raised the fact that they produced in a absurd format, right,

13   an hour of him scrolling through his DMs.  We've explained in

14   the papers we've filed, in multiple emails to counsel, that

15   it's not very hard to do this, that you just go, you export all

16   of your data, and then you go to the DM folder and extract

17   that.  So format is -- the case law on this is pretty clear.

18   You can't erase text searchability, which is obviously what a

19   video does.

20           But also there are massive holes in it.  The DMs we

21   have in video, as we put on the docket, include them talking

22   about what they describe as, "Alyssa-specific chats".  We don't

23   have any of those.  They describe emails.  We don't have any of

24   those.  We raised this with counsel, and I think this was

25   actually after we filed the motion for an extension, but the --

Colloquy

1    of the discovery end date.

2            But the discovery end date isn't when they were

3    required to comply with this.  They were required to produce

4    months and months ago.  Then they were ordered to produce by

5    the 28th.  And we still don't have a single proper production

6    of DMs or messages or emails, and just on its face, massive

7    holes in what's been produced because they discussed talking

8    about our clients else, right, in other chats that were not

9    produced.

10           I mean, there's also -- I think some of the problem

11   here is that it's hard to -- I mean, well, I can say I know

12   that Mr. Coleman on stream with his client said that he didn't

13   watch the video before producing it.  And I think that that's

14   kind of clear, because there's some stuff in there that I think

15   they probably should have withheld.  And some -- in addition to

16   that, I don't think they would properly withhold this, but I

17   would have expected at least a facial privilege claim, because

18   in this chat are screenshots of the defendant's emails to

19   counsel and counsel's emails back.

20           MR. COLEMAN:  Which were obviously waived regarding

21   those --

22           MX. GREEN:  Right.  And --

23           MR. COLEMAN:  -- communications --

24           MX. GREEN:  -- I mean --

25           MR. COLEMAN:  -- he shared them with third parties.



Colloquy

1          MX. GREEN:  Right.  And --

2          MR. COLEMAN:  So you're now trying to say by not

3     making a meritless claim --

4          MX. GREEN:  Mr. Coleman (indiscernible) --

5          But I mean, the point is that it seems like part of

6     this is that defendant himself is just not being forthcoming

7     with what exists and is not doing proper searches.  And --

8          THE COURT:  Okay.  I'm --

9          MX. GREEN:  -- counsel is not --

10          THE COURT:  -- running out -- sorry, I'm just cutting

11     you off because I actually have another --

12          MX. GREEN:  Okay.  Sorry.

13          THE COURT:  -- conference coming up very shortly.  So

14     we've been at this for 45 minutes.

15          Mr. Coleman, are you producing those chats and those

16     communications and those emails?  Like, what's --

17          MR. COLEMAN:  We will --

18          THE COURT:  -- are those going --

19          MR. COLEMAN:  -- yes, we will produce those chats and

20     those communications and those emails.  And I will remind the

21     Court, for the record, this is a SLAPP suit.  This is a SLAPP

22     suit.  And all the discovery, all that we're talking about

23     here, shouldn't even be taking place.  And the fact that the

24     Court ordered jurisdictional discovery here and therefore gave

25     the plaintiff here the ability in a SLAPP suit, in a meritless

Colloquy

1    SLAPP suit that should have been dismissed, the ability to

2    demand all these communications among people that it considers

3    and considers to be culture war rivals is outrageous.  And

4    we're doing our best to comply because we want this -- we want

5    to get rid of this case.  We've got nothing to hide.

6            But it's the idea that plaintiff is going to display

7    all this moral dudgeon about a lawsuit based on his client's

8    having had her feelings hurt under New York law is outrageous.

9            MX. GREEN:  Mr. Coleman, please use the correct way of

10   referring to me.  It's inappropriate.

11           MR. COLEMAN:  Her client?  I'm sorry, I'm not

12   trying --

13           THE COURT:  They.  They.

14           MX. GREEN:  You know that.

15           THE COURT:  They.  Use they/them pronouns, please.

16   Okay.

17           In any event, how much time -- now let's just talk

18   about dates -- how much time do you think you need now to

19   comply with all of these requests?

20           MR. COLEMAN:  A week.

21           THE COURT:  A week?  That includes all the

22   communications?

23           MR. COLEMAN:  Yeah.  Because it's really not really --

24   it's not the treasure trove that plaintiff thinks it is.

25           THE COURT:  Okay.  But I don't -- I'm really -- if I

Colloquy

```
 1    set a week, I want it to be a week.  I don't want everybody

 2    coming back and then we need more time here so.

 3              MR. COLEMAN:  Next Monday.  We will produce it --

 4              THE COURT:  Well, Monday --

 5              MR. COLEMAN:  -- next Monday --

 6              THE COURT:  -- is a holiday --

 7              MR. COLEMAN:  (Indiscernible, simultaneous speech)

 8              THE COURT:  -- so I'm going to do it -- I'm going to

 9    set it for February -- I'm going to extend discovery to 2/7.

10              And that gives you both time for the meet and confer

11    as we discussed as well?

12              MX. GREEN:  We can do that.

13              THE COURT:  Okay.

14              MR. COLEMAN:  Yup.  All right.  Thank you.

15              THE COURT:  Okay.  So I'm going to set the date for --

16    extend the discovery deadline 2/17.  I'm going to grant the

17    motion to compel to the extent discussed on the record today.

18    I'm going to withhold ruling on fees.

19              What I'm going to ask is on 2/17 is for a letter

20    confirming that the discovery has been completed and if not,

21    inform -- a status letter informing the Court of where things

22    stand.  Okay?  On 2/17.

23              MR. COLEMAN:  Yes.  Thank you.

24              MX. GREEN:  Yes, Your Honor.

25              MR. COLEMAN:  Thank you, Judge.
```

Colloquy

1          MX. GREEN:  Brief housekeeping, I think we are due to

2    file a letter today to Judge Brodie.  Do you think we should do

3    that or should we --

4          THE COURT:  What's the letter today to Judge Brodie?

5    I'm sorry, what?

6          MX. GREEN:  I think it's basically the letter you just

7    mentioned, which is we're supposed to file a letter today

8    confirming jurisdictional discovery closed.

9          THE COURT:  Oh, I don't think you're going to need to

10   do that once I put in my order --

11         MX. GREEN:  That's what I thought.

12         THE COURT:  -- stating what's going on.  I mean, she

13   knows I have this hearing today so.  And --

14         MX. GREEN:  Okay.

15         THE COURT:  -- that -- and she also knows that I was

16   going to wait until today to set the deadline for the end of

17   jurisdictional discovery.

18         MX. GREEN:  I figured as much, but it's always

19   better --

20         THE COURT:  Okay.

21         MX. GREEN:  -- to --

22         THE COURT:  Okay.

23         MX. GREEN:  -- when there when there's a deadline.

24         THE COURT:  And we will reach out to her chambers to

25   let them know that you won't be filing that letter because --

Colloquy

1     in case our order goes up later today or in the morning.  Okay?

2               MX. GREEN:  Much appreciated, Your Honor.

3               THE COURT:  Okay.

4               MR. COLEMAN:  Thank you, Judge.

5               THE COURT:  All right.  Thank you.  All right.

6               MR. COLEMAN:  Thank you, Judge.

7               THE COURT:  Bye.  Bye.

8               MX. GREEN:  Bye.

9          (Proceedings concluded.)

10                         *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T I O N

2

3              I, Rachel Wiley, court-approved transcriber, do hereby

4     certify the foregoing is a true and correct transcript from the

5     official electronic sound recording of the proceedings in the

6     above-entitled matter.

7

8

9                                                    February 14, 2026

10    _____          _____

11    Rachel Wiley, CET-3353                DATE

12

13    eScribers, LLC
      7227 North 16th Street
      Phoenix, AZ 85020
14    www.escribers.net

15

16

17

18

19

20

21

22

23

24

25

