# Coleman Law Firm, p.c.

RONALD D. COLEMAN
973 264 9611
RCOLEMAN@COLEMANLAW-PC.COM
50 PARK PLACE | NEWARK NJ 07102

Admitted in New York and New Jersey

May 9, 2026

*BY ECF*

Hon. Lara K. Eshkenazi, U.S.M.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:** *Mercante v. Tarzia,* No. 1:24-cv-08471 (E.D.N.Y.) — Response to ECF No. 89

Dear Judge Eshkenazi:

I represent Defendant Jeffrey Tarzia. I write in response to Plaintiff's Motion for Order to Show Cause (ECF No. 89), which asks the Court to disregard Defendant's Rule 37 fee objection letter (ECF No. 88) on three grounds: alleged errors in case citations, an alleged confidentiality violation, and an alleged deadline violation. All three grounds fail, and the motion should be denied.

**The Citation Errors.**

Plaintiff's motion characterizes the citations in ECF No. 88 as "AI citations" and "fact misrepresentations." That characterization is wrong, and Plaintiff knows it is wrong. Every case cited in ECF No. 88 was retrieved by counsel (i.e., the undersigned) **directly** from Westlaw. Every case **exists**. Every case stands for the **proposition** for which it was cited. Plaintiff does not argue otherwise, because she cannot. The full text of each case is attached to this letter as Exhibits A through D, and the Court can verify the substance of each citation in minutes.

These errors occurred because ECF No. 88 was filed on a Friday evening, under time pressure: Plaintiff had transmitted wire transfer instructions for the full fee amount at 4:52 that afternoon— minutes before the close of business on a Friday, two days after receiving Defendant's scope objections and without addressing any of them on the merits. With a payment deadline of May 13 running and Plaintiff taking the position, as she did in her order to show cause, that Defendant had missed a deadline to file objections with the Court, Defendant concluded there was a premium on filing them the same day. And counsel's availability to do so on a Friday evening was waning.

In that urgency, I made mistakes when recording citations for four of the cases. The citation errors are as follows:

> *Townsend v. Haza Foods, LLC*: Cited as "Slip Copy (W.D.N.Y. 2026)" without a WL number. Correct citation: 2026 WL 809490 (W.D.N.Y. Mar. 24, 2026). The case exists and

Hon. Lara K. Eshkenazi, U.S.M.J.                                                    May 9, 2026
Mercante v. Tarzia
Page 2 of 3

holds precisely what ECF No. 88 says it holds: that time spent in meet-and-confer conferences, reviewing discovery responses, drafting correspondence, and attending discovery conferences is not compensable as expenses "incurred in making the motion" under Rule 37.

*Richir v. Village of Fredonia*: Cited with WL number 4104455. Correct WL number: 943024. Full citation: 2008 WL 943024 (W.D.N.Y. Apr. 4, 2008). The case exists and holds what ECF No. 88 says it holds: the court conducted its own independent apportionment of time attributable to the motion to compel rather than accepting the moving party's submission as presented.

*A.M. v. City of New York*: Cited with WL number 17543173. Correct WL number: 20472225. Full citation: 2022 WL 20472225 (E.D.N.Y. Aug. 8, 2022). The case exists and holds what ECF No. 88 says it holds: a fee application was denied for failure to comply with formal filing requirements, including the absence of a notice of motion and supporting declarations.

*Cerco Bridge Loans 6 LLC v. Schenker*: Reporter citation (768 F. Supp. 3d 559) and court and year are correct. The pinpoint page cited (563) was in error; the relevant passage appears at page 587-88. The case exists and holds what ECF No. 88 says it holds: absent special circumstances, when a fee target fails to offer countervailing evidence or persuasive argumentation, it is not the court's job to do the target's homework. 768 F. Supp. 3d at 587-88.

Citation errors in real cases retrieved from Westlaw are not "AI citations." They are citation errors, of the kind that courts routinely allow counsel to address through errata or corrected submissions. The appropriate remedy is a corrected citation, not an emergency order striking a substantive filing.

Plaintiff's motion does not argue that any of these cases are nonexistent or that they fail to support the propositions for which they were cited. She cannot make that argument, because it is false. What Plaintiff seeks is to have Defendant's substantive objections to her fee submission disregarded on account of clerical numbering errors. That is not relief this Court should grant.

**The Confidentiality Claim.**

Plaintiff contends that Defendant filed her fee submission (Exhibit A to ECF No. 88) improperly because it was designated "CONFIDENTIAL — SETTLEMENT PURPOSES ONLY." That designation has no legal force here for three independent reasons.

First, the fee submission is not a settlement communication within the meaning of Rule 408 or any other rule. It was produced pursuant to the Court's April 21 Minute Order directing Plaintiff to provide Defendant with her fee costs by April 29. A document produced in compliance with a court order is not an offer to compromise a disputed claim. Plaintiff's watermark does not change what the document is.

Hon. Lara K. Eshkenazi, U.S.M.J.                                                    May 9, 2026
Mercante v. Tarzia
Page 3 of 3

Second, the submission is not a discovery document subject to ECF No. 52. It is not discovery. It was not produced in response to a discovery request. The protective order governing discovery materials does not reach a court-ordered fee submission any more than it does correspondence or other litigation communications.

Third, there was no legal basis to file the submission under seal. Plaintiff's unilateral designation is not a court order, not a Local Rule requirement, and not a designation under ECF No. 52. Courts in this circuit routinely consider billing records and time sheets in Rule 37 fee proceedings as part of the public record, filed on the docket without sealing. The cases cited in ECF No. 88 are themselves examples: in both *Townsend v. Haza Foods, LLC* and *Richir v. Village of Fredonia*, the fee applicant's billing records were filed publicly as part of the court record. Had Defendant sought to file the submission under seal on the basis of Plaintiff's watermark alone, the application would have been denied. Defendant filed the submission publicly because that is how fee records are filed in this court, and because the Court cannot adjudicate the objections without the submission before it. The wire transfer information was redacted. No confidential financial information was disclosed.

**The Timeliness Claim.**

Plaintiff argues that ECF No. 88 was filed after the May 6 objection deadline. Defendant addressed this fully in ECF No. 88 itself and will not repeat the argument at length. Briefly: Defendant served written objections on Plaintiff's counsel on May 6, the deadline. Defendant filed ECF No. 88 on May 8 in an abundance of caution after Plaintiff transmitted wire instructions that same morning, treating the objections as a nullity. The two-day gap caused Plaintiff no prejudice; she had the objections in her hands on the deadline date, responded to them the same day, and then proceeded to demand payment in full as though Defendant's objections did not exist.

**Relief Requested.**

Defendant respectfully requests that the Court deny ECF No. 89 in its entirety, accept ECF No. 88 with the citation corrections set forth above, and proceed to address the merits of the fee objections—including Defendant's request that the May 13 payment deadline be deferred pending resolution.

Defendant thanks the Court for its attention.

Respectfully submitted,

Ronald D. Coleman

EXHIBIT A

2026 WL 809490
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Sarah TOWNSEND, Individually
and on Behalf of All Others
Similarly Situated, Plaintiff,

v.

HAZA FOODS, LLC; Haza Foods of
Northeast, LLC; Haza Foods of Minnesota,
LLC, and Does 1 to 25, Defendants.

24-CV-6180-EAW-MJP
|
Signed 03/24/2026

**Attorneys and Law Firms**

Benjamin J. Sweet, Nye, Stirling, Hale & Miller, LLP, Pittsburgh, PA, Callum T. Appleby, Pro Hac Vice, Nye Stirling Hale Miller Sweet LLP, Pittsburgh, PA, Jordan Porter, Pro Hac Vice, Nye Stirling Hale Miller & Sweet, Santa Barbara, CA, for Plaintiff.

Kevin S. Simon, Pro Hac Vice, Scott C. Fanning, Pro Hac Vice, Fisher & Phillips LLP, Chicago, IL, Phillip Coursey Bauknight, Fisher & Phillips, Berkeley Heights, NJ, for Defendants Haza Foods, LLC, Haza Foods of Northeast, LLC, Haza Foods of Minnesota, LLC.

DECISION AND ORDER

Pedersen, United States Magistrate Judge

**\*1** Presently pending before the Court is Plaintiff's application for attorneys' fees (ECF No. 62) in connection with my decision and order on Plaintiff's motion to compel (ECF Nos. 53 and 58). For the reasons provided below, I award Plaintiff $2,025 in attorneys' fees.

**BACKGROUND**

The Court assumes familiarity with its earlier decision and order determining that an award of attorneys' fees is appropriate in connection with Plaintiff's partial success on her motion to compel. (Decision and Order, Oct. 23, 2025, ECF No. 58.) In that decision and order the Court directed Plaintiff to file an affidavit detailing the reasonable expenses incurred in making the motion along with contemporaneous time records. (*Id.* at 12.) On November 6, 2025, Plaintiff's counsel filed his declaration in support of attorneys' fees seeking fees at a rate of $450 per hour for an associate and $950 per hour for a partner for 21.5 hours totaling $10,925.00 in fees. (ECF No. 62). Defendants filed their opposition to Plaintiff's application on November 13, 2025 (ECF No. 63).

**LEGAL STANDARD**

The Second Circuit uses the lodestar method as the starting point to determine if a fee is reasonable. *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) ("While the lodestar is not always conclusive, its presumptive reasonability means that, absent extraordinary circumstances, failing to calculate it as a starting point is legal error."). It is the starting point because "the Supreme Court's directive that fee award calculations be 'objective and reviewable,' implies [that] the district court should at least provide the number of hours and hourly rate it used to produce the lodestar figure." *Id.* at 166–67 (alteration added) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 555 (2010)).

Courts calculate the lodestar or presumptively reasonable fee by "multiply[ing] 'the number of hours reasonably expended' by a 'reasonable hourly rate.' " *Schneider on behalf of A.T. v. City of Buffalo*, No. 18-CV-1431V(SR), 2021 WL 5042502, at *3 (W.D.N.Y. Oct. 29, 2021) (*alteration added*) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). Once calculated, there is a strong presumption that the lodestar figure is reasonable, but the Court may consider additional factors. *McPhaul v. Insight Mgmt. Partners*, No. 1:19-CV-1392, 2022 WL 542534, at *2 (W.D.N.Y. Feb. 23, 2022) ("Generally, the 'lodestar' creates a presumptively reasonable fee, guided by the *Arbor Hill* factors.[1]"). Courts may consider the *Arbor Hill* factors to determine if the lodestar method has produced a reasonable fee. *See McPhaul*, 2022 WL 542534, at *3 ("The court may then adjust the lodestar amount, factoring in the *Arbor Hill* considerations."). Finally, given "the district court's familiarity with the quality of representation and the extent of the litigation, the decision whether to award fees and the amount of fees awarded are issues generally confined to the sound discretion of the court." *Cush-Crawford v. Adchem Corp.*, 94 F. Supp. 2d 294, 301

(E.D.N.Y. 2000), *aff'd* 271 F.3d 352 (2d Cir. 2001) (citing *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998)).

## DISCUSSION

### *Scope of Magistrate Judge's Authority*

**\*2** A magistrate judge may hear and issue a decision on pretrial matters "not dispositive of a party's claim or defense" subject to district judge review on a "clearly erroneous" or "contrary to law" standard. Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). "Matters concerning discovery generally are considered 'nondispositive' of the litigation." *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990). More specifically, as relevant here, decisions on motions to compel and related requests for attorney's fees are nondispositive. *Averbach v. Cairo Amman Bank*, No. 1:19-CV-4-GHW-KHP, 2025 WL 1725148, at \*3 (S.D.N.Y. June 18, 2025) ("A magistrate judge's ruling on a motion to compel discovery is nondispositive." (quoting *United States ex rel. Integra Med Analytics LLC v. Laufer*, No. 17-cv-9424 (CS) (JCM), 2023 WL 4200865, at \*1 (S.D.N.Y. June 27, 2023))); *Xerox Corp. v. Conduit Glob., Inc.*, No. 6:21-CV-06467 EAW, 2025 WL 586244, at \*1 (W.D.N.Y. Feb. 24, 2025) (stating that magistrate judge's decision on motions for attorney's fees in connection with motions to compel and for protective order was nondispositive).

### *The Court's previous decision and order permitted Plaintiff to seek attorneys' fees.*

The Court's earlier decision and order (ECF No. 58) permitted Plaintiff to submit an application for fees under Federal Rule of Civil Procedure 37(a)(5)(C). When the court grants in part and denies in part a motion to compel pursuant to Federal Rule of Civil Procedure 37 the court "may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(C).

### *The Court will not award Plaintiff's attorneys their proposed out-of-district hourly rates.*

The Court's first task is determining the reasonable hourly rate. *Lilly v. City of New York*, 934 F.3d 222, 230 (2d Cir. 2019). "The reasonable hourly rate is the rate a [ ] client would be willing to pay." *Arbor Hill*, 522 F.3d at 190. When calculating the reasonable hourly rate, the Court assumes that the parties "wish[ ] to spend the minimum necessary to litigate the case effectively." *Bergerson v. New York State Off. of*

*Mental Health, Cent. New York Psychiatric Ctr.*, 652 F.3d 277, 289 (2d Cir. 2011) (quoting *Arbor Hill*, 493 F.3d at 112, 118).

Under the forum rule, "courts should generally use 'the hourly rates employed in the district in which the reviewing court sits.' " *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill*, 493 F.3d at 119). "[D]eviation from the forum rule is only appropriate 'in the unusual case,' in which a litigant demonstrates that her selection of counsel was 'reasonable under the circumstances[.]' " *Id*. at 175 (quoting *Arbor Hill*, 493 F.3d at 119). Thus, "when faced with a request for an award of higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule." *Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 547 (2d Cir. 2023) (quoting *Simmons*, 575 F.3d at 175), *cert. denied*, ––– U.S. ––––, 144 S. Ct. 822, 218 L.Ed.2d 31 (2024).

"[T]o overcome that presumption, a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Id*. (quoting *Simmons*, 575 F.3d at 175). Overcoming this presumption accordingly requires "a particularized showing...of the likelihood that use of in-district counsel would produce a substantially inferior result." *Id*. (quoting *Simmons*, 575 F.3d at 176).

While Plaintiff's counsel indicates that he utilized reduced rates of $450 per hour for associate billing and $950 per hour for partner billing, Plaintiff has not even attempted to show that retaining in-district counsel would have produced a substantially inferior result. *Legends Are Forever, Inc. v. Nike, Inc.*, No. 3:12-CV-1495 LEK/DEP, 2013 WL 6086461, at \*3 (N.D.N.Y. Nov. 18, 2013) (rejecting proposed out-of-district rate where the prevailing party had "not set forth any argument that it selected Boston- and Rochester-based law firms because there existed a 'likelihood that use of in-district counsel would produce a substantially inferior result' " (quoting *Simmons*, 575 F.3d at 176)). Accordingly, the forum rule applies here. *Osterweil v. Bartlett*, 92 F. Supp. 3d 14, 27 (N.D.N.Y. 2015) (applying forum rule where the plaintiff failed to show "that attorneys within [the] district [were] not competent to handle" the litigation because the plaintiff "appears to have assumed that local counsel could not have achieved a successful result in this action without inquiring into the competence and expertise of attorneys within this district" (alterations added)).

**\*3** Defendants argue that the hourly rates sought by Plaintiff's counsel are (1) significantly higher than rates requested by and awarded to Plaintiff's counsel in other recent matters and (2) that the hourly rates in the Western District are significantly less than what Plaintiff's attorneys are requesting. (Defs.' Mem. of Law at 4–5, ECF No. 63.)

The Court agrees with Defendants that the hourly rates sought by Plaintiff's attorneys are excessive for this District. See *Ortiz v. Stambach*, 657 F. Supp. 3d 243, 268 (W.D.N.Y. 2023) (finding that the "prevailing hourly rate for an experienced attorney in a civil rights matter is typically no more than $300 per hour, while less experienced attorneys typically have rates of no more $200 per hour"). Recent decisions of this District have awarded $350 per hour to experienced civil rights litigators. *Ryan v. Town of Tonawanda*, No. 23-CV-351-LJV( ), 2025 WL 997362, at \*2 (W.D.N.Y. Apr. 1, 2025) ("Accordingly, while allowing for some inflation effect and taking into account Plaintiff's counsel's extensive litigation experience, the court finds a reasonable hourly rate for counsel's time to be $350 per hour."); *Wright v. Rochester Sportfishing, Inc.*, No. 6:24-CV-06240 CJS CDH, 2025 WL 3703602, at \*7 (W.D.N.Y. Dec. 22, 2025) (finding that a $350 hourly rate was appropriate for a "Senior Litigation Counsel for...a boutique firm specializing in the enforcement and protection of intellectual property rights" with "over a decade [of experience] as a practicing attorney" and specific "expertise...in the field of copyright litigation.").

Based on the foregoing, the Court finds that hourly rates of $200 for associate time and $350 for partner time are appropriate hourly rates to utilize for the lodestar calculation.[2]

### The requested number of hours is excessive

Plaintiff seeks attorneys' fees for 21.5 hours, having reduced the total amount of fees sought by removing time associated with paralegal and assistant work. (Appleby Dec. ¶¶ 4–5, ECF No. 62.) Defendants first contend that Plaintiff failed to provide contemporaneous time records despite the Court ordering her to do so and that, therefore, the Court should deny Plaintiff's fee request. (Defs.' Mem. of Law at 6, ECF No. 63.) Defendants also assert that 21.5 hours was excessive considering the "simplicity of the issues involved in the motion." (*Id*.) Finally, Defendants contend that Plaintiff's request should be reduced by "at least 75% due to the limited degree of success and the unnecessary cost and expense that

Defendants incurred in responding to the denied portions of the motion." (*Id*. at 7.)

With respect to Defendants' argument that the Court should deny the fee application because Plaintiff did not provide contemporaneous time records, although Plaintiff's counsel did not submit backup documents, he did provide a fully detailed itemization of the dates that work was performed, a description of the work done, and the time expended. This is adequate. *S J Berwin & Co. v. Evergreen Ent. Grp., Inc.*, No. 92 CIV. 6209 (WK), 1994 WL 501753, at \*2 (S.D.N.Y. Sept. 14, 1994) (citing *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 946 (9th Cir. 1993)).

**\*4** The Court next turns to Defendants' argument that the 21.5 hours Plaintiff's counsel seeks is excessive. To determine the reasonable number of hours for purposes of a fee request, "the court must examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Kmonicek v. ASAP Restoration Inc.*, No. 24-CV-5226 (EK)(SIL), 2025 WL 1384709, at \*7 (E.D.N.Y. Apr. 3, 2025) (quoting *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 371 (S.D.N.Y. 2005)), *report and recommendation adopted*, No. 24-CV-5226 (EK)(SIL), 2025 WL 1384248 (E.D.N.Y. May 12, 2025). "The relevant issue...is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Id*. (alteration in original) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)).

Further, the plain text of Rule 37(a)(5)(C) provides that "[i]f the motion is granted in part and denied in part, the court...may, after giving an opportunity to be heard, apportion the reasonable expenses *for the motion*." Fed. R. Civ. P. 37(a)(5)(C) (emphasis added). In other words, Plaintiff is not entitled to attorneys' fees for time spent prior to receiving the motion papers. *S J Berwin & Co.* 1994 WL 501753, at \*2 (finding that time spent preparing discovery responses prior to filing a motion to compel was not compensable and only awarding fees for work done once counsel received the motion papers); *S.E.C. v. Yorkville Advisors, LLC*, No. 12 Civ. 7728(GBD)(HBP), 2015 WL 855796, at \*11–12 (S.D.N.Y Feb. 27, 2015) (finding that no fees should be awarded under Fed. R. Civ. P. 37(a)(5)(C) for time spent reviewing privilege logs that were the subject of a motion compel, drafting correspondence challenging the privilege logs, or participating in a discovery conference as they were not expenses incurred for the motion to compel.); *Skanga*

*Energy & Marine Ltd. v. Arevenca S.A.*, No. 11 CIV. 4296 DLC DF, 2014 WL 2624762, at *6 (S.D.N.Y. May 19, 2014) (finding that the defendant was "not entitled to recover fees for time expended by counsel on the day before the plaintiff filed its Protective Order Motion, even if that time was spent conferring or doing research in anticipation of a potential motion.").

Here, Plaintiff seeks to recover fees for

- Meeting and conferring with opposing counsel regarding the lack of discovery responses;

- Drafting a letter to Judge Pedersen regarding lack of discovery responses;

- Reviewing Defendants' discovery responses;

- Preparing for and attending a discovery conference;

- Reviewing Defendants' supplemental discovery responses;

- Researching and drafting a discovery letter to Defendants in light of deficient supplemental discovery responses;

- Correspondence with opposing counsel regarding the motion to compel;

- Reviewing Defendants' second supplemental discovery responses; and

- Reviewing and editing a discovery letter to Defendants. (Appleby Dec. ¶¶ 6 & 7.) The Court will not award attorneys' fees for this time as it was not incurred in making the motion. However, Mr. Appleby's 6.3 hours spent researching and drafting Plaintiff's motion to compel and 2.8 hours reviewing Defendants' opposition to the motion and drafting a reply brief were incurred in making the motion. (*Id*. ¶ 6.) Likewise,

Mr. Sweet's 2 hours spent reviewing and editing Plaintiff's motion to compel and reviewing and editing Plaintiff's reply brief were incurred in connection with the motion. (*Id*. ¶ 7.) In total, Plaintiff's counsel spent 11.1 hours making and supporting the motion to compel.

**\*5**  The Court agrees with Defendants that the Court should reduce the number of hours Plaintiff seeks as she was not successful on several of the issues raised in the motion. However, the Court finds that Defendants' request to reduce the fee award by 75% is too drastic. The Court will reduce the recoverable amount of hours to 9 to account for those parts of the motion on which Plaintiff was not successful and that Defendants spent time opposing, apportioned as 7.5 attributable to Mr. Appleby and 1.5 attributable to Mr. Sweet.

Accordingly, because the Court finds that hourly rates of $200 for associate time and $350 for partner time and the 9 hours spent on the making and supporting the motion to compel to be reasonable, and after considering the *Arbor Hill* factors, the Court awards Plaintiff $2,025 in attorneys' fees for litigating the successful portions of her motion to compel.

**CONCLUSION**

For the reasons stated above, the Court awards Plaintiff $2,025 in attorneys' fees pursuant to her request (ECF No. 62) in connection with Plaintiff's motion to compel (ECF No. 53) and my decision and order regarding the same (ECF No. 58).

**SO ORDERED**.

**All Citations**

Slip Copy, 2026 WL 809490

Footnotes

1    Found at *Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany*, 522 F.3d 182, 184 (2d Cir. 2008), the *Arbor Hill* factors are as follows:

the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

2      The Court is aware of the decision in *Howard v. City of Rochester*, 780 F. Supp. 3d (W.D.N.Y. 2025) in which it awarded Plaintiff's counsel an in-district rate of $475 per hour. *Id.* at 433. However, that case is distinguishable from the present. In that case, the party against whom fees were sought did not oppose an hourly rate of $475 per hour, whereas here Defendants have contested the rates requested by Plaintiff's counsel and have provided legal support for the hourly rates the Court has ultimately decided to utilize.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT B

2008 WL 943024
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Denise RICHIR, Plaintiff,

v.

VILLAGE OF FREDONIA,

NEW YORK, et al., Defendants.

No. 05CV76S.
|
April 4, 2008.

**Attorneys and Law Firms**

Charles Edward Fagan, Jamestown, NY, for Palintiff.

Gerard E. O'Connor, Lippman O'Connor, Buffalo, NY, Kurt Gustafson, Beckstrom & Plumb, Mayville, NY, for Defendants.

**AMENDED Order**

HUGH B. SCOTT, United States Magistrate Judge.

**\*1** Before the Court is plaintiff's application (Docket No. 68[1], March 19, 2008) for her motion costs regarding her motion to compel (Docket No. 61[2]). The Order granting plaintiff's motion to compel (Docket No. 65, Order of Mar. 11, 2008) gave plaintiff five days from entry of that Order to file and serve this application, with any response from defendants due five days from that filing and service (*id.* at 14, 12-13). The Court then issued an Order (Docket No. 71) awarding plaintiff as a discovery sanction the full amount of her fees, without realizing that defense counsel for the Village of Fredonia and affiliated defendants (collectively "Village defendants") had filed a response to this fee application (Docket No. 69). Familiarity with those Orders is presumed. This Amended Order supercedes the Order of April 4, 2008 (Docket No. 71) awarding plaintiff fees.

BACKGROUND

Plaintiff moved for extension of time to complete discovery, including making her expert disclosure, as well as to compel the Village defendants to answer her Interrogatories or submit to depositions (Docket No. 61, Pl. Atty. Aff. ¶ 3, Wherefore cl., Ex. B (Interrogatories and Demand for Documents upon Meyers or policy maker for Village of Fredonia). Plaintiff wrote in November 2006 and December 2007 requesting responses to these demands (*id.* ¶¶ 6-7, Exs. C, D). Plaintiff then called defense counsel's office, on or about January 30, 2008, noting that a motion to compel is being prepared unless these requests were responded to and, to date, no production was made by the Village's defense counsel (*id.* ¶ 8). Plaintiff submitted her Interrogatories in lieu of deposing Meyers a second time as the policy maker (*see id.* ¶ 25, Ex. H). Plaintiff also sought an extension of time to complete discovery.

After the Court granted plaintiff's motion to compel (in most part), plaintiff filed the present application for recovery of her reasonable motion expenses (Docket No. 68). Her expenses consists entirely of her attorney's fee. This totaled $1,813.50, for 9.3 hours of work by her attorney at his hourly rate of $195 per hour (*id.* Pl. Atty. Aff. ¶¶ 4, 5). Plaintiff's attorney was admitted to practice in 1975 and has admitted to practice before this Court since 2001. Plaintiff argues that her counsel's hourly rate is reasonable and the time allocated is fair for this motion (*id.* ¶ 5).

The Village defendants argued, first, that the application was after the five days ordered by the Court (Docket No. 69, Village Defs. Atty. Aff. ¶ 2). Next, they note that plaintiff does not distinguish the time spent drafting the motion to compel from the time spent on the motion for extension of the Scheduling Order, which was distinct from the discovery relief sought, and defendants argue that the time expended on the motion to extend should not be included in any award (*id.* ¶ 3). They also wish to exclude from the award time regarding the Village Police Department's General Orders which defense counsel believes were already produced (*id.* ¶ 4), but defendants do not state how many hours within plaintiff's application were involved with this (and plaintiff's application does not detail this aspect of her discovery, *cf.* Docket No. 68, Pl. Atty. Aff. ¶ 4). The Village defendants also argue that disclosure of Gary Ortolano's criminal records (with the disclosure of information about Ortolano and other third parties) raised concerns with them that should not be sanctionable (Docket No. 69, Village Defs. Atty. Aff. ¶ 5), as well as parts of plaintiff's request that were denied by the Court (*id.* ¶ 6, plaintiff's 1992 incident report). Finally, they submit that an award of $500 would adequately compensate

plaintiff for the costs of her motion (*id.* ¶ 7), without stating the mathematical basis for arriving at that figure.

*Original Order*

**\*2** This Court granted plaintiff the full amount of her motion costs, $1,813.50, based upon the apparent absence of opposition by the Village defendants (Docket No. 71, Order at 6-7). The Court held that plaintiff's counsel's rate was reasonable for this District (*id.* at 5-6) and allowed for the full 9.3 hours claimed despite not prevailing on all relief sought (*id.* at 4-5).

DISCUSSION

I. Standards-Discovery Sanctions for Motion to Compel

If a motion to compel is granted, the Court must award reasonable motion expenses, including attorney's fees, or, if relief is partially granted, apportion the reasonable expenses, Fed.R.Civ.P. 37(a)(5)(A), (C) (effective Dec. 1, 2007) (*see* Docket No. 64, Pl. Atty. Reply Aff. ¶ 12). If production is made in the face of a motion to compel, the sanction of awarding these expenses must be imposed, *id.* R. 37(a)(5)(A). Rule 37(b)(2) refers to the party or counsel advising that party or both being responsible for paying the motion expenses.

Under Rule 37, the movant is entitled to *reasonable* costs and attorneys' fees. "If the court determines to award expenses and fees, it is for the court to decide what amount is proper." 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure § 2288*, at 666-67 (Civil 2d ed.1994); *see also Addington v. Mid-American Lines,* 77 F.R.D. 750, 751 (W.D.Mo.1978) (three hours at $50 per hour held excessive where opponent merely failed to make timely response to interrogatories, reducing time to one hour). The rate or amount an attorney bills his or her client (especially where, as here, the client may never be billed due to the fee arrangement counsel has with the client) related to discovery or a motion to compel does not make that rate or time expended reasonable under Rule 37 as reasonable motion expenses. *See Kahn v. General Motors Corp.,* No. 88 Civ. 2982, 1993 U.S. Dist. LEXIS 5196, at \*4, 1993 WL 128014 (S.D.N.Y. Apr.19, 1993).

Using the lodestar (or the "presumptively reasonable fee," *see Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 493 F.3d 110, 111(2d Cir.2007)) method for calculating the reasonable attorney's fee, *Johnson v. the*

*Bon-Ton Stores,* No. 05CV170, Docket No. 39, 2006 U.S. Dist. LEXIS 20019, at \*8 (W.D.N.Y. Apr. 17, 2006) (Scott, Mag. J.); *Monahan v. SZS 33 Assocs., L.P.,* 154 F.R.D. 78, 83 (S.D.N.Y.1994) (applying lodestar method to determining attorney's fee for Rule 37(a)(4)(A) relief); *New York State NOW v. Cuomo,* No. 93 Civ. 7146, 1996 U.S. Dist. LEXIS 17578, at \*4, 1996 WL 689404 (S.D.N.Y. Nov. 26, 1996) (Francis, Mag. J.) (same); *see Hensley v. Eckerhart,* 461 U.S. 424, 429-30, 430 n. 3, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (applying for fees under 42 U.S.C. § 1988), the components for determining the reasonable attorneys' fee are the moving attorney's time spent on the motion and the reasonable billing rate for that attorney. The last component for determining the reasonable motion expenses are the other motion expenses incurred (not sought here). In calculating the "presumptively reasonable fee" this Court "should generally use the prevailing hourly rate in the district where it sits to calculate what has been called the 'lodestar,' " *Arbor Hill, supra,* 493 F.3d at 111. The movant seeking reimbursement bears the burden of proving the hours spent and the prevailing rates. 7 *Moore's Federal Practice-Civil* § 37.23 [8] (2005); *see Johnson, supra,* 2006 U.S. Dist. LEXIS 20019, at \* 11. It is within this Court's discretion to determine the reasonableness of those rates based on the Court's knowledge of prevailing community rates and the relative experience of counsel, *Creative Res. Group of N.J., Inc. v. Creative Res. Group, Inc.,* 212 F.R.D. 94, 103 (E.D.N.Y.2002) (Wall, Mag. J.) (Report & Recommendations, citation omitted); *see Johnson, supra,* 2006 U.S. Dist. LEXIS 20019, at \*11.

II. Application

A. Timing of Application

**\*3** The Village defendants argue that the application is out of time. The Order to compel (Docket No. 65) was filed on March 11, 2008, and it gave plaintiff five days to file her fee application (*id.* at 14). Calculating that period under Federal Rule of Civil Procedure 6(a), excluding intervening holidays and weekend days, that period ran on March 18, 2008. Plaintiff's counsel, however, contacted Chambers on that date and inquired if the application could be filed the next day and the Court allowed that filing, *see* Fed.R.Civ.P. 6(b)(1) (A). The Village defendants are not prejudiced by a one-day delay in filing and filed their timely response two days later.

B. Merits

1. Apportionment by Relief Obtained

Here, plaintiff prevailed for the most part on her motion, compelling the Village defendants at a minimum to produce a copy of the department's General Orders, provide *in camera* inspection of various records, and produce the police training records for Meyers and Luce. Plaintiff was denied production of her 1992 credit card theft records. (Docket No. 65, Order at 6-10, 13.) The Village defendants argue that the award should be reduced for the relief plaintiff failed to obtain (*see* Docket No. 69, Village Defs. Atty. Aff. ¶ 6). This one request should not be the basis for reducing the award. Plaintiff thus is entitled to recover her full reasonable costs in making this motion. Plaintiff submitted an affidavit of the total of her reasonable costs associated with this motion for the Court to determine the appropriate sanction award and the Village defendants filed their response (Docket No. 69).

2. Apportionment by Motion

Plaintiff's motion claim is only for the attorney's fee for the time expended in filing her motion. The Court has reviewed plaintiff's attorney's fee application with care. Plaintiff's attorney cited in the 9.3 hours time from his initial contact in November 2006 and subsequent correspondence in December 2007 and January 2008 seeking responses to his discovery demands including time spent attempting to resolve the issue short of motion practice (Docket No. 68, Pl. Atty. Aff. ¶ 5), but only .7 of an hour was spent in these activities prior to the actual drafting of the motion. Absent defense objection on this point, that time will be allowed. As for the moving papers, counsel seeks time for drafting correspondence to defense counsel and electronically filing the reply affidavit (totaling .8 of an hour); again, absent defense objection on this item, these will be allowed as well. The balance of the time was spent researching or drafting moving and reply papers.

The Village defendants argue that plaintiff filed two motions together, the motion to compel and the motion for extension of the Scheduling Order and that time expended on the latter should not be awarded in any sanctions (Docket No. 69, Village Defs. Atty. Aff. ¶ 3). Plaintiff's attorney's affidavit states time spent researching and drafting the motion to compel (Docket No. 68, Pl. Atty. Aff. ¶ 4), without accounting for the motion to extend time. Examining the original moving papers (*see* note 2, *supra* ), the motion to compel portion of the attorney's supporting affidavit consisted of eight paragraphs plus the exhibits (Docket No. 61, Pl. Atty. Aff. ¶¶ 4-11, Exs. A-D), while the rest of the affidavit (some fourteen paragraphs) and exhibits argued for extension of the Scheduling Order (*id.* ¶¶ 12-25, Exs. E-H). Plaintiff's reply affidavit (Docket No. 64) dealt entirely with the motion to

compel; thus, any time expended to create that document (*see* Docket No. 68, Pl. Atty. Aff. ¶ 4, totaling 2.5 hours, excluding time for drafting and mailing correspondence to defense counsel) should be included in the award, as should the time plaintiff's counsel expended reviewing defense response to the motion (*see id.,* .35 hours).

**\*4** With no statement of how much time was expended on the motion to compel as opposed to motion for extension of time, the Court reexamined the moving papers and this application and finds that half of the time expended in researching and drafting the initial moving papers was directed to the motion to compel and the other half to the motion for extension of time. As a result, plaintiff's claim of 5.25 hours[3] for the initial motion, of 9.3 hours total, is reduced to 2.625 hours. Retaining the remaining hours claimed, the reasonable amount of time expended on the motion to compel only is **6.675 hours.**

3. Scope of Relief-General Orders and *In Camera* Review

The Village defendants next argue that the sanction award should not include time expended on plaintiff trying to obtain the police department's general orders, since they were produced to plaintiff, or to the items defendants questioned and ultimately were reviewed *in camera* (Docket No. 69, Village Defs. Atty. Aff. ¶¶ 4, 5; *see* Docket No. 70). The Village defendants did not state how much time plaintiff expended in arguing these points.

Plaintiff ultimately prevailed (at least in part) in receiving a subset of the *in camera* items (*see* Docket No. 70). The Village defendants never sought a protective order against this disclosure when plaintiff first sought it or cross moved for such an order when plaintiff ultimately moved to compel. Thus, plaintiff's time expended moving for these items should not be reduced. As for the general orders, defense counsel concedes that his response to the motion on these items was incomplete and counsel "assumed" that he produced the disk containing copies of these orders to plaintiff (Docket No. 69, Village Defs. Atty. Aff. ¶ 4). Even if defense counsel believed that the items were produced earlier, plaintiff was induced to make her motion to compel their production and, as a result, the sanction should not be reduced by the (unknown) amount of time spent arguing this point.

4. Hourly Rate

The next issue is whether the rate of $195 per hour is reasonable within this District. This rate is reasonable based

on the Court's knowledge of prevailing community rates and the relative experience of counsel. This Court has upheld rates at this level and higher for attorneys with less than and equivalent experience as plaintiff's counsel here, *see Brick v. CSX Transp., Inc. et al.,* No. 06CV622, Docket No. 41, 2007 U.S. Dist. LEXIS 90742, at *7-8, 2007 WL 4373526 (W.D.N.Y. Dec. 10, 2007) (Scott, Mag. J.) (finding $195 per hour rate reasonable for partner who has practiced for ten years and had extensive federal court and litigation experience); *see also Steinman v. Spinal Concepts, Inc.,* No. 05CV774, Docket No. 84, 2007 U.S. Dist. LEXIS 86309, at *1-2, 4, 2007 WL 4198176 (W.D.N.Y., Nov. 21, 2007) (Scott, Mag. J.) (sixth-year associate claiming rate of $200 per hour not disputed by opponent, fee application awarded based upon undisputed rate); *cf. Johnson, supra,* 2006 U.S. Dist. LEXIS 20019, at * 10-13 (citing recent cases from this Court on recognized reasonable attorneys' fee rates). Here, plaintiff's counsel has been practicing for over 30 years and before this court for over 7 years. Again, in the absence of objections by defendants on this point, the rate claimed by plaintiff **is reasonable.**

5. In Summary

**\*5** Therefore, the rate and authorized time expended by plaintiff's counsel in making this motion is **reasonable.** With 6.675 hours determined to be reasonable and attributable to the motion to compel and at counsel's acceptable rate of $195 per hour, **$1,301.63** is the reasonable motion expenses here. The Village defendants suggest that the reasonable amount should be $500 (Docket No. 69, Village Defs. Atty. Aff. ¶ 7)

but they do not state the basis for this figure. Nevertheless, the Court determines that **$1,301.63** is the reasonable motion expenses here.

6. Apportionment of Liability

One final issue, not addressed by either party, is whether this sanction should come from defendants, from their counsel or from both. Under the Federal Rules, the attorney may also be held responsible even if he is not a litigant in the action for the manner in which discovery is conducted. Fed.R.Civ.P. 37(a)(5) (A). There is no clear attribution between client or counsel for the compelled discovery here. Thus, the Village defendants will be held responsible for this sanction.

CONCLUSION

For the reasons stated above, plaintiff's application for recovery of her motion to compel expenses (Docket No. 68) is **granted in part.** The Court has determined plaintiff's reasonable motion expenses and the appropriate sanction amount and the Village defendants shall pay as a discovery sanction **$1,301.63** to plaintiff. This Order supersedes the earlier Order (Docket No. 71).

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 943024

Footnotes

1    In support of her application, plaintiff filed her attorney's affidavit, Docket No. 68. In opposition, the Village of Fredonia defendants filed their attorney's affidavit, Docket No. 69.

2    In support of her motion, plaintiff filed her attorney's affidavit (with exhibits), Docket No. 61, and her attorney's reply affidavit, Docket No. 64. In opposition, the Village defendants filed their attorney's affidavit, Docket No. 63.

3    Docket No. 68, Pl. Atty. Aff. ¶ 4, entries for Feb. 5, 6, and 7, 2008.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-08471-MKB-LKE   Document 90   Filed 05/09/26   Page 13 of 49 PageID #: 1317

A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

EXHIBIT C

2022 WL 20472225
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

A.M., individually and as mother
and natural guardian of R.S. and
R.S., individually, Plaintiffs,
v.
The CITY OF NEW YORK and the New York
City Department of Education, Defendants.

21 CV 5191 (ENV) (CLP)
|
Signed August 8, 2022

**Attorneys and Law Firms**

Erika Louise Hartley, Law Office of Erika L. Harltey, Brooklyn, NY, for Plaintiffs.

Howard S. Krebs, Peter Louis Germanakos, New York City Law Department, New York, NY, for Defendants.

**REPORT & RECOMMENDTION**

POLLAK, Chief United States Magistrate Judge

**\*1** On September 17, 2021, plaintiff A.M., the mother and natural guardian of R.S., and R.S., individually, commenced this action against the City of New York (the "City") and the New York City Department of Education ("DOE"), seeking to recover attorney's fees arising out of special education due process proceedings that were resolved in favor of the plaintiff by the Impartial Hearing Officer ("IHO") in a decision rendered on June 7, 2020. (See Compl.[1]).

On February 2, 2022, the Court entered a Report and Recommendation ("February Report and Recommendation"), recommending that the settlement be denied without prejudice because plaintiffs failed to comply with Local Civil Rule 7.1, and failed to provide information that would allow the Court to make "due inquiry" as to the attorney's fees pursuant to Local Civil Rule 83.2(a)(1). (See R&R[2]); See United States Dist. Ct. Rules S. & E.D.N.Y., available at: https://www.nyed.uscourts.gov/content/local-rules-effective-october-15-2021. Currently pending before

this Court is plaintiff's June 10, 2022 motion to vacate the February Report and Recommendation. (See Vacate Mot.[3]).

For the reasons set forth below, the Court respectfully recommends that plaintiffs' motion be denied, and the Court's February Report and Recommendation be adopted.

FACTUAL AND PROCEDURAL BACKGROUND

The factual background that gave rise to this case is set forth in greater detail in this Court's February Report and Recommendation. (See R&R at 2-3). Thus, the Court will only set forth the facts necessary to a decision on the motion to vacate.

By letter motion dated January 7, 2022, plaintiffs' counsel moved, pursuant to Local Civil Rule 83.2(a)(1) and 28 U.S.C. § 1415(i)(3)(B), for court approval of a settlement between the parties regarding plaintiffs' counsel's attorney's fees. (See ECF No. 12). However, the original letter motion failed to set forth the amount agreed to in attorney's fees and failed to contain the total settlement amount agreed upon by the parties, making it impossible for this Court to approve the agreement. On January 10, 2022, this Court issued an Order directing counsel to supplement her application, noting the absence of information regarding the settlement amount and any attorney's fees. (Electronic Order, dated Jan. 10, 2022).

Thereafter, plaintiffs' counsel submitted a second letter motion on January 11, 2022, in which counsel set forth the rate charged, hours expended, her experience as an attorney, and the work performed in this action. (See ECF No. 13). On January 12, 2022, this Court issued another Order noting that plaintiffs had not provided contemporaneous billing records as required by New York State Association for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1139 (2d Cir. 1983), and gave plaintiffs time to supplement their motion again. (See Electronic Order, dated Jan. 12, 2022). On January 13, 2022, plaintiffs' counsel submitted a third letter, including her legal bill which she submitted under seal. (See ECF Nos. 14-15). In this third letter, plaintiffs' counsel, for the first time, indicated that the amount agreed upon by the parties as reasonable attorney's fees was $15,202.00. (ECF No. 14).

**\*2** On February 2, 2022, this Court issued the February Report and Recommendation in response to plaintiffs' motion. The Court indicated that, due to "the continued absence of certain critical information ... [it had] no choice but

to respectfully recommend that plaintiffs' motion for approval of the fee award be denied[.]" (R&R at 6-7). In making this recommendation, the Court pointed to the plaintiffs' failure to comply with the requirements set out in Local Civil Rule 7.1(a), which governs the filing of motions in the Eastern District of New York and the fact that Local Civil Rule 83.2(b) requires a court to make "due inquiry" before awarding attorney's fees. (Id. at 5-6). Specifically, plaintiffs' counsel failed to file a Memorandum of Law in support of the request for approval and, as noted, simply filed a letter motion without accompanying Notice of Motion and supporting declarations.

On February 15, 2022, plaintiffs' counsel filed an objection to the Report and Recommendation. (See Obj.[4]). On the same date, counsel also filed a letter including a release from plaintiff A.M., individually and on behalf of her minor child, plaintiff R.S., and the proposed stipulation of settlement and dismissal of this action.[5] (See Pls.' First Ltr.[6]). On March 2, 2022, defendants submitted a letter regarding the settlement and the Report and Recommendation. (See Defs.' Ltr.[7]). Both parties' letters, as well as plaintiffs' objection, indicated that they thought the Court should reconsider its approach in denying the motion for approval of attorney's fees in the February Report and Recommendation, emphasizing that Local Civil Rule 83.2(a)(1), which requires an infant compromise order, is inapplicable to this case. (See Pls.' First Ltr.; Defs.' Ltr.; Obj.). On June 10, 2022, plaintiffs filed another letter accompanied by a release signed by R.S., which also indicated the parties' intention to "move forward with the filing of the proposed Stipulation of Settlement and Dismissal without the need for an infant's compromise order for claims that do not exist in favor of the infant R.S." (See Pls.' Second Ltr.[8]).

Finally, on June 10, 2022, plaintiffs' counsel filed a letter motion to vacate the Court's February Report and Recommendation. Again, plaintiffs assert that Local Civil Rule 83.2(a)(1) "does not require motion practice for an infant's compromise order where a minor is no longer underage or where no relief has been sought on behalf of the minor in an action before the court." (Vacate Mot.[9] (citing School for Language & Commc'n Dev. v. New York State Dep't of Educ., No. 02 CV 0269, 2010 WL 1740416 (E.D.N.Y. Apr. 7, 2010), supplemented, 2010 WL 1752192 (E.D.N.Y. Apr. 26, 2010), and report and recommendation adopted, 2010 WL 1752183 (E.D.N.Y. Apr. 28, 2010), and report and recommendation adopted, 2010 WL 1752183 (E.D.N.Y. Apr. 28, 2010))). Counsel thus requests "that the

Court reconsider its position in reference to the need for motion practice to obtain an infant's compromise order for the settlement of the sole claim in this case involving prevailing party legal fees pursuant to 20 USC § 1415(i)(3)(B)[.]" (Id.)

**\*3** For the reasons set forth below, the Court respectfully recommends that plaintiffs' motion to vacate the February Report and Recommendation be denied.

DISCUSSION

**A. Local Civil Rule 83.2(a)(2)**
Plaintiffs' counsel's motion seeks approval of $15,202.00 as a "reasonable attorney's fee" for the work performed in this action and in the underlying impartial hearing proceedings. (ECF Nos. 12-14). This amount was agreed to pursuant to a settlement reached between the parties. (See Vacate Mot.; Pls.' First Ltr.; Obj.).

As indicated in this Court's February Report and Recommendation, plaintiffs originally sought approval of this proposed settlement and agreed-upon fee amount pursuant to Local Civil Rule 83.2(a)(2), which governs the settlement of actions by or on behalf of infants or incompetents. Rule 83.2(a) provides:

(1) An action by or on behalf of an infant or incompetent shall not be settled or compromised, or voluntarily discontinued, dismissed or terminated, without leave of the Court embodied in an order, judgment or decree. The proceeding upon an application to settle or compromise such an action shall conform, as nearly as may be, to the New York State statutes and rules, but the Court, for cause shown, may dispense with any New York State requirement.

(2) The Court shall authorize payment to counsel for the infant or incompetent of a reasonable attorney's fee and proper disbursements from the amount recovered in such an action, whether realized by settlement, execution or otherwise and shall determine the said fee and disbursements, after due inquiry as to all charges against the fund.

(3) The Court shall order the balance of the proceeds of the recovery or settlement to be distributed as it deems may best protect the interest of the infant or incompetent.

Case 1:24-cv-08471-MKB-LKE    Document 90    Filed 05/09/26    Page 15 of 49 PageID #: 1319

A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

The Rule requires the Court to make "due inquiry" before it can award attorney's fees. In their initial letter motion, plaintiffs not only failed to provide the Court with the amount of fees agreed upon by the parties, but also failed to cite any authority that would allow a court to award fees under Local Civil Rule 83.2(a)(2) without reference to local hourly rates or awards in similar cases. See I.B. v. New York City Dep't of Educ., 336 F.3d 79, 80 (2d Cir. 2003). As a result of the deficiencies in plaintiffs' original submission, the Court gave plaintiffs an opportunity to supplement and submit information regarding their rates. Despite being given several opportunities to supplement their papers, plaintiffs still have not provided references to local hourly rates or awards in similar cases.

In addition, this Court explicitly stated in its February Report and Recommendation that the Court was *not* required to conduct an infant compromise hearing because the infant was not receiving any monetary award in this case. (See R&R at 4). The parties, based on their recent communications to the Court, have made it clear that they agree with the Court on this point and do not believe an infant compromise hearing is necessary, in part because R.S. is no longer an infant. (See Vacate Mot.; Objection; Pls.' First Ltr.; Pls.' Second Ltr.; Defs.' Ltr.).

However, although plaintiffs cite one case that "conclude[d] that the court may approve the proposed settlement without convening a hearing," nowhere have plaintiffs cited any authority that would allow the Court to dispense with issuing an Order pursuant to Local Civil Rule 83.2(a)(2). (See Vacate Mot. (citing School for Language & Commc'n Dev. v. New York State Dep't of Educ., 2010 WL 1740416, at *2)).

 **\*4** Further, while plaintiffs' original letter motion cited Local Civil Rule 83.2 as the basis for this Court's review of the fee agreement, and R.S. is no longer an infant, plaintiffs have failed to provide any authority for the proposition that an Order is not required where a minor is no longer underage. Thus, plaintiffs' continued reliance on the argument that the Court is not required to approve of the parties' settlement as to attorney's fees is misplaced.

### B. Compliance with 20 U.S.C. § 1415, Local Civil Rule 7.1, and Judge Vitaliano's Individual Rules

Even if an infant compromise hearing and order are not required by Local Civil Rule 83.2(a)(2), plaintiffs have also failed to comply with the requirements of 20 U.S.C. § 1415(i), with Local Civil Rule 7.1 of the Eastern District of New York,

and with the district judge's Individual Rules. Again, as noted, despite at least three opportunities to correct the deficiencies in their application, they still have not done so.

This case was originally brought pursuant to 20 U.S.C. § 1415, which sets out certain procedural safeguards regarding "free appropriate public education" for children with disabilities. 20 U.S.C. § 1415(a). These procedural safeguards include the ability to file a complaint, access to mediation, entitlement to an impartial due process hearing, an appeals process, and the ability to file suit in a district court. See id. §§ 1415(b)-(i). The statute further provides that "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs ... to a prevailing party who is the parent of a child with a disability." Id. § 1415(i)(3)(B).

Plaintiffs continue to maintain that Section 1415(i)(3)(B) provides the legal basis for the court to approve of the settlement awarding fees. (See Vacate Mot. at 1; Pls.' First Ltr.). However, as set forth in the statute, fees are not mandatory; instead, the court "may award reasonable attorneys' fees" under the statute. 20 U.S.C. § 1415(i)(3)(B) (emphasis added). Section 1415(i)(3)(B) therefore makes an award of fees discretionary and states that the fees must be "reasonable," among other requirements. See B.W. ex rel. K.S. v. New York City Dep't of Educ., 716 F. Supp. 2d 336, 344 (S.D.N.Y. 2010) (requiring the court to find that plaintiff is a prevailing party, that the party should be awarded fees under the appropriate standard, and that the fees awarded are reasonable under a lodestar analysis). Notwithstanding the fact that the parties have reached an agreement as to the amount of fees, plaintiffs failed to provide sufficient information to allow the Court to determine if the agreed-upon amount of fees is in fact "reasonable" such that the Court should approve the amount under Section 1415(i)(3)(B).

Although plaintiffs have now provided some of that information in response to the Court's directive to supplement their filings, they still have not filed a Memorandum of Law setting forth the relevant standards for the court to apply when considering their fee application, nor have they provided any case law setting forth why the amount of fees in this case should be found to be reasonable. Further, they have provided no case law to support the argument now advanced that, should the parties reach an agreement as to the fee amount as they have here, the court does not need to conduct an inquiry as to the reasonableness of the fees.[10]

Case 1:24-cv-08471-MKB-LKE    Document 90    Filed 05/09/26    Page 16 of 49 PageID #: 1320

A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

**\*5**  Additionally, plaintiffs have failed to comply with Local Civil Rule 7.1(a). As stated in this Court's previous Report and Recommendation, Local Civil Rule 7.1(a), which governs the filing of motions, provides in pertinent part as follows:

Except for letter-motions as permitted by Local Rule 7.1(d) or as otherwise permitted by the Court, all motions shall include the following motion papers:

(1) A notice of motion, or an order to show cause signed by the Court, which shall specify the applicable rules or statutes pursuant to which the motion is brought, and shall specify the relief sought by the motion;

(2) A memorandum of law, setting forth the cases and other authorities relied upon in support of the motion, and divided, under appropriate headings, into as many parts as there are issues to be determined; and

(3) Supporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion.

Local Civil Rule 7.1(d) makes it clear that letter motions may *only* be filed when seeking non-dispositive relief:

Applications for extensions or adjournments, applications for a pre-motion conference, and similar non-dispositive matters as permitted by the instructions regarding ECF published on the website of each respective Court and any pertinent Individual Judge's Practices, may be brought by letter-motion filed via ECF pursuant to Local Civil Rule 5.2(b).

In the February Report and Recommendation, this Court made clear that plaintiffs' motion for attorney's fees "is a dispositive motion seeking approval of a settlement of the entire federal action." (R&R at 5). Thus, under the Local Rules, the motion should be made in accordance with Local Civil Rule 7.1(a). Rule 7.1(a) stipulates that any dispositive motion should be accompanied by a Notice of Motion, a Memorandum of Law, and supporting affidavits and exhibits.

While the parties have submitted additional documents since the February Report and Recommendation was issued, including releases signed by plaintiff A.M. and the former-infant R.S., the proposed stipulation of settlement and dismissal of this action, and letters regarding the settlement, they still have not satisfied all of the requirements of Local Civil Rule 7.1(a). (See Pls.' First Ltr., Defs.' Ltr., Pls.' Second Ltr.). Specifically, plaintiffs have not provided this

Court with a Memorandum of Law, Notice of Motion, or other affidavits in support of the motion. While plaintiffs' other submissions address some of the issues raised in the February Report and Recommendation, including defendant's position on the attorney's fees, and the terms of the proposed settlement, plaintiffs' counsel has still failed to comply with the requirements for filing a motion as set out in Local Civil Rule 7.1(a). (See R&R at 9).

Not only has plaintiffs' counsel failed to comply with this Court's February Report and Recommendation which Ordered plaintiffs' counsel to comply with Local Civil Rule 7.1, but in addition, plaintiffs' failure to follow Local Civil Rule 7.1 violates Rule I.I of the Individual Motion Practices and Rules of the Honorable Judge Vitaliano, which provide that "for matters requiring judicial approval such as ... for claims involving a minor, the parties must first file the appropriate motion." See Individual Motion Practice and Rules of Judge Eric N. Vitaliano at 2, last revised: May 18, 2021.

**\*6**  The continued failure to comply with Court Rules, despite direct orders specifying what was needed, in addition to the failure to provide adequate justification for the fees under the relevant statute, leaves this Court no choice but to recommend denial of plaintiffs' motion to vacate. The Court continues to maintain the earlier recommendation that plaintiffs' motion for approval of the fee application be denied, without prejudice to filing the proper paperwork. The circumstances that led the Court to recommend denial of plaintiffs' motion for attorney's fees in its prior Report and Recommendation remain unchanged.

## CONCLUSION

The Court respectfully recommends that plaintiffs' motion to vacate the February Report and Recommendation be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); see also Fed. R. Civ. P. 6(a), (e) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. See, e.g., Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a ... report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision").

Case 1:24-cv-08471-MKB-LKE    Document 90    Filed 05/09/26    Page 17 of 49 PageID #: 1321

A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

to respectfully recommend that plaintiffs' motion for approval of the fee award be denied[.]" (R&R at 6-7). In making this recommendation, the Court pointed to the plaintiffs' failure to comply with the requirements set out in Local Civil Rule 7.1(a), which governs the filing of motions in the Eastern District of New York and the fact that Local Civil Rule 83.2(b) requires a court to make "due inquiry" before awarding attorney's fees. (Id. at 5-6). Specifically, plaintiffs' counsel failed to file a Memorandum of Law in support of the request for approval and, as noted, simply filed a letter motion without accompanying Notice of Motion and supporting declarations.

On February 15, 2022, plaintiffs' counsel filed an objection to the Report and Recommendation. (See Obj.[4]). On the same date, counsel also filed a letter including a release from plaintiff A.M., individually and on behalf of her minor child, plaintiff R.S., and the proposed stipulation of settlement and dismissal of this action.[5] (See Pls.' First Ltr.[6]). On March 2, 2022, defendants submitted a letter regarding the settlement and the Report and Recommendation. (See Defs.' Ltr.[7]). Both parties' letters, as well as plaintiffs' objection, indicated that they thought the Court should reconsider its approach in denying the motion for approval of attorney's fees in the February Report and Recommendation, emphasizing that Local Civil Rule 83.2(a)(1), which requires an infant compromise order, is inapplicable to this case. (See Pls.' First Ltr.; Defs.' Ltr.; Obj.). On June 10, 2022, plaintiffs filed another letter accompanied by a release signed by R.S., which also indicated the parties' intention to "move forward with the filing of the proposed Stipulation of Settlement and Dismissal without the need for an infant's compromise order for claims that do not exist in favor of the infant R.S." (See Pls.' Second Ltr.[8]).

Finally, on June 10, 2022, plaintiffs' counsel filed a letter motion to vacate the Court's February Report and Recommendation. Again, plaintiffs assert that Local Civil Rule 83.2(a)(1) "does not require motion practice for an infant's compromise order where a minor is no longer underage or where no relief has been sought on behalf of the minor in an action before the court." (Vacate Mot.[9] (citing School for Language & Commc'n Dev. v. New York State Dep't of Educ., No. 02 CV 0269, 2010 WL 1740416 (E.D.N.Y. Apr. 7, 2010), supplemented, 2010 WL 1752192 (E.D.N.Y. Apr. 26, 2010), and report and recommendation adopted, 2010 WL 1752183 (E.D.N.Y. Apr. 28, 2010), and report and recommendation adopted, 2010 WL 1752183 (E.D.N.Y. Apr. 28, 2010))). Counsel thus requests "that the

Court reconsider its position in reference to the need for motion practice to obtain an infant's compromise order for the settlement of the sole claim in this case involving prevailing party legal fees pursuant to 20 USC § 1415(i)(3)(B)[.]" (Id.)

**\*3** For the reasons set forth below, the Court respectfully recommends that plaintiffs' motion to vacate the February Report and Recommendation be denied.

DISCUSSION

**A. Local Civil Rule 83.2(a)(2)**
Plaintiffs' counsel's motion seeks approval of $15,202.00 as a "reasonable attorney's fee" for the work performed in this action and in the underlying impartial hearing proceedings. (ECF Nos. 12-14). This amount was agreed to pursuant to a settlement reached between the parties. (See Vacate Mot.; Pls.' First Ltr.; Obj.).

As indicated in this Court's February Report and Recommendation, plaintiffs originally sought approval of this proposed settlement and agreed-upon fee amount pursuant to Local Civil Rule 83.2(a)(2), which governs the settlement of actions by or on behalf of infants or incompetents. Rule 83.2(a) provides:

(1) An action by or on behalf of an infant or incompetent shall not be settled or compromised, or voluntarily discontinued, dismissed or terminated, without leave of the Court embodied in an order, judgment or decree. The proceeding upon an application to settle or compromise such an action shall conform, as nearly as may be, to the New York State statutes and rules, but the Court, for cause shown, may dispense with any New York State requirement.

(2) The Court shall authorize payment to counsel for the infant or incompetent of a reasonable attorney's fee and proper disbursements from the amount recovered in such an action, whether realized by settlement, execution or otherwise and shall determine the said fee and disbursements, after due inquiry as to all charges against the fund.

(3) The Court shall order the balance of the proceeds of the recovery or settlement to be distributed as it deems may best protect the interest of the infant or incompetent.

A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

The Rule requires the Court to make "due inquiry" before it can award attorney's fees. In their initial letter motion, plaintiffs not only failed to provide the Court with the amount of fees agreed upon by the parties, but also failed to cite any authority that would allow a court to award fees under Local Civil Rule 83.2(a)(2) without reference to local hourly rates or awards in similar cases. See I.B. v. New York City Dep't of Educ., 336 F.3d 79, 80 (2d Cir. 2003). As a result of the deficiencies in plaintiffs' original submission, the Court gave plaintiffs an opportunity to supplement and submit information regarding their rates. Despite being given several opportunities to supplement their papers, plaintiffs still have not provided references to local hourly rates or awards in similar cases.

In addition, this Court explicitly stated in its February Report and Recommendation that the Court was *not* required to conduct an infant compromise hearing because the infant was not receiving any monetary award in this case. (See R&R at 4). The parties, based on their recent communications to the Court, have made it clear that they agree with the Court on this point and do not believe an infant compromise hearing is necessary, in part because R.S. is no longer an infant. (See Vacate Mot.; Objection; Pls.' First Ltr.; Pls.' Second Ltr.; Defs.' Ltr.).

However, although plaintiffs cite one case that "conclude[d] that the court may approve the proposed settlement without convening a hearing," nowhere have plaintiffs cited any authority that would allow the Court to dispense with issuing an Order pursuant to Local Civil Rule 83.2(a)(2). (See Vacate Mot. (citing School for Language & Commc'n Dev. v. New York State Dep't of Educ., 2010 WL 1740416, at *2)).

 **\*4**  Further, while plaintiffs' original letter motion cited Local Civil Rule 83.2 as the basis for this Court's review of the fee agreement, and R.S. is no longer an infant, plaintiffs have failed to provide any authority for the proposition that an Order is not required where a minor is no longer underage. Thus, plaintiffs' continued reliance on the argument that the Court is not required to approve of the parties' settlement as to attorney's fees is misplaced.

### B. Compliance with 20 U.S.C. § 1415, Local Civil Rule 7.1, and Judge Vitaliano's Individual Rules

Even if an infant compromise hearing and order are not required by Local Civil Rule 83.2(a)(2), plaintiffs have also failed to comply with the requirements of 20 U.S.C. § 1415(i), with Local Civil Rule 7.1 of the Eastern District of New York,

and with the district judge's Individual Rules. Again, as noted, despite at least three opportunities to correct the deficiencies in their application, they still have not done so.

This case was originally brought pursuant to 20 U.S.C. § 1415, which sets out certain procedural safeguards regarding "free appropriate public education" for children with disabilities. 20 U.S.C. § 1415(a). These procedural safeguards include the ability to file a complaint, access to mediation, entitlement to an impartial due process hearing, an appeals process, and the ability to file suit in a district court. See id. §§ 1415(b)-(i). The statute further provides that "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs ... to a prevailing party who is the parent of a child with a disability." Id. § 1415(i)(3)(B).

Plaintiffs continue to maintain that Section 1415(i)(3)(B) provides the legal basis for the court to approve of the settlement awarding fees. (See Vacate Mot. at 1; Pls.' First Ltr.). However, as set forth in the statute, fees are not mandatory; instead, the court "may award reasonable attorneys' fees" under the statute. 20 U.S.C. § 1415(i)(3)(B) (emphasis added). Section 1415(i)(3)(B) therefore makes an award of fees discretionary and states that the fees must be "reasonable," among other requirements. See B.W. ex rel. K.S. v. New York City Dep't of Educ., 716 F. Supp. 2d 336, 344 (S.D.N.Y. 2010) (requiring the court to find that plaintiff is a prevailing party, that the party should be awarded fees under the appropriate standard, and that the fees awarded are reasonable under a lodestar analysis). Notwithstanding the fact that the parties have reached an agreement as to the amount of fees, plaintiffs failed to provide sufficient information to allow the Court to determine if the agreed-upon amount of fees is in fact "reasonable" such that the Court should approve the amount under Section 1415(i)(3)(B).

Although plaintiffs have now provided some of that information in response to the Court's directive to supplement their filings, they still have not filed a Memorandum of Law setting forth the relevant standards for the court to apply when considering their fee application, nor have they provided any case law setting forth why the amount of fees in this case should be found to be reasonable. Further, they have provided no case law to support the argument now advanced that, should the parties reach an agreement as to the fee amount as they have here, the court does not need to conduct an inquiry as to the reasonableness of the fees.[10]

Case 1:24-cv-08471-MKB-LKE    Document 90    Filed 05/09/26    Page 19 of 49 PageID #: 1323

A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

**\*5**  Additionally, plaintiffs have failed to comply with Local Civil Rule 7.1(a). As stated in this Court's previous Report and Recommendation, Local Civil Rule 7.1(a), which governs the filing of motions, provides in pertinent part as follows:

Except for letter-motions as permitted by Local Rule 7.1(d) or as otherwise permitted by the Court, all motions shall include the following motion papers:

(1) A notice of motion, or an order to show cause signed by the Court, which shall specify the applicable rules or statutes pursuant to which the motion is brought, and shall specify the relief sought by the motion;

(2) A memorandum of law, setting forth the cases and other authorities relied upon in support of the motion, and divided, under appropriate headings, into as many parts as there are issues to be determined; and

(3) Supporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion.

Local Civil Rule 7.1(d) makes it clear that letter motions may *only* be filed when seeking non-dispositive relief:

Applications for extensions or adjournments, applications for a pre-motion conference, and similar non-dispositive matters as permitted by the instructions regarding ECF published on the website of each respective Court and any pertinent Individual Judge's Practices, may be brought by letter-motion filed via ECF pursuant to Local Civil Rule 5.2(b).

In the February Report and Recommendation, this Court made clear that plaintiffs' motion for attorney's fees "is a dispositive motion seeking approval of a settlement of the entire federal action." (R&R at 5). Thus, under the Local Rules, the motion should be made in accordance with Local Civil Rule 7.1(a). Rule 7.1(a) stipulates that any dispositive motion should be accompanied by a Notice of Motion, a Memorandum of Law, and supporting affidavits and exhibits.

While the parties have submitted additional documents since the February Report and Recommendation was issued, including releases signed by plaintiff A.M. and the former-infant R.S., the proposed stipulation of settlement and dismissal of this action, and letters regarding the settlement, they still have not satisfied all of the requirements of Local Civil Rule 7.1(a). (See Pls.' First Ltr., Defs.' Ltr., Pls.' Second Ltr.). Specifically, plaintiffs have not provided this

Court with a Memorandum of Law, Notice of Motion, or other affidavits in support of the motion. While plaintiffs' other submissions address some of the issues raised in the February Report and Recommendation, including defendant's position on the attorney's fees, and the terms of the proposed settlement, plaintiffs' counsel has still failed to comply with the requirements for filing a motion as set out in Local Civil Rule 7.1(a). (See R&R at 9).

Not only has plaintiffs' counsel failed to comply with this Court's February Report and Recommendation which Ordered plaintiffs' counsel to comply with Local Civil Rule 7.1, but in addition, plaintiffs' failure to follow Local Civil Rule 7.1 violates Rule I.I of the Individual Motion Practices and Rules of the Honorable Judge Vitaliano, which provide that "for matters requiring judicial approval such as ... for claims involving a minor, the parties must first file the appropriate motion." See Individual Motion Practice and Rules of Judge Eric N. Vitaliano at 2, last revised: May 18, 2021.

**\*6**  The continued failure to comply with Court Rules, despite direct orders specifying what was needed, in addition to the failure to provide adequate justification for the fees under the relevant statute, leaves this Court no choice but to recommend denial of plaintiffs' motion to vacate. The Court continues to maintain the earlier recommendation that plaintiffs' motion for approval of the fee application be denied, without prejudice to filing the proper paperwork. The circumstances that led the Court to recommend denial of plaintiffs' motion for attorney's fees in its prior Report and Recommendation remain unchanged.

CONCLUSION

The Court respectfully recommends that plaintiffs' motion to vacate the February Report and Recommendation be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); see also Fed. R. Civ. P. 6(a), (e) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. See, e.g., Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a ... report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision").

Case 1:24-cv-08471-MKB-LKE   Document 90   Filed 05/09/26   Page 20 of 49 PageID #: 1324

A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

**All Citations**

**SO ORDERED.**

Not Reported in Fed. Supp., 2022 WL 20472225

Footnotes

1       Citations to "Compl." refer to plaintiffs' Complaint, filed Sept. 17, 2021, ECF No. 1.

2       Citations to "R&R" refer to the Court's Report and Recommendation, entered Feb. 2, 2022, ECF No. 16.

3       Citations to "Vacate Mot." Refer to plaintiffs' motion to vacate the Court's R&R, filed June 10, 2022, ECF No. 21.

4       Citations to "Obj." refer to plaintiffs' objection to the Court's Report and Recommendation, filed Feb. 15, 2022, ECF No. 17.

5       At the time of plaintiff's first letter motion, it appears as though R.S. was an infant and thus the letter motion was brought seeking approval of the fee amount pursuant to Local Rule 83.2 which governs infant compromise orders.

6       Citations to "Pls.' First Ltr." refer to plaintiffs' letter submitting sealed documents, filed Feb. 15, 2022, ECF No. 18.

7       Citations to "Defs.' Ltr." refer to defendants' letter regarding the parties' settlement, filed Feb. 15, 2022, ECF No. 19.

8       Citations to "Pls.' Second Ltr." refer to plaintiffs' second letter submitting sealed documents, filed June 10, 2022, ECF No. 20.

9       Citations to "Vacate Mot." refer to plaintiffs' motion to vacate the Court's R&R, filed June 10, 2022, ECF No. 21.

10      Plaintiffs argue that the R.S. is no longer an infant, and "[Rule 83.2] does not require motion practice for an infant's compromise order where a minor is no longer underage[.]" (Vacate Mot. at 1 (citations omitted)). This argument fails to address the other issues in this case – the Rule 7.1 requirements, Judge Vitaliano's Individual Rule requirements, and the requirements of 20 U.S.C. § 1415(i)(3)(B). While plaintiffs' argument might provide support for the proposition that a Rule 83.2(a) infant compromise hearing is not necessary in this case, the Court recognized as much in its February Report and Recommendation. (R&R at 4). Thus, the fact that R.S. is no longer an infant is largely irrelevant to the issue at hand.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-08471-MKB-LKE    Document 90    Filed 05/09/26    Page 21 of 49 PageID #: 1325

A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

**All Citations**

**SO ORDERED.**

Not Reported in Fed. Supp., 2022 WL 20472225

Footnotes

1    Citations to "Compl." refer to plaintiffs' Complaint, filed Sept. 17, 2021, ECF No. 1.

2    Citations to "R&R" refer to the Court's Report and Recommendation, entered Feb. 2, 2022, ECF No. 16.

3    Citations to "Vacate Mot." Refer to plaintiffs' motion to vacate the Court's R&R, filed June 10, 2022, ECF No. 21.

4    Citations to "Obj." refer to plaintiffs' objection to the Court's Report and Recommendation, filed Feb. 15, 2022, ECF No. 17.

5    At the time of plaintiff's first letter motion, it appears as though R.S. was an infant and thus the letter motion was brought seeking approval of the fee amount pursuant to Local Rule 83.2 which governs infant compromise orders.

6    Citations to "Pls.' First Ltr." refer to plaintiffs' letter submitting sealed documents, filed Feb. 15, 2022, ECF No. 18.

7    Citations to "Defs.' Ltr." refer to defendants' letter regarding the parties' settlement, filed Feb. 15, 2022, ECF No. 19.

8    Citations to "Pls.' Second Ltr." refer to plaintiffs' second letter submitting sealed documents, filed June 10, 2022, ECF No. 20.

9    Citations to "Vacate Mot." refer to plaintiffs' motion to vacate the Court's R&R, filed June 10, 2022, ECF No. 21.

10   Plaintiffs argue that the R.S. is no longer an infant, and "[Rule 83.2] does not require motion practice for an infant's compromise order where a minor is no longer underage[.]" (Vacate Mot. at 1 (citations omitted)). This argument fails to address the other issues in this case – the Rule 7.1 requirements, Judge Vitaliano's Individual Rule requirements, and the requirements of 20 U.S.C. § 1415(i)(3)(B). While plaintiffs' argument might provide support for the proposition that a Rule 83.2(a) infant compromise hearing is not necessary in this case, the Court recognized as much in its February Report and Recommendation. (R&R at 4). Thus, the fact that R.S. is no longer an infant is largely irrelevant to the issue at hand.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT D

768 F.Supp.3d 559
United States District Court, S.D. New York.

CERCO BRIDGE LOANS 6 LLC, Plaintiff,

v.

Gregg SCHENKER and
Steven Hornstock, Defendants.

23 Civ. 11093 (DEH)
|
Signed February 26, 2025

**Synopsis**
**Background:** Leasehold mortgagee brought action under New York law against guarantors for breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment, alleging that leasehold mortgagor's default on ground lease and failure to pay rent triggered guarantors' liability under terms of guaranty. Guarantors moved to dismiss for failure to state a claim and lack of subject-matter jurisdiction, and they also moved for discovery sanctions. Leasehold mortgagee filed cross-motion for partial summary judgment.

**Holdings:** The District Court, Dale E. Ho, J., held that:

[1] leasehold mortgagor's failure to pay quarterly ground rent did not trigger guarantors' liability under the terms of the guaranty;

[2] particular representation of guarantors was not a breach of the implied covenant of good faith and fair dealing under New York law;

[3] leasehold mortgagee's chief executive officer (CEO) failed to appear for deposition;

[4] that failure to appears was not substantially justified;

[5] CEO's virtual appearance at a later deposition at which he was supposed to appear in person was a failure to appear;

[6] that second failure to appear was not substantially justified;

[7] as part of the awarded sanctions, guarantors would be allowed to recover attorney fees representing 25% of the time spent in preparation for the two depositions at issue; and

[8] sanctions as to the first missed depositions would be charged against leasehold mortgagee's counsel.

Motion to dismiss for failure to state a claim granted; claim for declaratory judgment dismissed; cross-motion for partial summary judgment denied; motions for discovery sanctions granted in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Subject Matter Jurisdiction; Motion for Summary Judgment; Motion for Sanctions (Discovery); Motion for Declaratory Judgment.

West Headnotes (52)

**[1]**    **Federal Courts**   Dismissal or other disposition

A case is properly dismissed for lack of subject-matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. Fed. R. Civ. P. 12(b)(1).

**[2]**    **Federal Courts**   Presumptions and burden of proof

In resolving a motion to dismiss for lack of subject-matter jurisdiction, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it. Fed. R. Civ. P. 12(b)(1).

**[3]**    **Federal Courts**   Weight and sufficiency

Where jurisdictional facts are placed in dispute on a motion to dismiss for subject-matter jurisdiction, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. Fed. R. Civ. P. 12(b)(1).

**[4]    Federal Courts** 🔑 Evidence; Affidavits

Although courts are generally limited to examining the sufficiency of the pleadings on a motion to dismiss for lack of subject-matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings. Fed. R. Civ. P. 12(b)(1).

1 Case that cites this headnote

**[5]    Federal Civil Procedure** 🔑 Construction of pleadings

**Federal Civil Procedure** 🔑 Matters deemed admitted; acceptance as true of allegations in complaint

In assessing the complaint on a motion to dismiss for failure to state a claim, the court must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor, but the court must disregard any conclusory allegations, such as formulaic recitations of the elements of a cause of action. Fed. R. Civ. P. 12(b)(6).

**[6]    Federal Civil Procedure** 🔑 Matters considered in general

On a motion to dismiss for failure to state a claim, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Fed. R. Civ. P. 12(b)(6).

**[7]    Federal Civil Procedure** 🔑 Matters deemed admitted; acceptance as true of allegations in complaint

As to a motion to dismiss for failure to state a claim, where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true. Fed. R. Civ. P. 12(b)(6).

1 Case that cites this headnote

**[8]    Federal Courts** 🔑 Limited liability companies

For purposes of diversity jurisdiction, a limited-liability company (LLC) has the citizenship of its membership. 28 U.S.C.A. § 1332.

1 Case that cites this headnote

**[9]    Federal Courts** 🔑 Place of business

A corporation's principal place of business, for purposes of diversity jurisdiction, is the place where a corporation's officers direct, control, and coordinate the corporation's activities. 28 U.S.C.A. § 1332(c)(1).

**[10]    Federal Courts** 🔑 Limited liability companies

Limited-liability company (LLC) that was leasehold mortgagee sufficiently alleged that its principal place of business was the Bahamas, as was relevant to determining if diversity jurisdiction existed in LLC's action against guarantors over claims such as breach of contract under New York law; although the opposing side's evidence suggested that directors of corporation that was LLC's sole member were affiliated with New York and might have been based in the New York in the past, the court saw no reason not to credit LLC's declarations affirming that, as of litigation's commencement, its sole member did not have a principal place of business in New York. 28 U.S.C.A. § 1332.

More cases on this issue

**[11]    Contracts** 🔑 Grounds of action

To establish a breach of contract under New York law, a plaintiff must show (1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages.

**[12]     Contracts** 🔑 Language of contract

Under New York law, a written contract must be interpreted according to the parties' intent, which is derived from the plain meaning of the language employed in the agreements.

**[13]     Contracts** 🔑 Existence of ambiguity

In a dispute under New York law over the meaning of a contract, a threshold question of law is whether the contract terms are ambiguous.

**[14]     Contracts** 🔑 Existence of ambiguity

In general under New York law, "ambiguity" exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

**[15]     Evidence** 🔑 Nature and Existence of Ambiguity in General

Under New York law, if the court determines the operative contract to be ambiguous, it may evaluate the extrinsic evidence as a matter of law.

**[16]     Guaranty** 🔑 General rules of construction

Under New York law, obligations of guarantor are strictly construed and cannot be extended by construction beyond plain and explicit language of contract.

**[17]     Guaranty** 🔑 Performance of contract or conditions by creditor

**Guaranty** 🔑 Default of principal

Leasehold mortgagor's failure to pay quarterly ground rent did not trigger guarantors' liability under the terms of the guaranty, despite argument that guaranty was triggered by an amendment, modification, termination, or cancellation or

surrender of the ground lease; under ground lease's terms, leasehold mortgagee was entitled to notice and right to cure leasehold mortgagor's default before lease could be terminated, lease's terms prevented it from being amended, modified, or surrendered without leasehold mortgagee's consent, and leasehold mortgagee did not contend that it gave such consent.

More cases on this issue

**[18]     Contracts** 🔑 Terms implied as part of contract

Under New York law, implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.

**[19]     Contracts** 🔑 Terms implied as part of contract

The covenant of good faith and fair dealing under New York law embraces any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

**[20]     Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

If a claim for breach of the implied covenant of good faith and fair dealing under New York law sounds in fraud, it must be pleaded with particularity, i.e., the claim must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Fed. R. Civ. P. 9(b).

**[21]     Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

An allegation of omission with intent to deceive is a quintessential averment of fraud, as would trigger the requirement of pleading with particularity. Fed. R. Civ. P. 9(b).

**[22]** **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Leasehold mortgagee's claim that guarantors breached the implied covenant of good faith and fair dealing under New York law sounded in fraud, and thus the claim had to be pleaded with particularity; leasehold mortgagee alleged that guarantors withheld, in bad faith, material information with respect to leasehold mortgagor's financial condition and management of the property, and leasehold mortgagee further alleged that guarantors deceived it by preventing it from receiving the benefit of what it bargained for under the guaranty. Fed. R. Civ. P. 9(b).

More cases on this issue

**[23]** **Guaranty** 🔑 Declaration, Complaint, or Petition

Guarantors' representation in guaranty that they were familiar with, and had independently reviewed, book and records regarding leasehold mortgagor's financial condition and were familiar with the value of any and all collateral intended to be created as security for the payment was not a breach of the implied covenant of good faith and fair dealing under New York law, absent an explanation of how the representation was fraudulent.

More cases on this issue

**[24]** **Federal Civil Procedure** 🔑 Failure to Appear or Testify; Sanctions

As is relevant to determining if discovery sanctions are warranted when a party fails to attend its own deposition, conduct is substantially justified if there is a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action. Fed. R. Civ. P. 37(d)(3).

**[25]** **Federal Civil Procedure** 🔑 Payment of expenses

Reasonable fees as a discovery sanction when a party fails to attend its own deposition may

include attorney fees and costs in connection with filing motion for sanctions. Fed. R. Civ. P. 37(d).

1 Case that cites this headnote

**[26]** **Federal Civil Procedure** 🔑 Failure to Appear or Testify; Sanctions

Party's failure to appear for its own deposition can justify imposition of sanctions pursuant to court's inherent power to impose sanctions against parties and their counsel who abuse litigation process.

2 Cases that cite this headnote

**[27]** **Costs, Fees, and Sanctions** 🔑 Reasonableness or Bad Faith

Inherent-power sanctions may be imposed to sanction party's misconduct during course of litigation where party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.

**[28]** **Costs, Fees, and Sanctions** 🔑 Inherent authority

Because of their very potency, inherent-powers sanctions must be exercised with restraint and discretion.

**[29]** **Federal Civil Procedure** 🔑 Failure to Appear or Testify; Sanctions

As is relevant to determining if discovery sanctions are warranted when a party fails to attend its own deposition, "failure to appear" is strictly construed and only occurs where a deponent literally fails to show up for a deposition session. Fed. R. Civ. P. 37(d).

**[30]** **Federal Civil Procedure** 🔑 Failure to Appear or Testify; Sanctions

Chief executive officer (CEO) of leasehold mortgagee "failed to appear" for his deposition in leasehold mortgagee's action against guarantors for, among other things, breach of contract,

despite argument that he appeared three days later for a half-day, virtual deposition, and thus, unless the failure to appear was substantially justified, discovery sanctions could be warranted under rule allowing such sanctions when a party failed to attend its own deposition; "failure to appear" occurred when a deponent literally failed to show up for a deposition session. Fed. R. Civ. P. 37(d).

More cases on this issue

**[31]    Federal Civil Procedure** 🔑 Failure to Appear or Testify;  Sanctions

Failure of chief executive officer (CEO) of leasehold mortgagee to appear for his deposition in leasehold mortgagee's action against guarantors for, among other things, breach of contract was not substantially justified and thus could warrant discovery sanctions under rule allowing for such sanctions when a party failed to attend its own deposition; despite argument that counsel was unavailable, such unavailability was not the basis for the motion to quash the deposition, and the court rejected the grounds actually given for the motion. Fed. R. Civ. P. 37(d).

More cases on this issue

**[32]    Federal Civil Procedure** 🔑 Failure to Appear or Testify;  Sanctions

A party applying for sanctions for failure of a party to attend its own deposition is not required to prove that the party who failed to attend the deposition acted in bad faith. Fed. R. Civ. P. 37(d).

1 Case that cites this headnote

**[33]    Federal Civil Procedure** 🔑 Failure to Appear or Testify;  Sanctions

Virtual appearance of leasehold mortgagee's chief executive officer (CEO) at a deposition that he was supposed to appear at in person in leasehold mortgagee's action against guarantors for, among other things, breach of contract constituted a "failure to appear," as could warrant

discovery sanctions under rule allowing such sanctions when a party failed to appear at its own deposition; although a deposition could, by rule, be taken remotely by stipulation of the parties or order of the court, neither of those existed. Fed. R. Civ. P. 30(b)(4), 37(d).

More cases on this issue

**[34]    Federal Civil Procedure** 🔑 Failure to Appear or Testify;  Sanctions

Failure of leasehold mortgagee's chief executive officer (CEO) to appear in person at deposition in leasehold mortgagee's action against guarantors for, among other things, breach of contract was not substantially justified, as could warrant discovery sanctions under rule allowing such sanctions when a party failed to appear at its own deposition; although leasehold mortgagee cited international travel for CEO's failure to appear in person, that was not a sufficiently compelling circumstance in the case, and timing of notice of deposition was reasonable under the circumstances. Fed. R. Civ. P. 30(b)(1), 37(d).

More cases on this issue

**[35]    Federal Civil Procedure** 🔑 Failure to Appear or Testify;  Sanctions

Pending motion to quash deposition did not excuse obligation of leasehold mortgagee to produce its chief executive officer (CEO) for an in-person deposition in leasehold mortgagee's action against guarantors for, among other things, breach of contract, as could warrant discovery sanctions under rule allowing such sanctions when a party failed to appear at its own deposition; the pending motion was not a motion for a protective order. Fed. R. Civ. P. 37(d).

More cases on this issue

**[36]    Federal Civil Procedure** 🔑 Notice of Examination or Motion for Leave to Examine

Rule on notice of deposition does not prescribe any minimum notice period, and the reasonableness of notice must be determined

in light of the facts and circumstances of the individual case. Fed. R. Civ. P. 30(b)(1).

**[37]      Federal Civil Procedure** 🔑 Notice of Examination or Motion for Leave to Examine

**Federal Civil Procedure** 🔑 Failure to Appear or Testify;  Sanctions

Seven-day notice of deposition of leasehold mortgagee's chief executive officer (CEO) was reasonable under the circumstances in leasehold mortgagee's action against guarantors for, among other things, breach of contract, as was relevant to determining if substantial justification existed for CEO's failure to appear in person and if discovery sanctions were therefore warranted under rule allowing such sanctions when a party failed to appear at its own deposition; despite argument that the seven days included a holiday and weekend, guarantors had been diligent in their efforts to reschedule the deposition, and leasehold mortgagee was aware five days prior to the seven-day notice period that guarantors were going to insist on taking CEO's deposition on the stated day. Fed. R. Civ. P. 30(b)(1), 37(d).

More cases on this issue

**[38]      Federal Civil Procedure** 🔑 Payment of expenses

It would not be unjust to impose, pursuant to rule allowing discovery sanctions when a party failed to attend its own deposition, expenses as discovery sanctions for failure of leasehold mortgagee's chief executive officer (CEO) to attend his deposition in person in leasehold mortgagee's action against guarantors for, among other things, breach of contract; despite argument that the dispute could have been avoided in its entirety had guarantors promptly noticed the deposition, leasehold mortgagee of the expected deposition date at least two weeks in advance, and to the extent that leasehold mortgagee suggested that it might have filed its motion to quash in time, surrounding events did not inspire confidence that a denial of the motion to quash would have induced CEO's attendance. Fed. R. Civ. P. 37(d).

More cases on this issue

**[39]      Federal Civil Procedure** 🔑 Failure to Appear or Testify;  Sanctions

District court would decline to use its inherent powers to issue discovery sanctions against leasehold mortgagee for failure to appear at depositions in leasehold mortgagee's action against guarantors for, among other things, breach of contract; court was awarding reasonable expenses as discovery sanctions under rule allowing such sanctions when a party failed to notice its own deposition, and court felt that that was sufficient to compensate guarantors and to deter leasehold mortgage from future misconduct. Fed. R. Civ. P. 37(d).

More cases on this issue

**[40]      Federal Civil Procedure** 🔑 Failure to respond;  sanctions

Starting point for determining reasonable attorney fee award as discovery sanction is "lodestar" or "presumptively reasonable fee," which is product of reasonable hourly rate and reasonable number of hours required by case.

**[41]      Federal Civil Procedure** 🔑 Failure to respond;  sanctions

Reasonable attorney fees that are awarded as a discovery sanction compensate counsel only for hours reasonably expended on litigation, and not for hours that are excessive, redundant, or otherwise unnecessary.

**[42]      Federal Civil Procedure** 🔑 Failure to respond;  sanctions

A reasonable hourly rate for attorney fees as a discovery sanction is the rate a paying client would be willing to pay.

1 Case that cites this headnote

**[43]    Federal Civil Procedure** 👉 Failure to respond; sanctions

In setting a reasonable hourly rate when awarding attorney fees as a discovery sanction, courts consider case-specific factors of: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

1 Case that cites this headnote

**[44]    Federal Civil Procedure** 👉 Failure to respond; sanctions

As is relevant to discovery sanctions, the presumptively reasonable attorney fee is not conclusive in all circumstances, and it may be adjusted when it fails to adequately take into account a factor that may properly be considered in determining a reasonable fee.

**[45]    Bankruptcy** 👉 Objections; sua sponte determination

**Compromise, Settlement, and Release** 👉 Class settlements

**Costs, Fees, and Sanctions** 👉 Hearing and Determination

District court should review any fee request, but courts have independent obligation to scrutinize fee petition in limited circumstances, typically in situations implicating concerns regarding adversarial process, such as class-action settlements and bankruptcy determinations; absent those special circumstances, when fee target has failed to offer either countervailing evidence or persuasive argumentation in support

of its position, it is not district court's job either to do target's homework or to take heroic measures aimed at salvaging target from predictable consequences of self-indulgent lassitude.

1 Case that cites this headnote

**[46]    Federal Civil Procedure** 👉 Payment of expenses

As discovery sanctions awarded under rule allowing such sanctions when a party failed to attend its own deposition, guarantors would be allowed to recover attorney fees representing 25% of the time spent in preparation for deposition at which leasehold mortgagee's chief executive officer (CEO) failed to appear in leasehold mortgagee's action against guarantors for, among other things, breach of contract; much of guarantors' preparation was ultimately useful for when CEO did appear three days later. Fed. R. Civ. P. 37(d).

More cases on this issue

**[47]    Federal Civil Procedure** 👉 Payment of expenses

As discovery sanctions awarded under rule allowing such sanctions when a party failed to attend its own deposition, guarantors would be allowed to recover attorney fees representing 25% of the time spent in preparation for deposition at which leasehold mortgagee's chief executive officer (CEO) failed to appear in person in leasehold mortgagee's action against guarantors for, among other things, breach of contract; the deposition was rescheduled, and guarantors did not appear to have accounted for that when making their fee request. Fed. R. Civ. P. 37(d).

More cases on this issue

**[48]    Federal Civil Procedure** 👉 Payment of expenses

As part of the discovery sanctions awarded under rule allowing such sanctions when a party failed to attend its own deposition, guarantors would be awarded the attorney fees incurred

in opposing leasehold mortgagee's motions to quash depositions of its chief executive officer (CEO) in leasehold mortgagee's action against guarantors for, among other things, breach of contract; despite argument that the motions to quash were made in good faith, there was no genuine dispute as to the merits of the motions, and leasehold mortgagee's conduct in the lead-up to both motions suggested that it never intended to produce CEO in person. Fed. R. Civ. P. 37(d).

More cases on this issue

**[49]   Federal Civil Procedure** 🔑 Payment of expenses

When awarding attorney fees to defendants as discovery sanctions under rule allowing such sanctions when a party failed to attend its own deposition, district court would assume that counsel's submitted rates were reasonable; defendants submitted a sworn declaration stating that the proposed fees represented counsel's customary hourly rates, plaintiff did not challenge the reasonableness of the rates or attorney staffing decisions, and plaintiff had ample opportunity to contest the rates in either of its two briefs opposing sanctions. Fed. R. Civ. P. 37(d).

4 Cases that cite this headnote
More cases on this issue

**[50]   Federal Civil Procedure** 🔑 Payment of expenses

As part of the discovery sanctions awarded under rule allowing such sanctions when a party failed to attend its own deposition, guarantors would be awarded their costs in connection with travel, lodging, and court reporter and videographer cancellation fees that were related to deposition at which leasehold mortgagee's chief executive officer (CEO) failed to appear in leasehold mortgagee's action against guarantors for, among other things, breach of contract; guarantors could have interpreted leasehold mortgagee's statement of counsel's unavailability as an act of gamesmanship, especially since it was not given as a basis for leasehold mortgagee's motion to

quash deposition, and court could have denied motion to quash at any moment and ordered deposition to go forward. Fed. R. Civ. P. 37(d).

More cases on this issue

**[51]   Federal Civil Procedure** 🔑 Payment of expenses

Discovery sanctions awarded to defendants under rule allowing such sanctions when a party failed to attend its own deposition would be charged against plaintiff's counsel, where plaintiff maintained that its chief executive officer's (CEO) failure to appear at his deposition was attributable to counsel's unavailability. Fed. R. Civ. P. 37(d)(3).

More cases on this issue

**[52]   Federal Civil Procedure** 🔑 Payment of expenses

Discovery sanctions awarded to defendants under rule allowing such sanctions when a party failed to attend its own deposition would be charged against plaintiff rather than plaintiff's counsel; failure of plaintiff's chief executive officer (CEO) to appear in person for his deposition appeared to have been due to his own unwillingness to travel from Europe to New York to be deposed. Fed. R. Civ. P. 37(d)(3).

More cases on this issue

**Attorneys and Law Firms**

 **\*565**   A. William Henkel, Fox Rothschild LLP, Lawrenceville, NJ, Brittany Barbet, Fox Rothschild LLP, Princeton, NJ, Gerard A. Riso, Mantel McDonough Riso, LLP, New York, NY, Isaac M. Hoenig, John Aubrey Wait, Fox Rothschild, Attorneys at Law, New York, NY, Nikolas S. Komyati, Fox Rothschild LLP, Morristown, NJ, Jeffrey M. Pollock, Pollock Law LLC, Trenton, NJ, for Plaintiff.

Diane Chan, Gabriel Herrmann, Michael Klurfeld, Gibson, Dunn & Crutcher LLP, New York, NY, James Prescott Fogelman, Gibson, Dunn & Crutcher, LLP, Los Angeles, CA,

Matthew Stewart Kahn, Gibson, Dunn & Crutcher LLP, San Francisco, CA, for Defendants.

**OPINION AND ORDER**

DALE E. HO, United States District Judge:

**\*566**  Plaintiff Cerco Bridge Loans 6 LLC ("Plaintiff," "Lender," or "Cerco") brings claims against Defendants Gregg Schenker and Steven Hornstock ("Defendants" or "Guarantors") for breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment, all in connection with a commercial real-estate loan. The parties dispute the legal interpretation of a personal guaranty made by Defendants in connection with the loan: Plaintiff asserts that the guaranty requires Defendants to pay the entire outstanding balance on the loan, while Defendants argue that the guaranty is more limited in scope and the conditions for liability have not been met.

For the reasons that follow, the Court concludes that Defendants have the correct interpretation of the guaranty, as is clear from Plaintiff's pleadings alone. Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss the First Amended Complaint, ECF No. 39. Because the Court dismisses all claims, it **DENIES** as moot Plaintiff's Cross-Motion for Partial Summary Judgment, ECF No. 45. Finally, the court **GRANTS IN PART** Defendants' Motions for Discovery Sanctions, ECF Nos. 78, 113.

**BACKGROUND**

Except where otherwise noted, the following facts are taken from Plaintiff's First Amended Complaint ("FAC"), ECF No. 23, and attached exhibits. Plaintiff's allegations are accepted as true solely for the purpose of adjudicating the Motion to Dismiss.

**A. The Parties**

Cerco is a limited liability company that originates short-term commercial real-estate loans. FAC ¶¶ 2, 16. Its single member, Cerco Capital Inc., is a Delaware corporation with a principal place of business in the Bahamas. FAC ¶¶ 16-17. Defendants are two adult individuals who are citizens of the State of New York. FAC ¶¶ 18-19. Together with two non-parties, AEW Partners Real Estate Fund VIII, L.P. and Earlin Investment L.P., Defendants agreed to a Guaranty of Recourse

Obligations ("Guaranty") in connection with the commercial real-estate loan at issue in this dispute. FAC ¶¶ 20, 33.

**B. The Ground Lease**

Defendant Schenker is the manager of non-party P8 ABS-EE 695 Lex Leaseco, LLC ("Borrower," "P8," or "Tenant"). FAC ¶ 8. In 2019, P8 signed a 99-year lease (the "Ground Lease") for the parcel of land and mixed-use commercial and office building located at 136 East 57th Street in New York City (the "Property"). FAC ¶ 27; *id.* Ex. 2 ("Ground Lease Part I") at 2-4, ECF No. 23-3. P8 leased the Property from Silk & Halpern 57, LLC ("Silk & Halpern" or "Landlord"). FAC ¶ 27. The Ground Lease provides that P8 shall pay Silk & Halpern "an annual basic net rent in quarterly installments, in advance, on the first day of each quarter" during the term of the lease. FAC ¶ 28; *id.* Ground Lease Part I § 5.

**\*567**  The Ground Lease also expressly contemplates the possibility of P8's entering into a leasehold mortgage (i.e., a loan secured by the leasehold estate)—as P8 did when it took the loan from Cerco (here, the "Leasehold Mortgagee"). *See* Ground Lease Part I § 15(a)(i); FAC ¶ 29; *id.* Exs. 3A & 3B. Recognizing the security interest the Leasehold Mortgagee has in the continuance of the lease, the Ground Lease ensures that the Mortgagee has notice of any default and the right to cure it before steps are taken to terminate the lease. Ground Lease Part I § 15(a)(ii). Specifically, in the event of a default by Tenant, "Landlord shall give written notice thereof to any Leasehold Mortgagee ... and Landlord shall take no action to terminate this Lease" provided that the Leasehold Mortgagee cures the default. *Id.* If the default takes the form of a missed rent payment, the Leasehold Mortgagee has the right to cure that default within fifteen days after the Tenant's cure period ends, or within fifteen days after the Leasehold Mortgagee receives notice of the default, whichever is later. *Id.* "Landlord and Tenant will not surrender, accept a surrender of, abandon, reject, materially modify or amend this Lease ..., subject to the cure rights granted in this Lease to a Leasehold Mortgagee." *Id.* § 15(a)(i). But if the Leasehold Mortgagee fails to cure a default "within the time period and in the manner so required above, then the Leasehold Mortgagee shall be deemed to have waived any right to cure and this Lease shall be deemed terminated" upon the expiration of the Leasehold Mortgagee's cure period. *Id.* § 15(a)(ii).

**C. The Loan and the Guaranty**

On March 8, 2022, Cerco made a loan of $23,500,000 (the "Loan") to P8 to finance, among other things, "tenant

improvements, real estate brokerage, and capital expenditure improvement costs" for the Property. FAC ¶ 3. The Loan consisted of $13,200,000 secured by a leasehold mortgage and $10,300,000 secured by a building mortgage. FAC ¶ 3. The Loan was evidenced by a bundle of documents collectively referred to as the "Loan Documents": a Leasehold Mortgage Note and Leasehold Mortgage, *see* FAC Exs. 3A & 3B, ECF Nos. 23-6 & 23-7; a Building Note and Building Mortgage, *see* FAC Exs. 4A & 4B, ECF Nos. 23-8 & 23-9; and a Building Loan Agreement, *see* FAC Ex. 5, ECF No. 23-10. The Loan Documents provide that:

> Upon the occurrence of any Event of Default beyond all applicable cure periods, the entire unpaid principal sum hereunder plus all interest accrued thereon plus all other sums due and payable to Lender hereunder and/or under the Loan Documents shall, at the sole option of Lender, become due and payable immediately without presentment, demand, notice of nonpayment, protest, notice of protest or other notice of dishonor, all of which are hereby expressly waived by Borrower. Notwithstanding the foregoing, Borrower has the right to cure the same prior to Lender declaring the acceleration of any of the debt.

Leasehold Mortgage Note § 12(a); Building Mortgage Note § 12(a).[1] The Loan's maturity date is March 7, 2025. FAC ¶ 3d.

 **\*568**  As a condition of making the loan to P8, Cerco required Guarantors to sign a Guaranty of Recourse Obligations (the "Guaranty"). FAC ¶ 4; *see* FAC Ex. 1 ("Guaranty"), ECF No. 23-2. Guarantors acknowledged that they would "materially benefit from Lender's agreement to make the Loan." Guaranty at 2. The relevant sections of the Guaranty provide:

> Section 1.1 <u>Guaranty of Obligations</u>. Guarantors hereby irrevocably and unconditionally guaranty to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (as defined in Section 1.2, below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise, subject to and in accordance with the limitations set forth in this Guaranty. Guarantors hereby irrevocably and unconditionally covenant and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

> Section 1.2 <u>Definition of Guaranteed Obligations</u>.

> (a) Guarantors hereby assume liability as primary obligors for, hereby unconditionally guaranty payment to Lender of, hereby agree to pay, protect, defend and save Lender

harmless from and against, and hereby indemnify Lender from and against, any and all actual out-of-pocket liabilities, obligations, losses, damages (excluding (1) punitive or exemplary damages or diminution in value of the Property or damages caused by the negligence or willful misconduct of Lender or those acting on behalf of Lender, and (2) consequential damages), out-of-pocket costs and expenses (including, without limitation, reasonable and documented attorneys' fees and costs), causes of action, suits, claims, demands and judgments, of any nature or description whatsoever, which may at any time be imposed upon, incurred by or awarded against Lender as a result of any of the following: ...

> (iv) the (A) execution and delivery of any Lease which is not a Qualifying Lease (as such term is defined in the Building Loan Agreement) or (B) termination of any Lease as to which the tenant thereunder is not in default beyond any applicable grace, notice or cure period; or (C) amendment, modification, termination, or cancellation or surrender of the Ground Lease from Silk and Halpern, LLC to Borrower for the Property; ...

> (c) The obligations of Guarantors set forth in <u>clauses (a)</u> and (<u>b</u>) of this <u>Section 1.2</u>, as and to the extent set forth in said <u>clauses (a)</u> and (<u>b</u>) of <u>this Section 1.2</u>, are hereinafter collectively referred to as the "**Guaranteed Obligations**"....

> Section 1.3 <u>Nature of Guaranty</u>. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by any Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) any Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced, pursuant to the Loan Documents, shall not release or discharge the obligation of Guarantors to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Notes and shall not be discharged by the assignment, sale, pledge, transfer, participation **\*569**  or negotiation of all or part of the Notes.

Guaranty §§ 1.1, 1.2, 1.3.

### D. P8's Unpaid Rent

On October 24, 2023, P8 informed Cerco that it would not make the quarterly rent payment ("Ground Rent") on the Ground Lease due on November 1, 2023, and offered to tender the Property to Cerco. FAC ¶ 41; *id.* Ex. 6 ("P8 Letter"), ECF No. 23-11. P8 explained that, "due largely to macro-economic events affecting the real estate market generally, it no longer ha[d] any position of value in the Property." P8 Letter at 2. P8 did not pay the Ground Rent on November 1. FAC ¶ 43. On November 2, Silk & Halpern notified both P8 and Cerco that P8 was in default of the Ground Lease and had fifteen days to cure its default. FAC ¶ 44; *id.* Ex. 8 ("Silk & Halpern Letter") at 3, ECF No. 23-13. On November 3, Cerco informed Guarantors that P8 was in default on the Ground Lease. FAC ¶ 45. Citing Sections 1.2(a)(iv)(C) and 1.8 of the Guaranty, Cerco told Guarantors that, if Guarantors did not pay the rent by November 15, Cerco might "remit payment for the Ground Rent to Silk & Halpern ... in order to preserve its rights in and to the collateral" and would "immediately demand payment from Guarantors for these out-of-pocket costs and expenses (including attorneys' fees), together with interest." FAC Ex. 9 ("Cerco November 3 Letter") at 2-3, ECF No. 23-14. P8 did not pay the Ground Rent by November 15. FAC ¶ 46.

On November 20, "[i]n order to preserve its rights and to protect the security of the Mortgage," Cerco entered into an agreement with Silk & Halpern in which it agreed to make the November 1 rent payment. FAC ¶ 47; *see id.* Ex. 7 ("November 20 Agreement"), ECF No. 23-12. In exchange, Silk & Halpern agreed to "conditionally refrain from terminating" the Ground Lease. November 20 Agreement at 1. The agreement stated: "Upon timely clearance of the payments set forth above, the Default Notice shall be deemed withdrawn in its entirety and that [sic] the [Ground] Lease will continue in full force and effect without modification." *Id.* at 2. On or about November 29, Cerco paid $783,984 toward the Ground Rent payment. FAC ¶ 48.

On November 29, December 5, and December 13, Cerco wrote to Guarantors informing them of P8's failure to cure and demanding indemnification for Cerco's payment toward the rent, plus interest and expenses. *See* FAC Exs. 10, 11, & 12, ECF Nos. 23-16, 23-17, & 23-18. Also on December 13, Cerco wrote to Guarantors stating that an event of default had occurred under the Loan Agreement and declaring the entire "unpaid principal amount of the Leasehold Note and Building Note, together with interests, costs, and fees, due and payable." FAC Ex. 10, ECF No. 23-15. It also stated

that, "[t]o the extent that Cerco continues to pay the Ground Rent under the Ground Lease, Cerco will continue to demand reimbursement from Borrower of its ongoing out-of-pocket payments each quarter." *Id.*

Cerco also paid the February 2024 quarterly rent payment, bringing its total payments, fees, costs, and expenses related to P8's unpaid rent to $1,696,069.92 as of March 1, 2024. FAC ¶¶ 59-60. P8 has not paid Cerco for the quarterly rent, fees, costs, and expenses, nor has it paid the outstanding balance on the Loan. FAC ¶ 61. Guarantors have also not paid Cerco the unpaid rent or the outstanding principal, interest, and costs on the Loan. FAC ¶ 73.

### E. Cerco's Claims

On December 21, 2023, Cerco filed a Complaint in this Court. *See* ECF No. 1. After Defendants filed a motion to dismiss, **\*570** *see* ECF No. 20, Cerco filed a First Amended Complaint on March 5, 2024, *see* ECF No. 23. Cerco brings three causes of action against Guarantors.

*First*, Cerco alleges breach of contract based on Guarantors' failure "to honor the Guaranty." FAC ¶ 83. Cerco states that because "P8 defaulted on the Ground Lease and Loan Documents and failed to cure its default," Cerco "declared the entire unpaid principal sum plus all interest immediately due and payable pursuant to the Building Loan Agreement and Loan Documents." FAC ¶¶ 77-78. Cerco asserts that "[t]he Guaranty is triggered" by (1) P8's default, (2) the November 20 agreement between Cerco and Silk & Halpern, and (3) Cerco's payment of the Ground Rent, each of which constitutes an "amendment, modification, termination, or cancellation or surrender of the Ground Lease" under § 1.2(a)(iv)(C) of the Guaranty. FAC ¶¶ 79-81. Cerco further alleges that "Guarantors have not indemnified Cerco for its 'out-of-pocket liabilities, obligations, losses, damages ... out-of-pocket costs and expenses ....' and the 'amount due' " under §§ 1.2(a), 1.5 of the Guaranty. FAC ¶ 82. As a result, Cerco seeks damages of "$13,864,229 on the unpaid principal, interest, and other costs and charges" under the Loan, and "$1,696,069 on the quarterly Ground Rent payments, fees, and costs, plus default interest at 24%, any future Ground Rent payments, and its out-of-pocket costs, attorneys' fees, and expenses." FAC ¶ 84.

*Second*, Cerco brings a claim for breach of the implied covenant of good faith and fair dealing. Cerco states that "Guarantors represented and warranted that '[e]very Guarantor is familiar with, and has independently reviewed

books and records regarding, the financial condition of [P8] and is familiar with the value of any and all collateral,' " FAC ¶ 88, and that "Guarantors have superior knowledge with respect to P8's financial status" and "P8's management of the Property." FAC ¶¶ 89-90. Cerco alleges that "Guarantors, in bad faith, withheld material information from Cerco with respect to P8's financial condition and management of the Property" and "deceived Cerco by preventing Cerco to receive its benefit of what it bargained for under the Guaranty." FAC ¶ 91. On this claim, Cerco also seeks $13,864,229 on the outstanding Loan and $1,696,069 on the unpaid Ground Rent, plus interest, costs, and fees. FAC ¶ 92.

*Third*, Cerco seeks a declaratory judgment under the Federal Declaratory Judgments Act, 28 U.S.C. § 2201(a), declaring that P8 defaulted on the Ground Lease and failed to cure its default, resulting in a default under the Loan Documents; that Cerco may therefore declare the entire unpaid principal and interest on the Loan due and payable; that the Guaranty is triggered by "amendment, modification, termination, cancellation, or surrender of the Ground Lease" in the form of P8's default, the November 20 Agreement, and/or Cerco's payments of the Ground Rent; and that Guarantors are required to pay "any and all actual out-of-pocket liabilities, obligations, losses, damages, out-of-pocket costs and expenses, including attorneys' fees" under § 1.2 of the Guaranty and the "amount due," including unpaid principal, interest, costs, and fees on the Loan, under § 1.5 of the Guaranty. FAC ¶ 97.

Defendants moved to dismiss the FAC under Rules 12(b)(1) and 12(b)(6). *See* Defs.' Mem. Supp. Mot. to Dismiss ("Defs.' Mem."), ECF No. 40. They argue that (1) Plaintiff failed to establish the diversity of citizenship required for this Court's subject matter jurisdiction; (2) Plaintiff failed to plead a claim for breach of contract because its own pleading demonstrates that the Ground Lease was not amended, **\*571** modified, terminated, cancelled, or surrendered; (3) Plaintiff failed to plead its implied-covenant claim with particularly as required by Rule 9(b); and (4) Plaintiff's declaratory-judgment claim serves no useful purpose. *See* Defs.' Mem. 9-13, 14-22, 22-25, 25.

## LEGAL STANDARDS

 **[1]**   **[2]**   **[3]**   **[4]**   "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to

adjudicate it."[2] *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving such a motion, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). Where "jurisdictional facts are placed in dispute," "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "Although courts are generally limited to examining the sufficiency of the pleadings on a motion to dismiss, on a challenge to the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 255 n.1 (2d Cir. 2003).

 **[5]**   **[6]**   **[7]**   To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). In assessing the complaint, the court "must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. But the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.' " *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In applying Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). "Furthermore, where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011).

## DISCUSSION

### A. Motion to Dismiss Under Rule 12(b)(1)

Plaintiff invokes this Court's diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332 "because Cerco and Schenker and Hornstock are citizens of different states and the matter in controversy exceeds the sum or value of $75,000." FAC ¶ 24. Defendants argue that Plaintiff's "constantly shifting jurisdictional contentions simply do not add up, and publicly available information directly undermines them." Defs.' **\*572** Mem. 9. After reviewing the pleadings and declarations, the Court concludes that Plaintiff has satisfactorily shown diversity of citizenship.

 [8]    [9]   "[F]or purposes of diversity jurisdiction, a limited liability company has the citizenship of its membership." *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000) (citing *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998)). A corporation is deemed a citizen of every state or country in which it is incorporated and of the state or country where it has its principal place of business. 28 U.S.C. § 1332(c)(1). "A corporation's principal place of business under § 1332 is 'the place where a corporation's officers direct, control, and coordinate the corporation's activities.' " *OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 218 (2d Cir. 2016) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010)).

 [10]   Here, the parties do not dispute that Defendants are citizens of New York; at issue is the citizenship of Cerco, a limited liability company. *See* Defs.' Mem. 9-13; Pl.'s Mem. Opp. Mot. to Dismiss & Supp. Cross-Mot. Summ. J. ("Pl.'s Mem.") 9-13, ECF No. 46. Plaintiff alleges that "Cerco has one member, Cerco Capital Inc.," which is "a Delaware corporation" with "a principal place of business" in "New Providence, Bahamas." FAC ¶ 17. If Plaintiff's allegations are true, then both Cerco Capital and Cerco (the LLC) are citizens of Delaware and the Bahamas, and complete diversity exists between Plaintiff and Defendants.

Defendants contest Plaintiff's allegations, arguing that publicly available evidence suggests Cerco may well be a citizen of New York. *See* Defs.' Mem. 9-13. First, Defendants argue that Plaintiff's allegation of "*a* principal place of business" in the Bahamas, *see* FAC ¶ 17 (emphasis added), is "improperly equivocal and evasive." *Id.* at 10. Defendants cite Third Circuit authority suggesting that the FAC's reference to "a" principal place of business, were it the only piece of information before the Court, might be insufficient to support diversity jurisdiction. *See J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1265 n.3 (3d Cir. 1994) (noting that complaint alleged "a" principal

place of business in New Jersey, leaving open the possibility that corporation had "its" principal place of business in Florida). But here, as in *J & R Ice Cream Corp.*, Plaintiff has offered "supporting material" indicating that its *sole* principal place of business is in the Bahamas. *Id.*; *see, e.g.*, Corrected Cervinka Decl. at ¶ 4, ECF No. 28 ("*The* principal place of business for Cerco Capital Inc. is ... The Bahamas." (emphasis added)). Accordingly, under the Third Circuit's precedent, any "jurisdictional problem" arising from the FAC's use of the indefinite article would nevertheless be "cured" by that supporting evidence. *J & R Ice Cream Corp.*, 31 F.3d at 1265 n.3.

Defendants next point to record evidence and publicly available documents suggesting that Cerco Capital's principal place of business is not in the Bahamas, as Cerco says, but in New York. Specifically, Defendants argue that:

- Cerco Capital's claimed principal place of business in the Bahamas is an apartment in a gated residential community (Defs.' Mem. 11);

- Cerco's Chief Executive Officer, Peter Cervinka, claims he directs Cerco Capital's activities from his residence in the Bahamas, but he does not purport to be an officer of Cerco Capital (*id.* at 12);

- The only identified officer of Cerco Capital, Wayne Sturman, has a public LinkedIn page citing his location as "New York, New York" (*id.*);

 **\*573** • Mr. Sturman executed the Loan Documents in New York (*id.*);

- Mr. Sturman, Mr. Cervinka, and a third colleague, Michael Bodnev, all hold themselves out publicly as New York-based executives working from the New York offices of Cerco Funding LLC at 230 Central Park South (*id.*);

- Mr. Cervinka has New York State broker's licenses listing the Central Park South address as his principal office and practice location (*id.* at 13); and

- Mr. Cervinka listed a phone number with a (212) area code in correspondence in November 2023, shortly before this action was filed (*id.*).

Against those arguments, Cerco presents a declaration by Mr. Cervinka stating that:

- Mr. Cervinka is "domiciled in, and a permanent resident of, the Commonwealth of The Bahamas," and he "direct[s], control[s], and coordinate[s] Cerco Bridge and Cerco Capital Inc.'s business activities from [his] residence in The Bahamas" (Corrected Mr. Cervinka Decl. ¶¶ 5-6);

- "The principal place of business for Cerco Capital Inc. is Venetian West, Unit 1602, Windsor Field Road, New Providence, The Bahamas" (*id.* ¶ 4);

- "All of Cerco Bridge and Cerco Capital Inc.'s employees work remotely from their own personal residence" (*id.* ¶ 7);

- Mr. Sturman, the President of Cerco Capital Inc., "is domiciled in the State of Connecticut" and "assists ... with directing, controlling, and coordinating Cerco Bridge and Cerco Capital Inc.'s business activities from his residence in Connecticut" (*id.* ¶ 8);

- Mr. Bodnev "is domiciled in the State of New Jersey," and "does not assist ... with directing, controlling, or coordinating Cerco Bridge or Cerco Capital Inc." (*id.* ¶ 9);

- "As of the commencement of this litigation, neither Cerco Bridge nor Cerco Capital Inc. has an office, building, or residence in the State of New York" (*id.* ¶ 11); and

- "As of the commencement of this litigation, no executive who assists ... with directing, controlling, and/or coordinating either Cerco Bridge or Cerco Capital Inc. is a resident of, domiciled in, or has a business address in, the State of New York" (*id.* ¶ 12).

Mr. Cervinka's affirmations are reiterated in relevant part by Sturman in a declaration submitted in response to Defendants' Motion to Dismiss. *See* Sturman Decl. ¶¶ 3-5, ECF No. 48 (confirming, *inter alia*, that Cerco Capital has no office, that all its employees work from home, that Mr. Cervinka directs the business from the Bahamas, and that Sturman assists in directing the business from Connecticut).

Although Defendants' evidence certainly suggests that Cerco Capital's directors are affiliated with New York and may have been based in New York in the past, at this stage of proceedings the Court sees no reason not to credit Plaintiff's declarations affirming that, as of the commencement of this litigation, Cerco Capital did not have a principal place of business in New York. After all, "in the post-COVID-19 era, ... substantially more employees telecommute," *Derrica v. Tura, Inc.*, No. 21 Civ. 8820, 2022 WL 1421452, at *3 (S.D.N.Y. May 5, 2022), and many businesses have moved away from physical headquarters—as P8's decision to stop paying rent on office building in Manhattan may well illustrate. *See generally* Katelyn L. Simmons, **\*574** *Tackling Principal Place of Business Post-Pandemic: When Headquarters Are Empty Boardrooms*, 18 Charleston L. Rev. 335 (2023). Moreover, it is not implausible that executives active in the New York commercial real estate market might conduct the bulk of their work from homes in Connecticut or the Bahamas.[3] The Court therefore finds that, for purposes of surviving a motion to dismiss, Plaintiff has adequately established diversity of citizenship. *See Charles v. Slade Indus., Inc.*, No. 19 Civ. 3013, 2019 WL 6768659, at *2 (E.D.N.Y. Dec. 12, 2019) (finding that various online sources suggesting corporation had headquarters in New York did not establish New York as its principal place of business, because corporation's president submitted a declaration stating that all decision-making and activities were conducted out of headquarters in New Jersey). Because there is no question that the amount in controversy exceeds $75,000, the Court concludes that it has subject matter jurisdiction and proceeds to the merits.

### B. Motion to Dismiss Under Rule 12(b)(6)

Defendants argue that Plaintiff fails to state a viable claim for breach of contract, breach of the implied covenant of good faith and fair dealing, or a declaratory judgment. The Court addresses each in turn.

### 1. Breach of Contract

 **[11]** **[12]** **[13]** **[14]** **[15]** To establish a breach of contract under New York law, which governs the interpretation of the Guaranty,[4] a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages." *CP III Rincon Towers, LLC v. Cohen*, No. 10 Civ. 4638, 2022 WL 61318, at *7 (S.D.N.Y. Jan. 6, 2022). "A written contract must be interpreted according to the parties' intent, which is derived from the plain meaning of the language employed in the agreements." *Id.* In a dispute over the meaning of a contract, a threshold question of law is "whether the contract terms are ambiguous." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000). In general, "ambiguity exists where a contract term could

suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 75 (2d Cir. 2009). "If the court determines the operative contract to be ambiguous, it may evaluate the extrinsic evidence as a matter of law." *Bank of N.Y. Tr. Co., N.A. v. Franklin Advisers, Inc.*, 726 F.3d 269, 275 (2d Cir. 2013).

 [16]   Under New York law, the "obligations of a guarantor should be strictly construed," *Dunkirk Tr. Co. v. Schmitt,* 316 F.2d 537, 539 (2d Cir. 1963) (citing *Wesselman v. Engel Co.,* 309 N.Y. 27, 127 N.E.2d 736 (1955)), and "cannot be extended by construction beyond the plain and explicit language of the contract," *Key Bank of Long Is. v. Burns,* 162 A.D.2d 501, 503, 556 N.Y.S.2d 829 (2d Dep't 1990). "Guarantees are strictly construed because the guarantor cannot be held responsible to guarantee a performance different from that which he intended or specified in the guaranty." **\*575** *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 93 F.3d 1064, 1073-74 (2d Cir. 1996).

The parties advance markedly different interpretations of the Guaranty, in three critical respects. First, Plaintiff contends that it is an absolute "guaranty of payment" binding the guarantors to pay the entire debt obligation if the borrower fails to do so, while Defendants assert that it is a "carve-out" guaranty triggered only by the occurrence of certain defined events within the control of the guarantors. *See* FAC ¶ 6; Pl.'s Mem. 2; Defs.' Mem. 15. Second, Plaintiff argues that, even if the Guaranty is a carve-out guaranty, Defendants are liable for the entire debt if one of the triggering events has occurred (*i.e.*, full recourse liability). *See* Pl.'s Mem. 24-25. Defendants, by contrast, maintain that they could be liable only for losses arising from the triggering event, not the entire loan (*i.e.*, loss recourse liability). *See* Defs.' Mem. 16. Finally, Plaintiff argues that P8's default on the Ground Rent triggered the carve-out provision because it was an "amendment, modification, termination, or cancellation or surrender of the Ground Lease." Pl.'s Mem. 2 (quoting Guaranty § 1.2(a)(iv)); *see id.* at 18-23. Defendants counter that, under the explicit terms of the Ground Lease, no amendment, modification, termination, cancellation, or surrender of the Ground Lease has occurred. Defs.' Mem. 15-16.

In sum, the parties disagree on three key questions: (1) what triggers the Guaranty (*i.e.*, whether it is a full payment

guaranty or a carve-out guaranty), (2) what liability the Guaranty imposes if triggered (*i.e.*, whether it is full recourse or loss recourse), and (3) whether the carve-out conditions have been triggered (*i.e.*, whether there has been an amendment, modification, termination, cancellation, or surrender of the Ground Lease). The Court will address the first two questions followed by the third.

*a. The Nature of the Guaranty*

"Lenders have long sought to enhance their recoveries on bad loans by requiring guaranties from a borrower's owner, affiliate or other related party." Lauren Beslow & Travis Eliason, *Commercial Loan Guaranties and Enforcement of Non-Recourse Carve-Out Liability*, 27 Com. Lending Litig. News 2 (2015). While "the typical non-recourse loan limits a lender's recovery from the borrower to the value of the collateral," guaranties ensure additional recovery from the guarantor. *Id.* Guaranties come in several forms. One is a "principal payment guaranty," in which "a guarantor agrees to pay all or part of the borrower's obligation in the event that the borrower does not pay." *Id.* Another is a "carve-out guaranty, known colloquially in the industry as a 'bad boy guaranty,' " which "requires defendants to compensate the lenders in the event they or the [b]orrower engage in certain acts that could harm the lenders' interest in the collateral or the lenders' ability to enforce their rights under the loan agreement." *Nexbank, SSB v. Soffer*, 144 A.D.3d 457, 41 N.Y.S.3d 217, 218 (2016). "Bad boy guarantees are frequently required by lenders providing financing to special purpose entities, often in real estate transactions, to permit the lender to pursue the individual controlling the special purpose borrower for actions that undermine the value of the lender's collateral." *CP III Rincon Towers, Inc. v. Cohen*, 666 F. App'x 46, 49 n.1 (2d Cir. 2016).

"Bad boy" or carve-out guaranties may be full recourse, subjecting the guarantor to liability for the entire debt if the triggering event occurs, or they may impose lesser liabilities. *See D.B. Zwirn Special Opportunities Fund, L.P. v. SCC Acquisitions, Inc.*, 74 A.D.3d 530, 902 N.Y.S.2d 93, 94 (2010) (describing a "carve-out guaranty" in which "defendant becomes liable for **\*576** *all or part* of its affiliates' payment obligations upon the occurrence of certain events" (emphasis added)). For example, a carve-out guaranty may be non-recourse or "loss recourse"—requiring the guarantor to cover losses sustained by the lender as a result of the borrower's failure to comply with its obligations under the carve-out, but

not "the entire amount of the loan." *CP III Rincon Towers, Inc.*, 666 F. App'x at 49.

By its plain terms, the Guaranty is unambiguously a carve-out guaranty. It lists a number of specific "Guaranteed Obligations" and provides for liability if those obligations are breached, but it does not assign any liability to Guarantors beyond that enumerated list. Specifically, Section 1.1 of the Guaranty, titled "Guaranty of Obligations," states that "Guarantors hereby irrevocably and unconditionally guaranty to Lender and its successors and assigns *the payment and performance of the Guaranteed Obligations.*" Guaranty § 1.1 (emphasis added). Section 1.2, titled "Definition of Guaranteed Obligations," provides:

> (a) Guarantors hereby assume liability as primary obligors for, hereby unconditionally guaranty payment to Lender of, hereby agree to pay, protect, defend and save Lender harmless from and against, and hereby indemnify Lender from and against, any and all actual out-of-pocket liabilities, obligations, losses, damages ..., out-of-pocket costs and expenses ..., causes of action, suits, claims, demands and judgments, of any nature or description whatsoever, which may at any time be imposed upon, incurred by or awarded against Lender as a result of any of the following:

Guaranty § 1.2(a). Subsection 1.2(a) then lists out a number of scenarios: (i) violation of environmental laws by Borrower or Guarantor; (ii) material physical waste due to negligence or willful misconduct, or the removal or disposal of any portion of the property, by Borrower or Guarantor; (iii) misapplication or misappropriation of various monies by Borrower; (iv) various lease impairments, including "amendment, modification, termination, or cancellation or surrender of the Ground Lease"; (vi) criminal activity relating to the Property by Borrower or Guarantor; or (vii) Borrower incurring new indebtedness without Lender's consent. Guaranty §§ 1.2(a)(i)-(vii). Subsection (b) provides another list of scenarios, including Borrower filing a voluntary petition for bankruptcy or making an assignment for the benefit of creditors, and states that "Guarantors hereby acknowledge and agree that the Guaranteed Obligations shall be fully recourse to each Guarantor in the event" of one of those scenarios. Guaranty §§ 1.2(b), (b)(i), (b)(v). Subsection (c) then states: "The obligations of Guarantors set forth in clauses (a) and (b) of this Section 1.2, as and to the extent set forth in said clauses (a) and (b) of this Section 1.2, are hereinafter collectively referred to as the 'Guaranteed Obligations.'" Guaranty § 1.2(c).

Nowhere does the Guaranty assign any liability to Guarantors except upon failure to perform the Guaranteed Obligations. The Guaranteed Obligations, in turn, describe the "bad boy" events that would trigger liability under the carve-out. *See* Guaranty §§ 1.2(a)(i)-(vii) and (b)(i)-(vi). They all describe acts within the control of Borrower or Guarantors that would threaten the value of Cerco's collateral (that is, the leasehold). The Court therefore rejects the contention that the Guaranty is an unconditional guaranty of payment.

Plaintiff protests, quoting language from the "Nature of Guaranty" section stating that the Guaranty "is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection." Pl.'s Mem. 15 (quoting Guaranty **\*577** § 1.3). But that merely distinguishes between *payment* and *collection*—clarifying that this guaranty, once invoked, permits the lender to obtain immediate payment from the guarantors rather than requiring it to first pursue a judgment against the borrower. *See N.Y.C. Dep't. of Fin. v. Twin Rivers, Inc.*, 920 F. Supp. 50, 52 (S.D.N.Y. 1996) (explaining that "[i]n a guaranty of collection, the guarantor undertakes the responsibility to pay if and only if the debt cannot be collected from the principal through legal proceedings," while "a creditor who seeks to enforce a guaranty of payment need not take any preliminary steps against the principal debtor before he seeks to collect the debt"). The very next sentence makes clear that the Guaranty is tethered to the Guaranteed Obligations: "This Guaranty may not be revoked by any Guarantor and shall continue to be effective *with respect to any Guaranteed Obligations* arising or created after any attempted revocation ...." Guaranty § 1.3 (emphasis added). In any event, even if the Guaranty's use of the phrase "guaranty of payment" could be read to suggest that it is *not* a carve-out guaranty, the more specifically enumerated Guaranteed Obligations negate that suggestion. *See Green Harbour Homeowners' Ass'n v. G.H. Dev. & Constr., Inc.*, 14 A.D.3d 963, 789 N.Y.S.2d 319 (2005) ("Where a contract ... employs contradictory language, specific provisions control over general provisions." (citing *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 150 N.Y.S.2d 171, 133 N.E.2d 688, 690 (1956))).

Plaintiff next argues that the Guaranty "contains both an absolute guaranty of payment **and** a guaranty of performance with respect to additional, specifically defined obligations." Pl.'s Mem. 16. Thus, according to Plaintiff, "Guarantors are liable for both defaults on the underlying debt and the specifically enumerated 'Guaranteed Obligations.'" *Id.* at 18. But nothing in the Guaranty suggests that any part

of it operates independently of the enumerated Guaranteed Obligations—indeed, nearly every section of Article I ("Nature and Scope of Guaranty") references the Guaranteed Obligations. *See* Guaranty §§ 1.1-1.10. Moreover, if the Guaranty contemplated a guaranty of payment upon any default by Borrower on the underlying debt, then there would be no reason to separately enumerate a list of conditions that trigger full recourse liability in the event of Borrower's bankruptcy—in which event Borrower would almost certainly have also defaulted on the debt. *See* Guaranty § 1.2(b)(i)-(b)(iii). In other words, Plaintiff's interpretation of the Guaranty would render much of Section 1.2(b) superfluous. *See Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("[Courts] disfavor contract interpretations that render provisions of a contract superfluous."); *Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of City of N.Y.*, 80 N.Y.2d 19, 586 N.Y.S.2d 554, 598 N.E.2d 702 (1992) ("[A] construction which makes a contract provision meaningless is contrary to basic principles of contract interpretation.").

Finally, Plaintiff argues that even under a carve-out guaranty, Defendants are liable for the entire debt if the Guaranteed Obligations are breached. Pl.'s Mem. 29-30. That is, Plaintiff maintains that the Guaranty is, at minimum, a full-recourse carve-out guaranty. Plaintiff is mistaken, at least as to the Guaranteed Obligations listed in Section 1.2(a). Guarantors are liable for "actual out-of-pocket liabilities, obligations, losses, damages ..., out-of-pocket costs and expenses ..., causes of action, suits, claims, demands and judgments ... incurred by or awarded against Lender *as a result of any of*" the Guaranteed Obligations in Section 1.2(a). Guaranty § 1.2(a) (emphasis added). Although Plaintiff elides the phrase "as a result of" at various points, *see* FAC ¶¶ 4, 6, 13, 82, that phrase is key to understanding that the Guaranty **\*578** is not fully recourse (it is merely loss recourse) as to the Guaranteed Obligations in Section 1.2(a). If, as Plaintiff argues, the nonpayment of Ground Rent violates Section 1.2(a)(iv) of the Guaranteed Obligations, then Guarantors must cover all out-of-pocket losses *caused by* the nonpayment of rent, plus costs, expenses, and fees—not the entire debt.

Section 1.2(b) reinforces that conclusion. The Guaranteed Obligations in that subsection, which concern intentional bankruptcy and other forms of business liquidation, are "fully recourse to each Guarantor." Guaranty § 1.2(b). But Section 1.2(a), critically, does not employ that phrase. Because it would be unnecessary to separate out subsections (a) and (b) if there were no difference in the liabilities arising from each,

Plaintiff's interpretation is clearly at odds with the parties' intent. *See Reda v. Eastman Kodak Co.*, 233 A.D.2d 914, 649 N.Y.S.2d 555, 557 (1996) ("When interpreting a written contract, the court should give effect to the intent of the parties as revealed by the language and structure of the contract.").

*b. Whether the Guaranteed Obligations Have Been Breached*

 **[17]**  Plaintiff contends that P8's failure to pay the quarterly Ground Rent resulted in an "amendment, modification, termination, or cancellation or surrender of the Ground Lease," Guaranty § 1.2(a)(iv), thus triggering Defendants' liability under the Guaranteed Obligations. *See* FAC ¶ 9. The Court disagrees.

As an initial matter, as Defendants point out, when Cerco and Silk & Halpern agreed that Cerco would pay the rent on P8's behalf, their agreement stated that "[u]pon timely clearance of the payments [by Cerco], the Default Notice shall be deemed withdrawn in its entirety and that the Net Lease *will continue in full force and effect without modification.*" November 20 Agreement 2 (emphasis added). That is strong evidence that the Ground Lease was not amended, modified, terminated, or surrendered, and Defendants argue that it is enough for Plaintiff to have "plead[ed] [it]self out of court by alleging facts that show [it] has no claim." *Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 120 (2d Cir. 2022); *see* Defs.' Mem. 21.

The Court need not decide whether the November 20 Agreement is dispositive on its own, however, because the terms of the Ground Lease conclusively refute Plaintiff's argument. The Ground Lease anticipates the precise scenario here: that the tenant (P8) might default on the rent and the leasehold mortgagee (Cerco), to preserve its collateral, might wish to pay it. *See* Ground Lease Part I § 15(a)(ii). Under the terms of the Ground Lease, the leasehold mortgagee is entitled to notice and the right to cure the tenant's default before the lease can be terminated. *Id.* Specifically:

(ii) Landlord shall give written notice [of Tenant's default] to any Leasehold Mortgagee ... and Landlord shall take no action to terminate this Lease ..., provided that:

(A) if such default is a default in the payment of any installment of basic net rent or any additional rent, such Leasehold Mortgagee cures such default on or before the date that is the later of (i) fifteen (15) days after the date that such default is required to be cured by Tenant hereunder;

and (ii) fifteen (15) days after such Leasehold Mortgagee's receipt of such notice ....

Ground Lease Part I § 15(a)(ii), (a)(ii)(A). Here, P8 failed to pay rent on November 1, 2023. FAC ¶ 43. On November 2, Silk & Halpern notified P8 and Cerco that P8 was in default and had fifteen days to cure its default. FAC ¶ 44; Silk & Halpern Letter 3. On November 20, Cerco agreed with Silk & Halpern that it would cover P8's rent payment, and on or about November **\*579** 29 it paid the rent. FAC ¶¶ 47-48. Cerco therefore cured P8's default within fifteen days of P8's own deadline to cure, as required. Accordingly, under the terms of the Ground Lease—and consistent with the November 20 Agreement between Cerco and Silk & Halpern that the lease would "continue in full force and effect without modification," November 20 Agreement at 2—the lease was not terminated.

Nor was the lease amended, modified, or surrendered. The Ground Lease provides that:

> Landlord and Tenant will not surrender, accept a surrender of, abandon, reject, materially modify or amend this Lease ..., subject to the cure rights granted in this Lease to a Leasehold Mortgagee, and Tenant shall not voluntarily waive any of its rights hereunder by its affirmative act, in any respect and in any such case *without the prior written consent of the Leasehold Mortgagee* and no Leasehold Mortgagee shall be bound by any such surrender, acceptance of surrender, abandonment, rejection, material modification, amendment or subordination of this Lease to any fee mortgage as to which the Leasehold Mortgagee has not consented.

Ground Lease Part I § 15(a)(i) (emphasis added). Plaintiff has not alleged that it consented, in writing, to the amendment, modification, or surrender of the Ground Lease.[5] Plaintiff's arguments that the Ground Lease was amended or modified because Plaintiff "stepped into the shoes of P8" by paying the rent, Pl.'s Mem. 19, or that P8's default was a surrender by operation of law, *id.* at 22, are therefore foreclosed by the express terms of the Ground Lease.

Because Plaintiff has not pleaded facts showing that the Ground Lease was amended, modified, terminated, or surrendered, it has failed to plead a violation of the Guaranteed Obligations. Plaintiff therefore fails to state a claim for breach of the Guaranty, and that claim is hereby dismissed.

## 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

 **[18]**    **[19]**    **[20]**  Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995). That covenant embraces "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* If a claim for breach of the implied covenant of good faith and fair dealing sounds in fraud, it must be pleaded with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *See Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 387-88 (S.D.N.Y. 2016). That is, the "breach of the implied covenant of good faith and fair dealing claims must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Id.* at 388 (quoting *Lerner v. Fleet Bank*, 459 F.3d 273, 290 (2d Cir. 2006)).

 **[21]**    **[22]**  Plaintiff alleges that Defendants "in bad faith[ ] withheld material information from Cerco with respect to P8's financial condition and management of the Property," and that "Guarantors deceived Cerco by preventing Cerco to receive [sic] its benefit of what it bargained **\*580** for under the Guaranty." FAC ¶ 91. As Defendants point out, an allegation of omission with intent to deceive "is a quintessential averment of fraud," Defs.' Mem. 22 (quoting *Matsumura v. Benihana Nat. Corp.,* 542 F. Supp. 2d 245, 252 (S.D.N.Y. 2008)). Plaintiff does not contest that point. The Court therefore concludes that Plaintiff's implied covenant claim sounds in fraud and must be pleaded with particularity. *See Fernandez*, 222 F. Supp. 3d at 388.

 **[23]**  Plaintiff's implied covenant allegations fall far short of Rule 9(b)'s heightened pleading standard. The only statement Plaintiff points to is Guarantors' representation in the Guaranty that they were "familiar with, and ha[d] independently reviewed books and records regarding, the financial condition of [P8] and [were] familiar with the value of any and all collateral intended to be created as security for the payment." FAC ¶ 88 (quoting Guaranty § 3.2). But Plaintiff does not explain how Guarantors' statement that they had reviewed P8's financials was allegedly fraudulent. Plaintiff alleges that Guarantors had "superior knowledge" of P8's financial situation and withheld information in bad faith,

but it never explains what information Guarantors supposedly had that they concealed from Plaintiff. FAC ¶¶ 89-91. Those threadbare allegations fail entirely to "specify the statements that the plaintiff contends were fraudulent" or "explain why the statements were fraudulent." *Fernandez*, 222 F. Supp. 3d at 388. Accordingly, Plaintiff's claim for breach of the implied covenant is dismissed.

### 3. Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Courts have consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). In deciding whether to exercise their discretion to render declaratory judgments, courts in the Second Circuit have typically considered "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Id.*

A declaratory judgment in this case would serve no useful purpose and offer no relief from uncertainty. The Court has already decided the questions on which Plaintiff seeks declaratory relief, *see* Pl.'s Mem 33-34, in its analysis of the breach of contract claim. *See supra* Part I.B.1. Accordingly, the Court dismisses Plaintiff's claim for a declaratory judgment.

### C. Cross-Motion for Partial Summary Judgment

Because the Court dismisses the First Amended Complaint in its entirety, it **DENIES** Plaintiff's Cross-Motion for Partial Summary Judgment.

### D. Motions for Discovery Sanctions

Defendants seek sanctions against Plaintiff and its counsel[6] in connection with **\*581** CEO Peter Cervinka's failure to appear at two depositions on May 7, 2024 and July 10, 2024. *See* ECF Nos. 78 & 113. For the reasons that follow, the Motions for Sanctions are **GRANTED IN PART**.

### 1. Factual Background

The parties do not appear to dispute the relevant facts. On April 11, 2024, Defendants noticed Mr. Cervinka's deposition for May 3, 2024. Herrmann Decl. Supp. First Mot. Sanctions ("First Herrmann Decl.") ¶ 2, ECF No. 80; *see id.* Ex. 1. On April 18, Plaintiff's counsel stated that they were unavailable on that date and would confer in good faith on other dates. *Id.* Ex. 2. On April 19, Defendants sent Plaintiff a letter in which they agreed to reschedule the deposition but advised that they needed it to take place at least a week before the May 17 deadline for filing their opposition to Plaintiff's Cross-Motion for Summary Judgment. *Id.* Ex. 3 at 3. Defendants proposed May 6, 7, or 8 and asked Plaintiff's counsel to confirm availability. *Id.* On April 25, having heard nothing from Plaintiff's counsel, Defendants served an amended notice of deposition for May 7. *Id.* ¶ 5; *see id.* Ex. 4.

On a phone call on April 30, Plaintiff's counsel raised for the first time an objection to Mr. Cervinka's deposition, arguing that the Court's earlier denial of Defendants' request for expedited jurisdictional discovery amounted to an indefinite stay of jurisdictional discovery. *Id.* ¶ 6. The following day, by email, Defendants disagreed that jurisdictional discovery was stayed but insisted that, in any event, Mr. Cervinka's deposition should go forward because it covered both jurisdictional and merits issues. *Id.* ¶ 7; *id.* Ex. 5 at 6-7. Two days later, on May 3, Plaintiff responded that it planned to file a motion seeking clarification of the Court's earlier order; counsel for Defendants urged Plaintiff's counsel instead to place a joint call to chambers given that the deposition was noticed to proceed in two business days. *Id.* Ex. 5 at 5. Plaintiff's counsel said they were unavailable that day to call chambers. *Id.* at 4. That afternoon, Defendants' counsel wrote that his partner was getting on a plane from Los Angeles and that Defendants were "proceeding with the intent that the deposition will go forward as planned." *Id.* at 3. Plaintiff's counsel responded, "We are not available on May 7," and "we trust you would agree that the deposition is adjourned pending a decision from" the Court. *Id.* at 2. Defendants' counsel stated that the deposition should not be postponed based on the mere filing of the motion to quash, which had not yet been decided at that point. *Id.* at 1.

Plaintiff's letter-motion, filed on Friday, May 3, sought to quash the May 7 deposition on the grounds that (a) the Court's order denying expedited jurisdictional discovery was

a stay of all jurisdictional discovery, and (b) the merits issues Defendants wished to explore amounted to improper extrinsic evidence. *See* ECF No. 51. Plaintiff urged that "Mr. Cervinka's deposition should be adjourned until after the completion of paper discovery and the Court's decision on the pending motions." *Id.* On Monday, May 6, the Court "denie[d] Plaintiff's request to quash Mr. Cervinka's deposition." Order Denying Mot. to Quash 2, ECF No. 53. The Court explained that its earlier order "did not stay jurisdictional discovery" and that Plaintiff was free to raise any argument about extrinsic evidence in its opposition papers. *Id.*

Upon receiving the Court's order at 5:40 p.m. on Monday, May 6, counsel for Defendants wrote to Plaintiff's counsel that, "[f]urther to the Court's order of this afternoon, we will plan to get started with Mr. Cervinka's deposition at 10:00 a.m. tomorrow." First Herrmann Decl. Ex. 6 at 2-3. Counsel for Plaintiff responded: "I will not be producing the witness tomorrow. I **\*582** will be producing the witness anytime you want next week. I can probably produce a witness later this week. I cannot do it tomorrow." *Id.* Defendants' counsel protested that his partner had just flown to New York to take the deposition the following day and would be returning to Los Angeles that same day after the deposition. *Id.* at 1. Plaintiff's counsel reiterated: "I cannot produce the witness tomorrow. I will not do so. I may be able to produce them on Thursday or Friday of this week and as I've said, I can produce some next week." *Id.* Defendants ultimately were unable to take Mr. Cervinka's deposition in New York on May 7, but they subsequently took a half-day, virtual deposition on May 10. *See id.* Ex. 7.

On May 22, Defendants emailed Plaintiff to schedule the remainder of Mr. Cervinka's deposition. *Id.* Ex. 8 at 1-2. Nearly a month later, on June 21, Plaintiff offered the date of July 10. *Id.* Ex. 11 at 1. On June 26, during the parties' meet-and-confer conversations, Plaintiff informed Defendants that Mr. Cervinka would only be available virtually because he was living in Europe. Barbet Decl. Opp. Second Mot. Sanctions ("Barbet Decl.") ¶ 2, ECF No. 120; Herrmann Decl. Supp. Second Mot. Sanctions ("Second Herrmann Decl.") ¶ 5, ECF No. 115. Although Defendants considered the possibility of a remote deposition, Barbet Decl. ¶ 3, they wrote back on June 28 stating that they would not agree to a remote deposition and were entitled to demand Mr. Cervinka's presence under the longstanding policy that "a plaintiff who chooses this district as his forum" must "appear for deposition in this forum absent compelling circumstances."

Barbet Decl. Ex. 1 at 5 (quoting *MPD Accessories B.V. v. Target Corp.*, 2013 WL 1200359, at \*1 (S.D.N.Y. Mar. 1, 2013)). Defendants asked Plaintiff to confirm that Mr. Cervinka would appear in New York on July 10—or, if he was not available that day, Defendants offered to confer on "another mutually workable date" for a deposition in New York. *Id.* Plaintiff's counsel responded that Defendants' "feigned need for in person [was] a self-inflicted injury" and that Plaintiff was "prepared to proceed by zoom." *Id.* at 4. On July 2, Defendants reiterated that "black-letter law require[s] Plaintiff to produce its CEO in person in New York" and indicated that they would pursue Rule 37(d) sanctions if Mr. Cervinka failed to appear in person. *Id.* at 1.

On the evening of July 3, Defendants noticed Mr. Cervinka's continued deposition for July 10 in New York. Barbet Decl. Ex. 3. Plaintiff responded, on July 5, that Mr. Cervinka was "unavailable for an in-person deposition" but was "available remotely for his continued virtual deposition on July 10." Barbet Decl. Ex. 2 at 2-3. In response, Defendants reiterated their intention to proceed in person and their entitlement to do so under "black-letter law." *Id.* at 1. On July 8, Plaintiff filed an emergency letter-motion to quash the in-person deposition. *See* Letter-Mot. to Quash July 10 Dep., ECF No. 95. On July 10, Plaintiff's counsel appeared at Defendants' office for the deposition with laptop in hand, ready to begin the deposition virtually. Second Herrmann Decl. ¶ 14. Defendants' counsel declined to take the deposition, noting that they "did not consent to a remote deposition and [would] not proceed with a remote deposition." *Id.* Ex. 3 at 9.

On July 16, the Court denied Plaintiff's motion to quash, holding that Plaintiff had failed to identify any compelling circumstances that would make traveling to New York unduly burdensome for Mr. Cervinka. *See* Order of July 16 at 2-3, ECF No. 103. The Court ordered the parties to meet and confer in good faith to find a mutually agreeable date to depose Mr. Cervinka in person. *Id.* at 3. The parties eventually agreed on an in-person deposition on August 30. *See* Barbet Decl. Ex. 5.

**\*583  2. Legal Standards**

Rule 37(d) provides the governing standard for the imposition of sanctions when a party fails to attend its own deposition. It states that "[t]he court where the action is pending may, on motion, order sanctions if ... a party or a party's officer, director, or managing agent ... fails, after being served with

proper notice, to appear for that person's deposition." Fed. R. Civ. P. 37(d)(1)(A), (A)(i). Such sanctions "may include," *inter alia*, prohibiting the disobedient party from introducing certain evidence, striking pleadings in whole or in part, staying proceedings, or dismissing the action. Fed. R. Civ. P. 37(d)(3) (referencing Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi)). "Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *Id.* A failure to appear "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)." Fed. R. Civ. P. 37(d)(2).

 **[24]**     **[25]**  Rule 37(d)(3) "place[s] the burden on the disobedient party to avoid expenses by showing that his failure is justified or that special circumstances make an award of expenses unjust." *Novak v. Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008) (quoting Advisory Committee Note to 1970 Amendments to Fed R. Civ. P. 37). "Moreover, courts and commentators alike have held that the provision 'requires the award of expenses' unless the disobedient party meets that burden." *Id.* "Conduct is substantially justified if there was a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action." *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 442 (S.D.N.Y. 2013). "Reasonable fees may include attorney's fees and costs in connection with filing a motion for sanctions." *Burks v. Stickney*, 837 F. App'x 829, 832-33 (2d Cir. 2020) (citing *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 145, 151 (S.D.N.Y. 2014)).

 **[26]**     **[27]**     **[28]**  A party's failure to appear for its own deposition can also "justify the imposition of sanctions pursuant to the court's inherent power to impose sanctions against parties and their counsel who abuse the litigation process." *Blauinsel Stiftung v. Sumitomo Corp.*, No. 99 Civ. 1108, 2001 WL 1602118, at *8 (S.D.N.Y. Dec. 14, 2001) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Inherent-power sanctions "may be imposed ... to sanction a party's misconduct during the course of litigation ... where a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Id.* (quoting *Chambers*, 501 U.S. at 45-46, 111 S.Ct. 2123). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123.

### 3. Whether Sanctions Are Warranted

Under Rule 37(d), Defendants seek an award of expenses and attorney's fees, jointly and severally against Plaintiff and its counsel, incurred in preparation for the May 7 and July 10 depositions, as well as in preparation of the two Motions for Sanctions. *See* Defs.' Mem. Supp. First Mot. Sanctions ("First Sanctions Mem.") 12, 20, ECF No. 79; Defs.' Mem. Supp. Second Mot. Sanctions ("Second Sanctions Mem.") 14, 17-18, ECF No. 114. Additionally, Defendants seek sanctions against Plaintiff's counsel under the Court's inherent authority for "vexatious and oppressive **\*584** litigation practices" in connection with the motion to quash the July 10 in-person deposition. Second Sanctions Mem. 12-13, 18.

Plaintiff argues that the Court should not impose sanctions because Mr. Cervinka did, in fact, appear for both depositions—he appeared for the May 7 deposition "within three days" and appeared for the July 10 deposition "virtually." Pl.'s Opp. First Mot. Sanctions ("First Sanctions Opp.") 7, ECF No. 99; Pl.'s Opp. Second Mot. Sanctions ("Second Sanctions Opp.") 10, ECF No. 119. Moreover, Plaintiff argues that the three-day adjournment in May and the virtual appearance in July were "substantially justified." First Sanctions Opp. 7-9; Second Sanctions Opp. 9-11. Plaintiff further argues that inherent authority sanctions are not justified because Plaintiff at all times acted in good faith. Second Sanctions Opp. 12-14.

#### a. *Rule 37(d)* Sanctions for the May 7 Deposition

 **[29]**     **[30]**  Plaintiff first argues that Mr. Cervinka did not fail to appear within the meaning of Rule 37(d). "Failure to appear is strictly construed in this Circuit and only occurs where a deponent literally fails to show up for a deposition session." *Salahuddin v. Harris*, 782 F.2d 1127, 1131 (2d Cir. 1986). Plaintiff argues that Mr. Cervinka "*did* appear for his deposition within three days of the unilaterally noticed date (May 7, 2024), which did not work for Cerco's counsel," and he then "appeared again for his deposition (remotely) on July 10, 2024." First Sanctions Opp. 7. Thus, according to Plaintiff, "[t]his was in no way a 'no show' " because "Cervinka appeared *twice.*" *Id.* Plaintiff's argument strains credulity. The deposition was formally noticed for May 7, 2024, and Cervinka did not show up—he "literally fail[ed] to show up for a deposition" on that day, *Salahuddin*, 782 F.2d at 1131. His later appearance on other dates does nothing

to change that fact. Accordingly, the burden is on Plaintiff to show that Mr. Cervinka's failure to appear on May 7 was substantially justified. *See Novak*, 536 F.3d at 178.

 **[31]** Plaintiff argues that "the short adjournment, from May 7 to May 10, 2024, was substantially justified, given counsel's unavailability and the Court's decision on the application to quash." First Sanctions Opp. 7. This argument, too, falls flat. First, the deposition was noticed on April 25, but counsel for Plaintiff failed to respond to the April 25 notice indicating their unavailability until May 3—two business days before the deposition.[7] *See* First Herrmann Decl. ¶ 5; *id.* Ex. 5 at 2. Moreover, counsel provided no explanation for the purported unavailability and did not specify whether it was counsel or the witness who was unavailable.[8] *See id.* Even **\*585** more fatal to Plaintiff's argument is that "counsel's unavailability" was not the basis for their motion to quash. Plaintiff instead asked the Court to quash the deposition on the grounds that it would constitute improper jurisdictional discovery and discovery of extrinsic evidence. *See* Letter-Mot. to Quash May 7 Dep., ECF No. 51. These were the only grounds for refusing to produce Mr. Cervinka that Plaintiff actually raised with the Court, and the Court rejected them before the deposition. *See* Order Denying Mot. to Quash. Plaintiff provides no justification, let alone a substantial justification, for its failure to produce Mr. Cervinka on May 7.

 **[32]** Finally, Plaintiff argues that an award of attorney's fees would be "manifestly unjust, given that Cerco acted in good faith at all times and attempted to work with Defendants regarding the deposition's scheduling, and that the brief adjournment was necessary and substantially justified." First Sanctions Opp. 9. The Court has already rejected the argument that Plaintiff's actions were substantially justified. As for good faith, "[i]t is well-established ... that a party applying for sanctions under Rule 37(d) is not required to prove that the party who failed to attend the deposition acted in bad faith." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 145, 149 (S.D.N.Y. 2014). Regardless, the record does not reveal that Plaintiff worked with Defendants in good faith on the scheduling of the deposition. Plaintiff was uncommunicative and evasive about its availability right up until the eve of the deposition—indeed, to this day, Plaintiff has failed to provide Defendants or the Court any explanation for its purported unavailability.

Accordingly, because Plaintiff has failed to show substantial justification for its actions or that imposing sanctions would be otherwise unjust, the Court will award Defendants reasonable expenses caused by Mr. Cervinka's failure to attend the May 7 deposition.

*b. Rule 37(d) Sanctions for the July 10 Deposition*

 **[33]**   **[34]**   **[35]**   Plaintiff argues that Mr. Cervinka's virtual appearance at the July 10 deposition was not literally a failure to appear and, in any event, it was substantially justified "given the untimeliness of Defendants [sic] notice of deposition coupled with Mr. Cervinka's international travel and Cerco's pending application to quash." Second Sanctions Opp. 9. Plaintiff's arguments are unpersuasive. Plaintiff cites no authority for the proposition that a deponent may unilaterally decide to appear remotely for a deposition that was noticed to take place in person. Rather, Rule 30(b)(4) provides that a deposition may be taken remotely by stipulation of the parties or order of the court—neither of which was present here. *See* Fed. R. Civ. P. 30(b)(4). Nor was the fact that Mr. Cervinka was not in the United States a sufficient excuse for his failure to appear in New York. As this Court has already explained, "[c]ourts in this District have 'long enunciated the policy of requiring a ... plaintiff who chooses this district as his forum to appear for deposition in this forum absent compelling circumstances." Order of July 16 at 2 (quoting *MPD Accessories B.V. v. Target Corp.*, 2013 WL 1200359, at \*1 (S.D.N.Y. Mar. 1, 2013)). Plaintiff cites international travel as a reason Mr. Cervinka was not produced in person, *see* Second Sanctions Opp. 9, but international travel, by itself, is not a sufficiently compelling circumstance, at least in this case. Moreover, the pending motion to **\*586** quash was not a motion for a protective order and therefore did not stay Plaintiff's obligation to produce Mr. Cervinka in person. *See* Fed. R. Civ. P. 37(d)(2) (failure to appear "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)").

 **[36]**   **[37]**   That leaves the timing of Defendants' notice of deposition. Plaintiff contends that the notice on July 3 of a deposition on July 10 was unreasonable under Rule 30(b)(1), given the intervening holiday and weekend. *See* Second Sanctions Opp. 9-10; Fed. R. Civ. P. 30(b)(1) ("A party who wants to depose a person by oral questions must give reasonable written notice to every other party."). But Rule 30(b)(1) does not prescribe any minimum notice period, and "the reasonableness of notice must be determined in light of the facts and circumstances of the individual case." *Fu v. Consol. Edison Co. of N.Y.*, 2018 WL 4373995, at \*5

(S.D.N.Y. Sept. 13, 2018). Here, Defendants were diligent in their efforts to reschedule the deposition, requesting Mr. Cervinka's availability on May 22. Second Herrmann Decl. ¶ 4. Plaintiff, however, did not respond until June 21—and it was not until June 26 that Plaintiff informed Defendants it would agree only to a remote deposition. *Id.* ¶¶ 4-5. By June 28, at the latest, Plaintiff was aware that Defendants insisted on taking Mr. Cervinka's deposition on July 10—the only date Plaintiffs had offered—in New York. *See* Barbet Decl. Ex. 1 at 5. Defendants' slight delay in formally noticing the deposition does not provide substantial justification for Mr. Cervinka's failure to appear. The Court finds that the notice here was reasonable under the circumstances. *See, e.g., F.A.A. v. Landy, 705 F.2d 624, 634 (2d Cir. 1983)* (holding that four days' notice was reasonable on the facts of the case).

 **[38]** Plaintiff also argues that an award of attorney's fees would be unjust because "this dispute could have been avoided in its entirety had Defendants promptly noticed Mr. Cervinka's deposition." Second Sanctions Opp. at 12. As discussed above, however, Plaintiff knew that Defendant insisted on taking the deposition on July 10 in New York at least two weeks in advance of that date. Having dragged its feet in scheduling the July deposition, Plaintiff cannot now cite untimeliness to excuse its noncompliance. In any event, it is unclear how the dispute would have been avoided if Defendants had noticed the deposition earlier. To the extent that Plaintiff suggests it might have filed its motion to quash in time for the Court to rule on the motion before the scheduled deposition, the events of May do not inspire confidence that a denial of Plaintiff's motion to quash would have induced Mr. Cervinka's attendance.

Plaintiff has not demonstrated substantial justification for Mr. Cervinka's failure to attend the July 10 deposition in person, or that imposing sanctions would be otherwise unjust. Accordingly, the Court will award Defendants reasonable expenses caused by that failure.

### c. Inherent Power Sanctions

 **[39]** Finally, Defendants seek a separate award of sanctions under the Court's inherent authority "in light of counsel's repeated acts of vexatious and oppressive discovery misconduct." Second Sanctions Mem. 2. Although the Court is sympathetic to Defendants' concerns, the Court finds that an award of reasonable expenses is sufficient to compensate Defendants and to deter Plaintiff from future misconduct.

Because the Court's inherent powers "must be exercised with restraint and discretion," *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123, **\*587** the Court declines to impose additional sanctions under its inherent powers.[9]

### 4. Calculation of Award

 **[40]** **[41]** **[42]** **[43]** **[44]** The starting point for determining a reasonable fee award is the "lodestar" or "presumptively reasonable fee," which is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Millea v. Metro-N. R.R. Co.,* 658 F.3d 154, 166 (2d Cir. 2011). Reasonable fees compensate counsel only for "hours reasonably expended on the litigation," and not for "hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart,* 461 U.S. 424, 433-34, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). A reasonable hourly rate is "the rate a paying client would be willing to pay." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany,* 522 F.3d 182, 190 (2d Cir. 2008). In setting a reasonable hourly rate, courts consider case-specific variables known as the *Johnson* factors. *Id.* at 190. The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 186 n.3. As its name suggests, the presumptively reasonable fee is not "conclusive in all circumstances," and it may be adjusted when it fails to "adequately take into account a factor that may properly be considered in determining a reasonable fee." *Millea,* 658 F.3d at 167.

 **[45]** "A district court should of course review any fee request," but courts have an "independent obligation to scrutinize a fee petition in limited circumstances, typically in situations implicating concerns regarding the adversarial process" such as class-action settlements and bankruptcy determinations. *United States v. Nursing Pers. Home Care,*

794 F.3d 232, 236 (2d Cir. 2015). Absent those special circumstances, when "a fee target has failed to offer either countervailing evidence or persuasive argumentation in support of its position, ... it is [not] the district court's job either to do the target's homework or to take heroic measures aimed at salvaging the target from the predictable consequences of self-indulgent lassitude." *Id.*

Here, Defendants seek to recover $75,368.50[10] in attorney's fees and $7,561.35 in costs in connection with the May 7 deposition, **\*588** *see* First Herrmann Decl. Ex. 18 at 1, 7, and $34,963.00 in attorney's fees and $5,773.03[11] in costs in connection with the July 10 deposition, *see* Second Herrmann Decl. Ex. 4 at 1-3. The Court will address the fees and costs in turn.

*a. Defendants' Proposed Fee Award*

Defendants' requested fees cover work undertaken by Defendants' counsel, Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), in connection with:

- Opposing Plaintiff's efforts to quash the May 7 deposition;

- Preparing for the deposition that did not proceed on May 7 as scheduled;

- Remonstrating with Plaintiff's counsel in an effort to secure Plaintiff's compliance with its discovery obligations leading up to the May 7 deposition;

- Preparing a pre-motion letter seeking permission to move for sanctions in connection with the May 7 deposition;

- Opposing Plaintiff's motion to quash the July 10 in-person deposition; and

- Preparing for the deposition that did not proceed on July 10 as scheduled.

First Herrmann Decl. ¶ 26; Second Herrmann Decl. ¶ 22. Defendants' requested fees are based on a total of 81.4 hours of work[12] performed by attorneys whose hourly billing rates range from $845 for a junior associate to $2,035 for a partner with more than 30 years' experience in real-estate and other commercial litigation. First Herrmann Decl. ¶ 24; *id.* Ex. 18; Second Herrmann Decl. Ex. 4.

Plaintiff does not mount a full challenge to the reasonableness of Defendants' proposed fee recovery. Notably, Plaintiff does

not take any issue with the reasonableness of Gibson Dunn's hourly rates. *See* First Sanctions Opp.; Second Sanctions Opp. But Plaintiff does briefly challenge some of the categories of fees that Defendants seek to recover. Specifically, Plaintiff argues that time spent preparing for the May 7 deposition was not wasted because the deposition occurred three days later, and that time spent preparing for the July 10 deposition was not wasted because the deposition was later rescheduled for August 30. Additionally, although it does not appear to connect this argument to the fee recovery, Plaintiff argues in passing that it acted in good faith with respect to the two motions to quash. The Court considers each of Plaintiff's arguments in turn.

[46] First, Plaintiff argues that "any time Defendants' counsel spent preparing for the deposition on May 7 was not wasted" because Defendants "used that preparation in connection with the May 10 deposition just days later." First Sanctions Opp. 9-10. This argument is best understood as a challenge to the reasonableness of the number of hours claimed by Defendants—or, put differently, an argument that those expended hours were not "caused by" Mr. Cervinka's failure to appear, Fed. R. Civ. P. 37(d)(3), because they would have been incurred eventually anyway. Indeed, Defendants acknowledge that some of their deposition preparation for May 7 would—albeit to a "significantly limited" extent— be "useful whenever the second half" of the deposition took place. First Sanctions Mem. 19 n.6. Accordingly, they seek 50 percent of the number of hours spent in deposition preparation "in **\*589** recognition of the fact that 'cancellation of the deposition means that defendants' counsel will have to repeat some of their preparation in advance of a rescheduled deposition.' " *Id.* (quoting *Sang Lan v. Time Warner, Inc.*, No. 11 Civ. 2870, 2015 WL 2078385, at \*1 (S.D.N.Y. May 4, 2015)); *see also* First Herrmann Decl. ¶ 27.

Ultimately, the Court finds that a more significant discount than what Defendants propose is appropriate here because much of Defendants' preparation was ultimately useful on May 10. The Court finds that it is reasonable for Defendants to recover for 25 percent of the time spent on deposition preparation in May. *Cf. Sang Lan*, 2015 WL 2078385, at \*1 (awarding 30 percent of preparation time for cancelled deposition).

[47] Second, Plaintiff also argues that "any time Defendants' counsel spent preparing for the deposition on July 10 was not wasted, as it has since been rescheduled to August 30." Second Sanctions Opp. 12. Defendants recognized this

point in principle and accordingly discounted their time in preparation for the May deposition, but they do not appear to have done the same in their accounting for the July deposition. *See* Second Herrmann Decl. Ex. 4. Defendants provide no explanation for this discrepancy. In light of the discussion above regarding the May deposition, the Court applies the same discount here and will award Defendants recovery for 25 percent of the hours spent in preparation for the July 10 deposition.

[48]   Finally, Defendants seek to recover fees for time spent reviewing and responding to Plaintiffs' two unsuccessful motions to quash, arguing that those motions were "frivolous." *See, e.g.*, First Sanctions Mem. 12; Second Sanctions Mem. 12. Plaintiff does not directly challenge Defendants' request for fees relating to the motions to quash, but it does insist that it filed those motions in good faith. *See* First Sanctions Opp. 12 (arguing that "there was a genuine dispute regarding whether the March 11, 2024 Order precluded Mr. Cervinka's deposition"); Second Sanctions Opp. 6 (arguing it had a "good faith basis to believe that the Court would allow Mr. Cervinka's deposition to proceed virtually"). The Court finds that Defendants should be reimbursed for the fees incurred in opposing the motions to quash because that work "would not have been necessary" had Plaintiff and its counsel "conducted themselves properly in the discovery process." *Creative Res. Grp. of N.J., Inc. v. Creative Res. Grp., Inc.*, 212 F.R.D. 94, 104 (E.D.N.Y. 2002). Plaintiff's conduct in the lead-up to both motions suggests that it never intended to produce Mr. Cervinka in person on May 7 or July 10—regardless of the Court's decision on the motions. Rather, Plaintiff appears to have been using the pendency of the motions as an excuse to adjourn the depositions. Plaintiff's attempt to delay the depositions was not substantially justified, as there was no genuine dispute as to the merits of either motion to quash. *See Klein*, 979 F. Supp. 2d at 442. Accordingly, the expenses Defendants incurred in opposing the motions are attributable to Plaintiff's decision not to produce Mr. Cervinka on May 7 and July 10 and will be included in the fee award.

[49]   Having considered Plaintiff's arguments and the *Johnson* factors, the Court finds that the number of hours requested by Defendants, adjusted as discussed above, is reasonable. Because Plaintiff does not challenge the reasonableness of Gibson Dunn's billing rates or attorney staffing decisions, the Court declines to "do [Plaintiff's] homework," *Nursing*, 794 F.3d at 236, and independently scrutinize the claimed hourly rates. Defendants have submitted a sworn declaration stating that the proposed fees represent Gibson Dunn's customary hourly rates, which are "commensurate with the rates charged by several **\*590** other premier, full-service firms actively involved in commercial litigation matters in the Southern District of New York." First Herrmann Decl. ¶ 25. Plaintiff had ample opportunity to contest those rates in either of its two briefs opposing sanctions—indeed, Defendants even pointed out in their first reply brief that Plaintiff had "fail[ed] to contest" the "reasonableness of" its proposed monetary award, First Sanctions Reply 6, ECF No. 107—but it did not do so. Given that Plaintiff essentially concedes the reasonableness of the rates for Defendants' counsel, the Court assumes their rates are reasonable. *See Nursing*, 794 F.3d at 236.[13]

In sum, the Court awards reasonable attorney's fees as described in Tables 1 and 2.

**Table 1. Fees Awarded in Connection with the May 7, 2024 Deposition**[14]

| Category | Hours | Requested Fees | Percent Awarded | Awarded Fees |
|---|---|---|---|---|
| Expenses incurred in preparing for the adjourned deposition | 39.1 | $32,497.50[15] | 50% | $16,248.75 |
| Other expenses, including those incurred in opposing the motion to quash | 22.3 | $42,871.00[16] | 100% | $42,871.00 |
| Total | 61.4 | $75,368.50 | | $59,119.75 |

[**Editor's Note:** The preceding image contains the reference for footnotes[15,16]].

**Table 2. Fees Awarded in Connection with the July 10, 2024 Deposition**[17]

| Category | Hours | Requested Fees | Percent Awarded | Awarded Fees |
|---|---|---|---|---|
| Expenses incurred in preparing for the adjourned deposition | 9 | $16,660.00 | 25% | $4,165.00 |
| Other expenses, including those incurred in opposing the motion to quash | 11 | $18,303.00 | 100% | $18,303.00 |

| Total | 20 | $34,963.00 | | **$22,468.00** |
|---|---|---|---|---|

*b. Defendants' Proposed Costs*

**[50]** In addition to attorney's fees, Defendants request reimbursement for the following costs:

- Airfare and lodging costs in connection with Mr. Fogelman's travel from Los Angeles to New York on May 6, 2024 for the deposition that did not take place on May 7, 2024;

**\*591** • Court reporter and videographer cancellation fees incurred for failing to cancel before 4:00 p.m. on the day before the May 7 deposition;

- Airfare and lodging costs in connection with Mr. Kahn's travel from San Francisco to New York for the purpose of, inter alia, conducting the deposition on July 10, 2024;[18]

- Court reporter and videographer cancellation fees incurred in connection with the July 10 deposition; and

- Costs associated with Westlaw research in connection with the legal work described above.

First Herrmann Decl. ¶¶ 28, 30-32; Second Herrmann Decl. ¶¶ 23, 25, 26. Plaintiff contends that "imposing sanctions for the court reporter and videographer fees and counsel's travel fees would be unjust because Cerco gave advance and reasonable notice of its unavailability on May 7." First Sanctions Opp. 10. As the Court has already discussed, however, Plaintiff did not give clear advance notice of its unavailability. Defendants could well have interpreted Plaintiff's vague "We are not available" statement on May 3, First Herrmann Decl. Ex. 5 at 2, as "an act of gamesmanship," *John Wiley & Sons, Inc.*, 298 F.R.D. at 150-51, especially given that "counsel's unavailability" was not the basis for Plaintiff's motion to quash. Moreover, the Court could have denied Plaintiff's motion to quash at any moment and ordered the deposition to go forward. It was therefore reasonable for Defendants to proceed under the assumption that the deposition would occur as noticed.[19] Accordingly, the Court approves an award for Defendants' costs in connection with travel, lodging, and court reporter and videographer cancellation fees. The Court also grants the application to recover Westlaw research costs, which Plaintiff does not contest.

In sum, the Court awards $7,561.35 in costs in connection with the May 7 deposition and $5,773.03 in costs in connection with the July 10 deposition. *See* First Herrmann Decl. Ex. 18 at 7; Second Herrmann Decl. Ex. 4 at 3.

*c. Whether Plaintiff and Plaintiff's Former Counsel are Jointly and Severally Liable*

**[51]** **[52]** Defendants seek sanctions "jointly and severally" against Cerco and its (now former) counsel, Fox Rothschild. First Sanctions Mem. 20; Second Sanctions Mem. 17; *see* Fed. R. Civ. P. 37(d)(3) (expenses are to be paid by "the party failing to act, the attorney advising that party, or both"). However, Plaintiff maintains that Mr. Cervinka's failure to attend the May 7 deposition was attributable to "counsel's unavailability." First Sanctions Opp. 7, 9; *see also id.* at 8. Cerco should not be held responsible for a decision that appears to have been based on *counsel*'s unwillingness or inability to attend the duly noticed deposition. Accordingly, the Court concludes that the sanctions in connection with the May 7, 2024 deposition ($59,119.75 in fees plus $7,561.35 in costs) should be charged against Fox Rothschild. Meanwhile, Mr. Cervinka's failure to appear in person for the July 10 deposition appears to have been due to his own unwillingness to travel from Europe to New York to be deposed in connection with a lawsuit that his company initiated in the Southern District of New York. The Court therefore holds that the sanctions in connection with the July 10, 2024 deposition ($22,468.00 in **\*592** fees plus $5,773.03 in costs) should be charged against Cerco.

*d. Defendants' Request for Fees on Fees*

Finally, Defendants seek leave to submit their additional expenses and fees incurred in preparing the two motions for sanctions. *See* First Sanctions Mem. 20; Second Sanctions Mem. 17-18. Any supplemental "fees on fees" application faces the complication that Plaintiff is currently uncounseled, and both Plaintiff and Fox Rothschild must be given the opportunity to respond. By **March 19, 2025**, Defendants are directed to meet and confer with the relevant parties and, if Defendants still wish to submit a supplemental application, to propose to the Court a briefing schedule that gives Plaintiff time to obtain new counsel in connection with the supplemental fee application.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**CONCLUSION**

Defendants' Motion to Dismiss is **GRANTED**; the First Amended Complaint is hereby dismissed with prejudice. Plaintiff's Cross-Motion for Partial Summary Judgment is **DENIED**. Defendants' Motions for Discovery Sanctions are **GRANTED IN PART**. The Clerk of Court is respectfully directed to terminate ECF Nos. 39, 45, 46, 78 & 113. All other pending motions are moot.

SO ORDERED.

**All Citations**

768 F.Supp.3d 559

Footnotes

1 An "Event of Default" is defined as, *inter alia*, Borrower's failure to make loan payments or to pay back the principal at maturity, failure to pay any other amount due under any of the Loan Documents, or failure to keep any other agreement contained or described in the Loan Documents; or Guarantor's default under any pledge or guaranty. Leasehold Mortgage Note § 10.1; Building Mortgage Note § 10.1.

2 All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

3 The Court need not decide whether Mr. Cervinka's residence or Sturman's is most relevant to determining Cerco Capital's principal place of business, since both affirm that neither is a resident or domiciliary of New York. Corrected Mr. Cervinka Decl. ¶¶ 5, 8; Sturman Decl. ¶¶ 4-5.

4 The Guaranty states that "this agreement shall be governed by and construed in accordance with the laws of the State of New York," Guaranty § 6.3(a), and neither party disputes that New York law applies.

5 Plaintiff argues that its agreement to pay the rent demonstrates its consent to P8's surrender of the lease, but it does not indicate that it ever consented in writing. *See* Pl.'s Mem. 23. Instead, the written agreement in which Cerco committed to paying the rent stated that the lease would "continue in full force and effect without modification." November 20 Agreement 2.

6 Plaintiff's counsel until very recently was the law firm Fox Rothschild LLP ("Fox Rothschild"). On December 27, 2024, the Court granted Fox Rothschild's motion to withdraw as counsel for Cerco and stayed the case pending resolution of the instant motions. *See* Order, ECF No. 187.

7 Plaintiff's repeated references to the "unilaterally noticed" deposition date, *see* First Sanctions Opp. 3, 4, 6, 7, 8, 9, are baffling in light of the evidence that Defendants consulted with Plaintiff about the May 7 date beginning on April 19 and only proceeded to notice the deposition for that date once they had received no clear response by April 25. *See* First Herrmann Decl. Ex. 3 at 3; *id.* ¶ 5. Though it is true that Defendants' April 25 notice was filed "right after Cerco informed Defendants that we were available to meet and confer to discuss depositions," Pollock Decl. ¶ 4, ECF No. 100, Plaintiff's proposed meet-and-confer date was April 30, *id.* Ex. 1 at 2, five days later and just one week before the tentative deposition. Defendants, having proposed several dates after Plaintiff initially rejected May 3, were entitled to notice the deposition for May 7 after inquiring about Plaintiff's availability and hearing no clear response.

8 Plaintiff's assertion that counsel "promptly (and repeatedly) communicated that unavailability to Defendants' counsel," First Sanctions Opp. 8, is belied by the submissions of both parties, which indicate that counsel first mentioned lack of availability on the afternoon of May 3. *See* First Herrmann Decl. ¶ 11; *id.* Ex. 5 at 2; Pollock Decl. ¶ 6; *id.* Ex. 3 at 2. On May 6, Plaintiff's counsel stated repeatedly that he would not be producing the witness the following day, but he gave no explanation for that refusal (nor did he attribute it to unavailability). *See* First Herrmann Decl. Ex. 6 at 1-2.

9 The Court also denies as moot Defendants' request for sanctions in the form of a discovery stay. *See* First Sanctions Mem. 19.

10     In a table attached to their declaration, Defendants state that they request a total of $118,092.50 in attorney's fees in connection with the May 7 deposition. *See* First Herrmann Decl. Ex. 18 at 1. But that sum appears to reflect two errors in Defendants' tabulation of the fee award. First, the sum of the figures in the "Requested Fees" column is $121,156.50, not $118,092.50—reflecting an undercounting of $3,064. *See id.* at 1, 2. Second, the sum is significantly inflated by a typographical error in the table. In requesting fees for James Fogelman's work of 2.5 hours at a rate of $2,035 per hour on May 6, 2024, Defendants entered the figure "$5,0875.50" (i.e., more than fifty thousand dollars) instead of $5,087.50 (around five thousand dollars). *See id.* at 2. These two errors account for the discrepancy of $42,724 between Defendants' calculation ($118,092.50) and the Court's calculation ($75,368.50) of the total fees requested for the May 7 deposition.

11     Defendants state that they request $5,773.96 in costs. *See* Second Herrmann Decl. Ex. 4 at 3. However, that appears to reflect a minor mathematical error—the sum of the costs listed in Defendants' table of costs is $5,773.03. *See id.*

12     After accounting for Defendants' proposed discounts, discussed below, Defendants request recovery for a total of 61.85 hours.

13     The Court notes that the rates awarded here are not wholly inconsistent with what other courts have awarded. *See, e.g., Roma Landmark Theaters, LLC v. Cohen Exhibition Co.*, 2021 WL 5174088, at *5-*6 (Del. Ch. Nov. 8, 2021) (approving a Gibson Dunn partner's hourly rate of $1,645 in November 2021, which translates to approximately $1,880 in January 2025, the latest month for which the U.S. Department of Labor's CPI Inflation Calculator has available data, *see* U.S. Dep't of Labor, U.S. Bureau of Labor Statistics, CPI Inflation Calendar, *available at* https://www.bls.gov/data/inflation_calculator.htm).

14     *See* First Herrmann Decl. Ex. 18.

15     This figure already represents the 50 percent discount proposed by Defendants.

16     This figure accounts for Defendants' calculation errors with respect to (1) James Fogelman's requested fees of "$5,0875.50" on May 6, 2024 and (2) the summation of their requested fees. *See supra* n.10.

17     *See* Second Herrmann Decl. Ex. 4.

18     In his declaration, Mr. Herrmann mentions a deposition date of May 10, 2024, but the Court understands him to be referring to the July 10, 2024 deposition. *See* Second Herrmann Decl. ¶ 23.

19     Plaintiff does not make the same argument as to the July 10 deposition, but the same reasoning would apply.

---

**End of Document**        © 2026 Thomson Reuters. No claim to original U.S. Government Works.