UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

ALYSSA MERCANTE,

              Plaintiff,

v.

JEFF TARZIA,

              Defendant.

Case No. 1:24-CV-08471-MKB-LKE

Brooklyn, New York
April 21, 2026
11:15 a.m.

TRANSCRIPT OF IN-PERSON CONFERENCE HEARING
BEFORE THE HONORABLE LARA K. ESHKENAZI
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Remy Green, Esq.<br>Cohen & Green, PLLC<br>1639 Centre Street<br>Suite 216<br>Ridgewood, NY 11385 |
| For the Defendant: | Ronald D. Coleman, Esq.<br>Coleman Law Firm, PC<br>50 Park Place<br>Ste 1105<br>Newark, NJ 07102 |
| Clerk: | MED |
| Court Recorder: | Electronic Sound Recording |
| Transcription Service: | Chris Hwang<br>Abba Reporting<br>PO Box 223282<br>Chantilly, Virginia  20153<br>(518) 302-6772 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**INDEX**

|                 | Page |
|-----------------|------|
| Court's Ruling  | 10   |
| Court's Ruling  | 19   |

(Call to order at 11:15 a.m.)

THE COURT:  Okay.

THE CLERK:  Status conference, 24-CV-8471.  Can everyone state their appearance for the record?

R. GREEN:  Good morning, Remy Green from Cohen & Green, PLLC for Plaintiff.  In the record or any transcript, I should appear as Mx. Green, spelled M-X, peroid, rather that Mr. or Ms.

THE COURT:  Good morning.

R. GREEN:  Good morning.

R. COLEMAN:  Good morning, for the Defendant, Ronald Coleman.

THE COURT:  Good morning.  Mr. Coleman, when I call a conference for 9, I do -- after a certain time for 11 o'clock, I do expect to start at 11 o'clock.

If you're running late, I do expect a phone call to the Court to let us know, so that we don't need to track you down.

I have cases after this one and I allotted a significant amount of time for this case because there are a lot of disputes, but it does put me behind when the parties are late.

R. COLEMAN:  I apologize.

THE COURT:  Okay, all right, so turning to the several motions before me and disputes before me, it seems that

a lot of the disputes that I have in front of me are because the parties are just unable to communicate with each other and that there's some sort of breakdown in the communications, which is unfortunate and it makes things more difficult in terms of moving this case forward.  And I want to address that.

And so, Mx. Green has raised concerns frankly about Mr. Coleman's behavior in meet and confers.  And when trying to discuss things like search terms or concerns, that Mr. Coleman had been obstructive and belligerent.

Mr. Coleman, I'll allow you to respond to that, but it really makes everything a lot more difficult when the parties cannot communicate with each other in a courteous and respectful way even when disagreeing.  So I'd like to hear a response to Mx. Green's concerns that were raised in the letter.

R. COLEMAN:  We have consistently erred on the side of producing more, rather than less, and have been responsive to all requests.

Our problem in the meet and confers is that they are treated by Plaintiff's counsel as a contest.  I have been told explicitly more than once that my words, my choices of words, my responses are being taken down verbatim.  And indeed, I see them coming back to me in discovery letters.

And in my practice, it has never been the case that attorneys trying to hammer out a solution to a discovery

problem don't feel that they can speak candidly and collegially because everything they say will be used against them as if it were an on-the-record discussion.

The entire purpose of a meet and confer is that it is not on the record, but these conversations have been treated as if they are on the record.

Therefore, it's extremely difficult for me to -- I feel as if I'm being cross-examined during these conferences. So, yes, it is difficult, it is difficult to communicate.

And I think also, Your Honor, that these issues are the concerns in and of themselves are red herrings. I mean, there's, you know, a lot of it comes down to Plaintiff not believing that my client doesn't have emails. He doesn't -- he's a person who doesn't use a lot of email. And --

THE COURT: But can I ask you a question? Just it is very common and normally the accepted practice to consult on search terms before you search things like emails.

My understanding is that the emails were searched with only two search terms, Hypnotic and Alyssa. And I don't -- it doesn't even include the last name Mercante, which I don't understand.

And why was there not -- I mean, it duplicates work on all sides if you can't agree to search terms in advance, now you have to redo the searches because you searched it based on

what you thought made sense to you.  I'm not sure how those two words were chosen.

But had you had a meet and confer with the other side and maybe you don't have to accept all those search terms.  I'm not saying they suggest 100 search terms and you say, well, no, I'm not searching 100.  That's fair, but there could be some baseline understanding of what to actually search.

R. COLEMAN:  We have -- we can run 10 more searches.  This is, again, this is a person whose email -- total email traffic is trivial.  So it's -- I think --

THE COURT:  But they don't have to accept your word for that, right?  If you conduct the searches that the parties agree on, then you don't even have to engage in that discussion.  And if there are so few emails, these searches should not be so burdensome.  So I --

R. COLEMAN:  So my client has represented to me that he -- that he ran 00 I would be -- I will -- I mean, I think the best way to solve a problem is for us to agree and the Court can do it to -- you know, to a set of search terms.  We'll running all it again.

THE COURT:  That's what I'm going to do.  That's my plan today.  But I'm trying -- I mean, I would love it if the parties can resolve these things without me getting involved every single time, but it seems like that's not the case.

So I'm going to go in order because I -- there are a

lot of pending motions and I want to make sure that I cover everything.

So, starting on, okay, the use of fake quotes, potential use of A.I. for the submissions. I mean, I'm not going to tell counsel that he can't use A.I. for initial thoughts or drafts, but you do need to check your work. You can't rely on A.I., and then, not look it and confirm that it's accurate.

So there had been, as you know, a number of cases already that have had happened in courts where A.I. briefs are submitted and there are cases that doesn't exist. So A.I. can be a useful tool to a point, but you have to check if what it produces is accurate. You can't just rely on A.I.

Now I don't know how much you relied on A.I., you know, but there do appear to be several examples where there are quotes that are not -- that don't appear in the cited cases.

R. COLEMAN: Oh, and Your Honor, there are no cases that is -- I'm not aware of an actual case that has been mis-cited.

THE COURT: Well, we double-checked some of the examples that your opposing counsel provided to us. And it did appear that there were certain quotes that didn't appear in the cited cases.

R. COLEMAN: I think there was -- I think was a -- an

example where the Court -- where the Court -- listen, I believe I addressed this in my response to that accusation.  The Court has been heard.  Nothing is submitted to the Court without my personally reviewing it, as well as subjecting it to review by -- in Westlaw and Lexis.  That's how I operate.

THE COURT:  All right, well, I think maybe some of those things are falling through and you need to review it more carefully and not just submissions to the Court, but submission -- if you're engaging in correspondence that the Court's not involved in, you need to check the accuracy.

I just want to -- one thing I wanted to confirm with both sides, are the parties confirming that Docket Number 57, all of that can be unsealed?  I was -- I know that some of the blanket designations of confidentiality now have been removed, but I don't want a -- I want to make sure I understood what the parties were agreeing to unseal.

R. GREEN:  Yes, Your Honor.  That is at least my understanding.  I also called the docket clerk, who said that even what you've unsealed, they need an additional notice from you to unseal it.

THE COURT:  For which -- sorry for?

R. GREEN:  For it was 57.

THE COURT:  Okay.

R. GREEN:  For all of 57-1, 2, and 3 still haven't been unsealed because they're waiting for something from you.

THE COURT:  Okay.  Yeah, well, I think we needed to confirmation.

R. GREEN:  Got it.

THE COURT:  So 57-1, 2, and 3 can all be unsealed.

R. GREEN:  As well as 57 and 57-4.  So the whole entry.

THE COURT:  57 and 57-4.  Okay, so all of it?

R. GREEN:  Uh-huh.

R. COLEMAN:  We conceded, yeah, we just because frankly it's just too much trouble to fight.  And you know, we think frankly the entire thing is overly broad.  Having made the record, it is what it is.

THE COURT:  Okay, so we will unseal all of 57.

R. GREEN:  While we are housekeeping, Your Honor, there was an -- a motion was due a couple weeks ago to seal ECF Number 69 that Defendant did not make.

THE COURT:  So we can unseal that?  Is there anything objection to unsealing 69?

R. COLEMAN:  I haven't memorized the docket.  I don't remember what document that is.

R. GREEN:  I mean, there's a motion due.  It was made.

THE COURT:  Can you just describe the document you're interpreting --

R. GREEN:  Yeah.

THE COURT:  -- and Mr. Coleman can remember what it is.

R. GREEN:  It's -- I have a copy of it here.

R. COLEMAN:  While she looks for it, Your Honor, I would just --

R. GREEN:  While they look for it.

R. COLEMAN:  Oh, you found it?

R. GREEN:  But it's -- it is the letter in response to ECF 68, which is the accusation that we are engaged in games -- one of the accusations we're in engaged in gamesmanship.

R. COLEMAN:  Is it just a letter from one of us?

R. GREEN:  It's just a letter.  And I think there was an exhibit, but --

R. COLEMAN:  No objection --

THE COURT:  Okay, so we'll --

R. COLEMAN:  -- to unsealing that.

THE COURT:  Okay, so we'll unseal 69.

R. COLEMAN:  I think the reason there was probably no motion was because we weren't moving to seal it.

THE COURT:  Okay, so we'll unseal it.  That's fine. Okay, we've addressed the A.I.  And I, you know, I've explained to counsel you need to be more careful.

Email search terms, let's move on to that now.  Let's establish those search terms right now that the Plaintiff would

like.

So which -- what are the search terms that you would like them to search emails?  And we should include this -- we may as well do this for the social media.

R. GREEN:  Yeah.

THE COURT:  As -- do they differ or would they --

R. GREEN:  I think they would be the same just all on the relevant topics.

THE COURT:  Okay, so let's establish search terms right now for both the emails --

R. GREEN:  Yeah.

THE COURT:  -- and the social media text messages.

R. GREEN:  Yeah, so I think Mercante, Alyssa, Lyssa without the A.

THE COURT:  Okay, you know what?  Hang on, because I'm going to -- I want to make sure.

Shelly, are you getting all of these?  Okay, so just do it slow enough so my --

R. GREEN:  Yeah.

THE COURT:  -- law clerk can get them.  Mercante, Alyssa, yeah.

R. GREEN:  Mercante with a "U" instead of the "A".

THE COURT:  Wait, what did you say about Alyssa?  You spelled it differently.

R. GREEN:  So Alyssa, and then, sometimes they talk

about her as 'L-Y-S-S-A.

THE COURT:  Okay.

R. GREEN:  Mercante with a "U" instead of the "A".

THE COURT:  Mercante?

R. GREEN:  It's profane.

THE COURT:  Got it.  Okay, but do you have -- you have an understanding that's how they refer to her at this point?

R. GREEN:  We've seen that.

THE COURT:  Okay.

R. GREEN:  Kotaku.

THE COURT:  Spell that, please?

R. GREEN:  K, I think it is K-O-T-A-K-U.  Hypnotic.

THE COURT:  Which I think they ran that one already.

R. GREEN:  They did run that one. ToastywiththeMosty.  I mean --

R. COLEMAN:  Why don't you just say Toasty.  I mean, it would --

R. GREEN:  Well, it --

R. COLEMAN:  Wouldn't that include --

R. GREEN:  -- depends how your search -- I think the best way to do is it Toasty with a wildcard, but I don't know if your search -- I don't know how he's searching.  So I don't know if a wildcard is going to work.

But if it's one word, it doesn't -- the -- just if

it's ToastywiththeMosty is one word, Toasty alone would not necessarily bring that up, which is one of the issues.

R. COLEMAN:  All right, we can address that.

R. GREEN:  Her real name, first and last, Hypnotics's real name, first and last.

THE COURT:  What do you mean her real name?  Sorry repeat --

R. GREEN:  Toasty with the Mosties.

THE COURT:  Toasty's real name, okay.

R. GREEN:  Hypnotic's real name, first and last.  And obviously, I'm not saying these on the record.

THE COURT:  Right.

R. GREEN:  RevSaysDesu and RevSaysDesu's real name, first and last, New York, lawsuit, gamer date.  And I think for jurisdictional purposes that's probably enough.

THE COURT:  Do you have any objections to any of those search terms?

R. COLEMAN:  Not at all.

THE COURT:  Okay, so when can you complete those searches?  And this is for both the emails and all of the text messages.

R. COLEMAN:  All text messages have already been turned over.

THE COURT:  No, but they -- my understanding is that those text messages were searched with only the words Hypnotic

and Alyssa; is that correct?

R. GREEN:  I'm not 100 percent sure, but no text messages have been turned over.

THE COURT:  I just want to be clear on the search term.  All of these search terms that we just went over applies to both the search for emails and text messages.  And did that include social media --

R. GREEN:  Yes, it includes everything.

THE COURT:  -- postings, DMs, whatever --

R. GREEN:  No.

THE COURT:  -- searching from social media?

R. GREEN:  Sure, uh-huh.

THE COURT:  Okay, all of those search terms?  Okay, they're now on the record.  Do -- I think do you need me to list them out in the Court's order that I put on the docket or will the parties get a transcript and you now have those?

R. GREEN:  If we split a transcript, that seems fine.

R. COLEMAN:  Yes.

THE COURT:  You have the transcript, okay.

R. COLEMAN:  Yes.

THE COURT:  So you have that.  I want to make sure that those are clear?

R. COLEMAN:  Yes.

THE COURT:  Okay, before moving on to the formal discovery responses, I thought I already ruled on this.  Why

have those not been fixed?

R. COLEMAN:  We maintained that they have been fixed.

R. GREEN:  You're still responding to wrong numbers. I don't -- it's -- the problem is that Mr. Coleman just doesn't read things.

THE COURT:  Okay, let's hold off on the personal attacks because they're not helpful.

R. GREEN:  I'm sorry.

THE COURT:  Okay?  So it appears that there are still mistakes in the formal responses that are making it difficult, so I'm going to ask you to review those and to fix them and make sure the numbering lines up, that the responses respond to the correct interrogatory or document request, and that the objections are not boilerplate.

And if you are withholding anything based on an objection consistent with the Rules, that you specify that documents are being withheld pursuant to an objection, not just these are vague and overbroad and --

R. COLEMAN:  Of course.

THE COURT:  -- the general.

R. COLEMAN:  Of course, Your Honor.

THE COURT:  Okay, that needs to be done.

R. COLEMAN:  Oh, actually, Your Honor, you had asked me, before you interrupted yourself, about a date for the -- to finish the --

THE COURT:  Yes, emails --

R. COLEMAN:  -- email searches.

THE COURT:  -- and all the searches, yeah.

R. COLEMAN:  So today is Tuesday.  Let's say Wednesday of next week.

THE COURT:  Okay, and I just want to be clear.

R. COLEMAN:  I'll tell you too -- excuse me.

THE COURT:  And I'm fine with that, but I also want this to be a real deadline that you can meet.

R. COLEMAN:  Yeah.

THE COURT:  And is that a real deadline you can meet? Because we need to bring this jurisdictional discovery to a close.

R. COLEMAN:  Yes, we do.

THE COURT:  Okay, so you can meet -- so that's April 29th?

R. COLEMAN:  Yes.

THE COURT:  Okay.

R. COLEMAN:  And we can also serve the corrected responses with the misdesignated numbers.

THE COURT:  Okay.  Okay, and then, I have a note. Sorry, on direct messages, were those produced?  There was an encryption issue?

R. GREEN:  Yes, the -- for the messages for certain sets of the Twitter direct messages --

THE COURT:  Uh-huh.

R. GREEN:  -- the production cuts off in November of 2025.  At a meet and confer, we finally came to understand this.

I don't know why, but Defendant's idea was to talk to one of the people who had sent him about it.  I communicated that was Hypnotic.  I communicated with Hypnotic's lawyer before this conference.  And they haven't heard from Defendant, but we still don't have direct messages from after November of 2025 at least with Hypnotic.

THE COURT:  And are those ones that also need to be researched with those search terms or --

R. GREEN:  No, because --

THE COURT:  -- are those the ones that are not of concern?

R. GREEN:  At least so far as -- what they for Twitter is they just produced every message he's ever sent.

THE COURT:  Okay.

R. GREEN:  Which --

THE COURT:  So what can we do to get them the messages after 20 -- November of 2025?

R. COLEMAN:  Well, from what I just heard, the only ones that are a problem are the ones from Hypnotic.

R. GREEN:  Well, that's all we know.

R. COLEMAN:  Okay, so we produced everything through

the date of the request, you know, ongoing.  But if there's a problem with the Hypnotic ones, I will follow up on that.  Correction, I mean, I think what my client -- evidently, Hypnotic began in November to encrypt these conversations.  So my client can't produce them unencrypted.  They're encrypted on the Hypnotic side.

R. GREEN:  I mean, he can take screenshots.  He could copy and paste the text.  There are ways around it.

It -- I mean, and I will just say, you know, in the letter at ECF Number 72, Defendant also said he was going to follow up and, you know, appears to have waited for this conference to do anything again.

R. COLEMAN:  No, actually, you know, everything's a gotcha.  I --

THE COURT:  Okay, again, I -- I'm not interested in the personal dynamics of how counsel gets along.  I would hope that -- I want to keep that out of this and just stay focused on the issues.

R. COLEMAN:  So in our previous productions of DMs that came in the form -- direct messages that came in the form of the screenshots, Plaintiff rejected that they wanted native productions.

Now Plaintiff is telling us, well, if you haven't got the native, give us screenshots, that's something I can do.

THE COURT:  Okay.

R. GREEN:  To be clear, video is not a screenshot, like we want something that is text searchable.

R. COLEMAN:  Screen, what?

R. GREEN:  But --

THE COURT:  Well, okay.  The -- produce what you can in the form you can and --

R. GREEN:  Okay.

R. COLEMAN:  We'll take it from there.

THE COURT:  And thank you.  All right.  All right. I'm going to now rule on the fees motions, which have been fully briefed.

And as I understand it, the Plaintiffs are seeking -- were seeking fees for the motions to compel two docket numbers 40 and 47 were those two motions to compel from way back when.

I deferred at the time because I wanted to see how things were going to go and how many more disputes we're going to have.

And unfortunately, the parties have continued to have numerous disputes.  And we're still here.  And it seems to have been difficult for Plaintiff to get the discovery responses that the Court's already ruled on.

So I'm going to grant reasonable fees and costs for the filings of the motions to compel Docket Number 40 and Docket Number 47.

As the orders on the docket make clear, the Court largely granted both motions and Defendants failed to demonstrate the objections and failure to respond were substantially justified.  So under Federal Rule of Civil Procedure 37, the fees are mandated.

The Court does not find any circumstances to support concluding that an award of fees would be unjust.  Have you provided already, I didn't see it on the docket, but what the fees are for those two motions?

R. GREEN:  No, we were going to do it all in one go.

THE COURT:  Okay.  So I'm going to ask you to provide that to Defendant by the 29th as well.  And then, if assuming there are no objections to the amount, I'm assuming that Plaintiff is going to be specific in terms -- they weren't long motions so I don't expect these fees to be huge.  As I recall, these were letter motions.  So I assume they're going to be reasonable.

But if you have a concern about the amount, then you can raise that with the Court by the 6th, okay?  If you had no concern about the amount, then I'm going to direct that they be paid by the 13th of May.

R. GREEN:  Can I ask two clarifying questions, Your Honor?

THE COURT:  Sure.

R. GREEN:  I believe fees are still outstanding for

the confidentiality motion as well.  That's ECF Number 65.  I know the Court denied it as or closed the motion as moot.  That was the confidentiality designation, but we did ask for Rule 37 fees and --

THE COURT:  Yeah, I'm denying fees (indiscernible) my motion.

R. GREEN:  Okay, that's fine.  And then, concerns on the 6th, are you asking for Defendant to file a letter or us to file a letter on the 6th?

THE COURT:  No, if Defendant has objections to the fees --

R. GREEN:  Yeah.

THE COURT:  -- that you've provided to them, then they can raise that with the Court on the 6th.

R. GREEN:  All right.

THE COURT:  So you provide your fees to them on the 29th.  And if they have any concerns about it, they can raise it.  And if not, just pay it by the 13th.  That seem reasonable to everybody?

R. COLEMAN:  Yes.

THE COURT:  Okay.  Okay, the next issue, Defendant was -- had concerns about Plaintiff publicly posting attempts at settlement.

And I know that Plaintiff responds that Defendants also publicly posting and willing to consent to an agreement

that neither party publicly discussed the case.

I mean, that's really between you two.  I mean, I'm not, you know, your clients have a First Amendment right to post whatever they want.

But obviously, it's not helpful to the case to have either side posting publicly about the case.  I think that that has just raised the tensions and made it more difficult to proceed, but I -- you know, I leave your client management to each of you.

R. GREEN:  Thank you, Your Honor.

THE COURT:  I'm not going to impose a gag order on anybody.

Then the last issue that I have is the motion for a protective order on the Discord server.  As I understand this dispute, it appears that at some point, and Mr. Coleman can correct me if I'm wrong, the Defense did agree to allow Plaintiff's counsel access to the Discord server because there were there -- there were disputes and issues with how to produce that information.  And then at some point, that changed and that access was no longer granted.

R. COLEMAN:  That's not quite right, Your Honor.

THE COURT:  Okay, so you -- yeah, if you can correct the record on that then.

R. COLEMAN:  We said that the Plaintiff could have access to the server the way anyone else had access to the

server.  We would not seek in any way to interfere with Plaintiff's access to the server.

But Plaintiff subsequently asked for administrative level access, which was never mentioned, which would give Plaintiff access to everyone's communications on the server as if Plaintiff herself were an administrator.

And given the Plaintiff's enjoyment of her First Amendment rights to talk about the case and to post materials from the case and to use social media --

THE COURT:  Is it Plaintiff that would have access to administrator or Plaintiff's counsel that was asking for access --

R. COLEMAN:  Well --

THE COURT:  -- as an administrator?  I just want to -- I'm not -- I'm just trying to clarify.

R. COLEMAN:  Well, Plaintiff's counsel.

THE COURT:  Okay.

R. COLEMAN:  But unless there is an eyes only order, which we would then have a spitting match over, you know, I don't -- it doesn't seem to us that that is necessary for purposes of the jurisdictional discovery that we're engaged in now.

And that it is beyond, you know, we were talking about thousands of people, the communications of thousands of people who have nothing to do with this case.

THE COURT:  Okay, Mx. Green?

R. GREEN:  So I think this is -- like we don't actually care about access.  We care about getting a complete search of relevant communications.

As we understand it, there's a channel and from where we are, we can see that there's a hidden channel called, quote, super secret mob chat.  One of the mobs is ToastywiththeMosty, who is one of the people whose communications you already ordered, that Judge Brodie ordered us to investigate.

When they ran their single search term, which was Mercante, across the entire server, there were over 1,200 hits.  There were 503 hits, I think is the number, outside of the super secret mob chat.

So the vast majority on the server of talking about Plaintiff, which is the -- with somebody from New York is in the super secret mob chat.

We don't care how we get it.  If they want to give us access so that we can their work for them and do the search, that's fine.

If they want to do their own search and produce everything with the search terms and so on and so forth, that's also fine.  We genuinely do not care how we get this, but we do need to get the documents the Court has ordered produced.

R. COLEMAN:  These are communications by third-parties.  And that is -- I'm not saying that it's

impossible for that to lead to the discovery of relevant evidence, but again, this, you know, it might be appropriate to subpoena Toasty, to subpoena, you know, these third-parties and justify that discovery, and if they have counsel, let them object to it or not.

But for my client to turn --

THE COURT:  Wait, these are communications though on your client's Discord, correct?

R. COLEMAN:  Only nominally speaking.  He --

THE COURT:  I don't know what that means, only nominally speaking?

R. COLEMAN:  He doesn't run it.  It is a fan Discord.  It's -- in his what's -- it's his community, his people, but he is only really a participant in it.

THE COURT:  But it's his Discord.  I admit, I don't use Discord, so --

R. COLEMAN:  God bless you.

THE COURT:  But Discord, but it's his like there's a handle or something; is that how it works?

R. GREEN:  Yeah, he's -- he is the administrator and creator of it.  He owns it.

R. COLEMAN:  He's an administrator, right?

R. GREEN:  What?

R. COLEMAN:  He's an administrator?

R. GREEN:  Yes, and the creator of it, but --

THE COURT:  Are there more administrators of it?

R. GREEN:  I don't think so.  There're only mods.

THE COURT:  Because you're saying an administrator. That's why I'm trying to understand the distinction here.

R. COLEMAN:  Yeah, he has told -- yeah, Your Honor, so he has told me that there are other administrators who actually run it.  Since the time he created it, he has not had any administrative responsibility.

THE COURT:  But is he a -- but is he the only one listed as an administrator of it?  I mean, the fact that he has -- doesn't administer it in practice, but it's still his name that's on there and --

R. COLEMAN:  Well, I myself am not sufficiently knowledgeable to know what listed or on there mean, but I do know this.  I think I can -- I now understand from what Plaintiff's counsel has said what is needed here, which is to find the specific -- we will ask Defendant to work with the admins, the people that actually run it and know how it's run, to identify those other hits and produce them.  And this way, it won't be necessary for the entire administrative permissions to be shared with the Plaintiff.  That, from what I understand, should do the trick.

R. GREEN:  I mean, I think we need the single list of search terms.

THE COURT:  Okay --

R. GREEN:  But --

THE COURT:  -- we'll use the same list of search terms.  We'll just keep it consistent for all of it.

R. COLEMAN:  Sure.

THE COURT:  Okay?

R. COLEMAN:  Sure.

THE COURT:  And can that be done by the 29th as well?

R. COLEMAN:  I believe it can, yeah, yes.

THE COURT:  Okay.  All right.

R. COLEMAN:  So we'll withdraw our motion for the protective order.

THE COURT:  Okay, that is -- let me just have my -- 81, right, docket 81 is withdrawn?  Okay.  Okay, I think that's my full list, but the parties can let me know if I am missing anything.

R. GREEN:  Your Honor, we still have privilege waiver, which is --

THE COURT:  Which is which docket number?

R. GREEN:  It's been raised.

THE COURT:  This is about the -- I had a question about that.

R. GREEN:  Yes.

THE COURT:  You're right.  The group chats, so I was a -- I didn't have a full understanding from the parties if we're talking about that the privilege is waived, maybe

Plaintiff can clarify this.  If the privilege is waived with respect to the specific group chats that we're talking about or are you saying the privilege is waived more generally because there are these group chats, because I was confused as to the scope of your argument?

R. GREEN:  Your Honor, it's neither.  It's one fact is the group chats, but I think what is more important is Defendant, parties communications with his attorney into Chatgpt, sending them in full to other people, that's footnote 1 on page 2 of ECF Number 72, describing his counsel's thought process to other people.  And that's Tarzian Number 22416.

And yes, it is relevant I think that counsel is in group chats, but the heart of this is not passive monitoring by counsel of a group chat.

It's that Defendant has literally shared his communications with his -- I'm sorry, Defendant has literally shared his communications with his counsel and third-parties in Defendant's discretion in the same space as Plaintiff claims to have been the locus of the alleged harms done to her.

That is -- and I think the parties agree on that -- this, sometimes that kind of disclosure can waive subject matter, not just the individual communications.

So, right, that's Cerus v. Kwafu from the First Department or Robbins v. J.M. in the Western District.  I think we all agree on that.

The question is just whether these disclosures are similar to the ones in the -- that case or in those two cases.

THE COURT:  You're saying that the subject matter throughout the case they waived privilege?

R. GREEN:  Over at least the subject matter of the communications they have disclosed.  So, for example, in Tarzia 22715, the subject matter --

THE COURT:  Can I just shorten this for a second?  Why does this particular issue need to be resolved in the context of jurisdictional discovery?  I mean, is this crucial to jurisdictional discovery because I'm trying to -- I do want to get this back to what this is about.

R. GREEN:  Understood.

THE COURT:  And this seems to be going well beyond that.  And I'm not sure that this particular issue matters with respect to jurisdictional discovery.

R. GREEN:  So I think two thoughts, one of which is largely just agreeing.  And I think in many senses, you're right.

On the other hand, right, we are trying to prove something that is hard to get at, which is his communications, his thought process, and his connections to New York.

And if he's talking about that with his lawyer and it's not privileged, that is something that's important.  That's said, right, like we can obviously litigate this on the

merits whether here or in California if we ultimately end up there.

I just think the waiver here at least to some extent is clear, right?  He's sent -- he shared his emails with counsel.  That's what -- that -- I mean, that's waiver of at least the communication and almost certainly the subject matter, but --

THE COURT:  And I'm not prepared at this time --

R. GREEN:  Okay.

THE COURT:  -- to find that he's waived all of that based on what I have before me.

R. GREEN:  Understood.

THE COURT:  I'm not saying that you can't make the argument in the future, but it seems to me that if you don't need this for jurisdictional discovery, that it is better for all if we're not ruling -- if I'm not ruling on this based on the limited information that's before me now and that this could --

R. GREEN:  Right.

THE COURT:  -- be fully briefed at a later date in the merits of the case.

I also am just going to assume for the sake of argument that if you -- if you're able to establish jurisdictional discovery, it's not going to be based on attorney-client privilege waived.  I mean, that's a pretty

shaky ground to establish it on.  And so, I would assume that that's -- your goal is to establish it on firmer grounds than that?

R. GREEN:  What it would be is things like, oh, yeah, of course, I know Hypnotic's in New York, but let's tell them otherwise.

THE COURT:  I hear you, but I feel like you're going to need more than that.

R. GREEN:  Of course.

THE COURT:  And I just think that -- I don't have enough in front of me now.  So if the parties want to fully brief this waiver issue, you can now.

R. GREEN:  Okay.

THE COURT:  What I would propose is maybe withdrawing that issue for now, finishing the discovery, and tabling this for the merits part of the case.

R. GREEN:  I think that's fine.  As you say, we should get to the end of this and --

THE COURT:  Okay.

R. GREEN:  -- figure out what's next.

THE COURT:  Okay.  So can I consider that issue withdrawn for now --

R. GREEN:  Yeah.

THE COURT:  -- without prejudice to renew at a later date?

R. GREEN:  I think all we were asking is how the Court wanted to hear it, so --

THE COURT:  Okay.  It's not even a motion pending.

R. GREEN:  Right, so there isn't.

THE COURT:  Okay.

R. GREEN:  So if what the Court wants is a formal motion, but you're suggesting me to wait to make it --

THE COURT:  Yeah.

R. GREEN:  -- there's nothing to withdraw.

THE COURT:  Okay.

R. GREEN:  I understand how the Court wants us to approach it.

THE COURT:  Okay, perfect.  So that's the last issue I have on my list.  Is there anything else that either side has on their list?

R. COLEMAN:  No, Your Honor.

R. GREEN:  No, Your Honor.

THE COURT:  Okay, now I am going to just say this. You know, Mr. Coleman, you have come in here before and told me we have no problem, we're going to do this, we're going to do this, we're going to do this.  And now we're months and months into this and it's not done.

So I really expect that by the 29th, what you say is going to be done with the search terms that we discussed today is going to be done.

I really do not want another, you know, I don't even know how many letters and motions I have from the parties on all of this, but I don't want a whole another round of this starting.  This should be the end of it, okay?

R. COLEMAN:  Absolutely.

R. GREEN:  Okay, on that, I -- if we do not get things, should we write right away?  Should we wait a couple days?  What would you like?

THE COURT:  I mean, okay, so I don't want a motion to compel the day after they don't produce it, okay?

R. GREEN:  Sure.

THE COURT:  Talk to each other first.  If he says I'll get it to you tomorrow, give him, you know, the courtesy of the day.

But I also don't want you to just keep dragging them along and saying it's coming, it's coming, it's coming, and now dragging.

So give a reasonable amount of time.  Maybe a week or so before you come to the Court --

R. GREEN:  Understood.

THE COURT:  -- and you are unable to do it, but that doesn't mean that the 29th is not a real deadline.  It is a deadline.

R. COLEMAN:  No, Your Honor, on the contrary, my client is going to be eager to demonstrate to the Court

that -- I mean, after all, he's being sanctioned.  So, you know, that often focuses the attention.

THE COURT:  That's what I'm hoping.  So and we need to get -- and again, this is just jurisdictional discovery.

R. GREEN:  Yeah.

THE COURT:  So we're just at the beginning of this case.  So we need to move this along, okay?

R. GREEN:  Yeah, the only other thing I have is I believe it is a question for Judge Brodie, but let's assume we get everything done, we get everything we need on the 29th.  Should we be making a motion to amend the complaint?  Should we be -- like what's -- I'm not sure her order was exactly clear on that, so --

THE COURT:  I think if jurisdictional discovery actually ends on the 29th, you should -- well, you know what? I have one of her law clerks here.  Just have them write to her, right?

THE LAW CLERK:  Yes, (indiscernible).

THE COURT:  Say that again?

THE LAW CLERK:  It's in her --

R. GREEN:  Oh, I'm sorry.

THE COURT:  Oh, okay.  So it's in the order.  And I don't recall what the order says at the end, but does it say to --

THE LAW CLERK:  (Indiscernible.)

THE COURT: Okay, which is just what I was going to tell you.

R. GREEN: Oh, yes, right.

THE COURT: Okay, so you should write to --

R. GREEN: Yeah.

THE COURT: -- Chief Judge Brodie and inform her that, you know, jurisdictional discovery is done and we're prepared to proceed on an amended complaint or however you're prepared to proceed.

R. GREEN: Yeah.

THE COURT: Okay?

R. GREEN: Understood. And to be clear, I wasn't suggesting she didn't tell us to write her.

THE COURT: Yeah.

R. GREEN: She did just --

THE COURT: Yeah.

R. GREEN: -- whether she wants us to just say we're done or propose a path forward or --

THE COURT: I would err on the side of proposing a path forward.

R. GREEN: Okay. I -- if she doesn't have a plan, that's what I plan to do, but I don't like to step on that kind of toe.

THE COURT: Okay.

R. GREEN: The Chief Judge's toes are not the ones to

step on.

THE COURT:  Okay.  Okay, anything else?

R. GREEN:  No, Your Honor.

R. COLEMAN:  No, thanks, Your Honor.  Thank you for your patience.

THE COURT:  All right, thank you.  Have a good rest of your day.

R. COLEMAN:  Thank you.  You, too.

(Proceedings concluded at 11:55 a.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Chris Hwang*
_____          April 28, 2026

Chris Hwang                       Date

Court Reporter