**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ALYSSA MERCANTE,<br><br>                    *Plaintiff,*<br>            v.<br><br><br>JEFF TARZIA,<br><br>                    *Defendant* | **Case No. 24-cv-8471 (MKB) (LKE)** |

### PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HER OBJECTIONS TO / APPEAL OF ORDER DENYING REQUEST FOR ORDER TO SHOW CAUSE

J. Remy Green
**COHEN&GREEN P.L.L.C.**
*Attorneys for Plaintiff*
1639 Centre St., Suite 216
Ridgewood (Queens), New York 11385
t : (929) 888-9480
f : (929) 888-9457
e : remy@femmelaw.com


**KAMERMAN, UNCYK, SONIKER,**
**   & KLEIN, PC**
Lane A. Haygood
1700 Broadway, 16th Floor
New York, New York 10019
Tel. 646.845.6085

June 16, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................ii

TABLE OF AUTHORITIES .........................................................................................................iii

PRELIMINARY STATEMENT ..................................................................................................... 1

RELEVANT FACTUAL & PROCEDURAL HISTORY ............................................................... 3

    a.    Defendant's counsel admits black-letter violations of Rule 11 in his Opposition, many of which he denied to the Magistrate Judge. ...................................................................................... 3

        i.    Counsel admits he only looked at an AI summary of cases. ......................................... 3

        ii.    Counsel admits he did not verify any citations before filing. ........................................ 3

        iii.    Counsel admits his representation to the Magistrate Judge that the citations were non-hallucination human errors was incorrect.......................................................................... 4

        iv.    Counsel admits he cited A.M. without review and the LLM summary of A.M. was hallucinated. ...................................................................................................................... 4

    b.    Counsel initially refused to explain remaining ambiguities, then admitted still more LLM use/hallucinations after the Court made clear it would accept a reply filing............................. 6

    c.    Counsel's characterization of what Westlaw's AI tools show confirms counsel never read any of the cases mis-cited. ........................................................................................................ 7

ARGUMENT.................................................................................................................................. 9

    I.    The Novel Form of Double-AI Misconduct Warrants Sanctions and a Show Cause Order. 11

    a.    The Opp. misunderstands what a hallucination is. .......................................................... 11

    b.    The double A.I., no review workflow counsel employed demands sanctions and further inquiry to determine the appropriate sanctions........................................................................ 13

    II.    The Magistrate Judge Did Not Exercise Discretion on Relevant Facts............................ 14

    a.    The Opp. seems to concede that the reasoning the Magistrate Judge actually articulated for declining an order to show cause or sanctions was legally incorrect................................. 14

    b.    Without sanctions, there is every reason to believe similar misconduct will continue; and the stroke of pure luck that counsel only completely misrepresented the holding of one of the cases he never reviewed is no defense to sanctions. ............................................................... 16

CONCLUSION.............................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andre v Warden, FCI Danbury,*
  2025 US Dist LEXIS 232986, at *14 (D Conn Nov. 25, 2025) ................................................... 5

*Johnson v Dunn*,
  792 F Supp 3d 1241 (ND Ala 2025).......................................................................... 9, 10, 13, 17

*Malkeet LNU v Blanche,* __ F.4th ___,
  2026 U.S. App. LEXIS 16174, at *15 (9th Cir June 3, 2026)............................... 11, 12, 13, 14

*Miller v Regions Bank*,
  2026 US Dist LEXIS 114487, at *16, n 1 (ND Ala May 21, 2026) ......................................... 17

*Renico v. Lett*,
  559 U.S. 766 (2010) ................................................................................................................ 15

**Other Authorities**

Magesh et al. *Hallucination-Free? Assessing the Reliability of Leading AI Legal Research Tools*,
  22 J. Empirical Legal Stud. 216, 221 (2025)............................................................................. 11

**PRELIMINARY STATEMENT**

Defendant's Opposition (ECF No. 99, "Opp.") — and his counsel's clarifications after the Court issued an order permitting a reply (*see* Green Reply Ex. 1) — make clear the Magistrate Judge was incorrect in refusing to issue an Order to Show Cause.  The simple filing of this appeal has moved Mr. Coleman from denying anything was wrong at all to (1) admitting black-letter Rule 11 violations, (2) admitting he misled the Magistrate Judge, and (3) admitting he filed papers citing cases pulled by a large language model (or "LLM") that he never personally reviewed.  As Mr. Coleman himself noted, "the whole story" has only "been on the docket since June 9."  Green Reply Ex. 1 at 1.  The Magistrate Judge, even in Defendant's own reckoning, lacked the "whole story" in issuing an order.  That strongly suggests error.

More, on top of admitting Mr. Coleman's statements about what he did in front of the Magistrate Judge were less than accurate, the Opp. continues to obscure and dissemble.  It offers a false account of how Westlaw's AI offerings work, to attempt to explain away the fashion in which counsel used two LLMs to fabricate the case citations themselves, apparently deciding at the end that they needed no review because "Claude that supplied citation numbers that were plausible in form but wrong in fact[.]"  *Id.* at 1.[1]

And then there's the Rube Goldberg-esque process counsel apparently used that led to hallucinated[2] citations — and the dramatic, now-admitted inaccuracy in how counsel described his conduct in front of the Magistrate Judge.  Apparently counsel plucked case names ***without***

---

[1] Page citations in this memo are to internal pagination.  All quotation marks and citations are omitted and all alterations are accepted, unless specifically noted.  Since this is a reply set by Court order on an appeal, it is not clear whether the page limit for motion papers directly applies.  To the extent it does, in light of the many new factual claims in the opposition, as well as the use of in-line screenshots below for easier review, Plaintiff asks the Court to excuse this slightly over-length (for a motion) reply.

[2] As explained in more depth below, the Opp.'s denial that there were "hallucinations" rests on a fundamental misunderstanding of what a hallucination ***is***.  For now, suffice to say, Claude's LLM inventing a citation from whole cloth, in a form that *looks* plausible, is exactly what the term of art "hallucination" refers to.

*citations* out of a Westlaw AI summary, plugged ***those*** into Claude's chatbot, and had Claude

generate briefing that invented the ***citations*** for those case names from whole cloth.  And despite

seeming to deny this in front of the Magistrate Judge — and insisting ***human*** error was involved

— counsel now admits he never "reviewed the decisions before filing" (Opp. at 8) and indeed,

filed a brief "without confirming [the decisions cited] against the decisions on Westlaw,"

apparently relying exclusively on the "holdings in summary form" offered by Westlaw.  *Id.* at 2.

Of course, counsel now also admits this led to a frivolous reading of at least one case —

*A.M. v City of NY*, 2022 US Dist LEXIS 141001 (EDNY Aug. 8, 2022) — on which, without

further explanation, Mr. Coleman purports to "withdraw[] reliance" and now disclaims the

"proposition for which it was cited."  Opp. at 9.

All of this only emphasizes ***why*** it was error to refuse to issue an Order to Show Cause.

Just needing to address the appeal led to counsel admitting an array of black-letter Rule 11

violations.  And indeed, the Court simply ***permitting a reply*** moved counsel from the vague

claims in the Opp. to admitting a frankly creative approach to submitting unreviewed AI output

to a court (though this is hardly an area where innovation should be encouraged).

Legally, these admissions cry out for reversal.  Before the Magistrate Judge, Mr.

Coleman claimed the hallucinations in his papers were human-generated:  He said, "***I*** made

mistakes when recording citations for four of the cases."  ECF No. 90 at 1.  Now he admits he

neither "reviewed the decisions before filing" (Opp. at 8) and only read the "holdings in

summary form" from one LLM, before having a different LLM altogether invent the actual

citations from whole cloth.  Regardless of the intention in the prior misrepresentations to the

Magistrate Judge, Defendant's argument boils down to, to paraphrase, "the Court should rely on

the fact that I convinced the Magistrate Judge that this was mere sloppiness."  But knowingly

submitting citations with *no* review is black letter bad faith — so refusing any follow on inquiry was an abuse of discretion, and the Court below explicitly explained that it was refusing because of a misperception of the law.

In sum, the Court should reverse, enter an Order to Show Cause of its own, or because of the admissions now in the record, impose Rule 11 sanctions and set a hearing on the exact parameters of such sanctions.

## RELEVANT FACTUAL & PROCEDURAL HISTORY

a. <u>Defendant's counsel admits black-letter violations of Rule 11 in his Opposition, many of which he denied to the Magistrate Judge.</u>

As noted above, Defendant's counsel admitted a number of things in his Opp. Those include, most relevantly, the below.

   i. *Counsel admits he only looked at an AI summary of cases.*

Defendant's Opp. admits he never actually reviewed the cases he cited in ECF No. 88. Instead, he says, "the cases were identified through Westlaw's AI-assisted research, which returned the decisions and their holdings *in summary form* but without the corresponding Westlaw reporter numbers." Opp. at 2 (emphasis added). And because of counsel's admission (discussed below) that he never saw case numbers in Westlaw (apparently because of a failure to even interact with the AI summary), that means he never clicked through to the cases themselves, where he admits the case numbers would appear. Instead, he "had worked from research *summaries* that did not themselves contain Westlaw numbers." *Id.* The email discussed below confirms counsel never read *A.M.*, noting "the numbers did not come from Westlaw, and a report displaying no numbers supplies nothing to copy anyway." Green Reply Ex. 1 at 1.

   ii. *Counsel admits he did not verify any citations before filing.*

3

Counsel also admits he "filed ECF No. 88 hastily, without confirming the[ citations] against the decisions on Westlaw." *Id.* He also — at least now — admits that "[v]erifying them was the undersigned's obligation, and he accepts responsibility for failing it, without qualification." *Id.*

> iii.    *Counsel admits his representation to the Magistrate Judge that the citations were non-hallucination human errors was incorrect.*

Next, counsel admits he ***now*** needs to "correct[] the record … in order to be entirely candid with the Court." Opp. at 2. Before Judge Eshkenazi, counsel said, "***I*** made mistakes when recording citations for four of the cases." ECF No. 90 at 1.

Counsel was already confronted with this problem and the implausibility of his initial representation, and declined to correct the record in front of Judge Eshkenazi. As Plaintiff's counsel pointed out at the conference, given the nature of the mistakes, that was simply and completely implausible that human error could have introduced the kinds of hallucinated citation at issue: "We have these citations where what he's saying is he transposed some numbers. … Like[, ']2008 West[l]aw' [followed by a] string of numbers. But the two strings of numbers look nothing like one another." 2026-05-11 Tr. at 35-36. Counsel sat silent while the Magistrate Judge explained she was not going to ask more questions, because the "difference[]" between this case and other cases with implausible explanations was that "all this has happened so quickly," so "his mis-citations honestly have not caused a particular burden … to the Court." *Id.*

Now, counsel admits, these were not human introduced-errors. However, in the Opp. itself, counsel ***did not*** directly explain where they came from. As discussed further below, that is likely because the answer is far more damning that silence: Counsel dropped case names into Claude's chatbot and Claude hallucinated the citations from whole cloth.

> iv.    *Counsel admits he cited <u>A.M.</u> without review and the LLM summary of <u>A.M.</u> was hallucinated.*

4

Last, as far as (major) admissions in the Opp. itself, counsel admits — albeit in a backhand way — that not every case was accurately cited.  Instead, there was "an exception" that counsel admits did not "support[] the proposition for which it was cited."  Opp. at 2.  And that exception made it into a filing, he explains, because "cases were identified through Westlaw's AI-assisted research," and only ever reviewed "***in summary form***."  *Id.* (emphasis added).  *Accord, Andre v Warden, FCI Danbury,* 2025 US Dist LEXIS 232986, at *14 (D Conn Nov. 25, 2025) (relying on "AI-generated summaries that distort or materially alter what a case actually decided" violates Rule 11).  Calling it a single mistake is also misleading, given the total number of citations in the letter:  One of seven total cases cited — or about 15% of citations — involved a hallucination that "distort[ed] or materially alter[ed] what a case actually decided."  *Id.*

It also appears that responding to this Appeal is the first time counsel read the case.  Plaintiff pointed out exactly what the opening memorandum explains:  That *A.M.* does not say what ECF No. 88 said it does.  *See, e.g.,* ECF No. 89 at 5 (noting *A.M.* is not about "fee application[s] generally," but "compliance with the particular requirements of Local Civil Rule 83.2 in relation to infant compromises").  And despite being on notice of that, Defendant's counsel doubled and tripled down, apparently still only relying on an AI summary of the case.  *See, e.g.,* ECF No. 90 at 2 (declaring, now admittedly incorrectly, *A.M.* "holds what ECF No. 88 says it holds"); 2026-05-11 Tr. at 27:13-14 ("every case was exactly what I said it was.").

While admitting he misrepresented *A.M.,* counsel does not address the fact that he continued to mispresent it to the Magistrate Judge after being challenged with evidence of the hallucinations in his workflow.

b.  Counsel initially refused to explain remaining ambiguities, then admitted still more LLM use/hallucinations after the Court made clear it would accept a reply filing.

After the filing of the Opp., Plaintiff reached out to ask follow up questions.  Namely, Plaintiff asked (1) whether, in light of the fact that Westlaw AI reports appear to have case numbers, counsel was using an in-process report; and (2) how, exactly, the invented citation numbers made their way into the papers, if not transcription error (as represented to the Magistrate Judge).  Green Reply Ex. 1 at 5-7.

Instead of answering, counsel attacked:

> "Regarding your questions, no rule and no order of the court authorizes plaintiff to serve me with discovery or obligates me to answer questions to assist plaintiff with a motion seeking to sanction me or my client. The mechanism for compelling such an explanation might, under extreme circumstances not present here, have been an order to show cause, which Judge Eshkenazi declined to issue. Plaintiff demand for answers by email creates no obligation to provide them, and my declining to do so is neither a burden on plaintiff nor a basis for a reply or an order to show cause."

*Id.* at 3.  That is, he emphasized that the very questions that needed answering could ***only*** be answered voluntarily or through the relief he had persuaded Judge Eshkenazi to deny:  "The mechanism for compelling such an explanation might … have been an order to show cause."  *Id.* But then, the Court granted leave for a reply, so Plaintiff followed up again.  *Id.* at 2.  And this time, apparently because the fact that the Court signaled it wanted a reply was a sufficient warning sign, counsel provided answers.  As to Westlaw:

> "No. Nothing was copied from any report in any state of loading. As you acknowledge, I say in ECF 99 that the numbers did not come from Westlaw, and a report displaying no numbers supplies nothing to copy anyway."

Green Reply Ex. 1 at 1. And as to how the hallucinated case numbers came about:

> "I gave the 'how' in ECF 99, and here it is with the brand name: I drafted with Claude, and it was Claude that supplied citation numbers that were plausible in form but wrong in fact for real cases with holdings I described accurately. My mistake, already acknowledged, was filing without checking them. The selection of the cases and the propositions they support was my judgment; the bad numbers were the tool's; the unperformed verification was mine alone."

6

*Id.* That is, counsel took the output of ***one LLM chatbot***, put it ***into another LLM chatbot***, and then filed the output of that process ***without any review***. This conduct steps far beyond, at least as far as grossly irresponsible conduct, what other citation hallucination cases involve.

Moreover, even in confessing serious misconduct, counsel appears not to recognize the seriousness of the fact that he ***did*** submit a misrepresented, hallucinated case to the Court from this process, omitting — once again — *A.M.* from his description that the cases had "holdings I described accurately." *Id.*

    c.  <u>Counsel's characterization of what Westlaw's AI tools show confirms counsel never read any of the cases mis-cited.</u>

Last, even in this posture, counsel continues to dissemble and mislead. As noted above, he says he received citations from Westlaw's AI tool without citation numbers. That's partially accurate. Westlaw's AI reports use "Not Reported in Fed. Supp." for unreported cases in their summaries:[3]

the attorneys' fees application as a dispositive motion seeking approval of a settlement of the entire federal action, and held that under Local Civil Rule 7.1(a), such a motion must be accompanied by a notice of motion, a memorandum of law, and supporting affidavits and exhibits. A.M. v. City of New York, Not Reported in Fed. Supp. (2022) The court also noted that the letter-motion format was impermissible under Local Civil Rule 7.1(d), which restricts letter-motions to non-dispositive matters. A.M. v. City of New York, Not Reported in Fed. Supp. (2022) The court recommended denial without prejudice to refiling with the proper paperwork, and when counsel still failed to comply, the court maintained its recommendation of denial. A.M. v. City of New York, Not Reported in Fed. Supp. (2022)

But stopping there would give an incomplete picture (never mind that just relying on an A.I. summary is black-letter sanctionable conduct). Just clicking a case name ***on the same page*** generates a pop up with all citations:

---

[3] Notably, as can be seen from the screenshots used above, running a similar query to the one Mr. Coleman may have run also produces a similar hallucination as to *A.M.* But even if a reasonable attorney ***could*** skip actually reading cases (they cannot), they still would have seen the signs of something having gone wrong when the summary characterized attorneys' fees as a dispositive issue without citation. Green Ex. 2 at 2.



Likewise, clicking the "Sources" tab also includes citation numbers:



And clicking through to the case itself from either window to the case — which is necessary to look at the actual decision and comply with basic ethical obligations — obviously goes to a page with the citation numbers.

Seemingly, the only way a lawyer could come out of Westlaw's AI report without the citation number for a case would be to never bother reading the case itself — exactly the conduct that *Mata* sanctioned — and not even taking the care to click the pop up ***within Westlaw's tool***.

8

Moreover, no diligent lawyer could rely purely on Westlaw's AI summary, given the warnings on the tool itself. The tool warns, explicitly:

> The AI-generated response can be extraordinarily useful for getting an overview of the issues and citations to authority, but it should **never** be used to advise a client, write a brief or motion for a court, or otherwise be relied on without doing further research.
>
> Use it to accelerate thorough research. Don't use it as a replacement for thorough research.

Green Reply Ex. 4 (emphasis in original). That is, the tool itself literally cautions users it "should **never** be used" the way counsel admits he used it, with the emphasis on "**never**."

## **ARGUMENT**

There is little question that simply filing this appeal generated many of the answers that issuing an order to show cause would have. As it stands, the record now is far different from what the Magistrate Judge reviewed — which itself emphasizes why it was a mistake to decline the Order to Show Cause. Perhaps most importantly, the novel, Rube Goldberg-LLM use admitted in Green Reply Ex. 1 is genuinely shocking — and was not before Judge Eshkenazi. No reasonable attorney can think he does not need to read cases, and it is acceptable to shove case names from one LLM into another, to generate "plausible in form" but fake in reality citations. And on this, the Court cannot defer to discretion that was not exercised. The fact that Mr. Coleman successfully avoided telling Judge Eshkenazi about the genuinely shocking contraption he used with no review at all is not a reason to lock in an order procured by that very avoidance.

Nor is it an answer to say all but one of the cases that could have been cited — putting aside the fact of the fake citation text — generally were consistent with what they were cited for. That is "a stroke of pure luck" and "any sanctions discount on this basis would amplify the siren

9

call of unverified AI for lawyers who are already confident in their legal conclusion." *Johnson v Dunn*, 792 F Supp 3d 1241, 1262 (ND Ala 2025).

More, Mr. Coleman has ***now*** admitted at least some of his representations to Judge Eshkenazi — and in particular, his representation that the mis-citations were not hallucinations but human errors — were inaccurate and needed to be corrected.

That leaves Mr. Coleman's assertion the Court must defer to how the Magistrate Judge was "uniquely positioned to understand the history" of the misconduct here on shaky ground. Opp. at 5. Mr. Coleman's admissions mean the Magistrate Judge was positioned uniquely ***poorly*** on this issue, given the inaccurate representations he has now recanted and confessions of misconduct the Magistrate Judge never heard, because of the failure to issue an order to show cause.

Likewise, Defendant's argument the Magistrate Judge's decision not was premised on a misapprehension of the law is misguided: The lower court ***explicitly*** said "***the*** difference[]" between this case and the cases where courts issued orders to show cause was that "all this has happened so quickly," so Mr. Coleman's hallucinated "mis-citations honestly have not caused a particular burden … to the Court." 2026-05-11 Tr. at 35-36 (emphasis added). To reduce that explanation to a mere "factor in a discretionary calibration, not the rule of decision" (Opp. at 6) attempts to write what the Magistrate Judge actually said out of the transcript.

As set out below, there is no real choice; at least, not consistent with the caselaw. Avoiding sanctions — and indeed, avoiding even the ***inquiry*** — here will, without doubt, "amplify the siren call of unverified AI for lawyers who" feel it can help them cut corners. *Johnson*, 792 F Supp 3d at 1262.

10

**I.    The Novel Form of Double-AI Misconduct Warrants Sanctions and a Show Cause Order.**

Again, perhaps the most striking thing on this record is the game of LLM telephone that Mr. Coleman has apparently decided to use in place of actual legal research.  As set out above, Mr. Coleman admits he never read the cases he cited.  He admits he misrepresented the holding of one of them (*A.M.*).  He admits he only ever reviewed an AI summary of the cases.  And he admits he fed that summary into a ***second*** AI, which in turn generated wholly fabricated and hallucinated citations.

The defenses offered simply do not square with the seriousness of this conduct.  And the Court should act to discourage this kind of creativity in AI misconduct, lest the message be that if an attorney's use of AI is complex enough, the Court may not care.

a.    The Opp. misunderstands what a hallucination is.

As a starting point, the claim that "nothing was fabricated, much less 'hallucinated'" is either wrong or untrue.  Indeed, it is inconsistent with the next clause of the sentence it appears in (which concedes *A.M.* did not stand for "the proposition for which it was cited").  Opp. at 2. One part of Defendant's mistake is simply misunderstanding the term of art, "hallucination." The Ninth Circuit just issued an opinion that helpful provides a small taxonomy of hallucinations — and here, counsel's response confuses "[f]abrications," which "are the most notorious hallucinations," with "inaccuracies."  *Malkeet LNU v Blanche,* __ F.4th ___, 2026 U.S. App. LEXIS 16174, at *15 (9th Cir June 3, 2026).

As the Ninth Circuit explains, there are "[t]wo types of mistakes, or 'hallucinations'" that generative AI can make:  "fabrications and inaccuracies."  *Id., citing* Magesh et al., *Hallucination-Free? Assessing the Reliability of Leading AI Legal Research Tools*, 22 J. Empirical Legal Stud. 216, 221 (2025).  "Fabrications are instances in which the generative AI

tool provides cases or quotations that do not exist at all." *Id.* But "[i]naccuracies are more subtle," because "generative AI tool might cite to real authorities but provide an answer that is legally or factually inaccurate or not supported by the citation." *Id.* And "inaccuracies may prove more dangerous to our profession in the long run." *Id.*

To be sure, some have used the term "hallucination" to only cover fabrications. But as the Ninth Circuit explained, citing scholarship, that narrow view leads to absurd results, where a tool that only ever cited *Brown v. Board*, even when reciting, say, the standard for discovery relevance, would be described as not hallucinating:

> "Courts, commentators, and industry actors have used the term 'hallucination' to describe a range of generative AI errors, but the term is currently being used inconsistently. Popular legal AI tools have apparently adopted a definition of hallucination that only includes fabrications. We agree with Magesh et al. that this is plainly irrational, as such a definition would require us to conclude that a tool that links only to *Brown v. Board of Education* on every query has provided 'hallucination-free' citations."

*Malkeet LNU*, 2026 U.S. App. LEXIS 16174 at *15, n 12. "Inaccuracies are common, even in newer generation models that produce fewer fabrications." *Id.* at *16. And indeed, the "most common error modes of the latest generation tools include misunderstanding holdings" (*id.*) just as Mr. Coleman admits his tool did for *A.M.*

As clarified by the email above, this appeal apparently concerns both hallucinations (primarily introduced by Claude during drafting) and inaccuracies (from Westlaw's AI tool). "[F]iling briefs with hallucinated fabrications and inaccuracies violates procedural and ethical rules," regardless of which. *Id.* And counsel's duty to check the output of a generative AI tool attaches to **each** output, because "the rules are not violated at the point of research and drafting, but at the point of signing and filing." *Id.* at *17.

So, in the interest of accurate taxonomy:

- The ***names*** of the cases outside *A.M.* are likely best described as not hallucinations at all (though counsel's admission he never reviewed the actual cases, and had a stroke of pure luck that the citations were generally accurate suggests the conduct would be sanctionable as to these case names anyway);

- The citation to *A.M.* is likely best characterized as an inaccuracy. Though the case exists, counsel now admits the case does not stand for what it was cited for — and that this happened because of a failure to read the case before citing it. That is, the claim made that Rule 37 fees cannot be awarded without a notice of motion was "legally … inaccurate" and "not supported by the citation." 2026 U.S. App. LEXIS 16174, at *15.

- The citation numbers in all of the cases were fabrications. Recall how the work flow has been described: Case names were input into Claude. And Claude, from whole cloth, invented citations. That is fabrication, because what was generated has no relationship to anything in the real world; it is simply text generated ***because*** the model's training data suggested numbers in roughly that shape would be "plausible in form" and therefore please the user. Green Reply Ex. 1 at 1.

  b. <u>The double A.I., no review workflow counsel employed demands sanctions and further inquiry to determine the appropriate sanctions.</u>

The mere fact of this appeal forced admissions to serious violations of Rule 11 — emphasizing that an order to show cause should have issued in the first instance. But with these admissions, the crux of the remaining issues is that the Court should ask for a more thorough explanation.

As far as sanctionability, Defendant does not seriously contest that this kind of conduct calls for sanctions — and his category mistake about hallucinations dooms his defense there. Indeed, Defendant ***does not cite a single, non-pro se case withholding an order to show cause or some sanction where multiple hallucinated citations were submitted, including one that misrepresented a holding.*** As so many hallucination decisions explain, that is because to allow it once by a lawyer is to invite poison into the entire legal process. And beyond that, the admission that counsel used ***two different LLMs***, did not read the cases cited at any point in the workflow, and was comfortable simply letting a chatbot invent citation text demands sanctions.

13

As set out in the opening papers, even though Rule 11 sanctions are generally viewed as discretionary, outside of pro se litigants, courts have generally used mandatory language in describing the obligation to crack down on hallucinations.  Again, this is with good reason:  They are poison to the entire system.  To suggest that the conduct here could escape without even inquiry is precisely the danger the hundreds of opinions on hallucinations to date warn of.  The time and efficiency savings involved in using AI without verification ***is*** a "siren call." *Johnson*, 792 F Supp 3d at 1262.  This is not an area where creativity should be encouraged.

And then there's the admission that counsel never bothered reading ***any*** of the cases cited.  "Had [Mr. Coleman] acted with competence and diligence, he would have read … the authorities cited in" ECF No. 88.  *Malkeet*, 2026 U.S. App. LEXIS 16174, at \*23.  He did not, and then he misled the Court about it.  His "signature was an attestation that he personally reviewed the contents of the [letter], including the cited authorities, and that they were accurate." *Id.* at 24.  So, signing the letter was, black-letter, a violation of the duty of candor to the Court.  To make that false attestation while standing on a card tower built of the output of two different, unreviewed sets of LLM output is shocking, and calls for sanctions.  And to decline is to make the siren call even stronger.

## II.    The Magistrate Judge Did Not Exercise Discretion on Relevant Facts.

a.    The Opp. seems to concede that the reasoning the Magistrate Judge actually articulated for declining an order to show cause or sanctions was legally incorrect.

The Opp. does not meaningfully engage with Judge Eshkenazi's actual explanation for why she declined sanctions — and in that failure, seems to concede that explanation was an error of law.

As noted in the opening papers, and uncontested in the Opp., it is common in AI hallucination cases that the Court does not face any burden until the order to show cause inquiry,

14

because the opposing party is the one that faces that burden.  Nor is there a serious option for the opposing party in ***not*** spending that time and energy.  As illustrated in the Second[4] Department oral argument cited in the opening papers, attorneys have been taken to task quite brutally for failing to alert a court to an adversary's reliance on hallucinations.  Oral Argument, *Landberg v. City of New York*, 2025-02380, at 29:00-29:45 (May 20, 2026) ("I am befuddled … You didn't see fit to bring it to our attention? … You should apologize to your client, not to me.").[5]  Of course, that is rightly so:  The duty of candor to the Court includes the requirement to alert the Court to citation to hallucinated cases — and thus, as the opening memorandum points out the burden on opposing parties is usually the first thing on the list of harms of hallucinated citations.

Meanwhile, the Opp. is straightforwardly wrong in saying the lack of a burden on the Court was just "a factor in her discretionary calibration" (Opp. at 3); it was, in the Court's own words, "***the*** difference[]."  2026-05-11 Tr. at 35-36 (emphasis added).  Though the written order says the Court "decline[d] to issue an Order to Show Cause at this time in light of the Court[']s on the record warning" (May 12, 2026 Minute Order), that "on the record warning" included an explicit explanation that the Court believed "the difference[]" between this case and the cases where courts issued orders to show cause was that "all this has happened so quickly," so "his mis-citations honestly have not caused a particular burden … to the Court."  2026-05-11 Tr. at 35-36.  So, Defendant cannot rely on discretion the Magistrate Judge did not actually exercise. *Cf. Renico v. Lett*, 559 U.S. 766, 775 (2010) ("if the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears.").

---

[4] Plaintiff mistakenly described this as a First Department argument in the opening memo.
[5] *Available online at* https://cmi.nycourts.gov/vod/WowzaPlayer/ad2/OA1779285484.mp4

Moreover, that principle applies doubly as to the confessions[6] only made in the Opp.: The Magistrate Judge *could* not have exercised any discretion as to the admissions only made now — and her reliance on what counsel now admits were inaccurate representations means there is no discretion to rely on. That is, counsel only now admits that he never read even a single case. Counsel only now admits that it was inaccurate when he told the Court "*I* made mistakes when recording citations for four of the cases." ECF No. 90 at 1 (emphasis added). Counsel only now admits he used a *second* LLM, and fed it cases without any citations, such that it would simply hallucinate plausible looking numbers. Counsel only now admits it was inaccurate when he told the Court "every case was exactly what I said it was." 2026-05-11 Tr. at 27:13-14.

On this, the Court could — and should — issue an order to show cause on its own, even if it were inclined not to find specifically some abuse of discretion: Counsel has specifically and directly admitted severe misconduct.

b. <u>Without sanctions, there is every reason to believe similar misconduct will continue; and the stroke of pure luck that counsel only completely misrepresented the holding of one of the cases he never reviewed is no defense to sanctions.</u>

As explained in the moving papers, the hallucinations in ECF No. 88 were hardly the only hallucinations on this docket. And the knee-jerk denial — apparently done ***without ever reading any of the cases*** and only reading an AI summary — in front of the Court both in writing and at a hearing[7] strongly suggests that no warning could be strong enough, particularly given that there had already been one warning that was cavalierly disregarded.

---

[6] It appears likely, from the form, that counsel is still using AI to draft in the Opp. For example, LLM chatbots built for law are somewhat notorious for encouraging people to confess to misconduct or crimes. And the strange characterization of the order on appeal as a *discovery* ruling (Opp. at 5) seems like an LLM misfire with a manual course correction at the end of the section.

[7] A hearing caused by careless filing of bank account information, now subject to a separate contempt and sanctions motion, no less.

16

Indeed, even in the email after the Court allowed the reply (Green Reply Ex. 1 at 1), Mr. Coleman seemed to forget that he **had** misrepresented *A.M.* and purported to withdraw it, retreating to something like the false declaration he made in front of Judge Eshkenazi that **every** case cited stood for what was claimed. And this seems to suggest he does not think it is a big deal to have misrepresented authority to the Court, after not bothering to read the case and only reading an AI summary.

More, Mr. Coleman has never addressed the basic problem that, with the admitted lack of review, it is "a stroke of pure luck" he has not misrepresented things more dramatically. *Johnson*, 792 F Supp 3d at 1262. The case law is clear that such strokes of luck are not — and cannot be — a basis to withhold sanctions. But even without that well-reasoned rule, every indication — including especially the admissions now in the record — is that without sanctions and an order to show cause, Mr. Coleman will hear the token second warning Judge Eshkenazi issued as no warning at all, but instead see a lack of consequences as Court as "not hearing it and quite understandably." 2026-05-11 Tr. at 26:12-18.

As the opening papers predicted, and as happens in so many of these hallucination cases, the cover up was far worse than the misconduct itself. And to allow both the cover up and the misconduct to go without sanction only amplifies the temptation to skip the hard work that is actual lawyering. The Court should not — and, at least according to many of the judges who have written on this issue, "must" not (*Miller v Regions Bank*, 2026 US Dist LEXIS 114487, at *16, n 1 (ND Ala May 21, 2026)) — allow either to pass without consequences.

## CONCLUSION

For all the reasons discussed herein, Plaintiff respectfully requests that the Court overrule the Magistrate Judge's Order and enter an order to show cause directing Defendant's counsel to

explain how the citation errors in ECF No. 88 — and across the rest of the docket — came to be, or otherwise set its own hearing and order to show cause in light of the admissions now in the record of severe misconduct.

Dated:        June 16, 2026
              Queens, New York

                                        Respectfully Submitted,

                                              /s/
                                        _____

                                        J. Remy Green
                                        COHEN&GREEN P.L.L.C.
                                        1639 Centre Street, Suite 216
                                        Ridgewood, NY 11385
                                        (929) 888.9480 (telephone)
                                        (929) 888.9457 (facsimile)
                                        remy@femmelaw.com

18